**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **BERT W. WHITTINGTON, III**<br>PLAINTIFF<br><br>- VERSUS -<br><br>**KIRK WAYNE BONSAL, JR.**<br>**SHERMAN EAGLETON**<br>**ISAAC VILLARREAL**<br>**TROY BARRINGER**<br>**PRECINCT 3 CONSTABLE'S OFFICE FOR HARRIS COUNTY, TEXAS**<br>**HARRIS COUNTY, TEXAS**<br>DEFENDANTS | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **CIVIL ACTION NO.** ________________ |

---

## PLAINTIFF'S VERIFIED ORIGINAL COMPLAINT

---

**TO THE HONORABLE JUDGE OF THE UNITED STATES DISTRICT COURT:**

Into court comes the plaintiff Bert W. Whittington, III who files this Verified Original Complaint and in support thereof would respectfully show the court as follows:

## COMPLAINT SUMMARY

1. This complaint involves a local government police agency that engaged in unlawful employment practices based on race and color discrimination, retaliation, and wrongful termination of employment; that engaged in the unlawful deprivation of constitutional and/or statutory rights, privileges, and/or immunities; and, that engaged in a conspiracy to deprive equal protection, privileges, and/or immunities.

2. This complaint makes express references to racial and color identifications because of the nature of the complaint and because the complaint is principally premised on a pre-charge inquiry and a formal charge filed with the United States Equal Employment Opportunity

Commission (hereinafter "EEOC").

## JURISDICTION AND VENUE

3. The court has jurisdiction in this case pursuant to 28 U.S.C. §§ 1331, 1343(a)(1), 1343(a)(2), 1343(a)(3), and 1343(a)(4).

4. The venue of the court is proper in this case pursuant to 28 U.S.C. §§ 1391(b)(1) and (b)(2).

## PARTY IDENTIFICATION; SUMMONS

5. Bert W. Whittington, III (hereinafter "Whittington") is the plaintiff in this case.

(1) Whittington is an individual who resides in Chambers County, Texas.

(2) Said plaintiff was a person as defined by 42 U.S.C. § 2000e(a), as it relates to the relevant claims for relief in this case.

(3) Said plaintiff was an employee as defined by 42 U.S.C. § 2000e(f), as it relates to the relevant claims for relief in this case.

(4) Said plaintiff was (is) African American with dark skin color as defined by the United States Office of Management and Budget civil rights compliance reporting classification in 62 Fed. Reg. 58789 (Oct. 30, 1997).

(5) Said plaintiff was (is) a person protected by 42 U.S.C. §§ 1981, 1983, 1985, and 2000e, et seq., as it relates to the relevant claims for relief in this case.

(6) The last three digits of the plaintiff's driver license number is 948 and the last three digits of the plaintiff's social security number is 943.

6. Kirk Wayne Bosnal, Jr. (hereinafter "Bonsal") is a defendant in this case.

(1) Bonsal is an individual who is believed to reside in Harris County, Texas.

(2) Said defendant was an employer as defined by 42 U.S.C. § 2000e(b), as it relates to the relevant claims for relief in this case.

(3) Said defendant was (is) White with light skin color as defined by the United States Office of Management and Budget civil rights compliance reporting classification in 62 Fed. Reg. 58789 (Oct. 30, 1997).

(4) Pursuant to Fed. R. Civ. P. § 4(b), the clerk of the court is requested to sign, seal, and issue a summons for service on said defendant at <u>701 West Baker Road, Baytown, Texas 77521</u> or wherever else said defendant may be found.

7. Sherman Eagleton (hereinafter "Eagleton") is a defendant in this case.

(1) Eagleton is an individual who is believed to reside in Chambers County, Texas.

(2) Said defendant was an employer as defined by 42 U.S.C. § 2000e(b), as it relates to the relevant claims for relief in this case.

(3) Said defendant was (is) African American with dark skin color as defined by the United States Office of Management and Budget civil rights compliance reporting classification in 62 Fed. Reg. 58789 (Oct. 30, 1997).

