

## HARRIS COUNTY
## OFFICE OF THE CONSTABLE
## PRECINCT 3

## OFFICE OF PROFESSIONAL STANDARDS
## INTERNAL AFFAIRS DIVISION

## CONFIDENTIAL

## INVESTIGATIVE REPORT

**Date:** June 15, 2020

**OPS Control #** IAD 2020-A-002

**Subject of Complaint:** Mishandling of Evidence

**Alleged Violations:**

> **313.5 When and How to Use the Body-Worn Camera.**
> **319.6.3 Prisoner Processing.**
> **321.2 Handling Prisoners.**
> **321 3.2.1 Restraint Guidelines.**
> **321.3.1 General Guidelines.**
> **600.8 Property room collection, inventory & storage.**

## INTRODUCTION

On June 15, 2020, I was asked by Chief Deputy Bonsal to conduct an Internal Affairs Investigation that involved Deputy Whittington. The investigation was to determine if there were any policy violations during the course of the arrest of ▇▇▇▇▇▇ the processing of evidence and to determine if additional training is required or a review of current policies that are in place.

## ALLEGATION

On May 28, 2020, Deputy Whittington conducted a traffic stop that resulted in the arrest of ▇▇▇▇▇▇ and the seizure of illegal narcotics. During the course of processing the prisoner and the narcotics evidence, approximately 14.8grams of white powder substance believed to be cocaine was determined to be missing.

1

HC - 0140

## INTERVIEW SYNOPSIS:

The typed statements that were provided by Sgt. Barringer, Sgt. Vega, Corporal Cornelius, Deputy Whittington, Deputy Watson, Deputy Castillo and Deputy David Johnson are included in this case file.

## INVESTIGATION:

On May 28, 2020, Deputy Whittington conducted traffic stop in the ███████████████ During the traffic stop, Deputy David Johnson checked by with Deputy Whittington to assist him. According to Deputy Whittington, he located a blue backpack inside the vehicle that was being driven by the sole occupant, identified as ████████████ The backpack was located behind the front passenger's seat on the floorboard. Deputy Whittington identified the following narcotics inside the back pack as the following: 347 Percocet (215.4 grams), 271 Adderall (97.4 grams), 300 Hydrocodone (163.5 grams), 109 Soma (70 grams), Cocaine (14.8 grams), Marijuana (86.9 grams), and 1.8 pounds of Ecstasy (816.5 grams).

The defendant ████████████ was subsequently arrested and transported to 904 Dell Dale for interviewing and processing of evidence. On June 5, 2020, the Harris County Institute of Forensic Sciences contacted Deputy Jaramillo (property room manager) regarding 14.8 grams of cocaine that was listed on the submission form; however was not in any of the evidence bags that were submitted. Deputy Wittington indicated in his statement that he contacted Deputy Jaramillo and reviewed all the evidence submitted in this case that was logged in the property room with negative results.

I reviewed Deputy Whittington and Deputy D. Johnson's body worn camera video, along with dash camera video. In reviewing the video, it was evident that the defendant was handcuffed with his hands to the front and not from behind. There were also policy violations that consisted of the defendant being detained in the training room at times unattended, allowed to handle the narcotics evidence on multiple occasions and leaving the evidence in the training room unattended. Due to the policy violations, I prepared a list of questions and provided those deputies and supervisors involved a list of questions with the exception of Sgt. Vega.

Upon reviewing Deputy Whittington's body worn camera video, I created a snap shot of each piece of narcotics evidence that was removed from the seized backpack by Deputy Whittington. The photographs are numbered from #1-#13 and are attached to this investigative report. It appears that each narcotic evidence was accounted for; however, I personally cannot determine the contents or they type of narcotics that was removed from the backpack by looking at body camera videos or photos.

The second series of snap shots that are numbered #14-#18 are of the defendant handling the evidence in the presence of Sgt. Barringer; however, in Sgt. Barringer's statement he explained "During the course of the interview, the male picked up several prescription medication bottles and verbally stated which each bottle contained and described that the numbers on the clear packages identified the tablets as "ecstasy" was for the number of pills in each bag, for example,

2

HC - 0141

sealed bag #1 contained one thousand tablets etc. During the course of the interview, Deputy Whittington stated that his body worn camera was activated. I am not sure if Deputy Johnson's body camera was activated, he was also present during the interview." Deputy Whittington statement correlates with the body worn camera video.

The third series of snap shots numbered #19-#21 are of Deputy Johnson standing just outside of the training room where the defendant and evidence were left unattended for a very brief moment.

The fourth series of snap shots numbered #21-#31 are of Deputy Whittington weighing the narcotics evidence and it appears that he is taking notes each time he weighs the evidence.

The fifth series of snap shots numbered #32-#47 are of Deputy Johnson taking possession of the evidence; the defendant is in close proximity of the evidence and photo #39 of the defendant being allowed to physically place what appears to be a green leafy substance in a glass jar. Photo #40 depicts Deputy Whittington in possessions of the same jar that appears to contain a green leafy substance.

