**ROBERT DUFFY  -  September 21, 2022**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

BERT W. WHITTINGTON, III §

       Plaintiff §

vs. § CIVIL ACTION 4:21-cv-03220

KIRK WAYNE BONSAL, JR., §
ET AL §

       Defendants §

*********************************************

ORAL DEPOSITION OF

ROBERT DUFFY

September 21, 2022

*********************************************

ORAL DEPOSITION OF ROBERT DUFFY, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on the 21st day of September, 2022, from 10:02 a.m. to 1:24 p.m., before Lucy Johnston, CSR in and for the State of Texas, reported by machine shorthand, at Harris County Attorney's Office, 1019 Congress, 15th Floor, Houston, Texas, pursuant to the Federal Rules of Civil Procedure and any provisions stated on the record or attached hereto; Rule 30(b)(5) requiring an on-record reporter's statement was waived.

A P P E A R A N C E S

FOR THE PLAINTIFF:
    Mr. Philip J. Orth, III
    Law Offices of Philip J. Orth, III, P.C.
    16406 Lamplighter Street
    Crosby, Texas  77532
    Phone:   (713) 520-8333
    Fax:     (772) 217-8162
    E-mail:  philip.orth@yahoo.com
FOR THE DEFENDANTS:
    Ms. Melissa G. Martin
    Ms. Susana G. Sosa
    Harris County Attorney's Office
    1201 Franklin Street, 13th Floor
    Houston, Texas  77002
    Phone:   (713) 274-6700
    Fax:     (713) 368-9278
    E-mail:  melissa.martin@harriscountytx.gov

ALSO PRESENT:

    Mr. Bert W. Whittington, III
    Mr. Eric L. Baumgartner
    Chief Kirk W. Bonsal, Jr.

I N D E X

| | Page |
|---|---|
| Appearances | 2 |
| Stipulations | 4 |
| Certificate | 100 |

EXAMINATION — Page
By Mr. Orth — 4
By Ms. Martin — 99

EXHIBITS

| Number | Description | Page |
|---|---|---|
| 1 | Notice of Intention to Take the Oral Deposition of Robert Duffy | 6 |
| 2 | Harris County Office of the Constable Precinct 3, Office of Professional Standards, Internal Affairs Division, Confidential Investigative Report dated 6/15/20 (HC-0140 through HC-0156) | 9 |
| 3 | 6/15/20 memo from Sergeant Barring to Lieutenant Duffy (HC-0216) | 51 |
| 4 | Internal Affairs Division Complaint Form, IAD Case #2020-A-002 (HC-0136) | 88 |
| 5 | Photographs (HC-0184 through HC-0185) | 89 |
| 6 | Photographs (HC-0199) | 92 |

THE REPORTER:  Stipulations?

MR. ORTH:  Pursuant to the Federal Rules?

MS. MARTIN:  Agreed.

ROBERT DUFFY,

having been first duly sworn, testified as follows:

EXAMINATION

BY MR. ORTH:

Q.  Please state your full name for the record.

A.  Robert James Duffy.

Q.  Have you ever given your deposition before?

A.  Yes.

Q.  Approximately how many times?

A.  Just once back in '90.

Q.  I'd like to make some agreements with you before we really actually begin with your deposition and make it easier on you and me and the court reporter. First agreement I'd like to make with you is that one person talks at a time, that I will give you the privilege of finishing your answer before I ask you another question if you allow me to finish my question before you begin an answer.  Okay?

A.  That's fair.

Q.  And you're doing a great job so far in giving verbal answers.  I'd like to make an agreement with you that you give verbal answers.  Since the court reporter

has it take down what you say, she can't take down a shake of the head or a nod or anything like that. Okay?

A. Yes, sir.

Q. And the last agreement I'd like to make with you is that I will ask you a question. If you don't understand the question and need it to be rephrased in any way, shape, or form, I'll be more than happy to do that. If you answer the question, I will assume that you understood the question. Okay?

A. Yes.

Q. And you do understand that the oath you took just now to tell the truth is the same oath that you would take in a court of law with the same penalties of perjury. Correct?

A. I understand.

Q. And that penalty would also apply if you say you don't remember an answer to a question when you actually do remember it. Do you understand that?

A. Yes.

Q. What is the highest level of education that you've obtained?

A. Second year of -- I went to Lamar University one year, so...

Q. Okay. And when did you go to Lamar University?

A. That was back in '84.

Q. And who is your current employer?

A. Harris County Precinct 3.

Q. And when did you initially start working at Harris County?

A. 1999.

(Duffy Exhibit #1 marked.)

Q. (BY MR. ORTH) All right. Before we go any further, let me hand you what's been marked as Exhibit 1 to your deposition and ask you whether you've ever seen this document (handing).

A. No, I haven't seen this.

Q. You haven't seen it?

A. This document?

Q. Yeah.

A. No.

Q. This document is just our intention to take your deposition. That's all.

A. Okay.

Q. Do you understand that?

A. Yes, sir. Do you need this back?

Q. No. You can put it right there if you want. There will be others.

A. I guess we'll just pile them up.

Q. You can pile them up.

A. Yes, sir.

Q. Okay. And when you started with Harris County Precinct 3 in 1999, what was your position at that time?

A. A deputy.

Q. And what were your duties?

A. I was assigned to the Galena Park School District.

Q. And when did that change, as far as your duties are concerned?

A. Well, deputy-wise, I'm not sure. I became a sergeant later on. I'm not exactly sure what year that was, but I've been there 23 years.

Q. And I'm sure that you received a lot of training since you've been with the constable's office since 1999. Correct?

A. Yes, sir.

Q. And during that period of time up until the time that you did an investigation on Deputy Whittington that we're here about, did you receive any training regarding how to do an investigation?

A. I'm pretty sure. I've had so much training since '99, I'm pretty sure that we had training, but I can't say off the top of my head.

Q. Now, is there a requirement that you're aware of that you need to be certified from any organization to do an investigation regarding Precinct 3?

A. I'm not aware.

Q. So I take it, since you're not aware, that you were not certified, if, in fact, there is a certification, before you were assigned to do the investigation of Deputy Whittington. Correct?

A. True. Correct.

Q. And they do have an employee manual at the constable's office in Precinct 3. Correct?

A. Yes.

Q. And you've read that at least once?

A. Well, looked over, yes, because we changed with different administrations, so...

Q. So they've revised the manual?

A. It's revised, yes.

Q. Now, in that manual, the employee manual that we were discussing, does it talk about discrimination in that manual, the employee manual?

A. I'm pretty sure it did. I really couldn't -- I would have to have the manual in front of me and just kind of look over it.

Q. Either in your current employment all the way since 1999 or any prior employment that you've had, which we didn't go over yet, have you -- do you believe that you've ever been discriminated against?

A. No, sir.

**ROBERT DUFFY - September 21, 2022**

Q. Okay. Are you aware of any family members that you have that have indicated to you that they have been discriminated against in the workplace?

A. No, sir.

(Duffy Exhibit #2 marked.)

Q. (BY MR. ORTH) Let me hand you what's been marked as Exhibit Number 2 to your deposition and ask you whether -- if you want to look over the whole thing, you can.

A. Yes, I looked through it.

Q. And can you identify what Exhibit Number 2 is?

A. Exhibit Number 2?

Q. Yeah. It's marked down in the lower corner of the first page there as Exhibit Number 2.

A. Okay. Got you. Yes.

Q. What is that, if you know?

A. This is a report -- an investigative report I completed.

Q. And it indicates on Page 1 in the introduction section that on June 15th, 2020, you were asked by Chief Deputy Bonsal to conduct an internal affairs investigation involving Deputy Whittington. Correct?

A. Correct.

Q. And were you given any other instructions from Chief Deputy Bonsal regarding this investigation?

A. Just the facts and to find out if any policy violations were violated.

Q. Did Deputy Bonsal indicate which alleged violations you should be looking into?

A. No, sir.

Q. So on Page 1 it says -- see the part that says "Alleged Violations" in the upper middle part there?

A. Okay.

Q. See that?

A. Yes.

Q. Did you come up with those alleged violations, or did someone else come up with those?

A. Well, I came up with it once I looked at the body-worn camera, all the information I got, and that's what I came up with.

Q. All right. So -- and you can correct me if I'm wrong -- the alleged violations would have been done by you after you completed the investigation, or was it before that?

A. No. Once I had got all the information, you know, the body-worn camera, looking at the dash cam and all of that, that's when I came up with it.

Q. Now, under the section called "Allegation," do you see that --

A. Allegation -- oh. Yes, sir.

Q. -- at the bottom. Okay. It indicates in the second sentence there that "approximately 14.8 grams of white powder substance believed to be cocaine was determined to be missing." Did you write out that allegation, or did you receive that from somebody else?

A. No. I received that 14 grams of cocaine was missing, evidence was missing. That's what I got.

Q. And who did you get that from?

A. I think Chief.

Q. Was that before you started the investigation, or was it sometime during the investigation?

A. No. That was before to find out what we had. And that's what the mishandling of evidence.

Q. Okay. Is there anything else that you recall at this point in time that Chief Deputy Bonsal told you prior to your investigation in Exhibit Number 2?

A. No, that was it, just to find out the missing evidence and find out if any violations were violated.

Q. Now, turning to Page 2.

A. Okay. Got you.

Q. Under the "Investigation" paragraph, we'll be dealing with that first.

A. Okay.

Q. The last line indicates "Deputy Whittington identified the following narcotics inside the back pack as the following," and then it lists all the stuff that was found. Correct?

A. Yes.

Q. Okay. Do you know when Deputy Whittington identified the narcotics in the backpack?

A. No, sir, I couldn't answer that.

Q. Would that have been, to your recollection, any of the body cam footage that you watched?

A. Yes, most of it was on the body cam.

Q. And when you say "body cam footage," what body cam footage are you talking --

A. Deputy Whittington's -- I'm sorry.

Q. What body cam footage were you talking about?

A. Deputy Whittington's body cam footage.

Q. Is there any other body cam footage that you used?

A. Yes. Deputy Johnson's.

Q. Any other, other than Deputy Johnson and Deputy Whittington?

A. That's all I can recall.

Q. Now, going to the next paragraph --

A. Yes, sir.

Q. -- where it says "The defendant was subsequently arrested and transported to 904 Dell Dale for interviewing processing of evidence," where did you

**ROBERT DUFFY - September 21, 2022**

Q. get that information from?

A. From Deputy Whittington's statement.

Q. And do you know why the defendant, in your investigation, was transported to that location instead of some other location?

A. That's where Deputy Whittington chose to take him.

Q. Do you know, in your investigation, whether Deputy Whittington was told to bring, by anyone, the suspect to the 904 Dell Dale address compared to someplace else?

A. No, I wasn't aware of that.

Q. Going to the next line where it says "Harris County Institute of Forensics Sciences contacted Deputy Jaramillo regarding" the cocaine, when did you first become aware of that happening?

A. Before I started the investigation, I was given that information.

Q. And who gave that information to you?

A. Deputy Jaramillo.

Q. And going on to the next paragraph that starts with "I reviewed Deputy Whittington's body worn camera, along with dash cam video," when you say "dash cam video," what are you talking about?

