**PAUL SIMPSON - September 21, 2022**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

BERT W. WHITTINGTON, III §

Plaintiff §

vs. § CIVIL ACTION 4:21-cv-03220

KIRK WAYNE BONSAL, JR., §
ET AL

Defendants §

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF

PAUL SIMPSON

September 21, 2022

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF PAUL SIMPSON, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on the 21st day of September, 2022, from 2:29 p.m. to 3:57 p.m., before Lucy Johnston, CSR in and for the State of Texas, reported by machine shorthand, at Harris County Attorney's Office, 1019 Congress, 15th Floor, Houston, Texas, pursuant to the Federal Rules of Civil Procedure and any provisions stated on the record or attached hereto; Rule 30(b)(5) requiring an on-record reporter's statement was waived.

---

I N D E X

| | Page |
|---|---|
| Appearances | 2 |
| Stipulations | 4 |
| Certificate | 41 |

| EXAMINATION | Page |
|---|---|
| By Mr. Orth | 4 |
| By Ms. Sosa | 39 |

EXHIBITS

| Number | Description | Page |
|---|---|---|
| 1 | Harris County Office of the Constable, Precinct 3, Office of Professional Standards, Internal Affairs Division, Confidential Investigative Report dated 7/28/20 (HC-0001 through HC-0007) | 7 |
| 2 | Harris County Constable Precinct Three, Internal Affairs Division, Voluntary Statements (HC-0076 through HC-0086, HC-0035, HC-0044, HC-0047 through HC-0050) | 12 |
| 3 | Use of Force Policy, Response to Resistance section (HC-0122 through HC-0123 | 22 |
| 4 | Use of Force Policy, Level of Force section (HC-0108, HC-0114 through HC-0116) | 24 |
| 5 | 8/11/2020 Memo to Kirk Bonsal (HC-0087) | 32 |

---

A P P E A R A N C E S

FOR THE PLAINTIFF:
    Mr. Philip J. Orth, III
    Law Offices of Philip J. Orth, III, P.C.
    16406 Lamplighter Street
    Crosby, Texas  77532
    Phone:    (713) 520-8333
    Fax:      (772) 217-8162
    E-mail:   philip.orth@yahoo.com

FOR THE DEFENDANTS:
    Ms. Susana G. Sosa
    Ms. Melissa G. Martin
    Harris County Attorney's Office
    1201 Franklin Street, 13th Floor
    Houston, Texas  77002
    Phone:    (713) 274-6700
    Fax:      (713) 368-9278
    E-mail:   susana.sosa@harriscountytx.gov

ALSO PRESENT:

    Mr. Bert W. Whittington, III
    Mr. Eric L. Baumgartner
    Chief Kirk W. Bonsal, Jr.

---

THE REPORTER:  Stipulations?

MR. ORTH:  Pursuant to the Federal Rules?

MS. MARTIN:  Agreed.

PAUL SIMPSON,

having been first duly sworn, testified as follows:

EXAMINATION

BY MR. ORTH:

Q.  Please state your full name for the record.

A.  Paul Joseph Simpson, Sr.

Q.  Does that mean there's a junior hanging around someplace?

A.  Yes.

Q.  Good.  The reason I ask is that I'm a third.

Mr. Simpson -- or should I say Lieutenant Simpson, have you given a deposition before?

A.  I have.

Q.  Approximately how many?

A.  Over the years, I'm not really sure.

Q.  Okay.  To make this one go a little easier, I'd like to make some agreements with you.  One is that you allow me to ask the full question before answering.  And I'll give you the same common courtesy and allow you to finish your answer before I ask another question.  And that's for the court reporter's sake.  It's hard to take down two people talking at one time.  Okay?

---

**LUCY JOHNSTON REPORTING**
**(281) 385-9088**

**PAUL SIMPSON - September 21, 2022**

A. Yes.

Q. The second agreement I'd like to make with you -- and you're doing fine so far and giving verbal responses. The court reporter can't take down a shake of the head or a nod or anything like that. Okay?

A. Yes.

Q. And the last agreement I'd like to make with you is that if you don't understand my question, just go ahead and tell me you don't understand. I'll be more than happy to rephrase the question. But if you answer the question, I'll assume that you understood the question then. Okay?

A. Yes.

Q. And being that you've done several depositions before, you know that you're under oath just like you're in a courtroom with a judge and jury under the same penalties of perjury. Correct?