(4) Pursuant to Fed. R. Civ. P. § 4(b), the clerk of the court is requested to sign, seal, and issue a summons for service on said defendant at 701 West Baker Road, Baytown, Texas 77521 or wherever else said defendant may be found.

8. Isaac Villarreal (hereinafter "Villarreal") is a defendant in this case.

(1) Villarreal is an individual who is believed to reside in Harris County, Texas.

(2) Said defendant was an employer as defined by 42 U.S.C. § 2000e(b), as it relates to the relevant claims for relief in this case.

(3) Said defendant was (is) Hispanic with light skin color as defined by the United States Office of Management and Budget civil rights compliance reporting classification in 62 Fed. Reg. 58789 (Oct. 30, 1997).

(4) Pursuant to Fed. R. Civ. P. § 4(b), the clerk of the court is requested to sign, seal, and issue a summons for service on said defendant at 701 West Baker Road, Baytown, Texas 77521 or wherever else said defendant may be found.

9. Troy Barringer (hereinafter "Barringer") is a defendant in this case.

(1) Barringer is an individual who is believed to reside in Galveston County, Texas.

(2) Said defendant was an employer as defined by 42 U.S.C. § 2000e(b), as it relates to the relevant claims for relief in this case.

(3) Said defendant was (is) White with light skin color as defined by the United States Office of Management and Budget civil rights compliance reporting classification in 62 Fed. Reg. 58789 (Oct. 30, 1997).

(4) Pursuant to Fed. R. Civ. P. § 4(b), the clerk of the court is requested to sign, seal, and issue a summons for service on said defendant at 701 West Baker Road, Baytown, Texas 77521 or wherever else said defendant may be found.

10. Precinct 3 Constable's Office for Harris County, Texas (hereinafter "Constable's Office")

is a defendant in this case.

(1) The Constable's Office is a local government agency within Harris County, Texas.

(2) Said defendant was an employer as defined by 42 U.S.C. § 2000e(b), as it relates to the relevant claims for relief in this case.

(3) Said defendant was (is) a person for purposes 42 U.S.C. § 1983 liability, as it relates to the relevant claims for relief in this case. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690.

(4) Pursuant to Fed. R. Civ. P. § 4(b), the clerk of the court is requested to sign, seal, and issue a summons for service on said defendant's agent constable Sherman Eagleton at 701 West Baker Road, Baytown, Texas 77521 or wherever else said agent may be found.

11. Harris County, Texas (hereinafter "Harris County") is a defendant in this case.

(1) Harris County is a political subdivision of the state of Texas.

(2) Said defendant was an employer as defined by 42 U.S.C. § 2000e(b), as it relates to the relevant claims for relief in this case.

(3) Said defendant was (is) a person for purposes 42 U.S.C. § 1983 liability, as it relates to the relevant claims for relief in this case. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690.

(4) Pursuant to Fed. R. Civ. P. § 4(b), the clerk of the court is requested to sign, seal, and issue a summons for service on said defendant's agent county judge Lina M. Hidalgo at 1001 Preston Street, Suite 911, Houston, Texas 77002 or wherever else said agent may be found.

12. The individual defendants named herein are being sued in their official capacity.

## PREDICATE SUMMARY

13. On or about September 21st, 2020 the plaintiff timely filed a pre-charge inquiry with the EEOC against the defendant parties on the grounds of wrongful employment termination. This pre-charge was assigned EEOC case number 460-2020-05941.

14. On or about June 7th, 2021 the plaintiff timely filed a formal charge with the EEOC against the defendant parties on the grounds of employer retaliation and employment

discrimination based on race and color. This charge was assigned EEOC case number 460-2021-03518. The EEOC action statement read in verbatim:

> "The EEOC issues the following determination: The EEOC will not proceed further with its investigation, and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge."

15. All conditions precedent to jurisdiction in this case have occurred or been complied with. The deadline for the plaintiff to file a claim for relief based the EEOC charge was October 4th, 2021 and suit was timely filed.