The sixth series consists of only one photo #48 of Deputy Whittington in possession of a clear plastic baggy and Deputy Johnson standing in the training room near the doorway. In reviewing the body camera video Deputy Johnson had taken possession of the backpack and the evidence; however, he left the clear plastic baggy on the table. Deputy Whittington walks to the table and takes possession of it, at which time Deputy Johnson enters the room and Deputy Whittington gives it to Deputy Johnson.

The seventh series of photos consists of #49-#51. Photo #49 depicts Deputy Whittington sitting at a table in the training room in front of his lap top computer. Photo #50 depicts the evidence at the same table that Deputy Whittington was sitting at; however, Deputy Whittington left the training room and all the evidence unattended. His body worn camera will show him leaving the training room and all the evidence unattended, upon returning to the training room a female with the janitorial service was in the training room by herself with the evidence, photo #51.

The eighth series of photographs #52-#53, depicts Sgt. Vega opening the backpack and photo #53 depicts the backpack on a desk in the Sergeants office. The video will show that Sgt. Vega was in the office and the bag was never left unattended. This was done while Deputy Whittington went to the restroom.

During the review of body camera video the defendant asked Deputy Whittington if he had a bag to spit in because he had something in the back of his throat (video time 1:10 pm). He is escorted to the men's restroom by Deputy Whittington and the defendant can be observed leaning his head in very close proximity to the toilet bowl and a sound as though he is spitting can be heard. He is then escorted back to the training room. It is unknown what the defendant had in the back of his throat that he had to spit out. I did not observe the defendant consuming anything other than what appears to be from a water bottle.

HC - 0142

After arrangements had been made to transport the defendant to the Harris County Joint Processing Center, Deputy Whittington was in the training room and leaves the training room (video time 2:15pm-2:19pm) and walks to the rear building. Deputy Whittington leaves all the evidence and his mobile data terminal in the training room unattended for approximately 4 minutes. Upon returning to the training room with his body worn camera recording, the female janitor can be seen in the training room with the evidence that was left unattended by Deputy Whittington.

Even though the Harris County Institute of Forensic Sciences signed the submission form, they are acknowledging they received the evidence. The receiving clerk does not unseal the evidence bag they just acknowledge the number of items in the bag corresponds to the submission form. I have attached photographs to this investigation that were submitted by the Harris County Institute of Forensic Sciences of each item that was submitted and the cocaine was not found in the evidence bags that were submitted in this case.

Even though Sgt. Barringer allowed the defendant to handle the narcotic evidence, it was secured in prescription medication bottles, as the defendant identified the tablets. Sgt. Barringer was present the entire time and never left the defendant unattended. Sgt. Barringer indicated that at one point during the interview, he exited the training room and upon returning to the hallway, leading to the training room, he observed both Deputy Johnson and Deputy Whittington in the hallway. It was his belief that from where they were positioned, neither one of them had the capability to view the defendant and or the evidence inside the training room. Sgt. Barringer questioned Deputy Whittington about the defendant being unattended and Deputy Whittington stated that he was not aware of the defendant being unattended and would rectify it.

Sgt. Barringer stated during the interview of the defendant he "poured out 13 tablets" which was identified by the defendant as "ecstasy" pills. The tablets were photographed to capture the pill press indentations for possible investigation in the near future and then placed them back in the same pill bottle. The defendant was in close proximity of the evidence and was never left unattended. This was only done to identify the tablets in each package.

Deputy Johnson acknowledges that he assisted Deputy Whittington in the investigation and was present in the conference (training room). He stated that the narcotics were laid out on the table and he was asked by Deputy Whittington to count the pills that were in the pill bottles, which he acknowledged he did and gave the final count to Deputy Whittington. Deputy Johnson in his statement stated that he did not recall and was uncertain if the suspect was ever left alone; however, after reviewing his body worn camera footage, he can confirm that at one specific time he did step into the hallway while Deputy Whittington was standing in the doorway.

Deputy Johnson indicated in his statement that at approximately 1:30 pm and 2:00 pm, he informed Deputy Whittington that he would assist him in packaging the narcotics, so that all he would have to do was print the labels and secure the narcotics in the evidence locker. He took possession of the backpack and narcotics evidence; he stated that he could confirm that after reviewing Deputy Whittington's body worn camera that the powered cocaine which was in a small clear plastic sandwich baggie was placed in the backpack to be packaged.

4

HC - 0143

Deputy Johnson packaged and sealed all evidence that was in his possession and that nothing that was left inside the backpack. Upon completing the packaging, he placed all evidence back in the backpack and immediately returned it back to Deputy Whittington.

Deputy Whittington's statement acknowledges the narcotics that was seized by him included 14.8 grams of cocaine and that at approximately 2:15 pm he left the backpack in the conference (training room) to speak with an evening shift Sergeant to transport the defendant (Deputy Johnson was left to watch the Defendant). He returned to the training room at approximately 2:30 pm, upon reviewing his body worn camera he did in fact leave the training room at 2:15 pm; however, he returned at 2:19 pm and not at 2:30 pm. He stated the defendant was allowed to handle the contraband in his view because he was able to identify the contents of the back with detail. His reasoning for allowing the defendant to do this was to strengthen the case and prove he had some knowledge of what was in the backpack.