A. The car video.

Q. Now, you said in the next sentence, "In reviewing the video, it was evident that the defendant was handcuffed with his hands to the front and not from behind." First of all, is that a correct reading of that?

A. Yes.

Q. Okay. Did the body cam video show that the defendant, at any point in time after he was handcuffed, that he was handcuffed in the back?

A. I don't recall seeing it -- his hands in the back.

Q. All right. During your investigation, did you find out who actually transported the suspect to the 904 Dell Dale address?

A. No -- well, they had a transporting deputy. I can't think of his name. But when COVID was going on at that time, and I think he got sick. And I think Freddie Castillo was the deputy that transported him.

Q. No. When I'm talking about the transportation, I'm talking about to the facility originally, whether it was Deputy Whittington or whether it was Deputy Johnson or somebody else?

A. No. As far as I know, it was Deputy Whittington.

Q. But you're not sure?

A. I'm not sure. Yes, exactly.

Q. And it was my understanding that Deputy Whittington at that time was a canine handler. Correct?

A. Yes, sir.

Q. And if he had a -- and there's two vehicles that a canine officer could use when they actually have a canine with them, correct, at that time?

A. Correct.

Q. And one vehicle would not allow a suspect in it with a canine unit at the same time. Correct?

A. That is correct.

Q. And do you know which vehicle Deputy Whittington was driving on 5/28/2020?

A. I'm not sure.

Q. Do you recall ever asking Deputy Whittington or Deputy Johnson which individual -- or anybody else, as far as who -- how the suspect got to the 904 Dell Dale address?

A. I can't recall that.

Q. But you would agree with me that it's not in your investigative report?

A. Yes.

Q. Would that have been important, as far as who initially handcuffed the suspect and transported him, to the investigation as to whether the handcuffs were from behind or in front or there was a potential violation of any policy or procedure, in your mind?

A. It's very important.

Q. Now, in that third paragraph, we're still in that one. Okay?

A. Okay.

Q. There in the middle it says, "There were also policy violations that consisted of the defendant being detained in the training room at times unattended." Let's start with that. What evidence indicated to you that the defendant was left in the training room unattended?

A. The body-worn camera that I viewed.

Q. And what on the body-worn camera did you view that indicated the suspect was left unattended in the training room?

A. Well, from the camera, you can kind of see the angle of it, that he's sitting by himself in there. They were in the hallway, and can see inside.

Q. And when you said "they were in the hallway," who were you talking about?

A. Deputy Whittington and I think Deputy Johnson, if I can be precise.

Q. And how many times, based upon the body-worn camera, did that happen --

**ROBERT DUFFY - September 21, 2022**

A. Can you repeat that again? I'm sorry.

Q. Sure. How many times on the body-worn camera did you view that happening?

A. I think I viewed that at least once.

Q. Okay. Now, when you viewed it on the body-worn camera, where was Deputy Johnson, if you recall on the body-worn camera, as far as location in regards to the door?

A. I think they were right outside the door in the hallway.

Q. And could you see, based on the body-worn camera, which one, whether Deputy Johnson or Deputy Whittington, was closest to the door?

A. I can't recall that. I'm not -- I would have to go back and look at it again.

Q. And can you recall, from the body-worn camera that you viewed, whether whoever was closest to the door, whether it was Deputy Johnson or Deputy Whittington, whether they would have line of sight into the room where they could have seen the suspect?

A. Basically, I can't recall that. I know they were in the hallway, but I can't -- I can't recall that.

Q. When you wrote -- you can't recall that now?

A. Yes.

Q. But at the point in time when you wrote the

report, did you indicate in the report, based upon your knowledge as to whether you're looking at the body-worn camera, whether Deputy Johnson or Deputy Whittington could have seen into that room?

A. I don't recall that. I would have to dig deeper.

Q. Other than the body-worn camera of Deputy Johnson and Deputy Whittington, did you use any other statements or evidence in your investigation to determine whether the suspect was left alone unattended while in the training room?

A. Yes. I think statements from the witnesses that were -- that's in the report.

Q. And which witnesses would those have been?

A. I would have to go back and see that. I'm not sure. I think Sergeant Barringer.

Q. And we'll get into that at a later point in time.

A. Okay.

Q. So we'll move on from there. Now, reading on from that, going back to that third paragraph --

A. Okay.

Q. -- at the point in time I stopped at "unattended," it goes along to read, "allowed to handle the narcotics evidence on multiple occasions."

A. Where are you at again? I'm sorry.

Q. In that third paragraph.

A. Okay.

Q. I stopped in the middle of the sentence, and I apologize for that. And you see where I am?

A. Yes.

Q. Okay. It states "allowed to handle the narcotics evidence on multiple occasions." And I'm going to stop there. What evidence do you have in your investigation that indicates that the defendant was allowed to handle the narcotics evidence on multiple occasions?

A. From the body-worn camera.

Q. And would just the fact that the suspect was able to handle the narcotics, whether individuals were watching him or not, be a violation of the policies and procedures, to your knowledge?

A. To my knowledge, yes.

Q. And do you recall, based upon the body-worn camera footage that you viewed, who was in the -- the training room at the times that you claim or found out that the defendant was being -- I mean that the narcotics evidence was being handled by the suspect?

A. I think Deputy Whittington, if I can recall, Deputy Johnson, and I think Sergeant Barringer.

Q. And do you recall, from the body-worn camera, when this happened that you viewed the suspect handling the narcotics, the position of those three individuals today?

A. I really can't recall. They were standing. I know that much. But I can't recall exactly where.

Q. Now, if a constable sees a violation of a policy happen, what is their responsibility, to your knowledge, as to whether to correct it or not to correct it?

A. You want to, hopefully, correct it.

Q. If you view -- if a constable views a possible or a probable violation of a policy or procedure, in addition to trying to correct it, are they supposed to report that to somebody?

A. Well, they should maybe correct it, maybe tell the deputy, if it's Deputy Whittington or whoever, or their arrestee, get with them and straighten it up there.

Q. Now, going back to the handcuffs in front of the -- the defendant's handcuffs or him being handcuffed in front, was Sergeant Barringer in a position see the suspect with his handcuffs in front?

A. I'm not sure of that. I can't speak on that. I know he was in there, but I'm not sure if he saw that

**ROBERT DUFFY - September 21, 2022**

or not.

Q. Well, you indicated in a prior answer when I asked you who was in the room --

A. Yes, sir.

Q. -- when the suspect was handling the evidence. Correct?

A. Yes.

Q. And you indicated it was Sergeant Barringer, Deputy Whittington, and Deputy Johnson. Correct?

A. Yes.

Q. Now, was the suspect -- did he have -- was he handcuffed in front at that point in time, if you remember?

A. Yes, sir. From what I can see from the video, yes, sir.

Q. And he would have been handcuffed in the front. Otherwise, he couldn't have handled the evidence. Correct?

A. Yes, sir.

Q. And being handcuffed in the front, I think you indicated earlier, is a policy violation. Correct?

A. Yes.

Q. And based upon your body cameras of Constable Johnson and Constable Whittington, was Sergeant Barringer aware of the fact that the suspect was cuffed

in front and not in back?

A. I'm not sure. I'm pretty sure he saw that. They were, you know, in the same room.

Q. And to your knowledge, based upon your investigation, Sergeant Barringer did not change over the handcuffs or have the suspect's handcuffs changed from the front to back, did he?

A. I did not see that.

Q. And handling of the evidence as the suspect did, based upon what you viewed on the body-worn camera of Constable Johnson and Constable Whittington, that, according to your investigation, was a violation of the policies and procedures. Correct?

A. Yes.

Q. And Sergeant Barringer was aware of that being done, too, based upon the body-worn camera. Correct?

A. Yes. Based on that, yes.

Q. And he didn't indicate on the body-worn cameras that the suspect should not be doing that. Correct?

A. No, I didn't see that.

Q. Now, I'm going to go back to that third paragraph and finish the sentence finally. Okay?

A. The third paragraph.

Q. Okay. It says, "and leaving the evidence in the training room unattended." First of all, that's a

correct reading of your report. Right? You see that?

A. I'm trying to see where we're at. The third --

Q. It's the same sentence, the end of the sentence that we discussed earlier. It's like three lines up from the bottom of that paragraph, the third paragraph.

A. All right.

Q. You see that?

A. Yes.

Q. Okay. And how many times do you recall in your investigation, based upon the statements, based upon body-worn cameras, that the evidence was left in the training room unattended?

A. How many times?

Q. How many times did that happen?

A. I can't recall how many times.

Q. All right.

A. I know it was a few.

Q. Now, when the evidence was left in the training room unattended, that would mean that no one was in the training room when the suspect was in the training room with the drugs or whatever narcotics. Correct?

A. Yes, sir. Correct.

Q. Do you recall whether the drugs, when the evidence was left in the training room unattended, were already sealed in the plastic bags at that point in time

or not?

A. I don't think it was sealed at that time. I think they were just scattered on the table.

Q. And would that have been on the body-worn cameras, or would that have been by statements or by both?

A. By both.

Q. Now, the last sentence in that paragraph, it says, "Due to the policy violations, I prepared a list of questions and provided those to deputies and supervisors involved." Correct?

A. Yes.

Q. Why didn't you interview the deputies and supervisors instead of providing them questions?

A. Well, that's just what I chose to do at the time.

Q. But you would agree with me that there was nothing stopping you during your investigation from actually discussing or interviewing the witnesses that were involved. Correct?

A. Nothing was stopping me.

Q. And in your investigation, did you find out whether Deputy Johnson's body cameras was on the whole time?

A. Yes. I think -- if I can go back on that, I

**ROBERT DUFFY - September 21, 2022**

don't think it was on -- it was not on the whole time, if I can recall that. It's been a while.

Q. Okay. And that would have been a violation of policy. Correct?

A. Yes.

Q. And do you know whether Deputy Johnson was disciplined at all for that?

A. I'm not sure. I can't answer that.

Q. If Deputy Johnson's testimony in his deposition indicates that he wasn't disciplined at all, would you know of any reason why that would be untruthful?

A. I couldn't answer that either.

Q. Okay. Would the policies and procedures indicate that Sergeant Barringer should have had his body-worn camera on during the time that he was investigating or interrogating the suspect?

A. I really can't -- on Sergeant Barringer, from what I know, I think he was just at 904 at the time. I'm not sure if he was on duty or anything like that. I know he was in plain clothing, so he wasn't in uniform. So I'm not sure if he was on duty at the time or if he was just stopping by 904. So I really can't answer that.

Q. If he was -- if the body-worn camera showed that Sergeant Barringer was with the suspect when he was

handling the evidence, would that have indicated that he should have had a body-worn camera operating at that time, according to the policies and procedures, to your knowledge?

A. Once again, I'm not sure. A lot of our department, we don't have a lot of body-worn cameras. I'm not sure if he has a body-worn camera. I can't speak on that, so I'm not sure if he has one.

Q. At some point in time during the investigation that was going on with the suspect on 5/28/2020, Deputy Watson was involved with the evidence. Correct?