A. Correct.

Q. Okay. What's the highest level of education that you have currently?

A. High school.

Q. Did you have any college?

A. Some. Some college hours.

Q. Okay. And who is your current employer?

A. Harris County Precinct 3.

Q. And when did you start working for Harris County Precinct 3?

A. September of 2018.

Q. And when you started working for Harris County Precinct 3, what was your job title?

A. I was a deputy.

Q. Okay. And what were your duties?

A. Court bailiff, courtroom security, building security.

Q. And how long before those changed at Precinct 3?

A. It was when I promoted to lieutenant in -- I think it was '21.

Q. Okay. Did you receive any training while in Precinct 3?

A. What type of training are you referring to?

Q. Any type of training.

A. Yeah. Yes.

Q. Did you receive any training involving how to do an investigation?

A. No.

Q. Did you receive any training on how to do an investigation in any of your prior employments?

A. Yes.

Q. Which one?

A. Texas Highway Patrol.

Q. And any others?

A. No.

Q. Okay. And do you recall how long that training was, as far as how to do an investigation, when you were working for the highway patrol?

A. Forty hours training.

Q. Okay. Is there a certification that you get or you have to obtain to be an investigator, to your knowledge?

A. Not to my knowledge, no, sir.

(Simpson Exhibit #1 marked.)

Q. (BY MR. ORTH) Now, let me hand you what's been marked as Exhibit Number 1 to your deposition and ask you whether you've seen Exhibit 1 before.

A. I'm sorry. Repeat the question.

Q. Yeah. Have you ever seen Exhibit 1 before? And you can take your time and look at it.

A. Yes, sir, I have.

Q. And what is Exhibit Number 1?

A. That's my report that I prepared for the investigation.

Q. Okay. In looking over Exhibit Number 1, other than the statements in the case -- and we'll be going over those later -- is there anything in Exhibit Number 1 in your investigation that is not included in Exhibit Number 1?

A. All the pages are there, so...

Q. Okay. Now, who requested you to do this investigation?

A. I was assigned the investigation by Chief Bonsal.

Q. Okay. And what did Chief Bonsal say to you regarding starting the investigation, if you can remember?

A. I can't remember the exact words other than the fact that "I'm assigning you an investigation to do for me."

Q. And prior to this investigation in Exhibit Number 1, you had you done any investigations prior to that?

A. Yes.

Q. Approximately how many?

A. For Precinct 3?

Q. Yeah, for Precinct 3.

A. I think maybe two.

Q. Okay.

A. I'm not sure.

Q. Okay. And for the highway patrol, how many did you do when you were there, approximately?

**PAUL SIMPSON - September 21, 2022**

A. No idea. I was a supervisor for probably 15 or more years. So over a term of 15 or more years, I'm not really sure.

Q. Okay. So you can reasonably say that prior to doing the investigation in Exhibit Number 1, you had plenty of prior experience in doing investigations. Correct?

A. Yes.

Q. Prior to Exhibit Number 1, have you ever done an investigation in which you just handed out questions for the individuals who were involved to answer and not get a written statement or a verbal or recorded statement from them?

MS. SOSA: Objection. Can you break it down a little bit?

MR. ORTH: Sure.

MS. SOSA: Thank you.

Q. (BY MR. ORTH) Prior to Exhibit Number 1, doing that investigation, when you would do an investigation, would you send out questions to witnesses, or would you get recorded statements from them or written statements from them?

A. No. I've never sent any questions out related to an investigation.

Q. Do you think it would be proper in doing an investigation to send out questions instead of getting written or recorded statements, in your opinion?

A. In my opinion, I think it's individual preference.

Q. Okay. But in this investigation that you did, you did not send out written questions. Correct?

A. No.

Q. Other than getting your instructions from Chief Bonsal to investigate Deputy Whittington, did you have any other contact verbally or through email with Chief Bonsal during the process of the investigation?

A. No.

Q. Did you have any contact, other than with the witnesses obviously, with anybody else from Precinct 3 indicating how to do the investigation or giving you instructions regarding the investigation?

A. No.

Q. Prior to doing the investigation in Exhibit Number 1, had you been a canine officer at all?

A. No.

Q. Prior to the investigation, had you worked with canine officers?

A. No.

Q. Now, directing your attention to Page 2 of Exhibit Number 1. And directing your attention to the last paragraph, do you see that where it says "According to Deputy Skero"?

A. Right.

Q. It goes on and it says "It is not common for an actively engaged K-9 to listen to the command to stop biting once engaged due to stress, anxiety, and adrenaline." Is "not" missing in there, or is that a correct statement? When I say "not," to not listen or to listen. Do you recall what Deputy Skero told you?