## STATEMENT OF FACTS

16. The plaintiff Bert W. Whittington, III ("Whittington") is a veteran of the United States Marine Corps who honorably retired as a Master Sergeant (Pay Grade E-8) in April 2012 after 24+ years of service. Whittington's military service included missions in Iraq, Korea, and global sea service deployment.

17. In military service, Whittington received the following decorations, medals, badges, citations, and/or campaign ribbons:

- Good Conduct Medal (8 times)
- Navy and Marine Corps Commendation Medal (2 times)
- Navy and Marine Corps Overseas Service Ribbon
- Sea Service Deployment Ribbon (8 times)
- Global War on Terrorism Expeditionary Medal (2 times)
- Iraq Campaign Medal (2 times)
- Korean Defense Service Medal
- National Defense Service Medal (2 times)
- Marine Corps Drill Instructor Ribbon
- Marine Security Guard Ribbon
- Navy Meritorious Unit Commendation
- Navy Unit Commendation
- Presidential Sharpshooter Badge (4 times)
- Pistol Sharpshooter Badge

18. In December 2013 Whittington graduated the Texas Department of Public Safety police academy and became a state trooper. Whittington has a degree from Central Texas College and is presently a Master peace officer with more than 27,465 course hours of police related training recognized by the Texas Commission on Law Enforcement.

19. Whittington was (is) African American with dark skin color.

**Deputy Constable Appointment**

20. On or about January 30th, 2017 Whittington was appointed as a commissioned peace officer with the Precinct 3 Constable's Office for Harris County, Texas ("Constable's Office"). About four months after this appointment, Whittington was assigned as a police canine handler in the Crime Interdiction Unit of the Constable's Office.

21. Early into Whittington's employment at the Constable's Office he recognized that elected constable Sherman Eagleton ("Eagleton") – an African American with dark skin color – had no interest in the day-to-day administration of the Constable's Office. Rather, newly promoted chief deputy Kirk Wayne Bonsal, Jr. ("Bonsal") was the de facto administrator of the Constable's Office.

22. It was openly apparent that Bonsal led a small clique within the Constable's Office, all of whom had light color skin. This clique excluded anyone with dark skin color. The lead enforcers of Bonsal's clique were major Isaac Villarreal ("Villarreal") and master sergeant Troy Barringer ("Barringer").

**Revelation of Workplace Racial Bias**

23. In the Crime Interdiction Unit, Whittington answered directly to Barringer. As Whittington's interactions with co-workers at the Constable's Office increased, his exposure to offensive jokes and comments slighting African Americans also increased.

Exceptionally offensive jokes and comments were made about African Americans alleged of criminal conduct. The core of the jokes and comments were that African Americans with dark skin color were an inferior race.

24. In one instance on or about May 9th, 2020, the Constable's Office was providing security for a medical testing site promoted by federal congressmember Shelia Jackson Lee. The majority of recipients at this test site were African American with dark skin color. At this event one of Bonsal's clique enforcers sent a group text message to co-workers that referred to the test recipients as "a bunch of monkeys". This enforcer was Jason Hutchins who was a supervisor with light skin color. Bonsal protected Hutchins after the text.

25. The murder of George Perry Floyd, Jr. on or about May 25th, 2020 at the hands of Minneapolis, Minnesota police officers was a particularly adamant topic by those in Bonsal's clique because they believed that Floyd deserved the consequences. Whittington's expression of disgust about such a notion prompted Villarreal to muster a mandatory meeting where Whittington was singled out to defend his expression to a group of co-workers. This meeting was nothing more than an effort to harass and distress Whittington.

26. These circumstances greatly offended Whittington, it created a hostile work environment for him, and it eventually led to him avoiding many co-workers who were a part of Bonsal's clique. Eventually, Whittington began to openly object to the offensive jokes and comments. These objections resulted in Whittington being alienated, unsupported, and discriminatorily targeted.