## STATEMENTS:

I provided Deputy Whittington a list of the following questions:
1. During the traffic investigation, a quantity of illegal narcotics was located. Where in the suspect vehicle was the illegal narcotics located and how was it packaged? Who located the narcotics and who took possession of the narcotics? Please describe how the narcotics was packaged, also provide the type of narcotics that was identified and seized. Are there any photographs that accurately depict the narcotics that was seized? If so, where are those photographs?

2. Upon taking possession of the narcotics, please provide a timeline of who physically handled the narcotics and the location of where they handled the narcotics.

3. During the interview of the defendant, that occurred at the patrol station 904 Dell Dale, was the defendant ever allowed to be unattended in close proximity of the seized narcotics? If he was ever left unattended who maintained visual of the defendant? Was he handcuffed the entire time he was at the patrol station?

4. Who logged the evidence? Who packaged and the sealed the evidence? Who placed the evidence in the lock box? Who transported the defendant to the Joint Processing Center?

**Deputy Bert Whittington's statement and responses to the above listed questions:**
1. On May 28, 2020 at approximately 8:45 AM, I, Deputy B. Whittington#83K93 conducted a traffic stop and the vehicle came to rest around the ████████████ Street. During the traffic contact, I observed Deputy D. Johnson#83P33 had checked-by on the scene.
I located a Blue Backpack behind the front passenger's seat on the floorboard. All narcotics except for the cigarette that the Defendant admitted was in the ashtray; were located inside the Blue Backpack. The illegal contraband were as follow: 347 Percocet (215.4 grams), 271 Adderall (97.4 grams), 300 Hydrocodone (163.5 grams), 109 Soma

5

HC - 0144

(70 grams), Cocaine (14.8 grams), Marijuana (86.9 grams), and 1.8 pounds of Ecstasy (816.5 grams). I have attached a copy of the photo that was taken on discovery of the illegal contraband.

2.  Who physically handled the narcotics and where is provided below:
    **-At approximately 0918, I located and handled the narcotics at the original scene.**
    **-At approximately 0919, D. Johnson handled the narcotics at the original scene.**
    **-At approximately 0934, all narcotics were returned to the backpack at the original scene.**
    **-At approximately 0935, I took possession of all contraband and secured into my approximately 1015, all narcotics were transported to 904 Dell Dale. I removed the backpack from my patrol unit and place the bag on the table in the conference room. During the interview of the suspect Sgt. T. Barringer, Deputy D. Johnson, M. Stelly (Defendant), and I were present/in contact with the contraband.**
    **-At approximately 1028, Sgt. T. Barringer watched the contraband.**
    **At approximately 1153, the contraband were removed from the backpack and Deputy D. Johnson counted the narcotics.**
    **At approximately1329, the narcotics were placed back into the backpack and Deputy Johnson packed the items for processing.**
    **At approximately 1345, Deputy D. Johnson return the narcotics.**
    **At approximately 1412, I unpacked the backpack and called the DA with final inventory.**
    **At approximately 1415, I left the backpack in the conference room to find Second Shift Sgt to get someone to transport the Defendant (Deputy Johnson was left to watch the Defendant and backpack)**
    **At approximately 1430, I secured all evidence into the backpack walked them over to the evidence process area. The evidence was left with Sgt. H. Vega while I used the bathroom.**

    *   **While utilizing the bathroom. I observed that my Body Camera was still on and I turned it off. I got physical control of the backpack after my bathroom break; the backpack was in the same location/position when I returned.**

3.  The Defendant was handcuffed at all times at during the interview. During the interview, the Defendant did touch the contraband. I did not object because in my view he was able to identify the contents of the backpack with detail after he said he had no idea what was in the backpack. My reasoning was to strengthening the case that he had some knowledge what was in the backpack.

4.  Deputy A. Watson offered to fill out all evidence log and submission forms. I generated all barcode labels. Deputy A. Watson and I secured the barcode labels on the packaged narcotics and I secured the evidence in the locker at 904 Dell Dale.

HC - 0145

5. Deputy K. Cornelius original transported the Defendant; however, he became sick and returned the Defendant to 904 Dell Dale. Deputy S. Salgado#83P41 transported the Defendant to the Harris County Jail Personnel.

**Officer's Notes:**

I was contacted on June 5, 2020, by ███████████ (Forensic Chemist I, ████████████ via phone and then followed up with an email informing me that the Cocaine was missing from the submission.

I contacted Deputy L. Jaramillo and requested to re-visit the backpack in which it was at 701 W. Baker.

Upon on my arrival, Deputy L. Jaramillo asked if something was wrong. I did not tell him about the conversation I had with L. Binder until after I did not locate the narcotics.