A. Yes, sir.

Q. And was she wearing a body-worn camera at that time; do you know?

A. I'm not sure. I didn't get any footage from her. I'm not sure if she was wearing one at the time. I'm not sure.

Q. And if she was wearing a body-worn camera at that time, should it have been turned on, to your knowledge?

A. To my knowledge, yes, if she was wearing one.

Q. Now, going on to the next paragraph --

A. Okay.

Q. -- it indicates that you made some snapshots of the body-worn camera footage from Deputy Whittington's

camera. Correct?

A. Yes.

Q. And you chose which ones that you were going to do that with. Correct?

A. Yes.

Q. You weren't told which ones to use --

A. No, sir.

Q. -- and which ones not to use. Correct?

A. No, sir.

Q. And then going on to the last sentence there where it starts with "It appears that each narcotic evidence was accounted for," do you see that?

A. Yes.

Q. What did you mean by that sentence or that part of the sentence?

A. Well, counting -- looking at the video and stuff, all the evidence was on the table, so it looked like it was accounted for basically.

Q. Okay. And when you said that, were you referring to the photographs numbered 1 through 13 that were referenced right above that?

A. Yes, sir, on the photographs.

Q. Now, going down to the last paragraph --

A. Yes, sir.

Q. -- it says, "The second series of snap shots

that are numbered #14 - #18 are of the defendant handling the evidence in the presence of Sgt. Barringer." Correct?

A. Correct.

Q. Okay. We know now, based upon that, that Sergeant Barringer was there at the time when the defendant was handling the evidence. Correct?

A. Yes, sir.

Q. And then it goes on, "However, in Sgt. Barringer's statement he explained"... "and verbally stated which each bottle contained and described that the numbers on the clear packages identified the tablet," as far as what the defendant was doing. Correct?

A. Yes, sir.

Q. Why did you feel you needed to put that in the investigative report? Because this is dealing with Deputy Whittington. Correct?

A. I felt I needed to put every little detail in the report, everything I could put in there.

Q. And would you agree with me that the defendant could have identified the narcotics that were on the table without handling them?

A. Yes, sir.

MS. MARTIN: Object to speculation.

**ROBERT DUFFY - September 21, 2022**

Q. (BY MR. ORTH) Well, could Sergeant Barringer have asked the defendant standing away from the table where the narcotics were at and held up each individual narcotic, whether it's a bottle or whether it was something else, whether a bottle or pills or whatever, and asked the defendant to identify that from a distance away from the defendant?

MS. MARTIN: Objection; speculation.

Q. (BY MR. ORTH) Turning to the next page.

A. Okay. Got you.

Q. All right. Now, in the second -- going to the second paragraph there from the top, you see that where it starts with "The third series"?

A. Yes, sir.

Q. And talking about Pictures 19 through 21 where it indicates "Deputy Johnson was standing just outside the training room where the defendant and evidence were left unattended for a very brief moment." First of all, that's a correct reading of what's in the report?

A. Yes, sir.

Q. And do you recall, as you sit here today, whether the snapshots indicate where Deputy Whittington was at the time?

A. I just can't recall. I know in the hallway. That's all I can -- I think he was next to Deputy Johnson.

Q. But you would agree with me you didn't put where Deputy Whittington is in the report?

A. Yes, sir. I can agree with that, yes, sir.

Q. Do you think that would be an important detail to put in the report?

A. Yes, I guess that's fair.

Q. Now, in the next sentence -- not next sentence, next paragraph where it says "The fourth series of snap shots," you see that?

A. Yes, sir.

Q. It indicates Deputy Whittington was "weighing the narcotics evidence and it appears that he is taking notes each time he weighs the evidence." Do you recall where the suspect was when Deputy Whittington was weighing narcotics as evidence?

A. I can't recall.

Q. Do you recall whether that was in the snapshot or in the body-worn camera footage or not?

A. At this time, I can't recall.

Q. Okay. In the next paragraph from the bottom where it says -- you see where it says "Photo #40"?

A. "Photo #40," yes.

Q. You see that?

A. Uh-huh.

Q. Okay. And it indicates that Deputy Whittington was "in possession of the same jar that appears to contain a green leafy substance." Do you recall what the green leafy substance was, or did you ever find out from your investigation?

A. From my investigation, it was marijuana.

Q. Okay. And do you recall, based on Photograph 40, who was in the training room with the suspect other than Deputy Whittington, if anybody?

A. I can't recall that.

Q. But that would be in Photo Number 40. Correct?

A. Photo 40, yes.

Q. Now, going to the next paragraph, what I want you to do is go ahead and read that paragraph to yourself.

A. Okay.

Q. And indicate, after you're done reading, what conclusions, if any, you made from that information in that paragraph. Okay?

A. Okay. Ready.

Q. Okay. Did you make any conclusions based upon what you wrote in that paragraph?

A. I didn't really come up with any conclusions.

Q. Okay. Did you ever find out through your investigation what was in the clear plastic baggy that was discussed in that paragraph?

A. No, I can't recall that.

Q. And when it says in the middle part of that "In reviewing the body camera video, Deputy Johnson had taken possession of the backpack and the evidence," do you recall at what point in time that you're talking about?

A. The statement of Deputy Johnson's statement that he did take possession of the evidence and put it in the backpack, yeah.

Q. And did the body-worn camera indicate what Deputy Johnson did after putting the evidence in the backpack?

A. No, I don't recall that being seen on it.

Q. And to your knowledge, in the investigation did Deputy Johnson package the evidence in what they call a train or clear plastic bags that are hooked together?

A. The camera didn't catch that, but I think in Deputy Johnson's statement, I think he advised that he packaged all the narcotics.

Q. And in Deputy Johnson's statement, did he indicate there was any other deputies around or anybody else around when he packaged the narcotics?

A. I can't recall. I would have to refer back to his statement.

**ROBERT DUFFY - September 21, 2022**

Q. Okay.

A. I don't recall.

Q. Now, going to the next paragraph.

A. Okay.

Q. Do you see that where it says "The seventh series of photos"?

A. Yes.

Q. It indicates that "Deputy Whittington left the training room and all the evidence unattended." And my question to you, when the evidence was left unattended, was it in the plastic -- was it in the train at that point in time, or was it laying out on the table or in some other condition?

A. I really can't recall that. It might have been just laying on the table still. I would have to refer back to that.

Q. But the photos would indicate. Correct?

A. The photos would indicate, yes, sir.

Q. Now, going back to the next paragraph where it says "The eighth series of photographs."

A. Yes, sir.

Q. Did Sergeant Vega have his body-worn camera on during that period of time?

A. I don't recall. I don't recall.

Q. If he had a body-worn camera, should it have

33

been turned on when he was opening the backpack?

A. I would imagine so.

Q. And if he had a body-worn camera and it wasn't turned on, would that, in your opinion, be a violation of the policies and procedures?

A. Yes.

Q. And do you know, as you sit here today, whether Sergeant Vega at that point in time did have a body-worn camera or not?

A. No. At that time, a lot of us didn't have body-worn cameras, so I really can't speak on if he had it or not.

Q. Okay. Now, going down to the last paragraph --

A. Last paragraph? Okay.

Q. Yeah, where you describe the defendant asking Deputy Whittington to basically go to the restroom. Correct?

A. Yes, sir.

Q. Okay. Do you recall where in the process of this investigation that this occurred?

A. I'm not sure. I can't recall whether it -- exactly when it occurred. I couldn't tell you that.

Q. Okay. Would it have been, to your knowledge -- and I know you don't recall exactly, but was it before or after the suspect was taken out by another officer to

34

be taken to where he is supposed to end up?

MS. MARTIN: Objection; asked and answered.

THE WITNESS: I'm sorry?

MS. MARTIN: Go ahead.

THE WITNESS: Oh, okay.

A. I got thrown off.

Q. (BY MR. ORTH) Let me clarify. During your investigation, did you find that the suspect was initially taken into custody from Deputy Whittington by one constable, who for medical reasons or being sick, had to transport the suspect back to 904, and then he was subsequently after that taken by another constable. Correct?

A. Yes.

Q. Now, my question to you, which is a little bit more clear now, would it have been in between those two transports of the suspect that we're dealing with the defendant going to the bathroom, or do you know?

MS. MARTIN: Objection; speculation.

A. I think that's before. That happened before he was taken. Way before.

Q. (BY MR. ORTH) Okay. Now, in the last sentence there before we go on to the next page, you indicated that "I did not see the defendant consuming anything other than what appears to be from a water bottle."

35

Correct?

A. Yes.

Q. And that would have been based on the statements, as well as a body-worn camera that you viewed. Correct?

A. Yes, sir.

Q. And what evidence, if any, in your investigation would indicate whether the defendant, when he went to the restroom, had access to the cocaine or had it in his possession when he went to the restroom?

A. Well, from the footage and being allowed to handle the narcotics and all of a sudden going to the restroom, there's a possibility that it was flushed.

Q. But that was not on the body-worn camera. Correct?

A. Well, the body-worn camera showed, I think, Deputy Whittington taking the suspect to the restroom. And you can see him making a mad dash to the toilet area to spit, so that's -- that's possible.

Q. At any point in time in viewing the body-worn cameras, did the defendant actually touch the actual cocaine instead of the baggy that it was in?

A. That, I can't answer. I know he touched a lot. It was a lot on the table, if you've seen the video or the cameras, so it was just a lot. So I'm not sure if

36

he actually touched it or not. I can't answer that.

Q. And I may have asked you this earlier, but if I didn't, the times that you saw in the body-worn camera the defendant or the suspect touching the evidence or the narcotics, that would have been while all three, Deputy Johnson, Deputy Whittington, and Sergeant Barringer, were in the room. Correct?

A. Yes. Correct.

Q. So if all three were in the room when the defendant or suspect was touching the narcotics, would you expect at least one of them to see the defendant, you know, pick up the cocaine or grab the cocaine or do something with the cocaine if, in fact, he did?

MS. MARTIN: Objection; speculation.

A. Yeah. It's speculation, I mean.

Q. (BY MR. ORTH) Well, based upon the body-worn camera, did you see the suspect handle the -- touch the actual cocaine that was on the table?

A. No, I did not see that.

Q. And in Sergeant Barringer's statement or in Deputy Whittington or Deputy Johnson's statement, did any of those individuals indicate that the suspect or defendant actually touched the cocaine instead of the baggy when he was handling the evidence?

A. I can't recall that. I don't think so.

37

Q. Now, directing your attention to the next page. Okay?

A. Okay.

Q. The first three lines that are on the top, you see them?

A. Yes.

Q. It says Deputy Johnson packaged and sealed all evidence that was in his possession and that nothing was left inside the backpack." Correct?

A. Correct.

Q. And based upon the body-worn camera footage that you saw -- of which I don't think there was any concerning this incident. Correct?

A. Correct.

Q. Based upon the statements that you reviewed and answers to your questions, did any of those statements either of Deputy Johnson's or Deputy Whittington's or Sergeant Barringer's indicate that the cocaine was not part of -- or not sealed like all the other evidence when Deputy Johnson was packaging it up?