A. I believe what's in my report is what he said to me.

Q. Let's see. Did you get a statement from Deputy Skero -- or Skero?

A. I don't recall getting a statement from him. I believe there was a statement included. I think I had asked all the witnesses to do a statement of some sort.

Q. Yeah. If you look at the last page, Page 7, the attachments --

A. Yeah.

Q. -- it indicates that you did get a statement from him, but it's not mentioned other than that it's not mentioned -- okay? -- as far as a conclusion, you know, where you put in the report the conclusions of the statements that -- the statements that were made.

See starting on Page 3, you have "See attached Statements from all involved parties." Deputy Amanda Watson -- summaries of Watson, Celis, Barringer, Larkin, Garcia, and Whittington. That's it. Do you know why you did not put a summary of officer -- or Deputy Skero's in there?

A. Probably because I included it in the body of the report.

Q. Okay.

(Simpson Exhibit #2 marked.)

Q. (BY MR. ORTH) Let me hand you what's been marked at Exhibit Number 2 to your deposition and ask you whether you can identify that.

A. I didn't take any of these statements, if that's what you're asking me.

Q. No. I'm asking you whether you can identify them. Exhibit Number 2, what this is?

A. Identify how, other than the fact that it's Exhibit 2?

Q. Let me ask you in a different way. Are these the statements that you attached to your investigative report, to your knowledge?

A. Yes, these were.

Q. That's all I was asking.

A. Okay.

Q. Okay. And in the report in Exhibit Number 2,

**PAUL SIMPSON - September 21, 2022**

you'll find -- in the bottom right-hand corner starting on Page 80, do you see that?

A. Yes, sir.

Q. That's the statement that Bryan Skero gave. Correct?

A. Correct.

Q. And you can read it, but it doesn't indicate any way, shape, or form the statement that you made in Exhibit Number 1 on Page 2 that we previously discussed where you indicated "It is not common for an actively engaged K-9 to listen to the command to stop biting once engaged due to stress, anxiety, and adrenalin; therefore isn't generally frowned upon"?

A. Okay.

Q. My next question is, where did you get that statement if it wasn't in his original statement?

A. I got that from Bryan Skero during the fact finding or fact checking doing my report. And I had a conversation with Bryan Skero, since he at that time I believe was the canine trainer for the agency. I asked him a question, and that's what he gave me.

Q. Okay. Did you record the statements that you have in Exhibit Number 2?

A. No, sir.

Q. Okay. Did you record at all any conversations

you had with any of the witnesses in your investigation?

A. Other than Bert, no.

Q. Okay. So Constable Whittington was the only one that you recorded?

A. Yes.

Q. And why was that?

A. Just the way I do my investigation.

Q. Okay. Going back to Exhibit Number 1 now. Going to Page, I believe, 3. Going to the first paragraph there, do you see that?

A. Yes, sir.

Q. In your description of your conversation with Sergeant Chris Moore with the canine training program, and you asked Sergeant Moore about the stress level with canines. Correct?

A. Correct.

Q. And what was your understanding as far as what he told you?

A. My understanding would have been pretty much what I put here in the paper.

Q. That basically canine dogs are just like people; they act differently depending on the circumstances. Correct?

A. Correct.

MS. SOSA: Objection; speculation.

Q. (BY MR. ORTH) It's what you wrote in your report. Correct?

A. It is what I wrote.

Q. And you wouldn't put anything in your report that you didn't get from the witness or that you didn't find out some other way. Correct?

A. Correct.

Q. And I know we talked about the fact that you didn't have any canine training or you weren't personally involved in canines, but in your duty as a constable, did you have experience with canines in the areas that you were investigating or working in?

A. Experience, what do you mean?

Q. Were there any canine units or dogs called out to any of the activities that you were investigating as a constable?

A. No, sir.

Q. Okay. Directing your attention to the same page, going down the -- do you see this paragraph one, two, three, four, five down, the one that starts with "The second issue"? Do you see that one?

A. Yes, I do.

Q. Okay. "According to certification standards for Patrol K-9, the K-9 must respond when 'recalled' at any point during deployment, especially when off-leash."

From what you recall, that's an accurate reading of what you wrote?

A. That's what?

Q. That's a correct reading, and I'm not putting anything in or adding anything to that?

A. That's correct.

Q. And did you find that didn't happen in the case that you were investigating?

A. I did.

Q. Okay. Did you check in your investigation whether K-9 Zane, who is the subject of the investigation, had passed a -- or had received a training certification?