**Onset of Racial Discrimination**

27. As soon as Whittington began voicing his objections about the racial bias in the workplace, co-workers with light skin color became slow or absent from backing Whittington up on

police scenes. These co-workers also refused to assist Whittington with processing police scenes, such as prisoner transports, vehicle inventories, and evidence handling. Whittington was largely left to handle police scenes alone while his light skin color co-workers readily helped each other.

28. Being the only dark skin color African American in the Crime Interdiction Unit, Whittington asked for another dark skin color African American to be assigned with him. This request was because Whittington worked in many predominantly dark skin color African American communities where light skin color co-workers were less able to work covert police scenes. Bonsal, Villarreal, and Barringer denied this request which left Whittington largely alone, less safe, and less effective.

29. During a three-year period, members of the Crime Interdiction Unit would host birthday parties for each other and not Whittington. These gatherings were held at government facilities during official work time. This unit was supervised by Barringer and all of the unit members were light skin color except Whittington. The deliberate exclusion of Whittington from these social gatherings was grossly obvious and troubling.

30. Bonsal, Villarreal, and Barringer were aware of Whittington's concerns and objections of the prevalent racial bias against African Americans with dark skin color within the ranks of the Constable's Office; however, as chief deputy Bonsal kept Eagleton ignorant of Whittington's concerns and objections. Bonsal, directly and through his subordinates, prevented Whittington from confronting Eagleton outside the chain of command.

**Continued Humiliation and Harassment**

31. Villarreal and Barringer began to routinely use Whittington as the front point on high-risk tactical entries at police scenes; the front point being the most dangerous position for a

tactical entry. Whittington was being directly placed in the most jeopardy while light color skin co-workers remained behind him in safer positions. These circumstances made it clear that Villarreal and Barringer wanted Whittington to be harmed.

32. On one occasion Villarreal and Barringer ordered Whittington to attend a weeklong remote canine leash training course, but denied allowing Whittington to use a county vehicle. This forced Whittington to use his own personal vehicle at his own expense and it forced Whittington to soil his personal vehicle in carrying a canine. These circumstances being imposed on Whittington could only be perceived as harassment and humiliation, since historically light skin color co-workers would routinely be granted use of a county vehicle for remote county business.

33. On another occasion Villarreal demanded that Whittington hand clean a county vehicle that was soiled with canine excrement. The vehicle was one previously used by a light skin color co-worker who deliberately left the vehicle soiled. This demand subjected Whittington to a demeaning subservient task that other light skin color co-workers historically were never tasked with. Whittington refused Villarreal's demand.

34. Due to the pervasive and barefaced racial bias against dark skin color African Americans in the workplace and the growing racial discrimination being occasioned against Whittington personally by co-workers and supervisors, Whittington began to record conversations while at work. Bonsal, Villarreal, and Barringer learned about these recordings.

**Pretextual Disciplinary Actions**

35. Bonsal, Villarreal, and Barringer began to target Whittington with administrative employee disciplinary actions, which included:

(1) a disciplinary action taken on or about February 24th, 2020 by Villarreal in which Whittington received a written reprimand on the accusation that he failed to wear a

body worn camera during a police scene;

(2) a disciplinary action taken on or about July 16th, 2020 by Bonsal in which Whittington received a one-day suspension without pay on the accusation that he failed to wear a body worn camera during a police scene; and

(3) a disciplinary action taken on or about August 28th, 2020 by Bonsal in which Whittington was terminated from employment on the accusation that he mishandled evidence during a police scene and was unable to control his police canine.

36. Barringer was involved in each of these disciplinary actions. With regards to the body worn cameras, the cameras assigned to Whittington were often defective and inoperable. Whittington routinely reported these problems to Barringer and other supervisors; however, the problems were never resolved. Further, exigent circumstances that on occasion left Whittington unable to turn on his camera were unjustly ignored by Bonsal, Villarreal, and Barringer to the detriment of Whittington.