Deputy L. Jaramillo said that Medical Examiner Office signed for the evidence and provided me a copy of the submission form (See attachment for the copy of the signed form).

In all previous case's that resulted in an investigation/interview... I would have taken the suspect to 14350 Wallisville Road, Houston, Texas 77049 to complete the interview at the Harris County Sheriff's Office Substation. Due to the Covid-19 Pandemic, the suspect was taken to 904 Dell Dale to conduct the interview.

**(Bar Codes were printed on thermo paper)**

**<u>Conclusion of Deputy Whittington's statement and responses.</u>**

Because Sgt. Barringer was present and participated in the interview of the defendant, I provided the following list of questions:

1. Were you asked by Deputy Whittington to assist him in interviewing the defendant ██████████████ If yes, please provide details where this interview took place, who was present and was the interview visually or digitally recorded?

2. Did you ever see the defendant unattended? If yes, please provide in detail the action you took? If, no please identify the deputy/deputies that had a visual on the defendant. Was the defendant handcuffed?

7

HC - 0146

3. Did you ever see the seized narcotics in close proximity of the defendant? Please provide any details that will be useful in this investigation.

**The following are Sgt. Barringer's responses to the questions that were submitted to him:**
On 5/28/2020 I, Sergeant Barringer, Unit 83A01 was approached by Deputy Whittington, Unit 83K93 who stated that he had arrested a male from a traffic stop he had initiated and had recovered a large sum of illegal narcotics from said vehicle. Deputy Whittington asked me to assist during the interview process. I found the suspect in the front main building, inside of the training room. The male was handcuffed with his hands in the front of his body.

During the course of the interview, the male picked up several prescription medication bottles and verbally stated what each bottle contained and described that the numbers on the clear packages identified the tablets as "ecstasy" was for the number of pills in each bag, for example, sealed bag #1 contained one thousand tablets etc. During the course of the interview, Deputy Whittington stated that his body worn camera was activated. I am not sure if Deputy Johnson's body camera was activated, he was also present during the interview.

At one point during the interview, I exited the training room and went back to my office. Upon returning to the hallway, leading to the training room a few minutes later, I observed both Deputy Johnson and Deputy Whittington in the hallway and from where they were positioned, neither could see inside of the room containing the defendant and or the evidence. I later questioned Deputy Whittington about the defendant being left alone upon seeing this. Deputy Whittington stated that he was not aware of the defendant being left alone and would rectify it.

During the interview, I poured out 13 tablets of what was identified by the defendant as "ecstasy" pills onto a desk and photographed them to capture the pill press indentations for possible investigation in the near future and then placed them back in the same pill bottle. The defendant was in close proximity of the evidence during the interview and stated which each package contained and how many. After the interview concluded, I returned to my office and did not take part in the processing or packaging of any evidence.

## Conclusion of Sgt. Barringer's statement and responses.

I provided Deputy Johnson the following list of questions:
1. Were you asked by Deputy Whittington to assist him in the investigation of the defendant ███████████ If yes, please provide details as to your involvement.

2. Did you ever see the defendant unattended? If yes, please provide in detail the action you took? If, no please identify the deputy/deputies that had a visual on the defendant. Was the defendant handcuffed?

3. Did you ever see the seized narcotics in close proximity of the defendant? Please provide any details that will be useful in this investigation.

**Deputy David Johnson's statement and responses:**
On May 28, 2020 at approximately 0904, Hrs. Deputy Whittington conducted a traffic stop on a motor vehicle at the intersection of E Fayle St. and Verdinell St. in the McNair Subdivision Baytown Harris County Texas 77521.

I Deputy Johnson arrived on scene and backed up Deputy Whittington as he conducted a search of the suspect vehicle. I was advised to detain the suspect by Deputy Whittington because he

HC - 0147

located a firearm. The suspect was placed in the back of my patrol vehicle. Deputy Whittington also discovered narcotics located inside of a backpack in the vehicle. I advised Deputy Whittington that I would transport the suspect to 904 Dell Dale St. seeing that his vehicle was not equipped to do so. When I arrived at 904, I took the suspect and sat him in the conference room and waited for Deputy Whittington to join us. Deputy Whittington came into the room with the narcotics and read the suspect his rights before conducting an interview. I was present. Sgt. Barringer was present and Deputy Whittington.

Suspect was handcuffed the entire time.

The Narcotics were eventually laid out on the table. Deputy Whittington asked that I count the pills that were in the pill bottles. I took count of those pills and handed Deputy Whittington the count. I did not recall and was uncertain if the suspect was ever left alone but after reviewing my bodycam footage, I can confirm at one time I did step into the hallway while Deputy Whittington was standing in the doorframe.

Sometime between 1:30 PM and 2:00 PM when I was getting ready to leave the office, I advised Deputy Whittington that I would help him out and package the narcotics for him so that all he would have left to do was the labels and securing the narcotics in the evidence locker. I took the suspect backpack and placed all narcotics that were on the table into the backpack. I can confirm after reviewing Deputy Whittington's body cam that the powered cocaine which was in a small clear plastic sandwich baggie was placed in the backpack to be packaged.