MS. MARTIN: Objection; ambiguous.

A. I'm sorry. I can't recall that at all.

Q. (BY MR. ORTH) Let's go --

MS. MARTIN: We've been going about an hour. Can we take a break?

38

MR. ORTH: Oh, yeah, we can.

Q. (BY MR. ORTH) I forgot to tell you. You can take a break at any time other than in between a question and answer. So that's not a problem. Okay?

A. Yes, sir.

Q. So if you need to take a break now, that's fine. If not, if you want to go forward, we can go forward.

A. I'll take a break.

MS. MARTIN: Yeah, let's take a break.

(Recess from 10:58 a.m. to 11:15 a.m.)

Q. (BY MR. ORTH) Now, when you initially were assigned to do the investigation on Deputy Whittington, do you think it would be important in doing an investigation like that to gather all the body-worn camera footage that you could from any individual involved in the process on 5/28/20?

A. Yes, sir. I think we did at the time.

Q. And did you ask Sergeant Barringer or Deputy Watson or Deputy Jaramillo if they had any body-worn camera footage of the incident?

A. I didn't.

Q. You didn't ask them that?

A. I didn't ask them that.

Q. Do you think that would have been important to

39

ask them?

A. It's possible, yes.

Q. Now, going back still on Page 5 --

A. Okay. I'm on 5.

Q. -- where it says "Statements," do you see that?

A. Yes.

Q. And there are certain questions that are listed, 1 through 4 there, that you were going to provide to Deputy Whittington. Correct?

A. Yes.

Q. Okay. Did you come up with these questions yourself, or did anybody else help with you coming up with these questions?

A. Well, this report, I had a little help, just kind of different people that helped out with it, you know. Major Villarreal.

Q. And what input did Major Villarreal have with your investigation?

A. Well, he's kind of like a mentor. And I just got with him to see what questions I would ask, you know, just leading before the statements.

Q. So going at Questions 1 through 4 on Page 5 again, what help did Major Villarreal give you, if any, concerning those four questions?

A. Not much. I was just -- just kind of picking

40

**ROBERT DUFFY - September 21, 2022**

his brains on what kind of questions I should -- that are out there, and that's what we came up with.

Q. And are you aware of what, if any, investigative experience that Major Villarreal had at this time that you asked him that?

A. I'm not sure. I'm not sure what kind of experience he has.

Q. Now, directing your attention, going to the next page, Page 6.

A. Yes, sir.

Q. Looking at Number 2 --

A. Yes.

Q. -- where Deputy Whittington answered your question as far as who physically handled the narcotics and where. Correct?

A. Okay. Yes, sir.

Q. All right. Was there anything in your investigation that you did, whether it was body cam footage or whether it was statements from any other individuals, that with indicates any of those things in Question Number 2 -- or I should say any answer that Constable Whittington put down there was not true or accurate? And you can take your time and look through it all.

A. I think this is -- I would say it's true.

Everything above that is true, to my knowledge.

Q. Okay. And it says in the middle of that or it says "At approximately 1329, the narcotics were placed back into the backpack and Deputy Johnson packed the items for processing." What is meant by "packed the items for processing," if you know?

MS. MARTIN: Objection; speculation.

A. I can't answer that. I don't know.

Q. (BY MR. ORTH) Okay. Going to the next page.

A. Okay.

Q. In the middle of the page, you see right above where it says "Bar Codes were printed on thermo paper," do you see that part?

A. Yes.

Q. The paragraph right above that?

A. Yes, sir.

Q. It indicates that in all previous cases the suspect would have been taken to Wallisville Road instead of the 904 Dell Dale location. Correct?

A. Yes.

Q. That's what it says?

A. That's what it says.

Q. And it was due to the COVID pandemic at the time, that the reason that the suspect at this time was taken to the location at 904 Dell Dale. Correct?

A. That's what I'm reading, yes.

Q. Okay. Now, at the bottom of that page it says "Because Sgt. Barringer was present and participated in the interview of the defendant, I provided the following list of questions." Correct?

A. Yes.

Q. And the three questions, the ones -- the two on Page 2 and the one on Page 8, did you come up with those questions, or did someone else have input on those questions?

A. I had input, like I mentioned before.

Q. Major Villarreal?

A. Yes. He helped me out a lot.

Q. And what input do you recall he offered?

A. I can't recall. Just formulating of the questions. That's all.

Q. And do you think or do you have an opinion, I should say, as to whether somebody being present and participating in an interview of a defendant should have a body cam working; or if they have it, it should be turned on at that point in time?

MS. MARTIN: Objection; calls for speculation.

A. No opinion.

Q. (BY MR. ORTH) Is interviewing the defendant, in your opinion, an important part of gathering information when you pick up a suspect and he has narcotics in his possession?

A. In my opinion, is it --

Q. Yeah, in your opinion, is an important part of the process, as far as if you pick up a subject that there's narcotics on their body or, you know, with them, would that be an important part of the process?

MS. MARTIN: Objection; ambiguous.

Q. (BY MR. ORTH) You can answer.

THE WITNESS: I can answer?

MS. MARTIN: Yes.

THE WITNESS: Okay.

A. If you can speak with him, if he's there to speak with, yes.

Q. (BY MR. ORTH) To your knowledge, are there any rules or regulations that would involve whether a body-worn camera should be activated during a process of interviewing a defendant?

A. Well, as to my knowledge, I'm not -- if you have a camera, it should be on. It should be on if you have a camera.

Q. And if you have one and you don't turn it on during an investigation of a defendant, would that be a violation of policies and procedures?

**ROBERT DUFFY - September 21, 2022**

A. Yes.

Q. Going to the next page, Page 8.

A. Page 8?

Q. Yeah.

A. Okay.

Q. According to the information that we see, the first paragraph underneath "The following are Sgt. Barringer's responses." Do you see that?

A. Yes.

Q. And it indicates Sergeant Barringer indicated in his response that Deputy Whittington asked him to assist during the interview process. Correct?

A. Yes. Yes.

Q. Did any other statement either from Deputy Whittington or Deputy Johnson verify or indicate that was that was correct, as far as what Barringer said?

A. I can't recall.

Q. Now, in the next sentence it says, "I found the suspect in the front main building, inside the training room. The male was handcuffed with his hands in front of his body." First of all, that's a correct reading of that. Correct?

A. Yes.

Q. You don't know, based upon your investigation, who handcuffed the defendant when he arrived in the front of the main building there, do you?

A. I don't.

Q. Do you think that would be important to know in an investigation as far as who originally handcuffed the suspect and brought them in?

A. Well, yeah, I guess that's important.

Q. And we know, based upon what Sergeant Barringer indicated here, that he from the very start had viewed the suspect in this investigation handcuffed in the front, with his hands in the front, and didn't correct that at that point in time by having the suspect handcuffed in the back. Correct?

MS. MARTIN: Objection; speculation.

A. According to the video, I really can't say. I'm not sure what he was thinking or anything like that.

Q. (BY MR. ORTH) Okay. But you would agree with me that if the suspect was handcuffed in the front, as indicated in Sergeant Barringer's response when he was actually -- before the investigation, that would have been a violation of the policies and procedures. Correct?

A. Yes.

Q. And if Sergeant Barringer indicated in his response that he obviously saw the suspect with his hands handcuffed in the front, that he should have known at that point in time that that was a violation of policy and procedure with the defendant having his handcuffs in the front?

MS. MARTIN: Objection; speculation.

Q. (BY MR. ORTH) Correct?

A. It's a possibility, yes, sir.

Q. Now, going to the next paragraph where it says "During the course of the interview, the male picked up several prescription medication bottles." Correct?

A. Yes.

Q. Now, obviously if Sergeant Barringer in his statement indicates that the suspect was picking up the prescription medication bottles, you would assume he was aware of the suspect doing that. Correct?

MS. MARTIN: Objection; speculation.

A. Possibility. I don't know what he -- I can't get in his mind what he was thinking. I'm not sure what he was thinking at the time.

Q. (BY MR. ORTH) Okay. Do you know if Sergeant Barringer viewed any body-worn camera footage from either Detective Johnson or Deputy Whittington before he supplied you his responses to these questions?

A. I'm not sure of that.

Q. Now, in the last sentence of that second paragraph there it indicates, "I am not sure if Deputy Johnson's body camera was activated, he was also present during the interview." Based on the information that you received in the investigation, do you know if Deputy Johnson's body cam was activated during the interview process?

A. I'm not sure of that.

Q. Did you ask Deputy Johnson if he had any body cam footage regarding this incident?

MS. MARTIN: Objection; asked and answered.

A. No.

Q. (BY MR. ORTH) Do you think it would be important in doing an investigation to know whether Deputy Johnson's body cam footage was activated during the interview process so you could view it to see if there were any violations that Deputy Whittington may have done during that period of time?

MS. MARTIN: Objection; asked and answered.

A. Sorry. I just can't recall on that.

Q. (BY MR. ORTH) No, I'm not asking you whether you recall. I'm asking you do you think it's important, if, in fact, there was body cam footage during an interview, that you should view that as part of your investigation?

A. Oh, yes, sir. Yes, sir.

Q. And yet did you ask Deputy Johnson -- if you

**ROBERT DUFFY - September 21, 2022**

thought it was important to view that body cam footage during the interview, do you think it was important enough to ask Deputy Johnson if he had body cam footage of that interview?

MS. MARTIN: Objection; asked and answered.

A. I did not ask.

Q. (BY MR. ORTH) Okay. Next paragraph, and we'll go on from there. Do you see the paragraph "At one point"?

A. Yes.

Q. "At one point during the interview," where Sergeant Barringer indicated that Deputy Johnson and Deputy Whittington were in the hallway, is this the same footage that we discussed earlier that you viewed with Deputy Whittington and Deputy Johnson being in the hallway?

A. Yes, sir, I think it is.

Q. Okay. And it indicates from the statement from Deputy -- I mean Sergeant Barringer that "from where they were positioned, neither could see inside of the room containing the defendant and or the evidence." Do you see that?

A. Yes, I see that. Yes.

Q. So in Deputy Barringer's opinion, from what he viewed, neither Deputy Johnson nor Deputy Whittington

could see inside the training room. Correct?

MS. MARTIN: Objection; calls for speculation.

A. That's his statement.

Q. (BY MR. ORTH) That's what's in the statement. Correct?

A. That's what's in the statement.

Q. Did you ask Sergeant Barringer where he was when he viewed this incident with Deputy Johnson and Deputy Whittington that he's writing about in his statement?

A. I just took his statement.

Q. And after you read his statement, did you follow up with Sergeant Barringer as far as where he was, how far he was away when he viewed this incident happening?

A. No, I didn't.

Q. And do you think that would have been important in the interview?

MS. MARTIN: Objection; asked and answered.

A. Possibly.

Q. (BY MR. ORTH) But you agree with me that's not in your report?

MS. MARTIN: Objection; asked and answered.

A. His statement is there. That's not in there,

no.

Q. (BY MR. ORTH) Okay. And you didn't have any follow-up conversations with Sergeant Barringer concerning where he was at the time that he viewed Deputy Johnson and Deputy Whittington in the hallway. Correct?