A. I did not.

Q. Okay. Is there any reason why you didn't check that out?

A. I took him at his word. He said it had.

Q. Okay. And when you say "him," you've got to understand, the court reporter can't --

A. I'm sorry. I took Deputy Whittington at his word.

Q. Okay. Going on to the next page, Page 4 now, you see the summary statement by Deputy Celis. Do you see that?

A. Yes, sir.

**PAUL SIMPSON - September 21, 2022**

Q. Okay. And you can read that if you want to. My question would be, then, did you make any conclusions based upon what Deputy Celis told you regarding your investigation?

A. Okay. Now I've read it, but repeat your question for me.

Q. Okay. Sure. In your investigation, did you make any conclusions based just upon Deputy Celis' statement or summary of that statement in your report?

A. No, sir.

Q. Okay. Going down to Sergeant Barringer then, reading his summary statement.

A. Yes, sir.

Q. Did you make any judgments or conclusions based upon what Sergeant Barringer told you in the investigation?

A. No, sir.

Q. Okay. And the same thing with Assistant Chief Larkin, if you can read that and answer the same question?

A. Yes, sir.

Q. Okay. Did you make any conclusions based on what Chief Larkin said -- or Assistant Chief Larkin?

A. No, sir.

Q. Okay. Going to the next page, Page 5, going down to the second sentence there, do you see where it starts "When asked"?

A. Yes, sir.

Q. And it states, "When asked about other events that occurred on that day, Garcia seem to have some difficulty recalling many details from memory."

A. Okay.

Q. And Garcia was the suspect. Correct?

A. Correct.

Q. And this is a statement based upon your interview with them?

A. This is a statement I wrote based on my interview with him and what I saw on video.

Q. Okay. And whose video were you looking at, as far as --

A. Deputy Whittington's.

Q. Okay. And going back to the same question, was there any conclusion that you made regarding that paragraph or that statement in your report?

A. No, sir.

Q. Okay. Going down Deputy Bert Whittington's summary statement, second paragraph where it says "After reading his report."

A. Yes, sir.

Q. And it says -- in the last sentence it says,

"was within feet of the suspect when he looked back and then turned, raising his hands to surrender." So what information does that give you, if any?

A. Well, it told me --

Q. Or I'm sorry. If you want to look up higher and see what the whole paragraph says.

A. There's no need to. I mean, it told me that K-9 Zane was within feet of him when he launched, and the suspect, Garcia, turned at that same time.

Q. Okay. And would you say that conflicted with what Garcia told you in the above paragraph and the last couple of lines there?

A. Well, I mean, it's -- I wouldn't call it a conflict. It's just a statement between two different people. They both saw something completely different.

Q. And that's what I want to point out. There was a difference as far as what Garcia, the suspect, said compared to what Bert Whittington told you regarding the distance, as far as the dog and the suspect is concerned. Correct?

A. Right. Correct.

Q. Going to Page Number 6. And when you have it, I'm going to deal with the paragraph "Facts Revealed." Do you see that?

A. Yes, sir.

Q. Okay. And from what information did you write that paragraph from? Was it in the recorded statement from Deputy Whittington, or was it all the evidence in the case? What did you come up with that -- how did you come up with that?

A. It's a combination of everything that was involved in the case. It's a combination of the facts.

Q. Okay. Did you see the body-worn camera from Deputy Whittington, the footage?

A. After the fact, yeah.

Q. Okay. And in reviewing his dash cam video, it indicates in there -- it's about the sixth line up from the bottom there -- yelling at least six times, according to what you put in here, for K-9 Zane to stop. Correct?

A. Correct.

Q. And that's something that you saw, I should say, or that you either saw or heard on the dash cam video. Correct?

A. That was something I heard on the video, yes.

Q. Okay. So essentially it wasn't Deputy Whittington not calling the dog off. He did call the dog off. It was a matter of the dog not listening to Deputy Whittington. Correct?

A. Correct.

**PAUL SIMPSON - September 21, 2022**

Q.  Now, going down to your conclusion, in the -- your -- the first sentence of your conclusion where you indicated "The facts, evidence, interviews, and available video footage support the conclusion that Deputy Whittington may have violated the use of force or response to resistance policy."  First of all, that's a correct reading.  Correct?

A.  That's a correct reading.

Q.  And when you say "may have violated," what did you mean by that?

A.  By releasing a dog that is not completely trained.

Q.  Okay.  And did you review any of the training reports regarding K-9 Zane prior to coming up with that conclusion?

A.  I did not.

Q.  Okay.  And did you know, from talking to Deputy Whittington or Deputy Skero or the other deputy that had canine experience, what testing the dogs -- a canine unit has to go through to get certified?