37. Most notable is that Whittington was terminated from employment on the very same day that Whittington had reported to the internal affairs division of the Constable's Office that Barringer had violated the civil rights of a juvenile suspect. An event that Villarreal had first-hand knowledge of. Whittington's report was summarily dismissed as unfounded, he was chastised for taking too long to make the report, and then he was terminated from employment. Whittington's report was disposed of by a light skin color co-worker.

**Wrongful Employment Termination**

38. The disparate treatment of Whittington as an employee of the Constable's Office was based on his race and color as a dark skin color African American. His qualifications as a peace officer were not a factor because his qualifications were unquestionably superior to the vast majority of his co-workers. Further, the discriminatory treatment of Whittington only worsened after he began objecting to the racial bias in the workplace.

39. Bonsal and those in his clique did not want Whittington in the workplace both because they disfavored Whittington's race and color and because Whittington posed a threat of publicly exposing the racial bias within the Constable's Office.

40. Bonsal, acting on behalf of the Constable's Office, reported to the Texas Commission on Law Enforcement that Whittington was terminated from employment under a general discharge which was (is) classified as follows:

> "(A) was terminated by, retired, or resigned from, or died while employed by a law enforcement agency and the separation was related to a disciplinary investigation of conduct that is not included in the definition of dishonorably discharged; or (B) was terminated by or retired or resigned from a law enforcement agency and the separation was for a documented performance problem and was not because of a reduction in workforce or an at-will employment decision."

41. As context, a dishonorable discharge involves criminal misconduct, insubordination, or untruthfulness – conduct that Whittington was not accused of.

**Acquiescence by Eagleton**

42. Eagleton was too aloof to and ignorant of the racism within the Constable's Office because he was too consumed with his own personal endeavors. Eagleton's utter detachment from realities within the Constable's Office was evidenced by his complete disinvolvement with the corrupt circumstances that Whittington was subjected to as an employee of the Constable's Office and afterwards. Eagleton ratified and acquiesced to Whittington's wrongful employment termination by failing to intervene as the elected constable.

43. Withstanding the racial bias and discriminatory practices committed by Bonsal and his clique, evidence was revealed that Eagleton was suspected of misappropriating county property for his personal benefit. Amongst many instances, Eagleton was found to be using high-output power generators owned by the county to supply power for personal parties at

his home in Chambers County, Texas. Generators that Eagleton transported using county-owned police vehicles and trailers.

44. Upon learning of such instances, Whittington in fact photographed one instance in February 2020 when Eagleton was hosting a Super Bowl 54 party at his home. Photographic evidence that Eagleton is aware that Whittington has. Based on information and belief, Bonsal and his clique were free to exercise racial bias and discrimination within the Constable's Office because of Eagleton's fear that Bonsal would expose Eagleton's abuses of official capacity as the elected constable.

**Post-Termination Oppression**

45. In the wake of Whittington's termination of employment at the Constable's Office, he applied for state unemployment benefits. These benefits were denied based on false information given by the defendant parties to the Texas Workforce Commission. This is known because Whittington was otherwise qualified to receive the benefits.

46. Bonsal maliciously intended to destroy Whittington's ability to obtain new gainful employment by classifying Whittington's employment termination as being due to a "[pending] disciplinary investigation" and/or "documented performance problem". Foremost, this classification was maliciously intended to hinder Whittington from obtaining new gainful employment as a peace officer. To this end, Bonsal threatened to have Whittington put on the "Brady" list which meant that Whittington's testimony as a peace officer would be considered unbelievable. This threat was intended to unduly intimidate Whittington.

47. Whittington was later invited to be commissioned as a peace officer with the Precinct 2 Constable's Office for Harris County, Texas, but during the application process Villarreal convinced the agency to deny Whittington employment. Bonsal, Villarreal, and Barringer

have continued to deliberately and unjustly hinder Whittington from obtaining gainful employment; and, they have done so chiefly through confidential conversations with prospective employers where Whittington is unable to defend himself.