I then walked over to the next building where I took the evidence out of the backpack and began packaging and sealing all evidence that was in my possession. When I completed the packaging, I loaded all the evidence back into the backpack. I can't say for certain that the missing evidence was packaged or left on the table.

I took the backpack back to Deputy Whittington and left for the day. I was not present when the labels were printed out and placed on the packages. I can say the last package I put together was all the extra baggies and the tray, which did not contain the cocaine. I take full responsibility for not verifying all evidence that was present before returning the bag to Deputy Whittington.
**Conclusion of Deputy Johnson's statement and responses.**

I provided Deputy Watson the following list of questions:
1. Were you asked by Deputy Whittington to assist him in the investigation of the defendant ▮▮▮▮▮▮▮▮▮ If yes, please provide details.

2. Did you ever see the defendant unattended? If yes, please provide in detail the action you took? If, no please identify the deputy/deputies that had a visual on the defendant. Was the defendant handcuffed?

3. Did you ever see the seized narcotics in close proximity of the defendant? Please provide any details that will be useful in this investigation.

**Deputy Amanda Watson's statement and responses:**

9

HC - 0148

On May 28, 2020, I arrived to the patrol station located at 904 Dell Dale. I was not asked to assist in the investigation of ███████████ however, I observed Deputy Whittington in the evidence room of the patrol station entering the evidence into his MDT. I observed the evidence laying already packaged and sealed on the table. I asked Deputy Whittington if I could help him out in any way, he stated sure, so I then completed the form for the Medical Examiner's Office. Deputy Whittington printed the labels for the evidence and together we placed the labels on the sealed evidence. At one point I asked Deputy Whittington which bag contained the cocaine because it was not visible to me. Deputy Whittington pointed and showed me the package that contained the cocaine so I attached the label to that package. I was not able to actually see any cocaine it looked like a bunch of wadded up clear baggies in the evidence bag but he stated he was sure that was the correct package so I attached the cocaine label to it. I did not see the Defendant unattended at any time. I saw the Defendant for a brief time. He was sitting at the station in the evidence room with Deputy Whittington. Myself and Deputy Whittington were in there with him until Deputy Castillo picked him up for transport to JPC. The Defendant was handcuffed when I saw him.
I only observed the Defendant downstairs in the evidence room. He was sitting in a chair on the north side of the room, (near the copier), I was sitting at the table on the south side of the room where we do evidence, that is how close the Defendant was to the narcotics when I was there. Should you have any additional questions please let me know.

## Conclusion of Deputy Watson statement and responses.

I provided Corporal Cornelius the following questions:
1. You were asked to transport defendant ███████████ to the Joint Processing Center for Deputy Whittington. Who asked you to transport the defendant?
2. What area of the patrol station did you take custody of the defendant? Was he handcuffed upon your arrival?
3. Did you search the defendant before placing him in your unit? Did you search the rear seat/area of your unit before placing the defendant inside?
4. Where was your exact location when you felt ill and returned to the patrol station? Please provide any details that will be useful in this investigation.

**Cpl. Kyle Cornelius's statement and responses:**
On June 28, 2020, I received a phone call from Sgt. T. Barringer to report to 904 Dell Dale to transport Deputy B. Whittington's prisoner from 904 Dell Dale to the JPC center. I had noticed myself coughing on this date and having minor chest discomfort. While on the way to 904 Dale Dell, I called Sgt. T. Barringer, explained my medical symptoms, and asked him if I should disregard assisting Deputy B. Whittington and go straight to get tested for COVID-19. Sgt. T. Barringer stated to do the transport first.
I arrived at 904 Dell Dale and found Deputy B. Whittington and his prisoner located in the downstairs conference room of 904. Deputy B. Whittington was seated along the east wall of the room working on his charges. I observed what I believed to be baggies of MDMA tablets to the left of Deputy B. Whittington but did not pay enough attention to any other evidence. The MDMA stood out due to its different colors.

10

HC – 0149

I observed Deputy B. Whittington's prisoner handcuffed and appearing to be asleep seated at a table behind Deputy B. Whittington. I assisted Deputy B. Whittington by providing him his prisoner's ID numbers, which I located in JWEB.

I then awoke Deputy B. Whittington's prisoner and swapped his handcuffs to my own pair. I checked the prisoner's pockets and observed a sum of money, which I left in his pocket. After securing the prisoner, I walked him to my patrol unit, which was parked, on the south side of the patrol building. I DID NOT search my back seat prior to placing the prisoner inside and seat belting him but did glance inside my back seat. I began my transport and once I reached the area of the East FW and what I remember to be about the area of US 59, I noticed my chest discomfort growing. I called Sgt. T. Barringer and informed him I was returning to 904 and that someone else needed to transport. Once I returned to 904, I was met by Deputy B. Whittington at my patrol unit, again parked on the south side of the patrol building, who took custody of his prisoner. I left my set of handcuffs on the prisoner and informed Deputy B. Whittington I would retrieve them at a later date.