A. Correct.

Q. In the body cam footage that you viewed regarding this incident with Deputy Johnson and Deputy Whittington in the hallway, could you see in any of the body cam footage whether Sergeant Barringer was in the hallway or not or if that appeared in the body cam footage?

A. From that camera, I didn't see Sergeant Barringer. I just saw, I think it was, Deputy Whittington and Deputy Johnson in that view. But I didn't see Barringer in that hallway.

Q. And how long is that hallway, to your knowledge; an estimate?

A. Regular hallway. I'm not sure how long it is or what, but I really couldn't say.

Q. All right. And going down to the last paragraph there, that -- let me find that. Let me hand you what's been marked as Exhibit Number 3.

(Duffy Exhibit #3 marked.)

Q. (BY MR. ORTH) And I want you to compare Exhibit Number 3 to the statement that you have there or the response from Barringer on Page 8 of Exhibit Number 2. And my question to you is, do you notice that the paragraph that starts with "During the interview I poured out" --

A. Yes.

Q. -- that paragraph is missing from Exhibit Number 3?

A. I see that. I think this was another -- this might have been the first thing he sent in statement-wise. And I think he maybe revised it. I'm not sure. But it doesn't -- I see what you're saying, yes. But I think there might have been another one. I don't know which one this is, but he might have revised his statement.

Q. Now, if Sergeant Barringer did revise his statement, did you ask him to revise the statement?

A. Well, a lot of them I wanted more detail. A lot of them, there wasn't enough details and stuff of exactly what happened. Once you start looking at the footage and stuff, it needs to match you.

So a lot of them, like himself, he may have had to redo it and put more details in it. That's the only thing I can think of.

**ROBERT DUFFY - September 21, 2022**

Q. Okay. My question to you, did you ask Sergeant Barringer to give another statement?

A. More than likely I did. I can't recall. At the time, it's been two years. I can't recall that.

Q. And do you recall how many statements Sergeant Barringer did give, if it was more than one?

A. I can't recall that.

Q. All right. If there were more than one statement given by Sergeant Barringer in your investigation, would you have included all the statements that Sergeant Barringer did in your investigation?

A. I would have included the one I have now that fit all the details in it. But no, I didn't include the one like this right here. Apparently it was revised to put more details in it actually.

Q. And Exhibit Number 3, where would you have put that statement? If there was another statement that was done by Sergeant Barringer, where would you have put that?

A. If it was, I guess on this report.

Q. Well, there's only one statement here from Barringer. Right?

A. Right. But I can't recall how many statements he did. I can't recall that. I really don't recall.

Q. And my question to you is, if there was another statement by Sergeant Barringer that he made, where would you have physically located that statement? Would it have been in the report or someplace other than in your investigative report?

A. It would have been here. I'm not sure -- like I said, it's been two years. I'm not even sure about this. All I know it is I wanted details, and maybe he did it over. I'm not sure. I can't speak on that right now. I have no idea. I can't answer that.

Q. But would you agree with me, based upon your testimony, that if he did another statement, that it would have been included in your investigative report?

MS. MARTIN: Objection; asked and answered.

A. It's possible. I don't know.

Q. (BY MR. ORTH) If there was another statement, why wouldn't you include both statements in your investigative report?

MS. MARTIN: Same objection.

A. No answer for that.

Q. (BY MR. ORTH) Okay. Now, we can go down to the same -- we're still on Page 8 in Exhibit Number 2.

A. Okay.

Q. We're going to be dealing with that. You don't have to worry about Number 2 right now. You asked

Deputy Johnson three questions. Did you come up with those three questions yourself, or did Major Villarreal have any input into those questions?

A. I had input. Like I told you before, he helped me out.

Q. Did Major Villarreal help you with each one of the sets of questions that you asked the individuals from your investigative report?

A. Yes, he gave me input on that.

Q. When you say he gave you input, what do you mean by that?

A. I had questions and stuff in just kind of formulating the questions and stuff. I think it was a big thing, and I wanted to get information from different people, and especially a mentor. I looked at him as a mentor, so he helped me out a lot.

Q. And I might have asked you this before. Is this the first investigation that you did?

A. No. I've been at the school, contract for 27 years, so I've done plenty of reports. Not mishandling of evidence. I've never done one like that. I think that's a pretty big one.

Q. When you said you've done reports, would those have been involving an investigation or --

A. Yes, investigation.

Q. Okay. Now turning the page over to Page Number 9, the first line up there says "The suspect was placed in the back of my patrol vehicle." And this is Deputy Johnson. Would that indicate that Deputy Johnson transported the suspect to the location at 904?

A. Yes, that's what it appears to be, yes.

Q. And if Deputy Johnson transported the suspect on 5/28/2020, would he be the constable most likely that had handcuffed the suspect?

MS. MARTIN: Objection; speculation.

A. Yes, possible.

Q. (BY MR. ORTH) Well, have you ever put a suspect in a vehicle in your investigation as a constable?

A. Well, if I'm the arresting officer, I'm going to put my cuffs on him. If that's my case, I'm putting the cuffs on him. And then if I need someone to transport or if I have a canine or I didn't have a cage in the back, I would let another deputy take them to transport for me, but I'd put the cuffs on them. If I arrest them, I put the cuffs on them.

Q. Now, going down there in that first paragraph there, the one, two, three, fourth line down, it says, "When I arrived at 904, I took the suspect and sat him in the conference room" --

A. I'm sorry. Where are you at again?

Q. The fourth line.

A. The same place?

Q. The same paragraph.

A. Okay.

Q. It says, "When I arrived at 904."

A. Yes.

Q. And "I took the suspect and sat him in the conference room and waited for Deputy Whittington to join us." So would that indicate to you, as being the investigating officer, that Deputy Johnson was the first one to arrive at 904 with the suspect and that Deputy Whittington was not there at that time?

MS. MARTIN: Objection; speculation.

A. That's what he wrote in his report. That's what it indicates.

Q. (BY MR. ORTH) So the next line indicates that when Deputy Whittington read the suspect his rights, that Sergeant Barringer and Deputy Johnson were present at that time. Correct?

A. That's what it says, correct. That's what it says.

Q. And is there anything that you reviewed during the investigation that would counteract or indicate that's not a true statement?

A. I can't recall. Nothing I can recall.

Q. Deputy Johnson, when he placed the suspect in the back of his unit, if he initially didn't handcuff the suspect and the suspect was handcuffed in the front, would you expect, based upon your knowledge the policies and procedures, would you think that Deputy Johnson should have placed the handcuffs in the back of the defendant before putting him in the car?

A. It's plausible. I mean, I'm not really sure on that.

Q. Okay.

A. Yeah.

Q. You understand the policies and procedures as far as handcuffing and restraining the individual. Correct?

A. Right. We've had cases where we might have to handcuff in the front, you know, in different situations, so...

Q. And would that have been one of them when you're placing this suspect in the back seat, based on your investigation?

MS. MARTIN: Objection; speculation.

Q. (BY MR. ORTH) We can go into the policies and go through all the exceptions if you want to.

A. We can.

Q. I'm asking you, to your knowledge, of the policies and procedures, was there an exception when Deputy -- regarding this suspect when Deputy Johnson placed him in the back of the vehicle, to your knowledge?

A. To my knowledge, no.

Q. So when the suspect was placed in the back of Deputy Johnson's patrol vehicle, he should have, based on the policy, had his hands handcuffed behind him. Correct?

MS. MARTIN: Objection; asked and answered.

A. He should have.

MR. ORTH: What was the objection?

MS. MARTIN: Asked and answered.

MR. ORTH: Okay.

Q. (BY MR. ORTH) Going on to the next sentence there where it says "Suspect was handcuffed the entire time."

A. Okay. Got you.

Q. Okay. You see that?

A. Yes.

Q. If Deputy Johnson was truthful when he said that, he would have known whether the suspect was handcuffed in the back or front. Correct?

MS. MARTIN: Objection; speculation.

A. I would assume.

Q. (BY MR. ORTH) Now, directing your attention to the next paragraph, you see the one that starts with "The narcotics"?

A. Yes, sir.

Q. Okay. Going to the middle of that paragraph that's actually the third sentence where it says "I did not recall." Do you see that?

A. Yes, sir.

Q. Okay. Where Sergeant Johnson indicates that he did not recall and was uncertain whether the suspect was ever left alone, but after reviewing the body cam he verified that "I did step in the hallway while Deputy Whittington was in the doorframe" (sic). Based on what Deputy Johnson wrote in there in your investigation, would that have been the same incident that you were discussing earlier with the body cam footage that we talked about?

A. I really can't answer. I'm not sure because I don't know. I really can't answer that. Possibly.

Q. And I might have asked you this before, and I apologize if I did. In reviewing the body cam footage from Deputy Johnson and Deputy Whittington, how many times did you see in that footage that it occurred that they were standing -- Deputy Whittington or Deputy Johnson were standing outside in the hallway?

**ROBERT DUFFY - September 21, 2022**

A. I think you did ask that. I can't recall, I mean, how long or how many times.

Q. No, no. How many times? Not how long.

A. I can't recall.

Q. Going on to the next paragraph, you see where it says "Sometime between 1:30 PM and 2:00 PM"?

A. Yes, sir.

Q. Directing your attention to the last sentence in that paragraph --

A. Okay.

Q. -- where it says, "I can confirm after reviewing Deputy Whittington's body cam that the powdered cocaine which was in a small clear plastic sandwich baggie was placed into the backpack to be packaged." What conclusion, if any, did you make concerning that statement by Deputy Johnson?

A. There's no conclusion at all. Just that he packaged everything and put it in the backpack. That's what he said.

Q. Okay. And that statement indicates that at that point in time Deputy Johnson had custody and control of the powdered cocaine which was in a small clear plastic sandwich baggie. Correct?

MS. MARTIN: Objection --

Q. (BY MR. ORTH) That's what he's stating.

61

Correct?

A. That's what he's stating, yes.

Q. Okay. Now, in the next paragraph it indicates that he walked over to the next building and packaged and sealed all the evidence in his possession. What is your understanding of what Deputy Johnson meant by packaging and sealing all the evidence, if you know?

A. As far as I know, just sealing it up, getting ready to take to the ME's office, medical examiner's office. So getting it sealed up and documented with what you have, from what I gathered.

Q. Okay. Did you have any discussions with anybody of Deputy Johnson and what he meant by packaging and sealing?

A. No. It was kind of clear to me what he meant by that.

Q. Okay. Can you explain to the ladies and gentlemen of the jury who don't know about that what that all entails?

A. It entails you labeling all the narcotics or evidence you have, writing it down, labeling it to get ready to go to the medical examiner's office to get tested.

Q. And what I meant by what's packaging and sealing, how do you package and seal the evidence?

62

A. You put them in a bag, and there's a seal on top and you seal it. And you should initial it.

Q. Okay. Are the bags connected to each other, to your knowledge?

A. To my knowledge, it's not -- I haven't done that in a long time, as far as in the trenches type stuff. But it's changed a lot. But as far as sealing, what I gather, he gathered, sealed, and documented to go to the medical examiner's office.