A.  I didn't ask them, no.

Q.  Okay.  Or the number of hours that a canine has to be put through to get certified?

A.  I'm sure that there is a beginners training, and then there's supposed to be so much training per week on that dog.

Q.  And correct me if I'm wrong.  It's your opinion based on your investigation that it was not Deputy Whittington that didn't call off the dog; it was the dog's problem in which the dog wasn't listening to Deputy Whittington that caused the problem with the suspect?

A.  That is my opinion.

Q.  Okay.  Let me hand you what's been marked as Exhibit 3 -- let me mark it a little better?

(Simpson Exhibit #3 marked.)

Q.  (BY MR. ORTH) Exhibit Number 3.

MR. ORTH:  And unfortunately, I don't have another copy.

MS. SOSA:  Can I take a look at it for a second?

MR. ORTH:  Sure.  Take your time.  There's not going to be a lot of questions on it anyhow.

MS. SOSA:  Thank you.

Q.  (BY MR. ORTH) And my first question is, can you identify what's Exhibit Number 3?  Have you ever seen this before?

A.  That's the Use of Force Policy.

Q.  Okay.  Now, I want to direct your attention to the first page, Section 200.2, Response to Resistance

Policy.  Do you see that?

A.  Yes, sir.

Q.  And basically, I mean, we can read it.  In Section (a) it says that "Given that no policy can realistically depict every situation a deputy might encounter, it is recognized that each deputy must be entrusted with well-reasoned discretion in determining the appropriate response to resistance in each incident."  Correct?  That is, first of all, a correct reading of that?

A.  Yes.

Q.  And that's your understanding of what the policy is of Precinct 3 at that time.  Correct?

A.  Yes.

Q.  And you would agree with -- I mean, being out there working as a deputy and in the years that you have worked for Precinct 3, you would agree that's a pretty good policy.  Correct?

A.  Yes, I would agree.

Q.  Now, directing your attention to the next page, directing your attention to Section (a).  Do you see the "(a)" in the first part there?

A.  Yes, sir.

Q.  Okay.  And it lists different factors, 1 through 12, regarding the reasonableness of use of force, correct, in determining what's reasonable and what's not?

A.  Yes.

Q.  And I don't want to go through each and every one of these, but did you take any of these into account when you did your investigation regarding Bert Whittington's use of force as far as K-9 Zane was concerned?

A.  All of them were taken into consideration.

Q.  Okay.  And did you mention any of these factors listed from 1 to 12 in your investigative report?

A.  No, sir, I didn't mention any of them.

Q.  Okay.  We're done with that one.

(Simpson Exhibit #4 marked.)

Q.  (BY MR. ORTH) This is Exhibit Number 4.  And I would ask you if you can identify Exhibit Number 4.

A.  Yes, sir.

Q.  And what is Exhibit Number 4?

A.  It's a part of the use of force --

Q.  Okay.

A.  -- evaluation or policy.

Q.  And first of all, I'm going to direct your attention to the first page under the section on top there, 211.2.2.  Do you see that "Level 2 Force Incidents"?

PAUL SIMPSON - September 21, 2022

A. Yes.

Q. Now directing your attention down to (c), which says "Any deployment of a police canine resulting in a bite to a subject's clothing or skin, or which results in any injury to a subject." First of all, that's a correct reading of that?

A. It is.

Q. Okay. And would the incident that you were investigating regarding Constable Whittington involve Number (c)?

A. It would.

Q. Okay. So in your opinion or based on your reading that policy as Exhibit Number 4, this would be a -- it would have been a Force 2 Incident, correct, that you were investigating?

A. Yes.

Q. Directing your attention to the second page, you see on the bottom there where it says 211.7.1?

A. Yes.

Q. And that reads or is regarding "Supervisor Responsibilities in Level 2 Force Incidents" of which you were investigating. And who would have been Deputy Whittington's supervisor on 5/28/20, to your knowledge?

A. The immediate supervisor would be Sergeant Barringer.

Q. And was Sergeant Barringer on the scene on 5/28/20 when the incident happened?

A. He was on the scene after the incident happened, yes.

Q. Okay. Now, going down on Page 2, it says, "Supervisors should secure and manage the scene upon arrival." Were you aware of whether Sergeant Barringer did, in fact, secure and manage the scene upon his arrival on the 5/28/20 incident that you were investigating?

A. I'm not sure of that. I wasn't there.

Q. Okay. And there's nothing in writing that you received from Sergeant Barringer indicating that he had done that, correct, in your investigation?

A. No, sir.

Q. Okay. And going down to Number 1, are you aware of whether Sergeant Barringer ensured that the "involved personnel, subjects, and witnesses were identified, separated, and advised that communication regarding the incident with other people is prohibited"?