**Summary of Damages**

48. As a proximate and/or direct result of the defendants' unlawful conduct, as described in this complaint, Whittington has suffered significant damages to include economic losses, injury to reputation, inconvenience, loss of enjoyment of life, mental anguish, and physical ailments manifested from the mental anguish.

49. Whittington's economic damages include lost wages, diminished wages, inability to collect unemployment benefits, and being forced to withdraw retirement funds early. These economic damages imposed great undue hardship on Whittington that significantly impaired his ability to provide for his family.

## CLAIMS FOR RELIEF

50. In support of the claims for relief asserted hereinafter, the plaintiff re-alleges each and every allegation as set forth in paragraphs 16 through 49 hereinabove and hereby incorporates said allegations by reference as if set forth in full hereinafter.

51. Whittington had a right to enjoy lawful employment practices by the defendant parties, employment practices free of discrimination based on race and color. Whittington further had the right to oppose unlawful employment practices without being retaliated against by the defendant parties. The individual defendant parties were further prohibited by law from abusing their public servant capacities with intent to harm and mistreat Whittington.

52. The unlawful conduct described herein occurred as a matter of custom, policy, and practice of the Constable's Office and Harris County itself. The individual defendants Bonsal,

Eagleton, Villarreal, and Barringer were (are) career agents of the Constable's Office and Harris County and by virtue of their command authority they dictated (dictate) the custom, policy, and practice as it is relevant to this case.

**Claim for Relief No. 1: Engaging in unlawful employment practices by discharging or otherwise discriminating against an individual with respect to the individual's compensation, terms, conditions, or privileges of employment on the basis of such individual's race and/or color. 42 U.S.C. § 2000e-2(a)(1).**

53. At the relevant times in this case, the plaintiff was an employee of the defendant parties and in the course of said employment the defendants jointly and/or severally engaged in unlawful employment practices that without limitation included:

(1) subjecting the plaintiff to a hostile work environment;

(2) subjecting the plaintiff to dangerous work conditions;

(3) subjecting the plaintiff to disparate work conditions;

(4) subjecting the plaintiff to wrongful employment termination;

(5) subjecting the plaintiff to loss of compensation;

(6) subjecting the plaintiff to loss of employee benefits;

(7) subjecting the plaintiff to loss of financial savings; and

(8) subjecting the plaintiff to other legally prohibited discrimination.

54. The aforementioned unlawful employment practices were because of the plaintiff's race and/or color.

**Claim for Relief No. 2: Engaging in unlawful employment practices by limiting, segregating, or classifying an employee for employment in a way which deprived or tended to deprive the employee of employment opportunities or otherwise adversely affected the employee's status as an employee because of such employee's race and/or color. 42 U.S.C. § 2000e-2(a)(2).**

55. At the relevant times in this case, the plaintiff was an employee of the defendant parties and in the course of said employment the defendants jointly and/or severally engaged in

unlawful employment practices that without limitation included:

(1) subjecting the plaintiff to a hostile work environment;

(2) subjecting the plaintiff to disparate work conditions;

(3) subjecting the plaintiff to disparate employment advancement;

(4) subjecting the plaintiff to alienation from employee social events; and

(5) subjecting the plaintiff to other legally prohibited discrimination.

56. The aforementioned unlawful employment practices were because of the plaintiff's race and/or color.

**Claim for Relief No. 3: Engaging in unlawful employment practices by discriminating against an employee because said employee opposed an unlawful employment practice as defined under subchapter 7 of 42 U.S.C. §§ 2000e, et seq. 42 U.S.C. § 2000e-3(a).**

57. At the relevant times in this case, the plaintiff was an employee of the defendant parties and in the course of said employment the defendants jointly and/or severally engaged in unlawful employment practices that without limitation included retaliation against the plaintiff because the plaintiff opposed unlawful employment practices committed by the defendants during the course of the plaintiff's employment.