Upon clearing 904, I proceeded to Patient's Emergency Room where I was tested for COVID 19. Please let me know if I can be of further assistance,

**Conclusion of Corporal Cornelius' statement.**

I provided Deputy Castillo the following questions:

1.  You were asked to transport defendan ███████ to the Joint Processing Center for Deputy Whittington. Who asked you to transport the defendant?

2.  What area of the patrol station did you take custody of the defendant? Was he handcuffed upon your arrival?

3.  Did you search the defendant before placing him in your unit? Did you search the rear seat/area of your unit before placing the defendant inside? Please provide any details that will be useful in this investigation.

**Deputy Freddy Castillo's statements:**
On May 28th 2020 at about 1400 hours, I, Deputy F. Castillo # 83G48 was at roll call at Pct. 3 Patrol station located at 904 Dell Dale Channelview TX, 77530 in the car bay area. While attending roll call I told by Sgt. H. Vega #83S08 to have Deputy S. Salgado #83P41 transport a subject that was in custody by Deputy B. Whittington #83K93 for training, to get him familiarized with the Joint Processing Center.

Upon walking into the patrol room, I observed a black male subject who was handcuffed behind his back sitting in a chair by the last computer adjacent to the copy machine. The male subject was later identified ░ ███████ ███ vas wearing an Orange T-shirt and baby blue shorts. Deputy Whittington and Deputy A. Watson #83K94 were also in the patrol witl ███████ Upon making contact with ███████ vas told to stand up because his handcuffs were going to be changed. We changing out handcuffs in the Patrol room, Deputy Salgado and myself went through ████ s pockets and told him to remove his shoes prior to getting in my patrol car. ████ only had numerous dollars (cash) and his TX identification card.
████ was then placed in the back seat, on the right side of my patrol car where he was secured with a shoulder/lap seat belt and a facemask was placed on him. On our way to the Joint Processing Center, Sgt. Vega called me via cell phone and told me Deputy Whittington was

11

requesting a photograph of ▮▮▮. I told Sgt. Vega once we get to the Joint Processing Center I was going to take his picture and send it to him (Vega).

Upon arrival to the Joint Processing Center, I took ▮▮▮ outside my patrol car and we walked him over to the jail doors. While standing at the jail doors we were told by the jailors in the sally port to search ▮▮▮ before they would open the jail doors. ▮▮▮ was searched once again without any items in his pocket.

While entering the jail, ▮▮▮ was issued another facemask and a Harris County Sheriff's Office Jailer patted him down for contraband.

▮▮▮ was then released to us where we began filling out his booking and property sheet. Deputy Salgado counted ▮▮▮'s money in front of him and then took it over to the bank machine. After booking ▮▮▮, I went inside the men's restroom at the jail and got some paper towels because I was going to disinfect the backseat where ▮▮▮ was sitting.

We walked back to my patrol car, I sprayed the back seat with the disinfectant that was provided by Pct.3, and I did not observe any contraband left in the back seat.

**Conclusion of Deputy Castillo's statement and responses.**

Sgt. Vega was asked to provide a statement and was not provided any questions.

**Sgt. Hector Vega-Cigarroa's statement:** On May 28, 2020 (time unknown), I was sitting in the Sergeant's office when Deputy Whittington walked in and put a backpack on the desk. Without saying anything, he opened it up and showed me what was inside of the backpack. I observed a large clear plastic bag with pills. He then closed the backpack and took it with him. **(Upon viewing Deputy Whittington's body camera, he is heard advising Sgt. Vega to watch the backpack while he goes to the restroom).**

**Conclusion of Sgt. Vega's statement.**

This concludes the statements submitted by deputies and supervisors that either assisted, witnessed or participated in Deputy Whittington's investigation.

**The following is a summary of the video-recorded statement that was given to Sergeant Barringer by ▮▮▮. A review of the recorded video statement will be necessary for specific details related to his account of what occurred.**

## *Summary Interview of Malcom Stelly*

On Friday, August 7, 2020, Sergeant Barringer met with ▮▮▮ at his current residence located at ▮▮▮ Sgt. Barringer advised upon arriving and making contact with ▮▮▮ he and Major Villarreal interviewed ▮▮▮ about the whereabouts of the missing 14.8 grams of cocaine from Harris County Case # 2005-00429.

Sgt. Barringer advised that he explained to ▮▮▮ what they witnessed while examining Deputy Whittington's body worn camera footage, while inside of the Harris County Precinct 3 training room, located at 904 Dell Dale, while he was being processed during his arrest. Sgt. Barringer explained to ▮▮▮ that they witnessed him handling evidence and that he made

12

HC - 0151

unusual movements when allowed to enter a restroom to spit and when retrieving water from the sink. Sgt. Barringer asked ███████ if he had placed the cocaine in the toilet and flushed it to get rid of any evidence. ███████ stated that he did not touch the cocaine at any time after being arrested. ███████ stated that when the deputies exited the room, he did grab possibly 8 "bars"also known as Xanax pills off the table where all the evidence was laying in arms reach from where he was siting and placed them into his mouth. ███████ stated that he was unable to swallow the pills due to having a dry mouth, so he asked Deputy Whittington to go to the restroom to spit, when in reality it was to gain access to water to swallow the pills. ███████ stated he wanted to be high as possible if he was going to jail. ███████ stated he would submit to be polygraphed about the incident, but would not come to the Police Station, due to not trusting us and would only allow to be polygraphed at his home. ███████ stated he asked his attorney about his money, $10,000 that he states was located in the center console of his vehicle, upon his arrest and he did not get it back.