Q. And do you know whether the bags that were sealed, that you would have to cut it open, or were they something that you could open and close?

A. They're sealed up. There's a seal on it, so you can't break it unless -- if you do, you damage the bag, so...

Q. And so then we know, based on that statement made by Deputy Johnson, that he sealed the cocaine in a sealed -- or that it was packaged along with everything else. Correct?

MS. MARTIN: Objection; misstates the evidence.

Q. (BY MR. ORTH) Okay. Let me revise that last question based upon the objection that was made.

Based on that last statement by the last sentence in that paragraph that starts with "I can't

63

confirm," that one there.

A. Yes.

Q. Okay. Would that indicate to you that Deputy Johnson had picked up the powdered cocaine and put it in the backpack to be packaged?

MS. MARTIN: Same objection.

A. That's what he's stating.

Q. (BY MR. ORTH) Okay. Now, going down to the next paragraph.

A. Okay.

Q. Deputy Johnson, according to his statement there, indicates that he went to the next building and took the evidence out of the backpack, took the narcotics out of the backpack and started packaging and sealing. Correct?

A. Correct.

Q. Okay. And the last sentence there in that paragraph, he indicates that "I can't say for certain that the missing evidence" -- what was your understanding of the missing evidence, first of all?

A. What was missing?

Q. Yes, the missing evidence.

A. The cocaine.

Q. The cocaine?

A. Yes.

64

**ROBERT DUFFY - September 21, 2022**

Q. "I can't say for certain that the missing evidence was packaged or left on the table." First of all, that's a correct reading of that?

A. Correct.

Q. Okay. And there was no body cam footage by Deputy Johnson that would indicate whether the cocaine was packaged or left on the table. Correct?

A. That's correct, at this point, yes.

Q. At that point?

A. Yes.

Q. And according to the policies and procedures, there should have been. Correct?

A. Correct.

Q. So based upon the paragraph above and this paragraph, those two sentence, the last two sentences of those two paragraphs, if you read those, would it indicate to you, as an investigating officer, that Deputy Johnson had custody and control of the cocaine and put it in a backpack and went to package and seal it, but he didn't know whether it was packaged and sealed or whether it was left on the table previous?

A. That's basically what I'm reading.

MS. MARTIN: Objection; compound.

Q. (BY MR. ORTH) So based upon Deputy Johnson's statement, as an investigating officer, we don't know

65

whether the cocaine was packaged in the sealing of the evidence to go to the ME's office or not. Correct?

MS. MARTIN: Objection; speculation.

A. Correct.

THE WITNESS: I can answer?

MS. MARTIN: Yes.

A. That's correct.

Q. (BY MR. ORTH) Now, going on to the next paragraph where it says "I took the backpack," do you see that?

A. Yes.

Q. Okay. Deputy Johnson indicates to you in his response to your questions that the last package that was put together by him contained extra baggies and a tray and did not contain the cocaine. Correct?

A. That's what his statement says, yes.

Q. Okay. Well, is there anything that you viewed in your investigation, whether it was by body cam footage or by answers to the statement, that would contradict that?

A. No.

Q. Do you know why Deputy Johnson would put baggies in a tray in a package and seal it if it there was no narcotics in it?

MS. MARTIN: Objection; speculation.

66

A. I can't answer that.

Q. (BY MR. ORTH) Okay.

A. I can't get in his mind.

Q. Would that indicate something that you would have done before that when you were packaging up narcotics?

A. Kind of hard to say, because there was a lot of moving parts with that, so...

Q. No.

MR. ORTH: Objection; nonresponsive.

Q. (BY MR. ORTH) Listen to my question.

A. Yes.

Q. You indicated earlier in the deposition that you had packaged evidence before. Correct?

A. Correct.

Q. Okay. Now, my question to you is, based on that experience, is this something that you would have done in putting baggies in -- empty baggies with a tray and seal it to go to the ME's office without any narcotics in it?

A. That's something I wouldn't have done, no.

Q. Okay. Do you know of any reason why anyone would seal up plastic baggies in a tray without narcotics when they're packaging and narcotics like Deputy Johnson was doing?

67

MS. MARTIN: Objection; speculation.

A. No idea why.

Q. (BY MR. ORTH) Okay. Now, going to the next sentence there in that same paragraph, do you see that?

A. Where are you at?

Q. Where it says "I take full responsibility," that one. Do you see that?

A. Yes.

Q. Okay. So basically Constable Johnson is taking, according to his statement, "full responsibility for not verifying all the evidence that was present before returning the bag to Deputy Johnson." Correct?

A. Correct.

Q. According to his statement?

A. According to his statement.

Q. Okay. Did you question Deputy Johnson concerning the missing cocaine between when it was put in the backpack, between that and sealing it and not knowing whether it was given back to Deputy Whittington at all?

MS. MARTIN: Objection; compound.

A. No.

Q. (BY MR. ORTH) Do you think, as an investigating officer in this investigation, that that information would have been important? And when I'm talking about

68

**ROBERT DUFFY - September 21, 2022**

"that information," I'm talking about the missing cocaine and Deputy Johnson's statement.

A. It's possible, yes.

Q. Now, how many statements did Deputy Johnson write, to your knowledge?

A. I can't recall on that one. Maybe two, that I know of, I think, so...

Q. Okay. And who asked him to revise his statement or to give more than one statement in the investigation?

A. Well, at that time we wanted to know what the cocaine -- what it was packaged in. And I think it was sent back asking if he can remember how was the cocaine packaged. And so he went back and put in that statement that it was packaged in a clear plastic bag. So he just added that part to that.

Q. And do you know whether -- where his previous statement is?

A. No, I don't.

Q. It was not in your investigation. Correct?

A. Correct.

Q. Should it have been in your investigation --

A. I possibly could have put it in there.

Q. -- in your opinion?

A. Possibly.

Q. Did anybody ask you to contact Deputy Johnson and get a more detailed statement, to your knowledge?

A. Yeah. My knowledge, once again, my mentor, Major Villarreal, I think it was an email he sent me, "Hey, can you find out what it was packaged in?" That's where we got that from.

And like I said, Deputy Johnson reviewed his camcorder, and that's when we added a little more detail to it. So we were looking for evidence, and he was able to verify that it was in a clear plastic bag.

Q. Did Chief Bonsal have any input into having Deputy Johnson revise his statement at all?

A. No, sir. Not to my knowledge, no, sir. Not at all.

Q. Going down to the next page, Page 10.

A. Page 10?

Q. Uh-huh.

A. Okay.

Q. You see where it says in the middle of the paragraph --

A. Okay.

Q. -- it says "Deputy Whittington pointed and showed me the package that contained the cocaine." Do you see that?

A. Yes.

Q. "So I attached a label to that package." And Deputy Watson in the next sentence indicates in her statement that she wasn't able to actually see any cocaine in the package or in the -- all she saw was basically a bunch of wadded-up clear baggies and the evidence tray. Correct?

A. Yes, correct.

Q. And that would coincide with Deputy Johnson's statement that we read before indicating that he placed the baggies in the tray and sealed them in a clear plastic package. Correct?

A. Yes. Correct.

Q. And according to Deputy Watson on Page 10, that's the package that was labeled cocaine -- or the cocaine label was placed on the one with the baggies in the tray. Correct?

A. Yes.

Q. And based upon those two statements, as far as that last package with the tray and the baggies, did you make any conclusions as to whether the cocaine was in there or not in there or where the cocaine was at all?

A. At that moment, I hadn't made any conclusions at that time.

Q. Okay. Well, did you make any conclusions at the end of your investigation concerning that issue?

A. Well, what? The missing cocaine?

Q. Yes.

A. My conclusion -- if you read the report at the end, my conclusion was I think the suspect might have -- he had opportunity to, you know, mess with all the narcotics and stuff. And I'm thinking maybe he went to the restroom and made an evasive move that wasn't natural, and I'm thinking that's probably where it went. That was my conclusion. There's a possibility that happened. That's just one possibility.

Q. But that was not verified by the body cam footage. Correct?

A. Well, the body cam footage saw him going to the restroom and the door was open. And no, I couldn't see that, but he made a mad dash to the toilet. So I'm concluding that's a possibility.

Q. And later on we'll be getting into more detail, but there was a question and answer that Sergeant Barringer did with the suspect concerning that same issue as far as whether the suspect picked up the cocaine or discarded it in the toilet. Correct?

A. Correct.

Q. And based upon what the suspect said, that's not something that he did or admitted to. Correct?

A. I think that's what his statement was.

**ROBERT DUFFY - September 21, 2022**

MS. MARTIN: Let's take a break. We probably need to talk about logistics; because I don't know how much longer, but the other guy is going to be here.

MR. ORTH: We can go off the record.

(Recess from 12:20 p.m. to 12:26 p.m.)

Q. (BY MR. ORTH) Okay. Was there anybody other than Major Villarreal who helped you with the investigation?

A. That's the only person I spoke with to get some guidance, yes, sir.

Q. Okay. Now, you indicated people that you spoke with. Did you email any individuals to gain help or advice regarding this investigation?

A. No. No, sir. No, sir.

Q. Now, is it your understanding that any time you sign out equipment such as body-worn cameras, that you have to sign for that?

A. I'm not sure about that.

Q. Okay.

A. I'm not the sure. I can't answer that.

Q. Have you signed for all the equipment that you've taken out?

A. I haven't taken out any equipment.

Q. So you've never worn a body-worn camera?

A. No, sir.

Q. Okay. Now, going to the next page, Page 10.

A. Sorry. This chair keeps going down. Do you mind if I switch this real quick?

MS. MARTIN: Sure.

A. Yes, sir.

Q. (BY MR. ORTH) Going to the next page, Page 10.

A. I'm on 10.

Q. You are?

A. Yes.

Q. Okay. Going to the bottom of that where we have Corporal Cornelius' statement in response to that.

A. Yes, sir.

Q. Where it says "I observed what I believed to be baggies of MDMA tablets to the left of Deputy B. Whittington," what are MDMA tablets, to your knowledge?

A. To my knowledge, it's narcotics or prescription drugs.

Q. Okay. Are the MDMA tablets listed in the statement on Page 2?

A. Page 2?

Q. Yeah, Page 2 where it says "Investigation" where we went through the following narcotics that were inside the backpack. Take your time.

A. Yes, I'm pretty sure that's what that means.

I'm not sure which one is MDMA. I'm not sure. I haven't done those in years actually.

Q. But they're not -- MDMA is not -- you would agree with me that MDMA is not listed in the investigation on Page 2?

A. Exactly, yes.

Q. What?

A. Yes, I agree.

Q. Okay. Now, directing your attention, go to the next page, Page 11.

A. Yes, sir.

Q. Okay. Where we have -- you see Deputy Freddy Castillo's statement --

A. Yes, sir.

Q. -- on the bottom there?

A. At the bottom?

Q. Yeah.

A. On 10.

Q. Oh, no. It's on Page 11.

A. Okay. But his statement.

Q. And the second paragraph where it says "Upon walking," do you see that?

A. Yes, sir.

Q. "I observed a black male subject who was handcuffed behind his back sitting in a chair by the last computer." Was Freddy Castillo the deputy that transported -- eventually transported the suspect?