A. Again, I wasn't there, so no.

Q. Okay. And Sergeant Barringer again did not let you know whether he did that or not. Correct?

A. No.

Q. Are you aware whether there is a report made by Sergeant Barringer regarding that first Number 1 that he did Number (a) 1?

A. I'm not aware of that.

Q. Okay. And if you'll look on Page 2 there where it goes through responsibilities again of the supervisor, and it goes through 2 through 10. And I'll let you go ahead and read that first, and then I'm going to ask you some questions about that. Okay?

A. Yes, sir. Okay.

Q. Okay. Now, my question to you is, after reading that, the laundry list, were you aware of whether Sergeant Barringer did any of these things listed on Page 2 during your investigation?

A. Again, I wasn't there, so I'm not aware.

Q. Okay. And you don't have any written statement from Sergeant Barringer, do you?

A. No, sir.

Q. And directing your attention to 7, do you see that?

A. Yes.

Q. Where it requires the supervisor to "personally interview the subjects upon whom the force was used, or alleged to have been used, and obtain a statement. The statement should be captured using a MVR recording system." Did you, in your investigation, ask Sergeant Barringer for an MVR recording of a statement made by the subject matter of the investigation?

A. I did not.

Q. Do you know why you didn't?

A. I didn't think it was necessary.

Q. Okay. Do you know if one was actually done?

A. I wasn't aware of one being done.

Q. Okay. And looking at 8 (a) where it says "Witness statements should be captured using a MVR recording system," are you aware of any statements made by Sergeant Barringer of witnesses that were captured by an MVR recording system?

A. No.

Q. Did you ask him about that?

A. I did not.

Q. Okay. And the reason why you didn't ask him?

A. I didn't feel it was necessary.

Q. Okay. So you didn't feel it necessary to get a recorded statement from the individual that received the injury that you were investigating. Correct?

A. I interviewed that individual later.

Q. Okay. And did you record that at all?

A. I did.

Q. Okay. And do you know where the recording is?

THE WITNESS: Well, I thought you guys had

**PAUL SIMPSON - September 21, 2022**

it (indicating).  It was part of the file.

MR. ORTH:  Off the record.

(Discussion off the record.)

MR. ORTH:  Going back on the record.

Q.  (BY MR. ORTH) Were there any other recordings of statements that you made during this investigation other than the individual that was injured?

A.  No.

Q.  Okay.  Do you recall what you did with the recording when you completed your investigation of the defendant?

A.  Under the standard, you attach a copy to the file or the report.

Q.  And that's what you did in this case?

A.  (Moving head up and down.)

MS. MARTIN:  Can I clarify something real quick off the record?

MR. ORTH:  Yeah.

(Discussion off the record.)

MR. ORTH:  Back on the record.

Q.  (BY MR. ORTH) Okay.  After you did the investigative report and attached the recording to it, who did you hand that to?

A.  I would hand deliver it to the chief's office.

Q.  Okay.  To the chief himself, or did you hand it

29

to someone else?

A.  No.  To the chief.

Q.  Okay.  And you don't know what happens after that, do you?

A.  No.

Q.  Okay.  So at the point in time that you were done with your investigation, Chief Bonsal was given the original of the report that you wrote and a copy of the recording.  Correct?

A.  Yes.

Q.  Now, going to the next page, to the top line, Number 11, it says "Supervisors shall ensure all MVR media is turned in as evidence in if contains any information or statements related to the incident."  You were not aware of any MVR media turned in by Sergeant Barringer concerning this incident, were you?

A.  No.

Q.  Now, going down to -- it says 11 (b), "Once the scene has been cleared, supervisors shall be responsible for the following."  And then it lists Number 1, "Send email notifications with the incident report number prior to the end of the tour of duty."  Did you see any incident report that Sergeant Barringer did?

A.  No, I don't recall -- I mean, they do a -- their supervisors do a response to resistance report.

30

But at that time I wasn't responsible for those reports; so, no, I wouldn't have seen it.

Q.  Okay.  And you didn't ask for it.  Correct?

A.  No.

Q.  Okay.  And going down to Number 3, you didn't see a response to resistance inquiry memorandum in this investigation, did you?

A.  I don't recall ever seeing one, but it's standard procedure that the sergeants send an email of things that occurred through the shift to the chain of command and other supervisors.

Q.  Okay.  And even though you didn't see one, did you ask for one in the investigation?

A.  I did not.  I did not.

Q.  Okay.  Why didn't you ask for that?

A.  I just didn't ask for it.

Q.  Okay.  And going down to Number 4 where it says "Prepare a response resistance inquiry packet," did you see any response to resistance inquiry packet in the investigation done by Sergeant Barringer?