**Claim for Relief No. 4: Engaging under color of statute, ordinance, regulation, custom, and/or usage in the unlawful deprivation of constitutional and/or statutory rights, privileges, and/or immunities of a person. 42 U.S.C. § 1983.**

58. At the relevant times in this case, the plaintiff was a citizen of the United States of America and as such a citizen the defendants jointly and/or severally engaged in unlawful conduct as public servants under color of law that deprived the plaintiff of constitutional and/or statutory rights, privileges, and/or immunities that without limitation included:

(1) the deprivation of the plaintiff's right and/or privilege to be free of unlawful employment practices prohibited under 42 U.S.C. § 2000e, et seq.;

(2) the deprivation of the plaintiff's right and/or privilege to equal rights as prohibited

by 42 U.S.C. § 1981(a);

(3) the deprivation, without due process of law, of the plaintiff's right and/or privilege to enjoy life, liberty, or property as prohibited by U.S. Const. amend. 14 § 1;

(4) the deprivation of the plaintiff's right and/or privilege to equal protection of the laws as prohibited by U.S. Const. amend. 14 § 1;

(5) the deprivation of the plaintiff's right and/or privilege to free speech as prohibited by U.S. Const. amend. 1;

(6) the deprivation of the plaintiff's right and/or privilege to equal rights as prohibited by Tex. Const. art. 1 § 3;

(7) the deprivation of the plaintiff's right and/or privilege to equality under the law as prohibited by Tex. Const. art. 1 § 3a;

(8) the deprivation of the plaintiff's right and/or privilege to free speech as prohibited by Tex. Const. art. 1 § 8;

(9) the deprivation of the plaintiff's right and/or privilege to be free of unlawful abuse of official capacity prohibited under Tex. Pen. Code §§ 39.02(a)(1) and (a)(2);

(10) the deprivation of the plaintiff's right and/or privilege to be free of unlawful official misconduct prohibited under Tex. Pen. Code § 39.03(a)(2);

(11) the deprivation of the plaintiff's right and/or privilege to be free of unlawful employment blacklisting prohibited under Tex. Labor Code § 52.031(b); and

(12) the deprivation of the plaintiff's right and/or privilege under other applicable laws, rules, policies, and/or practices.

59. The deprivation of the plaintiff's rights, privileges, and/or immunities include the disparate application of laws, policies, procedures, and customs.

**<u>Claim for Relief No. 5</u>: Engaging in a conspiracy of two or more persons for the purpose of depriving a person or class of persons of the equal protection of the laws or the equal privileges and/or immunities under the law. 42 U.S.C. § 1985(3).**

60. At the relevant times in this case, the plaintiff was a citizen of the United States of America and as such a citizen the defendants, being in conspiracy of two or more persons, engaged in unlawful conduct that without limitation included:

(1) the deprivation of the plaintiff's right and/or privilege to be free of unlawful employment practices prohibited under 42 U.S.C. § 2000e, et seq.;

(2) the deprivation of the plaintiff's right and/or privilege to equal rights as prohibited by 42 U.S.C. § 1981(a);

(3) the deprivation, without due process of law, of the plaintiff's right and/or privilege to enjoy life, liberty, or property as prohibited by U.S. Const. amend. 14 § 1;

(4) the deprivation of the plaintiff's right and/or privilege to equal protection of the laws as prohibited by U.S. Const. amend. 14 § 1;

(5) the deprivation of the plaintiff's right and/or privilege to free speech as prohibited by U.S. Const. amend. 1;

(6) the deprivation of the plaintiff's right and/or privilege to equal rights as prohibited by Tex. Const. art. 1 § 3;

(7) the deprivation of the plaintiff's right and/or privilege to equality under the law as prohibited by Tex. Const. art. 1 § 3a;

(8) the deprivation of the plaintiff's right and/or privilege to free speech as prohibited by Tex. Const. art. 1 § 8;

(9) the deprivation of the plaintiff's right and/or privilege to be free of unlawful abuse of official capacity prohibited under Tex. Pen. Code §§ 39.02(a)(1) and (a)(2);

(10) the deprivation of the plaintiff's right and/or privilege to be free of unlawful official misconduct prohibited under Tex. Pen. Code § 39.03(a)(2);

(11) the deprivation of the plaintiff's right and/or privilege to be free of unlawful employment blacklisting prohibited under Tex. Labor Code § 52.031(b); and

(12) the deprivation of the plaintiff's right and/or privilege under other applicable laws, rules, policies, and/or practices.