Sgt. Barringer advised Deputy Whittington's body worn camera, which was running during the arrest and during the search of the vehicle, never showed that amount of money in the camera's view.

Sgt. Barringer advised during the course of this interview, Deputy Brimzy, unit 83P34 was present and had his body worn camera activated which recorded the entire interview.
*(Sgt. Barringer signed statement will be attached and a copy of this interview will be part of this file)*

On Monday, August 10, 2020, I Lt. Duffy viewed Deputy Whittington's traffic stop that occurred on May 28, 2020, for the second time. Deputy Whittington's body worn camera was running during the arrest and during the search o███████ vehicle. Deputy Whittington's body worn camera showed what appeared to be loose US Currency inside the center console of the vehicle. Deputy Whittington's camera shows him retrieving the US Currency from the center console and placing it on the trunk of the vehicle.

Deputy Whittington is seen on his body worn camera counting the US Currency, which amounted to $54.00. Deputy Whittington is also heard on his body worn camera giving the $54.00 and ███████ wallet to his wife that was on the scene.

Upon reviewing **Body Worn Cameras** and reviewing statements from Deputies involved, it is determined, that several Harris County Pct. 3 Polices were not adhered too.

## POLICY VIOLATIONS
**313.5 When and How to Use the Body-Worn Camera.**
**319.6.3 Prisoner Processing.**
**321.2 Handling Prisoners.**

13

HC - 0152

**321 3.2.1 Restraint Guidelines.**
**321.3.1 General Guidelines.**
**600.8 Property room collection, inventory & storage.**

In reviewing the departmental policies it was determined that Deputy Whittington violated policy 313.5 that relates to when and how to use the Body Worn Camera. Deputy Whittington video recorded the traffic stop until he completed the investigation; however, policy 313.5.1 clearly states that employees shall begin recording prior to contact with persons involved in the following events and continue recording until the events are concluded. Any deviations will require supervisor's approval and must be documented in an incident report or call slip (field notes). There is no documentation to justify why Deputy Whittington "muted" his body worn camera and there is no recorded announcement as to the reason why the device is being deactivated, policy 313.5.2 Deactivation of Body Worn Camera. Deputy Whittington prior to interviewing the defendant read him is Miranda Warning and conducted his interview; however, on multiple occasions there is interaction between Deputy Whittington and the defendant where the body worn camera is "muted" and his offense report does not reflect that he notified his supervisor that he was muting his body worn camera.

The investigation also revealed that policy violations regarding policy 319.6.3 Prisoner Processing and 321.2 Handling Prisoners-Restraint Guidelines. The defendant was seen on video unattended on multiple occasions in close proximity of the narcotic evidence and handcuffed with his hands to the front. The policy 321.2 states that prisoners will be restrained with hands behind their back unless they are incapable of placing their hands behind their back. There is no documentation to indicate that the defendant could not be restrained with his hands behind his back. The defendant, as stated earlier was left unattended on multiple occasions and in close proximity of the narcotic evidence, violation of policy 319.6.3 and 321.3.1 General Guidelines, which states the prisoner must be under observation at all times to reduce opportunities for escape, disposal or destruction of contraband, and/or attack on the transporting officer. The fact that the defendant was allowed to handle the evidence and was left unattended on multiple occasions the defendant had the opportunity to dispose or tamper with the evidence.

Departmental policy 600.8 Property Room Collection, Inventory & Storage Subsection (B) states Deputies count, verify, test, and weigh controlled substances (or suspected controlled substances) prior to sealing them in containers or bags. The deputy then weighs the bag and notes "BW" (for bag weight) and the total weight in grams on the outside of the bag. The bag weight is entered in the property description line as "Marijuana BW 13 grams" or similar. The body worn camera video shows that Deputy Whittington weighed the narcotics evidence and Deputy Johnson placed the narcotic evidence in the back pack and walked to the rear building of 904 Dell Dale where he packaged and sealed the evidence and returned the back pack and the evidence to Deputy Whittington. Deputy Johnson stated that he did not log or label the evidence.

**313.5 When and How to Use the Body-Worn Camera**

14

HC - 0153

### 313.5.1 Employees shall utilize the BWC in the following circumstances

1. Employees shall begin recording prior to contact with persons involved in the following events and continue recording until the events are concluded. Any deviations will require supervisor's approval and must be documented in an incident report or call slip (field notes). The law enforcement actions include, but are not limited too.