A. He's the second deputy, yes, sir.

Q. So at that point in time, we know that the suspect had his hands handcuffed behind his back?

A. Yes, sir. To my knowledge, yes, sir.

Q. Okay. So essentially when you look at the policies regarding handling prisoners, the 321.2 that we were talking about before as far as exceptions when you can handcuff an individual in the front as indicated in 321.3.

A. Where are you looking?

Q. And I'm reading from Page 15, just so you know.

A. Page 15. Okay. Got you. Okay.

Q. It indicates that when a -- and that's Number 2, under (a) 2, "In case of advanced age, injury, physical disability, or other circumstances where arrested persons are incapable of placing their hands behind their back," we know those don't apply in this case because the individual suspect did have his hands cuffed behind his back. Correct?

A. Correct.

Q. Now, directing your attention to Page 13.

A. Page 13? Okay.

Q. On the top part there, the -- and this up to

Page 12, so we know what we're talking about first.

A. I'll go to 12.

Q. It says the "Summary Interview of Malcom Stelly" (sic).

A. Stelly, I think. Yes, sir.

Q. Okay. And this interview was done by Sergeant Barringer, according to what it says, on August 7th on Page 12. Correct?

A. Correct.

Q. Do you know, as this was part of the investigation, why you didn't handle that interview with the suspect?

A. I can't answer that. I'm not sure why.

Q. Do you think it was something that you should have done?

A. Probably not. I mean, I had all the information I needed at the time.

Q. Okay. Well, and Sergeant Barringer part of the process, as far as the issue was concerned, dealing with the interview of the suspect, watching him handle the narcotics and stuff like that. Correct?

A. Right.

Q. And it wouldn't -- in your prior investigations that you did, would it be normal procedure as far as an investigation to have somebody who's involved in the

case go out and do an interview of the suspect?

A. It's possible. I've never done that, but it's possible.

Q. Now, going on to Page 13, so we know what we're talking about.

A. Got you. I'm with you.

Q. Now, in the third line down, it states that the suspect "stated that he did not touch the cocaine at any time after being arrested."

A. Where are you at? I'm sorry.

Q. Yeah. The third line down from the top.

A. Yes, sir. I got you. Yes, sir.

Q. So the statement was that done by -- well, let me ask you this. Was this summary interview of the defendant done by Sergeant Barringer, or do you know who it was done by?

A. As far as I know, Sergeant Barringer.

Q. Okay. So when Sergeant Barringer stated that the suspect said he didn't touch the cocaine at any time after being arrested, what did that indicate to you, if anything, as an investigating officer?

A. I wouldn't have -- I wouldn't have believed him.

Q. All right. And, in fact, you know, going down one more line, he says "He did grab possibly 8 'bars'

also known as Xanax pills off the table." Correct?

A. That's his statement.

Q. And Xanax bars were not listed as any of the -- on Page 2 were not listed as any of the drugs or narcotics seized. Correct?

A. I don't see that. But Xanax comes in different names and stuff, so I'm not sure which one. They have a lot of different names for it.

Q. So essentially in the statement made by Sergeant Barringer, who did the interview, he indicated the suspect didn't touch the cocaine, but he did touch other narcotics. Correct?

A. That's what they're stating.

Q. And if you read later on in that statement, doesn't the statement of Sergeant Barringer in his interview with the suspect indicate that it wasn't cocaine that he had flushed down the toilet or needed to spit with, but it was the Xanax pills. Correct?

A. That's what they're stating.

Q. Now, in the bottom of that paragraph on Page 13.

A. Yes, sir.

Q. That first paragraph, it indicates that the suspect asked about his $10,000 that was located in the center console. Correct?

A. Correct.

Q. Okay. And would you agree with me if you look at the rest of the statement by Sergeant Barringer, that the body cam footage of Deputy Whittington did not indicate that there was any $10,000, there was a lot less in the amount of $54?

A. Yes. Actually, I went back and looked at his camcorder, watched him count out the $54, so we were able to establish that he was lying about that and lying about other things, too. They cleared him, but he was in plain view with the $54, so no problems with that.

Q. Directing your attention now to Page 14.

A. Page 14, yes, sir.

Q. In the middle paragraph, the one that states that "The investigation also revealed." Do you see that?

A. Yes, sir.

Q. Okay. And then it goes on to the second line there. "The defendant was seen on video unattended on multiple occasions in close proximity of the narcotic evidence and handcuffed with his hands to the front." That's a correct reading, first of all, of what you wrote?

A. Right.

Q. Now, we talked about the one instance in which

the constables -- and when I say constables, Johnson and Whittington -- were standing outside the room with defendant in the hallway.  Correct?

A.  Yes.

Q.  Was there any other occasion that would indicate to you as to why you put "multiple occasions" instead of "one occasion"?

A.  I can't recall, but I'm pretty sure there was a lot of footage of that.  And I can't recall how many times.

Q.  But you did not put in your investigative report, other than in this area, that the body cam footage of Deputy Johnson and Deputy Whittington showed that the suspect wasn't left unattended other than that one time.  Correct?

A.  That's probably correct, if that's what I put down, yes.

Q.  Well, that's what the report indicates?

A.  Well, yes.  Then that's correct.

Q.  Why did you put "multiple occasions"?

A.  At that time, I looked at a lot of footage.  Like I say, I wasn't sure it was more that one, but apparently it was.

Q.  But at this point in time, it's not in your report as far as any other occasions.  Correct?

MS. MARTIN:  Objection; asked and answered.

A.  As far as I know.

Q.  (BY MR. ORTH) Okay.  And going to the last sentence there on that same paragraph there, the middle one.

A.  The last sentence?

Q.  Yeah.

A.  Okay.

Q.  You wrote that "The fact that the defendant was allowed to handle the evidence and was left unattended on multiple occasions."  When you indicated the defendant was allowed to handle the evidence, do you recall at this point in time who was with the defendant when the defendant was handling the evidence at those times?

A.  Yeah.  I think I stated earlier, I think Sergeant Barringer, Deputy Whittington, and also Johnson was present, if I'm not mistaken.

Q.  Okay.  There was no time, to your knowledge, in your investigation that those -- that the defendant was allowed to handle the evidence where all three of those individuals that you've mentioned, Barringer, Whittington, and Johnson, were not there in the same room at the same time?

MS. MARTIN:  Objection; asked and answered.

A.  I'm not sure what you're asking.

Q.  (BY MR. ORTH) Okay.  In your investigation, do you recall any instances where those three individuals were not involved when the defendant was handling the evidence?

A.  No, I can't recall.

Q.  Directing your attention to Page Number 16.

A.  Page 16?  Yes, sir.

Q.  Okay.  We're getting there.

A.  Yes, sir.

Q.  In the first part there -- and I know we've talked about this -- where it says "Conclusions," that's where I'm at.  Sorry.

A.  Conclusions?

Q.  Yeah.  Sorry.

A.  Okay.

Q.  And specifically directing your attention to the first one, "Defendant was taken to 904 Dell Dale."

A.  Okay.

Q.  In your investigation, did you find out any information as to -- other than COVID 19, as to why the individual or the suspect was transported to that location?

A.  I have no idea.  I did speak with Deputy Whittington off on the side.  And, you know, he did admit that he probably should have taken him to Wallisville in a perfect scenario, because that's the training.  He might not remember that.

But COVID was going on.  A lot of different things were going on.  I'm not sure if Wallisville was open at that time, because they were closing things down at that time.  Maybe that's why they went to 904.

Q.  The fact that the suspect was taken to 904 Dell Dale instead of some other location such as Wallisville, would that have been a violation of any policies and procedures that you're aware of?

A.  No.  At that time, no.  I think we might have that in the policy now.  Coming from this situation, I think a lot of policies and stuff, we changed things up to make things better.  So at that time, I don't think so.  Not at that time.

Q.  Okay.  Did you write this whole report yourself, or did you have any help in writing the report?

A.  Like I stated earlier, Major Villarreal had an impact on me, just kind of guided me as far as putting everything together, because I've done some at the schools, investigations.  This was kind of complicated because a lot of stuff was involved.  So just by placing things and how to get everything put together, so he

**ROBERT DUFFY - September 21, 2022**

kind of -- like I say, he's my mentor.

Q. Okay.

A. My mentor.

Q. Okay. Did Major Villarreal actually write any of this report?

A. No, sir. No, sir.

Q. Did you write the whole report yourself?

A. I wrote the whole report, yes, sir.

Q. Other than Major Villarreal, which we talked about, did anybody else have input into writing the report?

A. No, sir, no other contributions.

Q. Okay. And going to the next page, the last page.

A. Page 16 or 17?

Q. Okay.

A. Is that 17, sir?

Q. Yeah.

A. Okay.

Q. First of all, that's your signature on the signature line. Correct?

A. Yes, sir.

Q. And 8/19, is that when you completed the report?

A. 8/19/2020, yes.

85

Q. In the first paragraph, the first sentence on the page, it indicates that "In this case, Deputy Whittington did not designate Deputy Johnson or Sgt. Barringer to stay with the defendant at all times." How do you know that?

A. Well, all that was seen in the camcorder, I'm -- from my experience, someone is doing the -- made the arrest, I think he probably could have done -- or as folks say, "Hey, watch the prisoner a little bit better while I'm out here." You know, he could have designated some folks to help a little bit better. That was just my opinion.

Q. So that's your opinion?

A. Yeah. That's all that is, yeah.

Q. Okay. Would that have been a violation of any policies or procedures that you're aware of?

A. No, not that I'm aware of. Just an arrest, if you made an arrest, you've got to take control of the arrest.

Q. Wouldn't it be like standard operating procedure, there's two or three deputies in a room, that if one leaves, the others are responsible for what's there?

A. Well, I can't get in their heads, but that's why I would kind of, you know -- you know, say, "Hey,

86

watch this prisoner here while I'm doing this." I would -- I wouldn't take it for granted, because that's my case and that's all my evidence. It all goes on me.

Q. Okay. Going on to the next --

A. The "Evidence"?

Q. The "Evidence being left unattended."

A. Yes.

Q. How many times, based upon your investigation, did that occur?

MS. MARTIN: Objection; asked and answered.

A. In this case?

Q. (BY MR. ORTH) Sure, in this case.

A. I could just say several. I can't give you a number on that. I could just say several.

Q. Okay. Going down past -- right past "The corrective measures."

A. Okay. Yes, sir.

Q. It says, "After considering all the evidence in the investigation, I was unable to determine what happened to the missing 14.8 grams of white powder (controlled substance)." That's the cocaine. Correct?

A. Yes, the cocaine.

Q. Okay. So in essence, what you're saying is you can't place the blame on anybody as far as who has the missing cocaine?

87

A. That's correct.

Q. And would you agree with me that during your investigation, that there was more than one -- more than one individual that had sole custody of the evidence at any point in time?