A.  I don't recall seeing a packet, but I recognize the things that are there because those are the standard items that are put in the packet related to what I just told you about, response to resistance or whatever.

Q.  So in your opinion, based upon what the

31

standard is, there should have been one done as far as resistance to a -- a response to resistance inquiry packet done by Sergeant Barringer.  Correct?

A.  Yeah.  I'm sure there was one done, but yes.

Q.  Okay.

MR. ORTH:  Off the record.

(Discussion off the record.)

MR. ORTH:  Back on the record.

Q.  (BY MR. ORTH) Done with that one.

(Simpson Exhibit #5 marked.)

Q.  (BY MR. ORTH) Let me hand you what's been marked as Number 5 --

MR. ORTH:  And I do have a copy for you (handing).

MS. SOSA:  Thank you.

Q.  (BY MR. ORTH) -- and ask you whether you've ever seen Exhibit Number 5 before.

A.  I don't remember them.  I mean, I recognize the material, but I don't remember this particular document or if it's supposed to be an email, whatever it is.

Q.  Okay.  And the point that I want you to look at as far as this is concerned is -- you see the statement -- let's see.  In the middle of the page there's a thing that says "Note," colon.  Do you see that?

32

PAUL SIMPSON - September 21, 2022

A. Uh-huh -- yes.

Q. And it says "It is not common for an actively engaged K9 to listen to the command to stop biting once engaged due to stress, anxiety, and adrenalin and therefore isn't normally frowned upon."

Now I want to go back to Exhibit Number 2. Remember when we were discussing that sentence from Bryan Skero where it says the "not" is not in there. But other than that, if you look at the two statements, they're essentially the same except for that "not" in there?

A. Right.

Q. And you can take your time and look if you want to.

A. There's not a need to. I looked up some information online on different sites, and I did get some information from some online training sites, so...

Q. So would you -- obviously there's a difference between "not" and having "not" in there. Correct?

A. If you say so.

Q. Well, I mean, either it is common or it's not common?

A. Right.

Q. And in your report in Exhibit Number 1, you said it's not common. And here in Exhibit Number 5 it says it is not common. In your report it says it is common -- let me rephrase that. Okay? And as you sit here today, looking at those two documents, do you have an opinion as to whether it is common or whether it's not common?

A. Do I have an opinion whether I made a typographical error?

Q. Yeah.

A. Because that's different from whether I believe it's common or not common.

Q. Well, let me --

A. Which page was that on again?

Q. It is on Page Number 2 on the bottom.

A. Yes, sir.

Q. Do you see that -- oh, I'm sorry. It is my fault. Did you say it is not common here, too?

A. Yes.

Q. Okay. My mistake.

A. No problem.

Q. Okay.

MR. ORTH: Can we take a break?

MS. SOSA: Okay.

MR. ORTH: I might be done.

(Recess from 3:24 p.m. to 3:46 p.m.)

Q. (BY MR. ORTH) Before we ended the deposition or stepped out for a break, you talked about the video -- or I should say a recording of the conversation you had with the suspect. Correct?

A. Yes.

Q. Okay. Now, during that conversation -- recorded conversation with the suspect, do you recall as you sit here today whether the suspect indicated to you during that conversation that someone hit him while he was in handcuffs?

A. I do recall that, yes.

Q. Okay. And what do you recall him saying, if anything, at this point in time?

A. His memory was foggy. He really couldn't remember or identify the person, because I did ask.

Q. But he did indicate to you --

A. And actually it was his mother that brought it up.

Q. And what is his -- do you recall what his mother said?

A. She just kind of reminded him, "Oh, what about when this happened?"

Q. When you say "this," what are you talking about?

A. About being hit in the back of the head or slapped in the back of the head.

Q. Okay. But the mother didn't indicate who did that. Correct?

A. No.

Q. Okay. And I know you weren't at the scene, but during your investigation, did you indicate any of the individuals that were at the scene that were in street clothing or anything other than a uniform?

A. You know, I'm wanting to say -- and my memory is kind of foggy because I haven't seen the video lately, but I think Sergeant Barringer may have been in plain clothes. I'm not sure. I can't remember.

Q. Okay. You can only go by what you remember because we don't have the video.

Now, you told me earlier in your deposition that you had 40 hours of training as far as doing investigations. Correct?

A. Correct.

Q. Okay. And I know it was a long time ago, but during that 40 hours of training, do you recall whether any of that training indicated in an important investigation you should -- whether you should interview the witnesses in person or whether it's okay to send them questions?