61. The deprivation of the plaintiff's rights, privileges, and/or immunities include the disparate application of laws, policies, procedures, and customs.

## JURY DEMAND

62. The plaintiff requests that a jury resolve all fact issues in this case and the plaintiff has paid the required jury fee.

## PRAYER FOR RELIEF

63. The plaintiff respectfully prays that the court grant the following relief:

(1) that, the plaintiff be granted injunctive relief requiring the defendant parties to employ the plaintiff in his prior position before he was wrongfully terminated from employment on August 28th, 2020;

(2) that, the plaintiff be granted injunctive relief requiring the defendant parties to restore (bridge) the plaintiff's employee health and retirement benefits with continuity from August 28th, 2020;

(3) that, the plaintiff be granted injunctive relief requiring the defendant parties to void the separation of licensee report filed with the Texas Commission on Law Enforcement with restoration continuity of licensure from August 28th, 2021;

(4) that, the defendant parties be enjoined from committing any further legally prohibited discrimination against the plaintiff;

(5) that, the plaintiff be awarded any deficient amount of wages and monetary benefits that he would have earned, together with interest thereon, during the period of August 28th, 2020 to present;

(6) that, the plaintiff be awarded economic damages, as defined by Tex. Civ. Prac. & Rem. Code § 41.001(4) or equivalent federal law, in an amount to be determined at adjudication of this matter;

(7) that, the plaintiff be awarded noneconomic damages, as defined by Tex. Civ. Prac. & Rem. Code § 41.001(12) or equivalent federal law, in an amount to be determined at adjudication of this matter;

(8) that, the plaintiff be awarded future damages, as defined by Tex. Civ. Prac. & Rem. Code § 41.001(9) or equivalent federal law, in an amount to be determined at adjudication of this matter;

(9) that, the plaintiff be awarded future loss of earnings, as defined by Tex. Civ. Prac. & Rem. Code § 41.001(9) or equivalent federal law, in an amount to be determined at adjudication of this matter;

(10) that, the plaintiff be awarded exemplary damages, as defined by Tex. Civ. Prac. & Rem. Code § 41.001(5) or equivalent federal law, in an amount to be determined at adjudication of this matter; and

(11) that, the plaintiff be awarded pre-judgment interest, post-judgment interest, attorney fees, and reimbursement of litigation costs.

64. The plaintiff's recovery of attorney fees in this case is authorized by:

(1) 42 U.S.C. § 1981a(a)(1); and

(2) 42 U.S.C. § 1988(b).

65. The plaintiff further prays for the court to grant all other relief at law or in equity to which may be just and proper.

Respectfully submitted,

/ s / Philip J. Orth, III

**Philip J. Orth, III**
Attorney-in-Charge

Texas BCN 15323070
Federal BCN 14065
16406 Lamplighter Street
Crosby, Texas 77532
(713) 520-8333
(772) 217-8162 Fax
philip.orth@yahoo.com

Attorney for:
Bert W. Whittington, III

**VERIFICATION**

THE STATE OF TEXAS §
§
COUNTY OF HARRIS §

Before me, the undersigned authority, on this day personally appeared Bert W. Whittington, III, who by me duly sworn, upon oath, deposes and says:

"I am the plaintiff in the cause filed in the United States District Court for the Southern District of Texas-Houston Division against the defendants which is pending docket assignment and the facts stated in paragraphs 16 through 49 of my Verified Original Complaint above are within my personal knowledge and are true and correct."

Bert W. Whittington, III
Affiant

Subscribed and sworn to before me on the 4th day of October, 2021.

Notary Public, State of Texas