Instances where the employee reasonably believes the recording may provide evidence in a criminal or internal investigation.

### 313.5.2 Deactivation of Body-Worn Camera

Prior to deactivation of the BWC, employees will make a recorded announcement as to the reason the device is being deactivated, such as:

a. "Contact complete"

b. "Incident concluded"

c. "Instructed by supervisor [supervisor name] to end recording," or

d. "Employee or supervisor discussion in the field"

**313.5.4** If an employee fails to activate the BWC or fails to record the entire contact, he or she shall document the reasons in his or her incident report or otherwise note in the case file or record the reasons for not activating the camera. Any justification for failing to activate the BWC because it is unsafe, unrealistic, or impracticable is based on whether a reasonable officer under the same or similar circumstances would have made the same decision.

### 319.6.3 Prisoner Processing
At no time will any person arrested or detained be left alone while in custody, including the police vehicle or any facility.
No person is kept in the temporary holding area without supervision.

### 321.2 HANDLING PRISONERS 321 3.2.1 RESTRAINT GUIDELINES

(a) Suspects being arrested and transported in police vehicles shall be handcuffed or otherwise restrained as described below:
1. Prisoners will generally be restrained with hands behind the back. If handcuffs are used, they shall be double locked.
2. In case of advanced age, injury, physical disability, or other circumstances
Where arrested persons are incapable of placing their hands behind their back, but circumstances warrant restraint, the deputy may:
(a) Use flex cuffs.
(b) Apply handcuffs with the hands to the front.
(c) Choose not to use a restraining device. If the prisoner is not restrained, two deputies should be used to transport the prisoner as safely as possible.

15

HC - 0154

## 321.3.1 GENERAL GUIDELINES

(c) The prisoner must be under observation at all times to reduce opportunities for escape, disposal or destruction of contraband, and/or attack on the transporting officer.

## 600.8 PROPERTY ROOM COLLECTION, INVENTORY & STORAGE
A. Property Collection
1. On a daily basis, the Property Custodian or alternate inspects all temporary storage lockers, bins, and annexes to remove and process all property items.
b. The deputy recovering the evidence will complete the following:
a. Assigns a bar code label to each property item submitted
b. Makes the appropriate entries into the automated property system
B. Property Inventory
1. Deputies submit every item into property in a safe and thorough manner consistent with these guidelines and policy.
D. Property Storage
2. Controlled Substances
b. Deputies count, verify, test, and weigh controlled substances (or suspected controlled substances) prior to sealing them in containers or bags. The deputy then weighs the bag and notes "BW" (for bag weight) and the total weight in grams on the outside of the bag. The bag weight is entered in the property description line as "Marijuana BW 13 grams" or similar.

## CONCLUSION

This investigation concludes that were multiple failures, policy violations and corrective measures that can be put in place to prevent such a calamity that occurred on May 28, 2020. The policy violations listed above are a direct result of the following:

- Defendant was taken to 904 Dell Dale, which is not an authorized holding facility (Deputy Whittington admitted he should have taken the prisoner to the Wallisville substation).
- Muting Body Worn Camera. Deputy Whittington needs to make sure his Body Worn Camera is on during the entire process and he should not have muted the body worn camera, since he read the defendant his Miranda warning.
- I observed Sergeant Barringer and Deputy Whittington, Deputy Johnson on Body Worn Camera allowing the Defendant while handcuffed; handle the evidence (narcotics). However, Sgt. Barringer was standing next to the defendant maintaining a visual of the defendant as he held the evidence that was either in the prescription bottles or sealed baggies. Deputy Whittington allowed the defendant to place "loose" marijuana in a glass jar and seal the jar. Deputy Johnson was an "observer" when this was taking place.
- Defendant was left unattended in the training room multiple times and was allowed to sit in close proximity to the evidence (narcotics). Ultimately, it is Deputy Whittington's case; he is responsible for directing deputies that are assisting him.

16

HC - 0155

In this case, Deputy Whittington did not designate Deputy Johnson or Sgt. Barringer to stay with the defendant at all times nor did he seek out another deputy to assist him.

- Evidence being left unattended. Again, ultimately the responsibility is that of Deputy Whittington. He did not designate anyone to maintain the evidence, during the times he exited the training room.

The corrective measures
- Property Bar codes should not be printed on thermo paper.
- Policies should be in place to make it clear on where to take prisoners and how to secure your prisoner while they are in your care and custody.
- More training on policy should be done
- Designate an audio/video interview room.
- All evidence must remain in the processing area (rear building).
- Install video cameras in the processing area.

After considering all the evidence in this investigation, I was unable to determine what happen to the missing 14.8 grams of white powder (controlled substance).

The possibility exist, when the suspect was allowed to go to the restroom, he could have discarded the cocaine by depositing it in the toilet. **(This cannot be ruled out, because the suspect had access to all the evidence)**

This report will be referred over to the Administrative Disciplinary Committee for review.

_____    8/19/2020
LIEUTENANT ROBERT DUFFY                      DATE

17

HC - 0156