A. Yeah, I would agree with that. Yes, sir.

Q. And in the next sentence, and we talked about this a little bit as far as the toilet with the suspect. There's no evidence specifically indicating that the suspect or defendant threw away the cocaine into the toilet, based only on the body cam footage, other than what we talked about before?

A. Yeah, that's the conclusion I came up with. Because I know he's a great guy (indicating), and all the other deputies. So that's the only conclusion I can come up with.

Q. And when you said "He's a great guy," you were pointing to Deputy Whittington. Correct?

A. Yeah. From what I -- I don't have any problems with Bert. We have no problems at all. So the possibility that this suspect -- you know, hey, that the is conclusion I came up with.

Q. Okay. Let's go on to -- this will be Exhibit Number 4.

(Duffy Exhibit #4 marked.)

88

**ROBERT DUFFY - September 21, 2022**

Q. (BY MR. ORTH) First of all, can you identify that?

A. Yes.

Q. And what is it?

A. An IAD Complaint Form.

Q. And who is the complainant in Exhibit Number 4?

A. Who is the what? I'm sorry.

Q. Who is the complainant, the person making the complaint?

A. Chief Bonsal, I guess. That's what it says.

Q. Okay. So it was Chief Bonsal that started the complaint or started the internal investigation. Correct?

A. From what I know, yes.

Q. Okay. And according to Exhibit Number 4, the only issue here, as far as the complaint form, was dealing with the missing 14.8 grams of controlled substance. Correct?

A. Correct. That's what I was dealing with, yes, sir.

Q. Okay. And other than Chief Bonsal, was there anyone else that had any involvement with starting the investigation, to your knowledge?

A. To my knowledge, no.

(Duffy Exhibit #5 marked.)

89

Q. (BY MR. ORTH) Let me hand you what's been marked as Exhibit Number 5 and ask you whether you can identify Exhibit Number 5 (handing).

A. Identify Number 5?

Q. Yeah. What is Exhibit Number 5, to your knowledge?

A. It's kind of grainy, but I'm not sure if that's Sergeant Barringer. I don't know. I really can't --

Q. Well, if you look at the second page --

A. The second page, yeah. The second page, that looks like Sergeant Barringer, I believe.

Q. Okay. Would these have been -- what I'm getting at, as far as identifying it, would these have been still shots you took as far as body camera of either Deputy Whittington or Deputy Johnson that we discussed earlier?

A. Yeah, that's correct.

Q. Okay. And looking at the second page, that's a little more -- it's color and a little more easy to look at. The person in the blue shirt would be Sergeant Barringer. Correct?

A. That's correct.

Q. Okay. And the other person is the suspect or the defendant?

A. It appears to be the suspect, yes.

90

Q. Okay. In either of these pictures on the first page or the second page -- and they might -- I mean, they're close to almost being identical, but you would agree with me that Deputy Whittington and Deputy Johnson are not in those pictures. Correct?

A. We can agree on that, yes.

Q. So we don't know where they were, according to the pictures themselves, when the defendant and Sergeant Barringer are having close contact. Correct?

A. Correct.

Q. And do you recall what was going on in the still shots, in any of the four still shots in Exhibit Number 5?

A. I can't recall. I can't recall.

Q. All right. Well, turning to the second page, the color page, in the top picture.

A. I see it. Yes.

Q. Does it appear that the defendant is holding a pill bottle or not?

A. He's holding something. I'm not sure if it's a pill bottle or not. I can't tell.

Q. Okay. And Sergeant Barringer is also holding something in his hand. Correct?

A. Something, yes.

Q. Okay. Do you recall, when you were taking

91

these off the body-worn cameras, whether the footage would indicate that the objects that Sergeant Barringer and the defendant are holding would have been some of the narcotics that were in the backpack?

A. I can't recall.

Q. Okay.

A. That's been a while.

Q. Okay. And from these pictures, you would agree with me that the suspect does have his handcuffs in the front of his body?

A. Yes. Yes.

(Duffy Exhibit #6 marked.)

Q. (BY MR. ORTH) Okay. Let me hand you what's been marked Exhibit Number 6 to your deposition and ask you whether you can identify what's in Exhibit Number 6, the two pictures, as far as what they are.

A. Looks like Deputy Johnson with the backpack.

Q. Okay. And in the bottom picture, it's a little more clear where the suspect is. Correct?

A. Correct.

Q. In relation to the backpack with the narcotics. Correct?

A. Yes, sir. Correct.

Q. And would you agree with me in Exhibit Number 6 that there's no indication in that exhibit as to where

92

**ROBERT DUFFY - September 21, 2022**

Sergeant Barringer or Deputy Whittington are as far as these photos?

A. Correct.

Q. And you don't recall at this point in time what sequence, in the events that happened, what we're dealing with here, do you?

A. I can't recall that.

Q. Directing your attention to Exhibit Number 2 again, Page 3.

A. Page 3?

Q. Yeah. Looking at what appears to be one, two, three -- the fourth paragraph down where it says "The fifth series of snap shots," do you see that?

A. Yes.

Q. They are numbered 32 through 47.

A. Okay.

Q. And if you look at Exhibit Number 6, we're looking at 45 and 46. Correct?

A. Okay. 45, yes.

Q. So that would have been included in those fifth series of snapshots. Correct?

A. Yes.

Q. Okay. And according to what you wrote in Exhibit Number 2, they "are of Deputy Johnson taking possession of the evidence; the defendant is in close

proximity of the evidence." Correct, as far as what you wrote?

A. That's what I wrote down, yes.

Q. Okay. So based on what you wrote in Exhibit Number 2 with the fact that Deputy Johnson and the defendant is in close proximity of the narcotics, would that have been a concern for you during the investigation at all, as far as what's depicted in Exhibit Number 6?

A. Well, that was all stated in the statement, so yes.

Q. Okay. What I'm asking you is, would that be -- if I'm an investigating officer and I'm looking at 45 and 46, you know, with the defendant's handcuffs in the front and the narcotics a short distance away, would that say "Hey, there's a problem here" or not to you, as an investigator?

A. Yeah. If he put that in a statement that he loaded the narcotics in a backpack, packaged everything, so that's in a statement, yes.

Q. Would that be any violation of policies and procedures, to your knowledge?

A. At that moment, I don't think so, no.

Q. Okay. And a body-worn camera, does that have -- that doesn't have any sound to it, does it?

A. I think they do. I don't have one, so I'm not sure.

Q. Well, when you viewed the body-worn camera footage in this case --

A. Yeah, they have sound. They do, yes.

Q. Okay. Do you recall any verbal communication between Sergeant Johnson and the defendant during that --

A. No.

Q. -- as to what was depicted in Exhibit Number 6?

A. Not at all. I don't recall that at all.

Q. Okay. And when you were viewing the body cam footage of Deputy Johnson and Deputy Whittington in the hallway, was there any communication that was on the body-worn camera when you took those shots, that you recall at this time?

A. I don't recall. I don't recall at this time. It's been awhile ago. I would have to view it again, but I can't recall at that time. To be precise.

Q. Okay. Going back to Exhibit Number 2 on Page 16.

A. Page 16?

Q. Yeah.

A. Okay.

Q. Under the "Conclusion."

A. Okay.

Q. Going down to the third bullet point there where you say "I observed Sergeant Barringer and Deputy Whittington," that one.

A. Yes.

Q. My question to you is, other than what we've talked about before previously in your deposition, is there any other body-worn camera footage, statements by anyone that we haven't discussed that would corroborate that conclusion?

A. Not that I can recall on that.

Q. Okay. And in the other two conclusions after that where you've indicated "Defendant was left unattended" and evidence being left unattended, in those two conclusions, you used only the information from the body-worn cameras and the statements. Correct?

A. The information I was given, yes.

Q. Okay.

MR. ORTH: Can we take a break?

MS. MARTIN: Yes.

(Recess from 1:05 p.m. to 1:19 p.m.)

Q. (BY MR. ORTH) Okay. Did you ever look at the interview that was done by Sergeant Barringer of the defendant?

A. No, sir. I have the statement.

**ROBERT DUFFY - September 21, 2022**

Q. Okay. So why didn't you think it was important to view the interview?

A. At the time, I'm not sure. It's been two years ago. I'm not sure what my thinking was at that time.

Q. Prior to this investigation, have you observed any other deputies that violated the body-worn camera policy?

A. No, sir. No, sir.

Q. Did you, in your investigation, talk to anybody or send questions to anybody at the lab regarding the missing cocaine?

A. The lab? No, sir.

Q. Why didn't you decide to talk to them, if you recall?

A. Why didn't I?

Q. Why didn't you talk to them?

A. Well, we got the report. I think Larry, Sergeant -- I forget who it is -- spoke to the lab. And I got all the results from them, so I didn't speak personally to them. I think it's Larry Jaramillo.

Q. Did you in your investigation give any more weight to any of the statements given to you in the investigation compared to any others?

A. No, not at all.

Q. Did Deputy Johnson, to your knowledge, or Deputy Whittington indicate to you that in their opinion, the suspect was not left alone at any time during their --

A. No, I don't --

Q. Go ahead.

A. I'm sorry. I don't recall them speaking -- speaking with them about that.

Q. Do you think that would have been important to know what they would have said concerning whether the suspect was left alone or not?

A. Well, that's important. It could have been important.

Q. Do you know why Sergeant Barringer interviewed the suspect or defendant?

MS. MARTIN: Objection; calls for speculation.

A. I'm not sure.

Q. (BY MR. ORTH) Okay.

A. It's been two years.

Q. You didn't tell him to interview the suspect, did you?

A. No, I didn't.

Q. Okay. Did you review any documents prior to your deposition today in preparation of the deposition?

A. Yes. I went over -- I looked over my -- the report briefly.

Q. Other than your report, which is Exhibit Number 2 in evidence?

A. No, that's it.

Q. Okay.

A. That's it.

Q. Okay.

MR. ORTH: I pass the witness at this time.

EXAMINATION

BY MS. MARTIN:

Q. I just have one question. Mr. Duffy, what race are you?

A. Black.

MS. MARTIN: No further questions. I'll reserve the rest for trial.

MR. ORTH: I have no further questions. That's it. You're done. You can go home or go back to work.

(Proceedings concluded at 1:24 p.m.)

C E R T I F I C A T E

STATE OF TEXAS )
)
COUNTY OF HARRIS )

I, Lucy Johnston, Certified Shorthand Reporter in and for the State of Texas, duly commissioned and qualified, do hereby certify that the foregoing is a true, correct, and complete transcript of the proceedings in the foregoing captioned matter taken by me and transcribed from my stenographic notes.

The original deposition and exhibits were delivered to Mr. Philip J. Orth, III, Custodial Attorney.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office at Houston, Texas, this the 11th day of October, 2022.

Lucy Johnston
Texas CSR No. 3847
Expiration Date: 7/31/23
Lucy Johnston Reporting
Texas Firm Registration No. 450
1225 North Loop West, Suite 327
Houston, Texas 77008
(281) 385-9088

Time used by each party:
Mr. Philip J. Orth, III - 02:37
Ms. Melissa G. Martin - 00:01
Ms. Susana G. Sosa - 00:00