A. I don't recall that.

Q. Okay. Did you view any of the body-worn camera

**PAUL SIMPSON - September 21, 2022**

video that was at the scene in which you were investigating?

A. Did I review?

Q. Did you review or look at any of the body-worn camera footage from the scene in which the minor was bit by K-9 Zane that you were investigating?

A. I did.

Q. And whose body-worn camera or video did you look at?

A. Deputy Whittington's.

Q. Okay. Other than Deputy Whittington, did you look at anybody else's?

A. No, sir.

Q. Do you know whether any of the officers that were at the scene had their body cameras on?

A. Not during the incident. I was only -- Deputy Whittington, K-9 Zane, and the suspect were the only people there at the time.

Q. And you don't recall whether Sergeant Barringer appeared at the scene?

A. I don't.

Q. Okay. And to your understanding, was the incident one in which somebody -- the suspect was fleeing from the scene or fleeing at the time of the scene or prior to the scene?

37

A. I went into the recording. Yeah, he fled from the original traffic stop.

Q. Okay. And when you have a fleeing incident, isn't it standard procedure to have the dash video cams operating in a car or on the constable's car who is pursuing?

A. Yes.

Q. Okay. And did you review that in-dash video camera at all, the footage?

A. I did not.

Q. And why didn't you?

A. I didn't -- I dealt with what was before me, which was Deputy Whittington's incident, period. That was what I was investigating.

Q. Okay. Do you know whether there was any in-dash video of the scene or of the suspect?

A. I'm sure there is, yeah.

Q. Okay.

MR. ORTH: Off the record.

(Discussion off the record.)

MR. ORTH: Back on the record.

Q. (BY MR. ORTH) Prior to Deputy Whittington's termination, did you have many dealings with him as an officer?

A. Just in passing, saying hello or brief

38

conversation.

Q. Okay. So you never worked directly with him?

A. No.

Q. Okay. Did you work with him -- or I should say have enough contact with him during the time that he was there at Precinct 3 to offer an opinion as to whether he was a good constable or not?

A. No, I can't say that I worked enough with him to say that.

Q. Okay. So you weren't working with him long enough to give an opinion as to that. Correct?

A. No.

Q. Okay.

MR. ORTH: Pass the witness at this time.

EXAMINATION

BY MS. SOSA:

Q. Okay. I have a few questions. Lieutenant Simpson, you testified previously that in this case the complainant for this case was Chief Bonsal. So my question to you is, is it a standard for your department that when the constable -- or for Chief Bonsal to be the complainant for IAD investigations sometimes?

A. Yeah, sometimes that's standard. If there's not a complainant, then the constable or his designee would be that person.

39

Q. Okay. You also testified that you were not aware whether some witnesses that were at the scene, you know, completing some items is according to policy or not. And why is that? I mean, do you normally -- I guess let me rephrase the question.

Is it normal for you to investigate all witnesses in a case, or how do you normally handle that?

MR. ORTH: Objection as to speculation. Go ahead.

A. Well, I mean, I'm not looking for policy violations from a witness. My concern was what I was tasked to investigate, and that's what I concentrated on. Of course, if I find something egregious, then of course I will bring it up and report it.

Q. (BY MS. SOSA) And in this case, you didn't find anything egregious related to Mr. Whittington?

A. No.

Q. Okay. Lieutenant Simpson, what is your race?

A. I'm African-American.

Q. Okay.

MS. SOSA: No further questions. I reserve the rest of the questions for the time of trial.

MR. ORTH: No further questions.

(Proceedings concluded at 3:57 p.m.)

40

**PAUL SIMPSON  -  September 21, 2022**

CERTIFICATE

STATE OF TEXAS    )
                  )
COUNTY OF HARRIS  )

I, Lucy Johnston, Certified Shorthand Reporter in and for the State of Texas, duly commissioned and qualified, do hereby certify that the foregoing is a true, correct, and complete transcript of the proceedings in the foregoing captioned matter taken by me and transcribed from my stenographic notes.

The original deposition and exhibits were delivered to Mr. Philip J. Orth, III, Custodial Attorney.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office at Houston, Texas, this the 11th day of October, 2022.

_____

Lucy Johnston
Texas CSR No. 3847
Expiration Date:  7/31/23
Lucy Johnston Reporting
Texas Firm Registration No. 450
1225 North Loop West, Suite 327
Houston, Texas  77008
(281) 385-9088

Time used by each party:
Mr. Philip J. Orth, III - 01:02
Ms. Susana G. Sosa - 00:03
Ms. Melissa G. Martin - 00:00

41