**Bert W. Whittington, III**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

BERT W. WHITTINGTON,            )
        Plaintiff,              )
                                )
vs.                             ) Civil Action No.
                                ) 4:21-cv-3220
                                )
KIRK WAYNE BONSAL, ET. AL.,     )
        Defendants.             )

*****************************************************

ORAL AND VIDEO-RECORDED DEPOSITION OF

BERT W. WHITTINGTON III

August 22, 2022

*****************************************************

ORAL AND VIDEO-RECORDED DEPOSITION OF BERT W. WHITTINGTON III, produced as a witness at the instance of the Defendants and duly sworn, was taken in the above-styled and numbered cause on Monday, August 22, 2022, from 9:49 a.m. to 3:52 p.m., before JAMES M. PLAIR, Certified Shorthand Reporter in and for the State of Texas, reported by computerized stenotype machine in the Second Floor Conference Room of 602 Sawyer Street, Houston, Texas 77007, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

Job No. 57383

**Bert W. Whittington, III**

(Page 2)

APPEARANCES

REPRESENTING PLAINTIFF:
Mr. Philip J. Orth III
LAW OFFICES OF PHILIP J. ORTH III
16406 Lamplighter Street
Crosby, Texas 77532-5154
713.520.8333 Telephone
772.217.8162 Fax
Philip.Orth@yahoo.com Email

REPRESENTING DEFENDANTS:

Ms. Melissa G. Martin
Mr. Susana G. Sosa
HARRIS COUNTY ATTORNEY'S OFFICE
1019 Congress, Fifteenth Floor
Houston, Texas 77002
713.755.5101 Telephone
713.755.8924 Fax
Melissa.Martin@cao.hctx.net Email
Susana.Sosa@HarrisCountyTx.gov Email

ALSO PRESENT:
Mr. Eric L. Baumgart, Staff Investigator
GILLESPIE LAW FIRM
226 Sheldon Road
Channelview, Texas 77530
281.457.9999 Telephone
281.457.0990 Fax
Eric.Baumgart@TexasInvestigations.us Email
Chief Kirk Wayne Bonsal

THE REPORTER:
Mr. James Plair
THE VIDEOGRAPHER:
Ms. Devaney Diamond
devo.1111@icloud.com

(Page 3)

INDEX

PAGE

TESTIMONY OF BERT W. WHITTINGTON III
Examination by Ms. Martin ............ 5
Changes and Signature ............... 169
Reporter's Certificate .............. 171

EXHIBITS MARKED

EXHIBIT          DESCRIPTION                    PAGE

Exhibit 1    Notice of Intention to Take the Oral    4
             and Video Deposition of Plaintiff Bert
             W. Whittington

Exhibit 2    Charge of Discrimination for Bert       22
             Whittington III dated 05-28-21

Exhibit 3    Amended Charge of Discrimination for    23
             Bert Whittington III dated 06-24-21

Exhibit 4    Plaintiff's Verified Original           25
             Complaint

(Page 4)

THE VIDEOGRAPHER:  Okay.  Today's date is August 22nd, 2022.  The time now is 9:49 a.m. and we are on the record.

THE REPORTER:  This is the voice of the court reporter speaking.  I will now put our witness under the oath.

Please raise your right hand.

Do you swear or affirm under penalty of perjury that the testimony you are about to give shall be the truth, the whole truth and nothing but the truth, so help you God?

THE WITNESS:  I do.

THE REPORTER:  Thank you.  You may be seated.

Counsel, this is a time to put on the record any stipulations that may be necessary or just proceed with the examination.

MS. MARTIN:  Proceed.

MR. ORTH:  We don't have any stipulation other than he is going to read and sign.

MS. MARTIN:  Sounds good.

(Exhibit 1 marked)

MS. MARTIN:  This is Exhibit 1.

(Page 5)

BERT W. WHITTINGTON III, having first been duly sworn, was examined and testified as follows:

EXAMINATION

BY MS. MARTIN:

Q.  All right.  Good morning.

A.  Good morning, ma'am.

Q.  We're here, uhm, today to take your deposition uh, pursuant to what I have marked as Exhibit 1, uhm, pursuant to this notice of deposition and also pursuant to the Federal Rules of Civil Procedure.

Uh, my name's Melissa Martin.  I'm here; I represent Harris County, uhm, in the case, uh, that you have filed.

Uh, can you please state your full name for the record.

A.  My first name is Bert, that's spelled B-E-R-T; middle name William; last name Whittington; that's W-H-I-T-T-I-N-G-T-O-N; and I'm the III.

Q.  Okay.

And have you ever given a deposition before?

A.  No, ma'am.

Q.  All right.

Uhm, so you have taken an oath to tell the

**Bert W. Whittington, III**

(Page 6)

truth, the whole truth and nothing but the truth.

Uhm, do you understand what that means?

A.   I do.

Q.   All right.  And let's go ahead and go over some ground rules.

So you're doing a great job of answering the question, uhm, and so I would ask that you continue that.

So just for the purpose of the court reporter, uhm, he can't take down nods or "nuh-uhs" and "uh-huhs".  So we both need to do a good job of answering, you know, verbally, uhm, because he can't take down body language.

Now, is that fair?

A.   Yes, ma'am.

Q.   All right.

Uhm, also, we'll both have to work on making sure we don't talk over one another.  So I'm going to do my very best to make sure that I listen, uh, and wait for your whole, uhm, answer to be finished before I go and ask another question.  And so I would also ask that you, uhm, let me finish my question before, uhm, you answer the question.  So that way we're not talking over one another.

A.   Yes, ma'am.

(Page 7)

Q.   Okay.

Uhm, and, you know, I want to make sure --
Uhm, all the questions I ask, I want to make sure that you're answering questions that you understand and also questions that you hear.

Uhm, so if there is a question that, you know, I ask and it makes no sense or you don't understand what I'm asking, please let me know, and so that way I can go ahead and rephrase it or I can repeat it if you didn't hear it.

Uhm, does that work for you?

A.   Yes, ma'am.

Q.   Okay.

And, uhm, you know, I want to make sure if you need to take a break, let me know.  Uhm, the only thing that I would ask is, obviously, if there is a question on the table, that you answer the question first and then we can take a break.  So you'll let me know, uhm, when you need a break.

Correct?

A.   Yes, ma'am.

Q.   Okay.  Uhm, so we can go ahead and get started.

Uhm, is there any reason, uhm, today, as you sit here, that would affect your ability to tell the truth?

(Page 8)

A.   No, ma'am.

Q.   And are you on any medications that would either affect your ability to understand my question or tell the truth?

A.   No, ma'am.

Q.   All right.

Now, did you bring any notes with you today?

A.   No, ma'am.

Q.   Okay.

And did you meet with anyone to prepare for your deposition?

A.   No, ma'am.

Q.   All right.

Uhm, and did you ru- -- review any documents to prepare for your deposition?

A.   The only documents that were, uhm, received during the discovery.

Q.   Okay.

And who did you review those with?

A.   Uh, myself.

Uh, I reviewed them last night.

Q.   Okay.

And, uhm, was there anything else that you reviewed to prepare for your deposition?

(Page 9)

A.   No, ma'am.

Q.   Was there anything else that you did to prepare for the deposition?

A.   No, ma'am.

Q.   Okay.

And how old are you?

A.   I am 54.

Q.   All right.

And what is your date of birth?

A.   My date of birth is February 24th, 1968.

Q.   Okay.

And what is your current address?

A.   Current address is 24502 Winter Circle, Menifee, California.

Q.   Okay.

And how long have you lived at that address?

A.   Uhm, approximately -- approximately, about five months now.

Q.   Okay.

So when did you move into that, uhm, address?

What is that, around?

A.   I can't tell you.  I don't know the exact date.

I know what I will say is that, uh, my

**Bert W. Whittington, III**

(Page 10)

family and I left, uh, the state of Texas in November. And for a couple of months we stayed in a RV until our house was built and I just don't remember the exact date.

Q.   Do you remember the month the house was ready?

A.   I don't.

Q.   So in November, uhm, is that 2021 that you left the state of Texas?

A.   That is correct.

Q.   And you lived in an RV.

Is this at one location where you parked your RV?

A.   That is correct.

Q.   And what's that address?

A.   It's going to be on Camp Pendleton, California. Marine Corps base Camp Pendleton, California.

Q.   Okay.

And who lives with you?

A.   My wife.

Q.   Anyone else?

A.   I have a college-age student that returns home, uhm, during the break in the summer.

Q.   Okay.

Anyone else?

A.   No, ma'am.  That's it.

Q.   Do you have any other kids that do not live with

(Page 11)

you?

A.   I do.

Q.   And how many kids?

A.   Biological?  I have three boys.  His, hers and ours.  I have two boys.

Q.   Okay.

And what is your wife's name?

A.   My wife's name is Katrina.

Q.   Okay.

And where does Katrina work?

A.   I don't know the name of the company that she works for.  Uhm...

Q.   How long has she worked there?

A.   I don't know that as -- as well.

Q.   Is the company in California?

A.   Uh, I know it's not in California.

I think the company's base is out of Florida.

Q.   Does she telework?

A.   Yes.

She works from home.

Q.   And what kind of work does she do?

A.   She's an accountant.

Q.   All right.

And then the college student that lives

(Page 12)

with you sometimes, what's his name, or her name?

A.   His name is Miles.

Q.   Okay.

And how old is Miles?

A.   Miles is 20.

Q.   Where does Miles go to school?

A.   SFA, Stephen F. Austin.

Q.   What's he studying?

A.   Business.

Q.   Okay.

And then, uh, your three boys, what's the first boy's name?

A.   Bert William Whittington IV.

Q.   And how old is he?

A.   Thirty-five.

Q.   Okay.

And then the next boy?

A.   Jabron Copeland.

Q.   And Jabron is how old?

A.   Thirty-five.

Q.   Are they twins?

A.   No.

Q.   And then other than Jabron, what's the other -- third boy?

A.   Christopher Whittington.

(Page 13)

Q.   And how old is Christian -- Christopher?  I'm sorry.

A.   Approximately 32.

Q.   And then the two boys, are those your wife's sons, the other two boys that you described?

A.   Uh, I was giving them to you in order. Jabron Copeland and Dajuan Copeland is my wife's.  Uh, those are my stepchildren.

Q.   Okay.

So in total, other than Miles, how many boys are there?

A.   There are, total, four.

Q.   Okay.

So --

A.   Miles makes five.

Q.   Okay.

So I have Bert, Jabron, Christopher?

A.   Then Dajuan is next.

Q.   And how old is Dajuan?

A.   Approximately 32.

Q.   How long have you been married?

A.   Twenty-three years, this October.

Q.   Did you graduate from high school?

A.   I did.

Q.   All right.

**Bert W. Whittington, III**

(Page 14)

And where did you, uh, graduate from?

A. Anahuac High School.

Q. And what year was that?

A. 1987.

Q. And after you graduated from high school, did you go to college or what did you do?

A. I joined the United States Marine Corps.

Q. And was that immediately from high school, in 1987?

A. No.

Q. What year?

A. Uh, 1988.

Q. And how long did you serve in the Marine Corps?

A. Twenty-four years. Approximately 24 years, nine months.

Q. Was that active duty the entire 24 years?

A. Yes, ma'am.

Q. Okay.

And what year did you, uh, get out of the Marines?

A. Uh, the year was 2012.

Q. And was that an honorable discharge?

A. Yes, ma'am.

Q. What did you do in the Marine Corps?

A. I was in logistics; uh, I was a drill

(Page 15)

instructor; I was on the marine's security guard school.

Q. Okay.

Now, in between the, uhm -- your graduation from high school in 1987 and joining the Marine Corps in 1988, did you work anywhere?

A. I did.

Q. Uh, where did you work?

A. We had a family business, a plumbing business, called Whittington Plumbing & Heating.

Q. Are you a licensed plumber?

A. I'm not.

Q. The, uh, business did HVAC as well?

A. No HVAC.

Q. No HVAC.

Is the family business still, uhm, around?

A. No, ma'am.

Q. What was it called?

A. Whittington Plumbing & Heating.

Q. Was it in Anahuac?

A. That's correct.

Q. After you left the Marine Corps, did you, uh, attend any, uh, sep- -- additional education?

A. I did, while I was in the Marine Corps --

Q. Okay.

A. -- yes, ma'am.

(Page 16)

Q. What -- what did you -- Uh, where did you go?

A. I went to Central Texas College.

Q. And what did you study?

A. Uh, I was studying, uh, criminal justice.

Q. Did you get a, uh, degree?

A. I got a degree in general studies.

Q. Was that an associate's or a bachelor's?

A. An associate's.

Q. Did you get a bachelor's degree?

A. I did not.

Q. Other than Central Texas College, did you attend any other colleges?

A. I did.

Q. And what college is that?

A. Uh, Lee College.

Q. And what did you study at Lee College?

A. Process technology.

Q. What is that?

A. Uh, plant work, where you process, uh, chemicals into, uh, oil.

Q. Okay.

And how long did you study at Lee College?

A. A semester.

Q. Did you come out with a certification or anything like that?

(Page 17)

A. No, ma'am.

Q. And other than Central Texas College and Lee College, any other colleges that you attended?

A. Uh, yes, ma'am.

Uh, Penn State, I took an online class when I was in Lagos, Nigeria, in psychology.

Q. Was it one class or more than one class?

A. One class.

Q. Is that the only class you took at Penn State?

A. Yes, ma'am.

Q. Any other colleges?

A. No, ma'am.

Q. And after you, uh, got out of the Marine Corps, what do -- what was your first job?

A. My first job, uh, I was a plant manager at a pesticide company.

Q. And what was the name of that company?

A. Univar.

Q. In what year did you start working for Univar?

A. I don't recall, ma'am.

Q. How long did you work for Univar?

A. Approximately, a year.

Q. Do you recall the year that you got out of the Marine Corps?

A. Yes, ma'am.

**Bert W. Whittington, III**

(Page 18)

Q.   What year was that?

A.   That was 2012.

Q.   Did you work for Univar in 2012?

A.   I don't recall the exact year, ma'am.  Uh, it's possible.

Q.   And why did you leave Univar?

A.   I left Univar, uhm, because I was trying to, uh, pursue, uh, law enforcement.

Q.   Did you leave on good terms?

A.   Yes, ma'am.

Q.   And after you left Univar, where did you go?

A.   From Univar, I went to DPS Academy.

Q.   Do you recall the year that you went to DPS Academy?

A.   Yes, ma'am.

     Uhm, it would be '13.  So that would be 2013.

Q.   And did you work at the DPS Academy or did you study at the DPS Academy?

A.   I was a, uhm, candidate to become a trooper, a cadet.

Q.   How long were you a cadet?

A.   Approximately six months.

Q.   And after the six months that you were a cadet, where did you go next?

(Page 19)

A.   I went to Manvel.

Q.   When you went to Manvel, were you assigned as a DPS trooper?

A.   Yes, I was a -- a DPS trooper in Manvel.  That's correct.

Q.   Would that have been 2014?

A.   That is correct.

Q.   And how long were you a DPS Trooper in Manvel?

A.   Approximately six months.

Q.   And why did you leave?

A.   I resigned.

Q.   Did you leave on good terms?

A.   I -- In my opinion, I left on good terms, ma'am. Yes.

Q.   Did you receive an honorable discharge from DPS?

A.   I don't recall what the discharge was.

Q.   Is there any reason that it would not have been a honorable discharge?

A.   No, ma'am.

Q.   Who was the supervisor at DPS?

A.   At that time, uh, his name was Sergeant Cummings.

Q.   And why did you resign?

A.   I resigned because there was, uh, some FTO training that wasn't consistent.

(Page 20)

Q.   And what does that mean?

A.   Meaning that I was assigned to one FTO; the FTO teached [sic] me something; I would go to the next FTO; the FTO would question, "Why are you doing that"; "Well, I was taught that from the FTO."  And it just kept -- It happened twice.

Q.   Did you tell them that you felt the FTO training was inconsistent?

A.   I did express that, yes.

Q.   And what did they say?

A.   I don't recall.

Q.   Okay.

     After you left DPS, where did you go next?

A.   From DPS, that's when I went to Lee College.

Q.   Okay.

     And that's when you, uh, went for one semester?

A.   Yes, ma'am.

Q.   Did you work while you were at Lee College?

A.   No, ma'am.

Q.   And after you finished the semester at Lee College, where did you go next?

A.   I received a phone call from Chambers County and, uh, I was employed there as a patrol officer.

Q.   What year did you go to Chambers County as a

(Page 21)

patrol officer?

A.   I believe it was 2016.

Q.   And how long did you work at Chambers County as a patrol officer?

A.   For one year.

Q.   And why did you leave Chambers County?

A.   I was approached by, uh, my cousin.  Uh, he advised me of Precinct 3 had just had a newly elected constable.  He told me who the newly elected constable was.  I knew of him because I went to the courthouse and, uh, saw him there, uhm, and, uh, we submitted an application to work for Precinct 3.

Q.   And what's your cousin's name?

A.   Early Williams.

Q.   Was he with Precinct 3 at the time?

A.   No, he was not.

Q.   What year did you apply with Precinct 3?

A.   It was 2000 and -- I don't recall, ma'am.  I'm sorry.  I -- I don't recall the year exactly.

Q.   And, I'm sorry, I didn't ask you.

     On Chambers County, uhm, did you leave on good terms?

A.   I did.

Q.   And did you, uh, receive an honorable discharge?

A.   I did.

**Bert W. Whittington, III**

(Page 22)

Q. Now, other than this lawsuit, have you ever sued anyone?

A. No, ma'am.

Q. Has -- Uhm, have you ever been sued?

A. No, ma'am.

Q. Okay. Let's look over --

MS. MARTIN: I'm going to mark this as Exhibit 2.

(Exhibit 2 marked)

Q. (BY MS. MARTIN) Now, do you recognize, uhm, that document?

A. Yes, ma'am, I do.

Q. And is that a true and correct copy of the charge you filed with the EEOC?

A. Yes, ma'am.

Q. Is that your signature?

A. That is my signature, yes, ma'am.

Q. And it's dated May 28th, 2021.

Uh, is that the date you signed it?

A. That's correct, ma'am.

Q. And did you review it before filing it?

A. That is correct, ma'am.

Q. And did it accurately summarize your claims against the County?

A. Yes, ma'am.

(Page 23)

Q. Did you have an attorney representing you when you filed it?

A. Uh, yes, ma'am.

Q. And who was your attorney?

A. Uh, Robinson law firm.

Q. What's the name of the attorney?

A. I don't recall his first name, ma'am. Uh, I know it was -- it was Mr. Robinson and it was Robinson law firm.

(Exhibit 3 marked)

Q. (BY MS. MARTIN) Okay.

I am looking at the document that I have marked as Exhibit 3.

Do you recognize that document?

(Witness reviewing document)

THE WITNESS: Yes, ma'am.

Q. (BY MS. MARTIN) Okay.

And that one is dated June 24th, 2021.

Is that your signature?

A. Yes, ma'am.

Q. And is that the date that you signed it?

A. That is correct, ma'am. Yes.

Q. And why did you file an amendment?

A. I don't recall.

Q. Did you review this one before you filed it?

(Page 24)

A. I did. Yes, ma'am, I did.

Q. And does the amended charge accurately summarize, uhm, the facts that support your claim against the County?

A. Yes, ma'am.

Q. Now, on both of Exhibit 2 and Exhibit 3, did you check the box marked "Color"?

(Witness reviewing document)

THE WITNESS: Where it says: "Discrimination based on," is that what you're talking about, ma'am?

Q. (BY MS. MARTIN) Correct.

A. Yes, ma'am.

Q. Okay.

Where did you check the box marked "Color"?

A. Where it says: "Race and retaliation".

Q. Okay.

And right next to "Race," you see the box called "Color".

Is that box checked either on Exhibit 2 or Exhibit 3?

A. Uh, no, ma'am, they are not.

Q. Okay.

And were you represented by an attorney when you filed the amended charge?

(Page 25)

A. Yes, ma'am.

(Exhibit 4 marked)

MS. MARTIN: Okay. I'll go ahead and move on. Uhm, I'm going to mark the Complaint as Exhibit 4.

Q. (BY MS. MARTIN) Now, is that a true and correct copy of what, uh, you filed with the Court?

(Witness reviewing document)

THE WITNESS: That is correct, ma'am.

Q. (BY MS. MARTIN) Okay.

I would like to go over, uhm, the claims.

If you could, turn to Page 4 --

A. (Witness complies).

Q. -- and starting on, uhm, Paragraph 13, where it says: "On or about September 1st, 2020, the plaintiff timely filed a pre-charge inquiry," do you recall, uh, the pre-charge inquiry?

A. I don't recall no more than what I see here as far as a case number.

Q. Were you assisted by an attorney for that pre-charge inquiry?

A. Yes, ma'am.

Q. Who was that attorney?

A. Uhm, my current attorney.

Q. And what was the purpose of the pre-charge?

A. I don't recall.

**Bert W. Whittington, III**

(Page 26)

Q.   Do you have a copy of what you filed, uh -- of the pre-charge inquiry that you filed?

A.   With me right now?  No, ma'am.

Q.   Have you given the pre-charge copy to your attorney?

A.   I don't recall.  I have -- I don't recall, ma'am.

Q.   What was the result of the pre-charge inquiry?

A.   I do not recall, ma'am.

Q.   Is there any document that you know of that would be helpful in helping you recall?

A.   I do not, ma'am.

Q.   Okay.

Uhm, next line down:  "On or about June 7th, the plaintiff timely filed a formal charge with the EEOC."

Now, that's -- that date is different than Exhibit 2 and 3.

Was there another charge filed on June 7, 2021?

A.   I have no idea, ma'am.

Q.   Do you recall filing three charges, three formal charges?

A.   I do not.

Q.   And when you filed the amended charge in June of

(Page 27)

2021, you were not represented by Mr. Orth but you were represented by Mr. Robinson.

Is that correct?

A.   That is correct, ma'am.

Q.   We can go to the Page 6 --

A.   (Witness complies).

Q.   -- on the -- the Complaint.

And starting on Paragraph 21, where it says you -- you recognized that:  "Elected Constable Sherman Eagleton, an African-American with dark skin color, had no interest in the day-to-day administration of the constable's office."

Why did you believe that?

A.   Not only did I believe it, there were other deputies that believed it and we were having that conversation.  There were things going on in the department that, uhm, the African-American deputies felt that Constable Eagleton should have been aware of what was going on in the department.

Q.   And that's why you believed that?

A.   That is correct.

Q.   Okay.

Any other reason that you believed that he had no interest?

A.   Other than, like I just expressed, ma'am, there

(Page 28)

were things going on in the department that he was unaware that was happening in the department.

Q.   Okay.  And let's talk about, uhm, what was going on in the department.

Uhm, what -- what was going on in the department that led you to believe that he had no interest?

A.   For me personally or as a department?  What are you asking about, ma'am?

Q.   Only what you have experienced or what you know is what I'm interested in.

A.   Okay.

What specifically are you looking for, ma'am?

Q.   Just whatever you want to tell me as to:  You said there were things going on in the department that led you to believe that he had no interest.

A.   It was -- it was the way I was treated.

Uh, for example, uhm, I was in a specialized unit which is called the CIU unit.  Uh, things that were happening to me were; one, uh, there were a lot of racial undertone, uh, amongst, uh, the unit.  I was the only African-American in the unit.

I had been advocating, uh, for additional African-Americans in the unit based on, uh, my safety,

(Page 29)

based on the areas in which I was working and based on investigations of which I was conducting in the African-American communities in Precinct 3.

Uhm, I would stop -- Because of the nature of my -- my job, a canine officer working in the Criminal Interdiction Unit, uhm, I was looking for, uh, high profile; I was looking for criminal; and, uh, I would stop folks that had large sums of narcotics; I would stop folks that had guns.

And a lot of times that -- Because I was working in those communities, my unit were, you know, on the other side of the precinct and it was patrol deputies that was assisting me, uhm, and so, uh, I was advocating for that.

Uh, they were having birthday parties, uhm, and they would skip my birthday party.  Uh, uhm, they would talk about officer-involved shootings with African -- with African-Americans and they would have their personal opinions about it, uh, that I thought was, uh, inappropriate.

Uh, they would talk about politics, uhm, uh, that was hurtful to me and I thought it was inappropriate.

Uhm, they will make comments, uh, about race that I thought was inappropriate.  They would send

**Bert W. Whittington, III**

(Page 30)

racial text messages that I thought was inappropriate, and I felt as if that, you know, I was a standalone.

I had -- I had no one there to -- to -- to verify or to support me, uh, mentally, physically, uh, and I felt like I was on an island by myself.

Q. Okay. I want to talk about some of the things that you've just explained.

So the first one, uh, you said that it was a safety issue.

A. Yes, ma'am.

Q. Can you, uh, elaborate on that?

A. Yes, ma'am.

Uhm, I'll make a traffic stop, and that traffic stop, uh, like I said, would be, you know, weapons or narcotics. And if a patrol was not in the area, it would take, sometimes, for either my unit or another patrol in the area or I would have to call for a backup out of Baytown or any other adjacent agency to get there to assist me.

Q. And how often did that occur?

A. Quite often.

Q. When is the first time that happened?

A. The first incident that I recall that happened was I made a traffic stop on Interstate 10, uh, feeder road. It was just east of, uh, Buc-ee's.

(Page 31)

Uh, I pulled over a gentleman, uh, had multiple narcotics in the vehicle, and he took off running on me across the Interstate 10. He went north Interstate 10 towards McNair. Uh, it's dark; it was at night; I was by myself and, uh -- Yes, ma'am. It was -- it was, uh -- it was nerve-racking.

Q. Do you know what year that would have been?

A. I do not, ma'am.

Q. Can you recall another time?

A. Yes, ma'am.

Q. Okay.

A. Uh, I was working Interstate 10 again. Uhm, I made the traffic stop just, uh, west of 330. It was an out-of-state license plate. Uhm, it was at night. It was two occupants in -- in -- in the vehicle. It was a female driver. It was a male passenger.

I approached, uhm, that vehicle on the passenger side. When I approached that vehicle on the passenger side, the passenger -- the -- the male had his window down. When he had his window down, he turned around towards me outside the car and he had his left hand against -- between him and the door, and he was looking back at me and I was speaking to him. I was giving him the command, "Show me your hands. Show me your hands," and the stare that he was looking at me just put a chill

(Page 32)

through my body.

Uhm, I retreated, I drew my weapon, and when I drew my weapon, he looked at me; I looked at him; and I realized right then that he didn't speak English.

Uhm, he realized that he didn't understand what I was saying and he was in trouble. So he immediately turned around, sat back in his seat, put his hands out where I could -- I assume in a position where he was in safety, and then I realized that -- that he just didn't speak English. So I took my weapon. I did secure it. I kept it behind my -- my right hip.

I walked up to the car. I seen his hands was good. I realized that he didn't speak English. I realized that everything was okay. It was just a misunderstanding.

I got back to my patrol unit. I called to dispatch, requested a Spanish speaker. Sergeant Lopez showed up. I explained everything to Sergeant Lopez and it took Sergeant Lopez some time to get to me. Yes, ma'am.

Q. How long did it take Sergeant Lopez to get to you?

A. I -- I don't recall. Uhm, I don't recall how long it took.

I knew he was coming -- If I recall

(Page 33)

correctly, he was coming from the Channelview area somewhere. Uhm, Sergeant Lopez arrived. Uh, Sergeant Lopez, uh, uhm, translated for me. We moved to the parking lot of, uhm, of Denny's and continued on with the traffic stop. Yes, ma'am.

Q. Okay.

And when did that occur? When did that happen?

A. I don't recall, ma'am.

Q. Any other time that you can recall?

A. Yes, ma'am.

Q. Okay.

A. Working Interstate -- Interstate 10 again. Uh, this time it was during the daytime. Uhm, I don't know if it was midday or so.

Uhm, I observed a vehicle traveling westbound. Uh, I observed the driver not having a seatbelt. Uh, I stopped him for not wearing his seatbelt. He was a single occupant inside the vehicle. I approached the passenger side of the vehicle. Uh, I realized that something wasn't right. I wasn't sure what it was.

Uh, I looked in the backseat. I saw a bottle that was laying in the backseat. Uh, I saw a Styrofoam cup up there that had a -- that had a lid on it with a straw.

## Bert W. Whittington, III

(Page 34)

He -- I also saw, uh, some apple Gatorade that was sitting in the console next to the -- the Styrofoam cup. I began to ask the driver some questions. I started seeing some signs of -- of nervousness, uh, behavior, body behavior. Uhm, I had the -- had the -- the individual step out, out of the vehicle; uhm, called for backup.

The first person that showed up, I'm not sure where he came from, was Major Villarreal. I ended up doing a vehicle search and there was a large quantity of narcotics inside that vehicle. Yes, ma'am.

Q. Okay.

Do you know when that was?

A. No, ma'am, don't recall.

Q. Now, are -- You mentioned, uhm, the three times on I-10.

A. Uh-hm.

Q. Do you regularly work that area that these traffic stops occurred?

A. I would -- I would work anywhere that, uhm -- anywhere that I was -- When I check on -- in -- in the morning, and I will tell myself, "Okay. I'm going to work the interstate" or I will tell myself, "Okay. I'm going to go work in the neighborhood."

So it's just these -- In -- in the

(Page 35)

particular ones that I'm telling you about that I recall just happened to be when I was working that particular day on the interstate. Yes, ma'am.

Q. And are there other units in the area that -- to provide backup or...

A. Just depending on the -- the -- the pulse of our unit and depending on the pulse of, uh, of whatever that shift patrol is. And what I mean by "pulse," I mean, uhm, manpower and where they are assigned, uh, within Precinct 3.

Q. So does the units go to where they are assigned?

A. Uh, yes. Uh, patrol does, yes.

Q. Okay.

But you, in the CIU, can go wherever you feel you want to go on any given day?

A. Unless we -- If we wasn't given any directions from our supervisor, we checked on it and we went out looking for our criminal activity anywhere within Precinct 3. Yes, ma'am.

Q. And any other, uhm, encounters?

A. Yes, ma'am.

Q. Okay.

A. Uhm, I had a DEA assignment. Uhm, normally, with DEA assignments, our supervisors make sure that -- that -- that it was two of us from Precinct 3 that

(Page 36)

assisted any outside agencies.

This particular time, I was assigned to a DEA assignment, and I was assigned by myself and it was outside of our precinct.

Uhm -- uhm, I was shocked that I was sent alone. Uhm, I was frustrated that I was sent alone, uhm, but I went. I made a traffic stop on a single veh- -- vehicle occupant, uhm, resulted in, uh, crys -- uh, crystal meth. Uhm -- Yes, ma'am.

Q. Do you know when that was?

A. No, ma'am, I don't recall.

Q. And who gave you your assignment?

A. Uh, it was Major Villarreal.

Q. Did you question Major Villarreal as to why you were assigned alone?

A. No, ma'am.

It was just -- I didn't question it. I was just frustrated because this thing had just been occurring, and so, uh, I -- I didn't.

Q. And when you say "this thing had been occurring," what do you mean?

A. I mean, like, if I would make suggestions about uhm, the areas in which I worked were predominantly African-American. If I would make suggestions or I would need assistance, it was always like, "Yeah, yeah, yeah.

(Page 37)

Okay."

It almost seemed like I had to walk into the CIU unit and -- and -- and pout like a child to get assistance. And if that didn't happen, I would go to patrol. I would go to the patrol sergeants and request a patrol deputy; and I have had on several occasions. You know, three patrol sergeants ask me, "Why is it that, you know, you always come to us? Why isn't your unit backing you up?" Or "Why is it you always come and ask us for a deputy transport your prisoner to jail? Why isn't your unit doing it?" And I would say, "Hey, man..."

Like, for instance, the last one -- Uh, the last incident I had, the sergeant asked me, "Why is it that you always come to us to ask to take my deputy?" And I just looked at him and I said, "Sergeant, this has been going on since I've been here," and I walked away from him.

Q. And what sergeant was it that asked you that?

A. Sergeant Villa -- I mean -- Not "Villa" -- Sergeant Vega.

Q. And what was it that the sergeant specifically said?

A. Sergeant Vega said, "Why is it you -- you always get patrol to transport your -- the prisoner? Why don't they help?" And I said to the sergeant, "Sarge, they have

**Bert W. Whittington, III**

(Page 38)

been doing it since I have been here."

Q. And when was that?

A. I -- I don't recall.

Uh, but I will say this, ma'am. It was the -- it was the incident in which I am here today. It was the incident why I'm here today, my case, and I just -- I just don't recall the date.

And he asked me why my body cam was on. So it's on my body cam.

Q. And these instances that you, uh, listed, uhm, with regard to, uh, the traffic stops you conducted, does anyone else in the CIU, uh, do they contract -- do they conduct traffic stops on their own?

A. Yes.

Q. Okay.

The next, uhm, thing you mentioned is birthdays.

A. Yes, ma'am.

Q. Did you attend -- Well, let me strike that. Let me back up.

The birthdays that you are referring to, are you referring to within Precinct 3 as a whole or within the crime interdiction unit?

A. Within the crime interdiction unit.

Q. And how did birthdays get conducted?

(Page 39)

A. Uhm, as of later on during my tenure with CIU, there was a -- there was a deputy named Deputy Suarez. Deputy Suarez' wife, she would make the cakes, she would make the, uh -- she would do all the -- the -- the cooking and the trimmings for the birthday parties and, uhm, they would have the birthday parties.

Q. Did you attend any birthday party?

A. I initially started attending them.

Q. And what -- When was -- Around what time was the first one you attended?

What year did they start having these birthday parties?

A. I don't recall the year it -- it started happening. Uhm, I would say it's -- it started shortly after I became part of the CIU unit.

Q. And at no time were you provided a cake?

A. No, ma'am.

Q. And were you on duty on your birthday?

A. Yes, ma'am.

Q. And at no time were you -- were you provided a, uh, meal or trimmings or anything like that?

A. No, ma'am.

Q. Did you ever ask anyone about that?

A. No, ma'am.

Q. And why is it, do you think, that they would not

(Page 40)

give you, uh, a cake?

A. Maybe they was trying to, you know, hurt my feelings or -- I'm not sure because it didn't matter to me, you know.

I -- It -- it mattered but it didn't matter. It mattered because, if I would have received, uh, a party, okay, it would have been fair because everybody else was receiving one.

Uh, it didn't matter because I had eight hours to do my job; I had eight hours to do my job. I did my job.

Q. Okay.

Would you rather have been doing your job than having a party?

A. Absolutely.

But it would have been nice if they would have recognized my birthday like they recognized everybody else's birthday.

Q. Did you bring up -- bring it up?

A. No, ma'am.

Q. Did you bring it up to, uhm -- I'm sorry. Who did you say provided the cakes?

A. Uh, at the latter part it was Suarez, Deputy Suarez.

Q. And how do you spell "Suarez"?

(Page 41)

A. I -- I don't know, ma'am.

Q. Who was -- Who provided the cakes before Deputy Suarez?

A. I'm not sure.

May I -- Can I correct that, ma'am?

Q. Yes, absolutely.

A. Uhm, I do recall in -- in the -- in the beginning we were taking up a collection. We were taking up a collection for each deputy, uh, uh, for those parties.

And then, uhm -- then it kind of shift, uh, and I just stopped giving my money and I wouldn't show up.

Q. Now, when they were taking a collection for the deputy, all the deputies, did you ever receive a cake at that time?

A. No, ma'am.

Q. And the birthday parties, you stopped going at some time?

A. Yes, ma'am.

Q. Okay.

Do you know what year that was, that you stopped going?

A. I don't recall the year, ma'am, but I do recall an incident that happened.

Q. Okay.

Bert W. Whittington, III

(Page 42)

And what is that incident?

A. Uh, I got, uh, reprimanded verbally because I didn't show up to a birthday party.

Q. And whose party was that?

A. It was, uh, Deputy Watson's.

Q. And who verbally reprimanded you?

A. Uh, Sergeant Barringer.

Q. What did Sergeant Barringer say?

A. He was -- said he was disappointed that I didn't show up.

Q. Did he say that it was a verbal reprimand?

A. He didn't say it was a verbal reprimand but it was just like a -- a scolding, you know, like -- you know, like, you would scold a child for not doing something.

Q. Okay.

When he said he was disappointed that you didn't show up, what did you say?

A. I told him I had -- I -- I was doing an investigation.

And that's what I would do to get out of it. I would make a traffic stop so I don't have to be there or I will get into an investigation or something. I was always trying to find ways not to be there because I just felt uncomfortable.

Q. Why did you feel uncomfortable?

(Page 43)

A. Simple fact that; one, uh, they made it seem as if that, "Okay. We want you to show up at this birthday party but we're not going to give you one. We're not going to recognize yours."

Uhm, uh, another reason why is because, you know, they would talk about things that -- that made me feel uncomfortable. They would talk about, uhm, you know, officer-involved shootings, uh, with African-American people and what they thought, uh, about the case and there was no adjudication on it. Uh, they would talk about politics, uh, that was offensive to me and, uhm, so I chose not to -- not to be a part of that.

Q. What did they say about politics that was offensive?

A. Oh, man. President Trump was tough, was really tough on a lot of racial issues during his presidency and they seemed to boast that. They seemed to really revelish [sic] in talking about Black Lives Matter and him walking with a Bible while they bombing these protesters. Just -- It was just constantly stuff like that; it just got very irritating.

And that's why I blew up on the last text message that I received about George Floyd, and that's why I feel like I'm here today.

Q. When did these comments first begin?

(Page 44)

A. Oh, man. It was, like, almost early when I was with the unit.

Like I said, it was, like, anytime there was an officer-involved shooting with an African-American, man, they would just have a field day with that thing. You know, Sergeant Barringer was the big -- was the biggest ringleader. He -- he would start it, you know. Uh, say stuff like, "The only thing you got to do is -- is comply, just comply and you wouldn't get shot," you know. And, uh, he would always brag about how he used to whoop deputies -- I mean, not "deputies" -- but suspects' behinds when he was with the sheriff department; you know, how canine officers love for him to go because he would get into the fight. I mean, just that kind of stuff that just -- just irritated me.

And so, uh, I would find an excuse to not show up.

Q. Was his comments only regarding African-Americans or other races, such as Hispanics or other races?

A. It was mostly African-Americans.

Now, when he was talking about what he did with the sheriff's department, I don't know who they were because he never identified anything but it was mostly about African-Americans. Uh, that was basically what the

(Page 45)

topics were about.

Q. Did he make specific statements about race?

A. He didn't make specific statements about race.

But he would talk about the officers involved in shootings that was involving African-Americans.

Q. Anyone other than Sergeant Barringer that would make these comments?

A. I mean, they all would chime in.

You know, I'm -- I'm -- I'm the only one there so, you know, I would say something to show my disapproval and it was like they would all gang up on me. And then I would sit there for a minute and I was, like, "Oh, I need to go check on something," and I would leave.

Q. Now, was this only within the CIU or was this within the Precinct 3?

A. No. I -- It was only with CIU.

I can't say what was -- what's necessarily happening out in Precinct 3. I mean, I heard some things but, you know, I wasn't the one to kind of get into none that kind of stuff.

I would hear it and I would keep going, or unless that deputy or some deputies will come to me and say, "Hey, what do you think about this?" And a lot of them came to me because of my Military experience and my

**Bert W. Whittington, III**

(Page 46)

age, and, uh, we would have -- have a discussion about it. But, uh, mostly it was inside the CIU unit.  Yes, ma'am.

Q.   And who was in the CIU unit at the time that were -- that were participating in these discussions?

A.   Uh, all of us.

Q.   And who are they?

A.   Major Villarreal; Sergeant Barringer; uhm, uhm, uh, Corporal Dugat at the time, until Corporal Dugat left; uh, it was Corporal Cornelius; uh, it was Skero; it was, uhm, Watson; uhm, uh, Ross Woods; Ely Pereda; and it was, uh -- and then later on, it was Suarez.  Suarez came in later on.

Q.   And did all of them participate in the discussions with Sergeant Barringer?

A.   For the most part, yes.

Uh, I can tell there were a couple that was uncomfortable with it.  Uh, uh, and I have had a couple come to me and say, "Hey, you know, that wasn't appropriate."

Uhm, but for the most part, yeah.  Yes, ma'am.

Q.   Did any of them, of the people that you named that were present, make any specific statements about race?

A.   I can't say it was, like, specific statements.

(Page 47)

It was statements that were relating to race-related offenses, race-related shootings, uh, race-related politics, uhm, race-related criminal activity.  Uhm, that's how I would, uh, identify what the rhetoric was -- was about.

Q.   When you say "race-related criminal activity," what do you mean?

A.   Uh, Black folks doing crimes.

You know, they would -- Something would come on TV or -- or, you know, we will be in a -- we will be working a, uh, specific area as a unit in a predominantly Black area, like the northeast or Barrett or -- or -- or -- or McNair; they would make these comments.

Q.   What type of comments?

A.   Like, "These people have a job and not have to sell this dope" kind of stuff; or "These people riding around here with expired registrations."  I mean, it was just -- just little stuff like that.  Just little, you know, like -- Uh, it was just little stuff.

It was just -- It was like potshots.  You know, it was, like, with the inner shot -- within earshot potshots and it was outside a unit or outside of -- of the -- the -- the workspace but it was out -- out on the streets.  It was just like little -- little potshots they

(Page 48)

would -- they would say.

Q.   Okay.

Anything else, uhm, other than that they would, uh, talk about, other than politics, uhm, the criminal conduct --

MR. ORTH:  Objection.  Speculation.

Q.   (BY MS. MARTIN) -- when you were present?

A.   Can you repeat that, ma'am.

Q.   Yes.

When you were present, other than the political rhetoric or the criminal conduct that they would talk about or make comments on --

A.   Yes, ma'am.

Q.   -- any other subjects that they would comment on that was related to race?

A.   At this time specifically, as I'm sitting here, uhm, those are -- those are the things that -- that I discuss with you that really hits me.  I'm sure there is probably more that I may -- you may have got in discovery that I don't remember.

Uh, uhm, but at this particular time, yes, ma'am, that's the things that really affected me that -- that I can recall right off the top of my head.

Q.   Okay.

Uhm, and let's move on to, uh,

(Page 49)

Paragraph 22.

A.   Yes, ma'am.

Q.   Uhm, Bonsal led a small clique with the constable's office.

Who -- who makes up this clique?

A.   That's going to Chief Bonsal, that's going to be Major Villarreal; that's going to be Barringer; uhm, that's going to be, uhm, uh, Sergeant Magana; that's going to be, uh, Sullivan, Sergeant Sullivan.  Uh, mainly -- mainly that, that crew.

Q.   Okay.

And the next sentence:  "The lead enforcers of Bonsal's clique were Major Villarreal and Master Sergeant, uh, Troy Barringer."

What do you mean me by "enforcers"?

A.   Let me see if I can give you an example, if I can recall an example.

Uhm... So I can't recall a specific example right now.

So if -- if Bonsal don't like somebody or don't like something, Major Villarreal is going to take care of it or Barringer is going to take care of it.

Give you an example:  If Bonsal got mad at somebody, they would get back at him; like, take him out of a good patrol unit and put him in a bad patrol unit

**Bert W. Whittington, III**

(Page 50)

that don't have a radio or, you know, that's actually to be, you know, disposed of, uh; or they would take him from a shift that they requested him and put him on a shift that they know they don't like or it would affect their family's livelihoods.

You know, may have somebody as a single parent or may have, you know, a dual family household where the schedule they're on would support them to support their kids and to support their spouse. They knew that, so they would screw with him and put him on a night shift where it would just totally disrupt their whole family, that kind of stuff.

Q. Did you know anyone who, uh, that happened to, what you described?

A. Oh, yes, ma'am.

Q. Okay.

Who is that?

A. One of them was, uhm, uhm, uhm... I can see his face and I'm just, uhm... I can see his face, ma'am. I just can't recall his name right now.

Uhm, uh... I don't know why I'm -- I'm -- I'm -- I can see his face. Uh, give me a second. Uh... Gosh, man, it's been so long. I can see his face. I just can't recall his name.

Q. Okay.

(Page 51)

Is there anyone else?

A. Uhm... Ma'am, to be honest with you, it's been so long.

Uh, the way this thing affected me, uhm, I try not to read documents, uhm, I try to move on with my life and so right now, I'm just drawing a blank.

Q. Do you know if the two -- I know you can't recall their names -- uhm, did they ever, uh, complain or file a charge of discrimination?

A. I know they complained.

Because the one I'm thinking about, he raised a big stink. I was -- I was newly there. I -- I -- I don't know. I may have been there maybe a year or so and, uh, uhm, he done something. I'm not sure what he had done. And he walked in Major Villarreal's office and he put up a big stink.

Uh, I even -- I even -- If I recall correctly, he even, uh, went to, uh, chief, uh -- the assistant chief now, went to him and they -- they all went in there. And, I mean, he made a stink about it and it was all over the department. So, uhm, yes.

Q. He complained of discrimination?

A. I don't know what the complaint was.

I know he was complaining. And if I -- if I'm not mistaken, he -- I think he may have used that word

(Page 52)

"discrimination". Uhm, but, yeah, it was a big stink.

Q. Did he tell you that he had used the word "discrimination"?

A. Yes, ma'am, he did. He did tell me that. He -- he -- he did tell me that.

I can -- I can remember some of the -- the language that he used and, uh, I don't know if it's appropriate to tell you what he said but, uh, I -- I can remember some of the language he used.

Q. Yes.

What did he say?

A. He said, you know, "They are just fucking with me and I'm tired of it."

And he said, "Villarreal don't know who he's messing with." That was the language he used. And he said, "They only fuck with me because I'm Black."

Q. Did he tell them that?

A. I don't know.

I wasn't in those clo- -- behind -- behind those closed doors. The only thing I can hear was the voices being raised and -- and, oh, he was vividly upset.

Q. Now, when you said he did something, what did you mean?

A. I don't -- I don't know what -- what he did for them to do him like that. I mean, he was a veteran. He

(Page 53)

had been there a long time ago. Everybody looked up to him. He was an FTO. Uhm, you know, he didn't mind helping folks out.

I mean, he was a -- he was, what we call in -- in -- in -- in the Military, "a good piece of equipment." You know, you -- you -- you didn't know how to do something, you went to him and he had no problems saying, "Hey, this is how we do this" or "this is how I do it." Uhm, uhm, but, yeah, he was just -- he was just a great, all-around guy.

Q. Do you know if he committed any policy violations?

A. I have no idea, ma'am.

I -- I -- Like I said, when it came down to that, I would just hear what the issue was but I didn't never get down into the details about that, ma'am. No, ma'am.

Q. Now, moving down to, uh, Paragraph 23 --

THE REPORTER: Counsel, if we could just go off the record just a minute.

MS. MARTIN: Sure. We'll go off the record.

THE VIDEOGRAPHER: Okay. The time is 11:05 a.m. We are off the record.

(Recess from 11:05:20 a.m. to 11:19:32

**Bert W. Whittington, III**

(Page 54)

a.m.)

THE VIDEOGRAPHER:  The time is 11:19 a.m. and we are back on the record.

Q.  (BY MS. MARTIN) All right.

Mr. Whittington, uhm, and let me apologize. I didn't realize we had gone so long.  So, please, if you need a break, before, you know, we -- somebody else says they need to take a break, please let me know.

A.  Yes, ma'am.

Q.  Okay.

Uhm, so I believe we were on Paragraph 23, uhm, and the last sentence:  "His exposure to offensive jokes and comments slighting African-Americans also increased."

Let's talk about the offensive jokes.

Can you tell me about that.

A.  They would -- they would, uh, send text messages with jokes about, uhm, again, officer-involved shootings with African-Americans.

Q.  Okay.

And who would do this?

Who -- who sent -- Let's take one text at a time.  Tell me about the first text.

Do you recall when that was?

A.  The -- the one text that I remember is when, uh,

(Page 55)

the toxicology came back about George Floyd.

Q.  And who sent that text?

A.  If I -- if I -- if I recall correctly, it was Sergeant Barringer.

Q.  And what did he say?

A.  I have to paraphrase because I -- It was talking about, in retrospect, that, "I guess there is going to be a riot now" since his toxicology back -- came back, uh, with whatever narcotic it was in his -- in his, uh -- in his toxicology report.

Q.  Okay.

And what else?

Uhm, so he said that there would be a riot? Uhm --

A.  Black -- Black Lives Matter, uh, riot, something to that effect about the toxicology report.

Q.  Did he say anything else about Black Lives Matter?

A.  In that text message, ma'am?

Q.  Correct.

A.  Uhm, I don't recall.  I -- I don't have that texting message with me, ma'am.

Q.  Okay.

At any other time that, uhm, somebody put in a text message, uhm, an offensive joke or comment

(Page 56)

slighting African-Americans?

A.  Yes, ma'am.  There was -- there was several.

Q.  Okay.  So we have talked about one.

Tell me about next one.

A.  Like I said, ma'am, it was just so many.

That one stood out in my head because that's when, uhm, I stood pretty strong.

Q.  Okay.

Do you recall when the others happened?

A.  No, ma'am.  It was -- it was a course of my time in CIU.

Again, the only reason I remember that one is because I stood pretty strong, and whatever date that was that, uh, Mr. George Floyd's toxicology report came back, that, like I said -- that's when I stood strong.

Q.  Okay.

What was the subject of the other texts?

A.  Ma'am, I -- Again, I don't recall those subjects of the other texts.

Uhm, it's been just so long, uhm, and -- and, like I told you before, I just try to remove myself from it.  It -- it -- It's been so long.

Q.  If you're comparing the text you've told me about with the other text, do you recall which one offended you the most?

(Page 57)

A.  I would have to say the George Floyd one because that's when I -- like I said, I just had enough.

Q.  Okay.

And did you complain, uhm, about that text?

A.  I did.

Q.  And who did you complain to?

A.  On that group text.

Q.  Okay.

And what happened from there?

A.  A meeting was called.

Q.  Okay.

And who called that meeting?

A.  Major Villarreal.

Q.  And who was present at that meeting besides you and Major Villarreal?

A.  The entire team.  The entire CIU team.

Q.  Other than the CIU team, was there anyone else from Precinct 3 present?

A.  No, ma'am.

Q.  And what happened at that meeting?

A.  Major Villarreal started the meeting off.

THE REPORTER:  Started the...

THE WITNESS:  Started the meeting off. Started -- started -- Just started the meeting.

Q.  (BY MS. MARTIN) Okay.

**Bert W. Whittington, III**

(Page 58)

And what did he say?

A.  The two things that stuck out in my mind, what he said was, "We are not here to talk about George Floyd and we are not here to talk about, uhm, the incident that happened with Hutch."  Sergeant Hutch -- Hutchins.

Q.  Okay.

And then what -- Did he say what he was there to talk about?

A.  If I recall correctly, I immediately interrupted him.

Q.  I'm sorry.  Repeat that.

A.  If I recall correctly, I immediately -- I immediately interrupted him.

Q.  Okay.

And what did you say?

A.  I said, "This is the reason why we're here.  We need to talk about those two things."

Q.  Okay.

And then he said -- What did he say?

Did he reply?

A.  He did.  Yes, ma'am, he did.

Q.  What was his reply?

A.  I don't recall specifically what he said after I said that.

In my mind, at that particular time, I felt

(Page 59)

as if they all just chimed in like they always did and jumped on me.

So there was conversations going back.  I just can't remember exactly what he said at that particular time after I said that.

Q.  And when you say they "jumped" on you, what do you mean?

In what way?

A.  As if to discredit what I had to say, how I felt.

Q.  And when you say how you "felt", how you felt about what?

A.  About that, the reason why I was there at the meeting.

Q.  And so I can get clear for the record, what was that?

A.  The racial tone of the text message; the racial tone of, uh, about George Floyd and about everything else that had occurred, the reason why I'm here today.

Q.  Okay.

And when you say what "occurred", have we talked about those occurrences?

A.  All those that I can remember that, uhm, I know that I provided, uh, during discovery that I may have forgotten.

(Page 60)

Q.  Okay.

And how did you feel, uhm, about the result of the meeting?

A.  What -- what do you mean by "the meeting"?

Q.  So let me restate that.

Uhm, did you feel that the meeting accomplished what you had hoped it would -- Well, let me -- let me -- I'm sorry.  Bad question.

What did you hope to accomplish at this meeting?

A.  I didn't have any expectations because I knew, uh, what I had to say was; like, anytime I said anything else, it was just my opinion, in one ear and out the other.

Q.  And what made you feel that way during this meeting?

A.  Their responses to how I felt.

Q.  What were the responses?

A.  Downplaying the fact that what they had said had -- or what I had said was no merit.  Uhm...

Q.  And when you say what they had said and what you had said, are you talking about statements about George Floyd's murder?

A.  Yes and no.

Q.  Okay.

(Page 61)

"Yes", because why?

A.  Yes, because we were there for George -- about George Floyd's murder, but, no, it turned into something totally different.

Q.  Okay.

What did it turn into?

A.  It turned into me defending myself.

Q.  And what was being said or why did you believe you had to defend yourself?

A.  Because they were all, like -- like I said once before, was pointing a finger at me and, "No, that's not true," and that type of rhetoric.

Q.  What did you say that somebody responded, "That's not true"?

A.  One in particular thing that was said that came from Sergeant Barringer was -- his statement to me was, "Come on, Bro.  You don't really think that officer killed that guy."

Q.  And did he bring that up during the meeting?

A.  Yes.

Q.  And what did he say?

A.  He asked me the same thing he asked me in the text message:  "Come on, Bro.  You really don't think he mean -- he mean the -- he mean -- that officer mean to kill that guy."

**Bert W. Whittington, III**

(Page 62)

Q. And what did you say?

A. I said, "Did you recognize that I didn't answer you in that text message"?

Q. And did he respond?

A. He did.

Q. And what was his response?

A. He said, "Yes, I recognize you didn't answer me in the text message."

Q. And were you able -- Did you resolve that issue with him at that meeting?

A. I said what I had to say, the reason why I didn't answer him in that text message.

Q. At that meeting, were you able to say all that you needed to say?

A. No.

Q. What were you not able to say that you would have said?

A. I would talk about my birthday that they missed.

Q. What else?

A. I would talk about them not assisting me when I had a stop. I would talk about they trying to make me do stuff that wasn't right. I would talk about them falsifying documents, trying to get me to falsify reports. I would talk about them doing the rare things that I disapproved of.

(Page 63)

Q. Okay.

Anything else?

A. Not that I call -- recall right now.

Q. Okay.

I know we have talked about the birthdays. Uhm, you just mentioned not assisting you at stops.

A. Uh-hm.

Q. Other than those stops that you described, were there other stops?

A. Yes, ma'am.

Q. Okay.

And what is -- what -- what is another stop?

A. My very last major stop.

Q. Your last stop?

A. My last major stop, yes. I mean, "major stop", meaning where I had, you know, weapons and narcotics. Yes, ma'am.

Q. And no one assisted you?

A. Not from my unit, they didn't.

Q. Did someone from Precinct 3 assist you?

A. Yes, ma'am.

Q. Who assisted you?

A. Deputy David Johnson.

Q. And when you say no one from your unit would

(Page 64)

assist you, did you call officers from your unit to assist?

A. There was no protocol to call.

When they dropped a call and it would have to do with major drugs or weapons, I was coming. They didn't have to ask me to come; I was coming. No matter where I was at or what I was doing, I was coming. It didn't happen for me like that.

Q. How did you find out that somebody needed assistance?

A. Over the radio.

Anytime someone say, you know, "They have got a weapon," or -- or whatever. To me, if I'm listening to the radio and they got multiple occupants in the vehicle and they are by themselves, I don't care if it's from my unit, I don't care if it's from some other agency, if I was in the area or if I wasn't in the area, I was coming.

Q. So you would hear officers from your unit over the radio stating that there was -- that the suspect had a weapon?

A. If they called they had a weapon; if they called they had narcotics; if they called they had multiple occupants of the vehicle, I was coming.

Q. So no one on the radio ever said, "I need

(Page 65)

backup"?

A. They didn't have to for me.

If they had weapons; if they had multiple occupants; if they had narcotics, I was coming.

Q. But did you ever hear them say they needed backup?

A. Again, ma'am, I wasn't looking for them to ask for backup. I was coming.

Q. I understand.

I just want to ans- -- ask the question whether you ever heard anyone from the CIU say they needed backup over the radio.

A. Yes.

Q. And when you would arrive at the scene to back them up, who else arrived at the scene to back them up?

A. The other CIU units, maybe highway patrol, maybe other agencies if they was in the area or listening to the radio.

Q. So other than you, who else from CIU would respond?

A. Respond to?

Q. To a call for backup.

A. Uhm, other patrol units. Sometimes the whole calvary will go, depending on the nature of the request for the backup. I mean, you have to listen to the tone of

**Bert W. Whittington, III**

(Page 66)

the individual's voice.

I listen to the tone of the individual's voice, uh, and if it was a sense of urgency, you best believe that probably the whole calvary was coming.

Q. All of CIU was coming --

A. All --

Q. -- when you say that?

A. When I was -- Either all of CIU was coming or who -- or patrol deputies were coming.

It just -- Again, it just depended on how that individual asks for it. You know, if they say, "Step it up," you know, that was a code for us that, you know, we're trying to tear the roads up to get to them.

Q. Did you ever state on the radio that you needed backup?

A. Sometimes.

Q. And who would show up?

A. It just varied.

Uhm, if -- When -- when Corporal Cornelius was with the unit, if I said I needed backup, Corporal Cornelius was coming.

Q. And Corporal Cornelius was in the CIU?

A. At one point, yes, ma'am.

Q. And he would arrive for backup?

A. Yes, ma'am.

(Page 67)

Even -- even when Deputy Johnson was there, he would -- he would -- he would show up. He would -- he would get to me, yes, ma'am.

Q. Did any patrol officers arrive for backup?

A. Yes, ma'am.

Q. Did any other agencies arrive for backup?

A. Sometimes.

If they were listening to the radio or there was no nearest backup to me, dispatch or one of the supervisors would come over the radio and, you know, ask for Baytown or, depending on where I was, ask for Chambers County or Liberty.

Or just depending on where I was working that particular day and there was no unit near me, one of the supervisors would -- would request dispatch to contact the nearest agency that was in that borderline of our precinct.

Q. And on the days that you said no one from CIU would back you up, on those days, did you state on the radio that you needed backup?

A. No, ma'am.

I -- No, ma'am.

Q. Okay.

Uhm, now move on to another thing, uhm, that you said, uhm, about falsifying documents.

(Page 68)

A. Yes, ma'am.

Q. Who was falsifying documents?

A. I don't -- I don't -- I don't know who, as far as cases outside of my cases, but I've been approached to falsify documents.

Q. By who?

A. Sergeant Barringer.

Q. And what did he say when he told you to falsify a document?

A. He said, "Hey, you may need to falsify -- falsify your report."

Q. And why?

A. I really don't know why he said that to me.

Q. Did you ask why he wanted you to falsify a report?

A. I did not ask him why.

But I told him these words, "Sergeant, I don't do that."

Q. How did he want you to falsify a report?

A. Uh, he wanted me to change a report.

Q. What change did he want you to make?

A. I'm not sure because I didn't let him specify what he wanted changed. I stopped him in his tracks.

Q. How many times did he do that?

A. On two occasions that I know of.

(Page 69)

Q. And both times you declined to change --

A. Absolutely --

Q. -- the report?

A. -- without a doubt.

Q. Did you report that activity to anyone?

A. No, ma'am.

Q. Why not?

A. Because I told him I wasn't falsifying a report, and that was the end of it.

It's not something I'm going to do, so I nipped it in the bud and left it alone and kept on moving.

Q. Was he angry?

A. I'm -- I'm not sure if he was angry or not, ma'am.

Q. Did he express any angry words to you?

A. Are you asking me you want to know what he said?

Q. Sure.

A. He said, "I know you ain't going to do that. That's just you," and he changed the subject.

Q. Did he push the issue further?

A. No, ma'am.

Q. And other than those two times that Sergeant Barringer came to you, are there any incident -- ins- -- instances of falsing -- falsifying documents that you're referring to?

**Bert W. Whittington, III**

(Page 70)

A.   Can you repeat that, ma'am.

Q.   You have named the two times that Sergeant Barringer came to you.

A.   Yes, ma'am.

Q.   Are there any other times that anyone has asked you to falsify a document?

A.   No, ma'am.

Q.   And the two times that you're referring to with Sergeant Barringer, are the documents reports or what type of documents were they?

A.   Reports.

Q.   And what type of reports?

Are these arrest reports?

A.   Yes, ma'am.

Q.   And you also stated that doing things that you disapproved of.

Uhm, what were you talking about?

A.   Illegal searches, illegal traffic stops.

Q.   Okay.

Let's --

A.   Illegal reason for running a canine.

Q.   Okay.  Let's talk about illegal searches.

Who was conducting illegal searches?

A.   It -- it -- it depend on who was working, uh, who made the traffic stop.  So -- And what I mean by that,

(Page 71)

as a K-9 officer, they call for a K-9, I'll ask the individual, "What was your reason for stopping them?"  And if it wasn't a legitimate probable cause, I'll tell them I'm not doing it and I'll get in my vehicle and leave.

THE REPORTER:  You're not doing it and you'll...

THE WITNESS:  Get in my vehicle and leave.

THE REPORTER:  Thank you.

Q.   (BY MS. MARTIN) So you would leave the traffic stop with your canine?

A.   Or --

Q.   Is that correct?

A.   That's correct.  Yes, ma'am.

Q.   And how many times did that happen?

A.   (No audible response).

Q.   How many times a month?  Let's break it down.

A.   Oh, it wasn't like -- like -- like that.  It wasn't like -- it's like a reoccurrence thing.

It was like, if they made a traffic stop and I showed up and they -- to -- to back them up and they asked me, "Hey, can you run your K-9?"  And I asked him, "Hey, why did you stop them?  What's your probable cause?"  And if the probable cause wasn't probable cause to stop the vehicle, I would tell them, "No," and I would get in my unit and I would leave.

(Page 72)

Q.   How many times do you think that happened?

Five times?

A.   I couldn't give a number, ma'am.

Q.   Do you think it was less than five?

MR. ORTH:  Objection.  Asked and answered.

THE WITNESS:  Ma'am, I -- I -- I just can't give you a number.

Q.   (BY MS. MARTIN) Other than, uh, illegal searches that you mentioned, what other things that -- did you disapprove of that you were referring to?

A.   Taking stuff from scenes during investigations.

Q.   And how often did that occur?

A.   Often.

Q.   Every month?

A.   Not every month.

Every time -- Anytime we had a big investigation, a big drug investigation, a big...

Q.   Is that more than ten times?

A.   I -- I -- I can't put a number on it.

Q.   So going back to the exhibit, uhm -- We're on, uh, 23, the -- the last sentence:  "The core of the jokes and comments were that African-Americans with dark skin color were an inferior race."

Who stated that African-Americans were an inferior race?

(Page 73)

A.   It was -- it was always Sergeant Barringer drumming up the -- drumming up that rhetoric.  He was always beating the table.

Q.   So we have talked about the George Floyd issue.

What else did he say?

A.   Ma'am, again, it was just so much, you know.

You know, when you go through a lot of stuff, you kind of become numb to it until you strike a nerve.  You just become numb to it.  When you don't have nobody there to stand with you against these people and it's just you and it's you against them, you learn to deal with it.  You learn to -- until they struck a nerve.

Q.   Anyone other than Sergeant Barringer?

A.   Like I said, he was -- he was the -- he was the drum leader, you know.

And if something hit the news and we all get together and, boy, he's just over there just ramming it up and they would just chime in.  And, like I said, it just got so much to me that I just started making excuses not to eat lunch with them or go to the office.

You know, I would like to go in the office and sit on the computer and be relaxing and type up my reports.  I would do it in my vehicle.

Q.   Now, are the issues that he would, uhm, as you said, drum up, were these issues that were on the news?

## Bert W. Whittington, III

(Page 74)

A.   Yes, ma'am.

Q.   And was this by group text or was this verbal?

A.   50/50.

Q.   And who was present, uhm, both on the verbal and the group text?

A.   Well --

Q.   Was this the CIU or Precinct 3, other --

A.   It was -- it was the CIU unit.

Q.   Now, the next paragraph on 24, you said, uh -- This was the -- the text, uhm, that Jason Hutchins had sent --

A.   Yes, ma'am.

Q.   -- and you say:  "Bonsal protected Hutchins after the text."

How did he protect him?

A.   Initially, my understanding -- Again, when stuff like that happened, a lot of the Black officers would -- would talk and it would get back to me.  The initial word was that, uh, they wasn't going to demote him; they was going to put him on night shift on, uhm, the toll road.

Q.   Okay.

And this was for the text message specifically?

A.   Yes, ma'am.

Q.   And is that what happened?

(Page 75)

A.   Uhm, yes and no.

Q.   How did it happen?  In what way "yes"?

A.   One way, yes, he was going to the toll road as a night shift sergeant.

Q.   And what's the "no"?

A.   The "no" was:  Somehow it got leaked to the media and they did a, uh, a big press conference and said they was firing him.

No, uh, "he resigned" and nothing happened.

Q.   Did you have any knowledge whether there was a investigation ongoing before the text message?

A.   Uh, yes.

Q.   And what was that investigation for?

A.   Can you say that again.  I may have missed something.

Q.   Yes.

Was there an investigation being conducted against Jason Hutchins before the text message was sent?

A.   Oh, I have -- I have no idea about that, ma'am.

Q.   Do you have any knowledge whether the discipline that you're referring to had to do with any other policy violation committed by Jason Hutchins outside of the text message?

A.   Oh, I -- Ma'am, I have no idea.

Q.   Does Jason -- Did Jason Hutchins still work at

(Page 76)

Precinct 3 following the text message?

A.   Uhm, for a short period that I know of, yes, ma'am.

Q.   How long did he work there?

A.   After the text message?

Q.   Yes.

A.   I'm not really sure, uhm, how long after the text message because, like I said, uhm, word was it got leaked and they all immediately did a press conference.

Q.   Did you receive the text message?

A.   I did not receive that text message, ma'am.  No, ma'am.

I wasn't a part of the -- the patrol piece that was providing security.  I did provide security for that test site, but I wasn't a part of that text.

Q.   Did you make a complaint about the text message?

A.   No, ma'am, I did not.

Q.   How did you hear about the text message?

A.   Uhm, African-American deputies telling me about it.

Q.   Did you ever see the text message?

A.   No, ma'am, I did not see the text message.

Q.   Okay.

Uhm, moving down to the next paragraph, uhm, where it says, uhm, the third sentence:  "In Bonsal's

(Page 77)

clique because they believed that Floyd deserved the consequences."

Who, uh -- who are you referring to that just -- that believed George Floyd deserved the consequences?

A.   Barringer, Villarreal.  I -- I would have to say everybody inside CIU except for me, at that particular time.

Q.   Okay.

And what did they say that made you believe that they believed George Floyd deserved the consequences?

A.   Their comments about his toxicology, the comments about not complying.  Yes, ma'am.

Q.   Anything else?

(Pause in proceedings)

MS. MARTIN:  Mr. Whittington, would you like to take a break?

THE WITNESS:  Please.

MS. MARTIN:  Okay.  Let's go off the record.

THE VIDEOGRAPHER:  The time is 12:01 p.m. and we are off the record.

(Recess from 12:01:34 p.m. to 12:44:40 p.m.)

THE VIDEOGRAPHER:  The time is 12:44 p.m.

**Bert W. Whittington, III**

(Page 78)

and we are back on the record.

MS. MARTIN: Mr. Court Reporter, can you read the last question that I asked before the break.

(The record ^^^ found at Page     , Line     , to Page     , Line     , was read)

Q. (BY MS. MARTIN) So anything else than what, uh, he just read with regard to that question?

A. With regard to Mr. George Floyd?

Q. Correct.

A. Hm, hm, hm, hm. Nothing more than, uhm, my statement to Sergeant Barringer about his additional text message of, uhm, "Man, you don't -- you don't believe that officer -- you don't believe that officer meant to kill him, do you? I love you anyway."

Q. Okay.

And did you feel that statement meant that he believed George Floyd deserved the consequences?

A. Absolutely.

And I didn't answer that text because I had a feeling he was going to ask me that question at that meeting --

Q. Okay.

A. -- and he did, and I responded.

Q. And anything else that was said that made you feel or believe that either Sergeant Barringer or somebody

(Page 79)

else from the CIU felt that George Floyd deserved the consequences?

A. When the verdict came out.

Q. Okay.

And what happened when the verdict came out?

A. Or I shouldn't say, "When the verdict came out." When it was discussing the verdict. Uhm...

Q. Who was discussing the verdict?

A. Uhm, it was -- Again, it was Barringer, you know, stating that, you know, "He didn't mean to kill him," you know. "He didn't meant to kill him." Uh, uhm, uhm, you know, I can't remember how he was insinuating what George Floyd's charges were. Uh, "The drugs in his system killed him. He didn't kill him." That type of comment.

Q. Were these comments made during the medium -- medium -- meeting or a different time?

A. Uhm, the one specifically was during the meeting.

Q. I'm sorry.

What did you say?

A. I said one specifically was during the meeting.

Q. Okay.

Was there -- was there a different time

(Page 80)

than the meeting that these discussions -- this discussion happened?

A. Yes, ma'am.

Q. Okay.

What's the other time?

A. Uh, we was -- We were all upstairs. I don't know. I forget what we was all upstairs for, and they was going on and on about it. Uh...

Q. Let me stop you right there.

When you say "we", are you talking about all of the members of the CIU?

A. The one who was working that particular day and who was up there. I don't recall, uhm, but I know it was Barringer was there, uh, myself was there. Uh, uh, I want to say Pereda was there.

I -- I don't think everybody was there but it was -- we -- we were up there and I can't remember what we were up there for. It was something that we was getting prepared for and they started -- they -- he started the rhetoric again.

Q. Was anyone outside of the CIU at this meeting?

A. I -- I don't recall, ma'am.

Q. Okay.

And was this meeting that you're referring to before or after the meeting that we discussed earlier

(Page 81)

that was, uh, called because of the text?

A. That was -- It was before. It was way before.

Because, uhm, you know, the incident with Mr. George Floyd happened and then all the rhetoric, and then the only reason why we ended up in that meeting was after the toxicology report --

Q. Okay.

A. -- was released.

Q. So let's call the first meeting -- I'll just call it "first meeting," uhm, and the -- the second meeting that was called after the group text, we'll call that the "toxicology meeting" so it's clear from the record.

A. Yes, ma'am.

Q. So the first meeting, what was said?

A. Specifically, I don't know exactly what was said, but it was always the same thing. You know, it was always the suspect's fault. They never could see where the officer was negligent in his duties, if it was even negligent.

You know, my thing was, hey, yeah, I had my opinion, but they never seemed to see the officer's possible negligence in handling that particular incident or any incident that we discussed.

Q. Okay.

**Bert W. Whittington, III**

(Page 82)

And who was, uh -- who was talking at this meeting?

A.  Well, like I said, it was Barringer drumming it up and people just chiming in.  Uh, that's just how -- That's how it all, you know, basically, all started.

And we'll be -- we'll be up there doing something, talking.  You know, we had a television up there.  So the television would kind of kick it off, too.

Q.  Okay.

A.  Uh, and that's how -- how it would start.

Q.  Did you complain at the first meeting?

A.  Like I said, I -- I -- I really never complained because, to me, I was -- it was them against me when it came to that type of stuff.

Q.  Okay.

Did you complain after the first meeting?

A.  I didn't complain about it.

I did what every African-American deputy does in the unit.  We get together and I express my feelings about what had happened, you know.  That's basically how I complain.

That's how we was able to feel like, in my opinion, to express how we felt without any repercussions, is we would get together and talk about it; like a deputy or something happened in his unit, what will happen if we

(Page 83)

meet for lunch or just meet to say "hello" because we all kind of work in different areas and talk would just come up.

Q.  Did any other deputies that were talking about the first meeting make any complaints?

A.  Not that I know of.

Q.  All right.

Uhm, getting back to the -- the Petition --

A.  Yes, ma'am.

Q.  -- uhm, on -- We're on Paragraph 25, I believe.

And where it says:  "This meeting was nothing more than an effort to harass and distress Whittington."

Is the meeting that's being referenced in this particular paragraph the toxicology meeting?

A.  Yes.

Q.  Okay.

And how -- Who harassed, uh, you at this meeting?

A.  All of them, basically.

Q.  Okay.

So it's your testimony that everyone who attended the toxicology meeting harassed you?

A.  It's my testimony in some form or shape by what they said, being insensitive to how I felt, overlooked how

(Page 84)

I felt, yes.

Q.  Okay.

And what did they do to harass you?

A.  Uhm, the first thing that irritated me or I felt like I was harassed was when Major Villarreal said, "We're not talking about Hutch and we're not talking about the incident in Minneapolis."  That was the first one.

The second one I recall was when they all started chiming in at one time about my stance on that, and then a third one was when Sergeant Barringer sat on the edge of his chair, torqued his body to look at me, and he said, "Come on, man.  You don't mean to think that that deputy -- that deputy mean to kill him.  Come on."  And I responded to it.

Q.  Were there any other statements or anything else done to harass you at the toxicology meeting?

A.  No, ma'am, not that I can recall at this time.

Q.  Going down to, uh, Paragraph, uh, 26:  "These circumstances greatly offended Whittington."

What circumstances are we talking about?

A.  We're talking about the continuous things that we have been talking about here, and over the -- the -- you know, talking about the officer-involved shooting with African-Americans.  The -- You know, the George Floyd incident really kind of brought this thing to the head for

(Page 85)

me.  Uhm, uhm...

Q.  Was the --

A.  And I think --

Q.  -- politics one of them?

A.  The politics was -- was one of them.

Uhm, you know, me abdicating for my -- for more -- for more diversity in the unit.  I mean, it was just -- Yes, ma'am.

Q.  Okay.

Anything else?

A.  At this particular time, man -- ma'am, uhm, I -- I can't think of everything.

Uhm, there may be some things that I have missed, uh, that was submitted in -- in discovery.

Q.  Okay.

And it goes on to say:  "It created a hostile work environment for him."

Have you told me about all the instances of a hostile -- of the hostile work environment?

A.  Ma'am, I -- I'm -- I'm sure I -- I haven't told you everything.

It's just -- Right now, my brain is just -- Uhm, it's -- it's some things that I just don't remember.

Like, when I walked out of here and went to lunch, was able to settle down, a couple of things popped

**Bert W. Whittington, III**

(Page 86)

in my head.  So I'm sure I missed something.

Q.    Okay.

So this is our only opportunity to talk to you, so, uhm, it's important that we try to dig down and -- and, you know, see if there is anything else.

Uhm, what did you remember that you just said that popped up while you were on break?

A.    Well, one of the things that I remember is where you said, uhm -- you asked me about, uh, Bonsal's clique going after folks.  Uhm, one of -- one of those instances popped up and -- that I recall that I was told about, uhm, and that instance was with, uh -- was with Sergeant Davis.

Uhm, I was told that, uhm, Sergeant Davis was accused of having a relationship with Major Jones, and I was told that, uhm, that Bonsal spearheaded that.  And I was also told that the reason why Bonsal spearheaded that was because there was a request from, uh, Lieutenant Duffy and that that was Lieutenant Duffy's, uhm, reward or a "that-a-boy" for his investigation in his case.

Q.    And who told you this?

A.    Sergeant Davis told me that.

Q.    Okay.

And when did -- What is Sergeant Davis' first name?

A.    Uh, Sergeant Julia Davis.

(Page 87)

Q.    Okay.

And when did Sergeant Julia Davis tell you this?

A.    Oh.  Ma'am, I don't recall.  It was several months ago.  I don't recall exactly when.  It was several months ago.

Q.    Okay.

So Sergeant Julia Davis told you this, this year?

A.    Yes, ma'am, it was --

Q.    Okay.

A.    -- this year.

Q.    Was that the first time that she told you that?

A.    Yes, ma'am.

I -- I -- I don't recall who I heard it from, initially.  Uh, initially, I heard it from someone else.

And then, uh, we call Sergeant Julia Davis "Mama Davis," and, uh, I just basically called her to tell her I was sorry this was happening to her, and, uh, she told me what happened.

Q.    Okay.

And you don't have any personal knowledge regarding what she told you?

A.    I do not.

(Page 88)

Q.    And how did she -- how did she know that, uh, Chief Bonsal -- that that was -- or that that was Lieutenant Duffy's reward?

MR. ORTH:  Objection.  Speculation.

Q.    (BY MS. MARTIN) Did she tell you how she came about this information?

A.    Uhm, she told me that she felt that a way because of the history between her and, uh, Lieutenant Duffy.

Q.    Okay.

And Lieutenant Duffy did not tell you this?

A.    No.

Q.    Let's go on to, uhm, Paragraph -- We're still in Paragraph 6.

Uhm, you began to -- "Whittington began to openly object to the offensive jokes and comments."

Can you tell me when you -- Or -- or let's back up.

Uh, what did you do to object to the offensive jokes and comments, as referenced in Paragraph 26 of the Complaint?

A.    Uhm, what I mean by that is, like, uh, on -- on -- on -- on one occasion -- well, maybe a couple occasions, uh, Sergeant Barringer will come in and say, "Hey, man.  You're not coming and eat with us."  And I

(Page 89)

was, like, "Man, I don't come eat with y'all because I don't like, you know, y'all Trump rhetoric and I don't like, you know, y'all talking about this officer-involved shooting," and I would just walk away.

Q.    Any other objections?

A.    Uhm, Major Villarreal came to me one time.  David Johnson was within earshot.  We was at 904.  And he was, like, "Hey, man.  You know, you need to start come hanging out with us."  You know, you know, "We want you to be a part of the team," that kind of stuff.

And I was, like, "Yeah, okay.  All right.  Okay, Major.  No problem."  I say, "But I be busy.  Y'all -- y'all want to sit down and, you know, talk and joke for one or two hours.  Man, I got eight hours.  I'm trying to get something off the streets, out of these communities."

That was my response back to him, and I just kind of walked off.

Q.    Any other, uh, times that you openly objected to the offensive jokes and comments as referenced in Paragraph 26 of the Complaint?

A.    Well, I mean, I -- I would -- I would tell, you know, you know, other members in the -- in -- in the unit that -- that had came to me and kind of reflect, like, "Hey, man.  You know, that was -- that was foul for them

**Bert W. Whittington, III**

(Page 90)

to say stuff like that," you know. And, uh, I would just say how I felt to those individuals.

But other than outside of the unit or outside of me talking to African-American deputies when we got together and it was, you know, expressing how I'm feeling, uhm, you are in -- I never took it -- talked -- talked to no one else besides that, or my wife.

Q.   Were these objections after George Floyd's murder?

A.   Uh, the one with Major Villarreal was --

Q.   Okay.

A.   -- yes.

Q.   What about the others?

A.   Uhm, maybe one or two could have.

Q.   Could have been what?

A.   Could have been after, uh, the murder.

Uh, especially the one on -- I think it was Watson. It was Watson's birthday, I think it was. We --

Q.   And what happened at Watson's birthday?

A.   It wasn't that -- that the Sarge was upset with me. Barringer was upset with me because I didn't go to the -- to the birthday.

Q.   Okay.

Any others that we didn't talk about?

A.   Again, I just have to reference back to -- have

(Page 91)

to reference back to, you know, discovery, ma'am. Like I said, I -- I may have forgotten some.

Q.   Is there anything that you could review that would help you remember?

A.   Uhm, your questions that you sent to me possibly, yes.

Q.   So reviewing your discovery responses would help you remember, uhm, answers to these questions?

A.   If I haven't -- if I haven't -- Yes, to the best of my knowledge. I mean, I thought that I put the majority of it in -- in the discovery, yes.

Q.   Okay.

A.   And there may still be some that's -- I didn't remember that's not in discovery, yes.

Q.   Okay.

So the reason I'm asking is this is the time that I get to ask questions, but if you're saying that, if you had time to prepare with your discovery that you could be able to answer questions, then that may mean, you know, we'll have to visit about it another time.

So I just want to make sure I get that clear, if there is anything that could be helpful.

A.   Again, ma'am, I know, sitting here today, talking to you, I haven't talked about everything that was in that discovery. I -- I'm -- I'm almost positive. Uhm,

(Page 92)

it was just so much.

And like I said, I separated myself when I -- when I left here and -- and -- and I haven't been looking at none of these documents, uhm, so it's possible.

Q.   Well, if your discovery refers me to the Petition, how would that help you have a better recollection?

A.   Because if I'm not mistaken, I think I kind of listed the things that -- that, uh -- that affected me, uh, in this particular question, and I think on here (indicating), I don't think anything is listed.

So that's how come I don't have nothing to -- to say have I covered everything.

Q.   So if you had moments with your discovery, you would be able to answer the questions fully?

Is that what you're saying?

A.   Yes, ma'am.

MR. ORTH:   Objection. Asked and answered and -- Asked and answered.

Go ahead.

THE WITNESS:   Uh, yes, ma'am.

MS. MARTIN:   I'm going to finish and then we may have to revisit it if he's saying he can answer my questions after reviewing discovery.

MR. ORTH:   I think what he's saying is the

(Page 93)

answers that he -- And we can go off the record or on the record. It doesn't matter to me.

MS. MARTIN:   We can go off the record.

THE VIDEOGRAPHER:   Okay. The time is 1:09 p.m. and we are off the record.

(Recess from 01:09:18 p.m. to 01:10:46 p.m.)

THE VIDEOGRAPHER:   Okay. The time is 1:10 p.m. and we are back on record.

Q.   (BY MS. MARTIN) Okay.

Uhm, moving down to Paragraph 27, uhm, and continuing into, uh, the next page, uhm, it describes that:  "Coworkers with light skin color became slow or absent from backing Whittington up on police scenes."

Is this what we had talked about earlier with regard to backup calls?

A.   Yes, ma'am.

Q.   Okay.

And the next one, uh, that:  "Coworkers refused to assist Whittington with processing police scenes, such as prisoner transports, vehicle inventories and evidence handling."

Have we talked about this yet or is this, uh -- Can you -- can you explain or can you describe, uhm, what you mean by that.

**Bert W. Whittington, III**

(Page 94)

A.   Yes, ma'am.

Q.   Okay.

A.   So if I was -- If I went to back up someone from CIU on a traffic stop or whatever, there's an arrest or whatever, you know, I was always get assigned either; one, transport a prisoner; two, do a vehicle inventory.  Uhm, uhm, maybe there will be, you know, two other canines or one other canine, they would always ask me to run my dog.

Uhm, you know, and I -- and I always be sitting there, saying, "Well, why ain't you running Watson's dog?  Why are you -- why are you always want to..."  In my mind I'm saying this because I don't -- Like I said, I'm one against the rest of the team.  So I'll just get my dog, run my dog.  And I know why they was doing it.  It makes me write a report.  You know what I mean?  It frees them up.

Uhm, or evidence handling; uh, they get a big case, they'll assign me to evidence.  You know, I'll have to go over there, process the evidence, like we do.

And then, uh, on prisoners, proud of me getting a -- a full, uh, canine kennel in my -- in my unit.  I had a partial canine kennel with a transport seat.  I would be the one to transfer -- to transport the deputies.  But when it came to me, they wouldn't transport my deputies.  They wouldn't help me process my evidence.

(Page 95)

Q.   Okay.

And why do you think they wouldn't help you process your evidence?

A.   I'll give you the same answer that I -- I give to the sergeants:  I don't know.

Q.   Okay.

And why do you think that, uhm, they would want you to use -- they would want you to use your canine rather than another canine?

MR. ORTH:  Objection.  Speculation.

Q.   (BY MS. MARTIN) You stated they would --

A.   My opinion --

Q.   You --

A.   I -- Yes, ma'am.  Sorry.

Q.   You stated that they would ask you to use your canine --

A.   Yes, ma'am.

Q.   -- and that you knew why.

A.   Yes, ma'am.

Q.   And so I want to know:  What do you know as to why?

A.   My personal opinion is to prevent from writing a report.  Uh...

Q.   To do what?  I'm sorry.

A.   Prevent from writing a report.

(Page 96)

Because every time you write your canine, you got to -- run your canine, you got to write a report.

If you do a -- a vehicle, uh, outside of sniff with a canine, you have to write a report.

Uhm, and another thing, I think just plumb laziness.

Q.   Who was lazy?

A.   Oh, man.  If I show up to -- to their scene and they already got a dog on, already got a dog there prior to me getting there, but you ask me to run my canine?  I mean, to me, that just look like laziness or, to me, they look like they are just using me to write a report to free them up to go do what they want to do.

Q.   And why did you believe that they wanted you to write the report to free them?

MR. ORTH:  Objection.  Speculation.

THE WITNESS:  I just told you, ma'am.

I mean, we are canine officers.  Our job is to, you know, provide canine services to whatever, Precinct 3, any other agency, around the agency or any, you know, DEA, FBI; whoever call and ask for our assistance, you know, and they need a canine, you're the canine unit there; run your dog, you know.

Q.   (BY MS. MARTIN) And let's go on to the next paragraph.

(Page 97)

A.   Yes, ma'am.

Q.   Uhm, it says:  (As read)  "Whittington asked for another dark skin color African-American to be sign -- assigned, with him, uhm, in the crime interdiction unit."

Who did you talk to?

A.   I talked to Sherman Eagleton; I talked to Isaac Villarreal; I talked to Troy Barringer.

Q.   Okay.

And when did you talk to Constable Eagleton?

A.   I don't know the specific date or time, but myself and David Johnson went to his ranch and talked to him.

Q.   Okay.

And do you know what year that was?

A.   I don't, ma'am.

Q.   Was it before George Floyd or after George Floyd?

A.   It was before George Floyd, yes, ma'am.

Q.   Okay.

And did you get invited to go to Constable Eagleton's ranch.

A.   Yes, ma'am.

Q.   Who invited you?

A.   Uh, Sherman Eagleton.

**Bert W. Whittington, III**

(Page 98)

Q.   Okay.

And at that meeting or -- or at his ranch, what did you tell him with regard to another dark skin African-American in the crime interdiction unit?

A.   The same thing I told them all, is that -- is that the other members of my unit can't go into McNair, can't go into Barrett Station, can't go into the northeast and do any ground investigation, any surveillance because they don't look like them and they don't talk like them and they would get picked out instantly.

Whereas, if I had another individual in that unit that was of -- that was an African-American person, we can go in that unit or in those neighborhoods and stake out, walk the streets, and we'll look just like them and there would be no my problem.

Just like I couldn't go into a predominantly Hispanic neighborhood with a Hispanic, uh, CI Unit unit because I would look out of place.  Never could speak the language and they would never trust me, and that's what I told them.

Q.   And what did the constable say to you?

A.   He agreed with me.

Q.   Okay.

And what did he say?  How --

What did he specifically say?

(Page 99)

A.   He said, "You're right."

Q.   And what did he say he would do next?

A.   He said that he would get me another counterpart and it would be, uh, David Johnson.

Q.   Okay.

And did David Johnson agree to be part of the unit?

A.   Absolutely.

Q.   Okay.

And who else did you tell that, uh -- I'm sorry.  You said Major...

A.   Isaac Villarreal.

Q.   Okay.

And what did you tell him?

A.   The same thing I just told you.

Q.   And what did he say?

A.   Basically nothing.  Just kind of -- You know, like he always did.

Anything -- anything I would come to him about, it was just, like, "Yeah.  Okay." You know, like, "I hear you," type deal.

Q.   And who else did you tell?

A.   Uh, I told Troy Barringer.

Q.   Okay.

And what did Sergeant Barringer say?

(Page 100)

A.   The same thing, you know, that "I hear you."

And I told one other person, too.

Q.   Who was that other person?

A.   The other person was, uh, uh, Ely Pereda.

Q.   And is he a member of the CIU?

A.   Yes, ma'am.

Q.   Is he a sergeant?

A.   No, ma'am.

Q.   Is he a lieutenant?

A.   No, ma'am.

He's a -- he's a deputy.  Deputy Ely Pereda.

Q.   And did you tell Chief Bonsal?

A.   Uh, no, ma'am.

Q.   And who, specifically, denied the request?

A.   Isaac Villarreal.

Q.   And what did he say?

A.   We had an office at Hollins, and I walked in there one evening after where it was expressed in the department that David Johnson was coming to the unit.

Because the word that David Johnson was coming to the unit, the deputies; meaning, African-American deputies, were excited because there had been so many trying to get in that kept getting denied or excuses made up for it.

(Page 101)

But when they heard about David Johnson, everybody was excited and they were constantly asking David, "When you going?  When you -- when you getting your black Tahoe?  When you going"?

And how I know this was happening because David Johnson and I, like I said, we would meet in the park and he would beat me down on when we were coming or what was being said.  And because he was doing it so much to me and he was getting frustrated, when I would hear stuff in the office, I would come back and tell him about it.

And so one day I went to, uhm, the office and they were all in the office talking and --

Q.   Who was present in the office talking?

A.   It was Major Villarreal; it was, uh, Barringer; it was, uh, Cornelius; it was, uhm -- it was Ely Pereda; and it was, uhm -- it was, uh, Dugat --

Q.   Okay.

A.   -- Corporal Dugat, Corporal Cornelius Dugat.

And, uh, I walked in the office and they was having a meeting, uh, or they was discussing, and I heard them say, "We are going to bring so-and-so on."

I don't remember the name, and I stopped and I said, "Wait a minute.  You mean to tell me -- I thought we was bringing David Johnson on."

**Bert W. Whittington, III**

(Page 102)

And I can't remember who said it. I think I -- Yeah, I do remember who said it. It was Cornelius who said it; Corporal Cornelius. Corporal Cornelius said, "Mandy got David Johnson wrapped around his finger and he -- and it won't be a good fit." And I reply -- Can I tell you exactly what I replied?

Q.   Please.

A.   I said, "That's not his motherfucking wife. That's his girlfriend. You take what the -- what -- what this unit -- what this unit requires of him, you produce it to him and let him determine if that is going to affect his relationship with Mandy."

And then Ely Pereda said, "Why is it always about Black and White with you?" And I got ready to answer and the major cut me off. And I said, "No, no, Major." I said, "If he got big boy drawers to answer that question, let him have big boy drawers to receive the answer."

And that's when I began to tell him, "You can't go into McNair; you can't go on into Barrett Station; you can't go into northeast or any Black neighborhood and do any surveillance or do any investigation because they don't listen to you. You don't -- you don't look like them. Just like I can't go into any Hispanic neighborhood. I don't speak the

(Page 103)

language. I don't look like them. They will pinpoint me out staking out a house. So that's why we need more diversity in this unit."

Q.   Now, before you became a member of the CIU --

A.   Yes, ma'am.

Q.   -- did they do operations in the neighborhoods that you just discussed?

A.   Uh, I would have to say yes because it was a different -- it was a different, uh -- it was a different unit. It was a different combination of -- It was only, like, two of them that was doing it when we first started up with Precinct 3.

Q.   "Two" who?

A.   It was two deputies that was doing what -- that was doing specialized, like, criminal investigation at the time.

Q.   And were these African-American deputies?

A.   No.

Q.   And they were doing operations in the nei- -- African-American neighborhoods?

A.   Yes, they was doing operations in African-American neighborhood.

Uh, they was doing -- You know, they was, like, making stops. You know, watching cars coming out, making stops, busting people, like, doing stuff like that.

(Page 104)

Yes, ma'am. Traffic stops, getting narcotics, yes, ma'am.

Q.   And what did you -- After, uh, you and Pereda had the -- the issue with regard to David Johnson, what happened next?

A.   I went back and told David Johnson.

Q.   And what did you tell David Johnson?

A.   I told David Johnson what had happened at that -- at that -- what I had just told you.

And David Johnson was furious. Oh, he is mad. And he wanted -- He was, like, "I don't want to go to..." I said, "David Johnson, listen. I need you, man." I said, "I need you. I need you, one, because we're the only ones working predominantly Black neighborhood." And I said, "Because you are on first shift patrol, they can pull you and take you away and I'm out here by myself."

Q.   What did he say that made you think he was furious?

A.   Oh, he -- Ma'am, let me tell you. David Johnson is a gentle giant, don't say hardly nothing at all, until you make him mad. And when you make him mad, he comes out of his character, and he was furious.

Q.   What did he say?

A.   He said that, you know, "The only reason why they're doing what they're doing because I'm dating Mandy," and -- and -- and, you know, it was -- You know,

(Page 105)

it was BS, basically, is what he was saying.

Q.   Did you agree with him?

A.   Oh, absolutely, I agree with him.

But the one thing I didn't agree with him with is that, uh, he got me in trouble behind that.

Q.   I'll get to that in a minute.

But what did you think that meant about his relationship with Mandy?

A.   Mandy is a Caucasian young lady, uh, that was -- that, as far as my knowledge, that was -- or still is, uh, working for Precinct 3. Uhm, there were rumors, uh, all over the department about Mandy. Uhm, and, uhm, when David Johnson came to me and told me that he was dating Mandy, I was in shock. I was in total shock.

Q.   Why were you in shock?

A.   Mandy is a, uh -- a very attractive young lady. Uh, there were people in the unit that was pursuing Mandy and, uh, David Johnson just don't talk much. He's quiet, you know. It was -- it was just what they call a Ying and a Yang.

And so when he told me, I was -- I -- I was floored, but I was happy for him. And I basically told him, "Man, don't pay no attention to what they say. If you love her and she love you, man, that's all -- that's all -- that's all it needs. Y'all -- y'all can be happy."

## Bert W. Whittington, III

(Page 106)

Because he came to me several times, "What -- what do you think?" I said, "Can you handle the pressure? Can you handle the -- the -- the pressure that's coming from the department and, if you love her, marry her."

Q. And did you think that Mandy's race had -- that anyone had an issue with Mandy's race and David Johnson's race?

A. Oh, absolutely.

Q. Why did you think that?

A. Because David Johnson came and told me.

Q. Did anyone tell you that they had an issue with her race and his race?

A. (No audible response).

Q. Did anyone tell you that they had an issue with the fact that they were a interracial couple?

A. No, ma'am. No one came to me personally and said that they had a problem with, uh, the interracial couple.

It was just second and third hand or third and fourth hand, you know.

Q. Okay.

A. People talking and it got back to me. Yes, ma'am.

Q. Okay. Okay.

(Page 107)

Let's go ahead and go to, uh, Paragraph 31. Uhm: "Villarreal and Barringer began to routinely use Whittington as a front point on high-risk tactical entries at police scenes."

What's a "tactical entry"?

A. A tactical entry is when you, uh, stack up at a door to enter a known criminal, uh, residence, uhm, and that tactical team will enter that residence methodically to clear, to make sure that any threat inside that -- that, uhm, uh, building/residence is, uhm, taken under control --

Q. Okay.

A. -- and secure that structure.

Q. And how often did you, uh, participate in tactical entries?

A. I would say every one that's on record with the CIU unit.

Q. Okay.

Would that begin with when you first joined the CIU?

A. Uh, no, ma'am.

Because we didn't start -- we really didn't start doing that until maybe 2019, maybe.

Q. So in 2019, you began participating in tactical entries?

(Page 108)

A. Uhm, uhm, I don't -- I -- I -- I want to say it was around 2019, ma'am, because we went to Pasadena, uh, and, uh, we started training as a unit to be a, uh, tactical, uh, uh, entry team. Yes, ma'am.

Q. And I don't know if I asked you this: How often did you participate in the tactical entries?

A. Every one that is recorded with the CIU unit, I participated in.

Q. And how many were you the front point for the tactical entries?

A. Oh, I don't -- I don't recall, ma'am. Uhm, I can't -- I can't put a number on it.

Either I was in -- either I was in what we call Position No. 1 or I was in Position No. 2. And Position No. 1 and Position No. 2 is a, uhm, a highly dangerous position in the, uhm, tactical entry team.

Q. And how are the teams structured?

A. What do you mean by "structured"?

Q. If you have -- How many -- how many members of the CIU participate in a tactical entry?

A. Depending on who was available, and most times when we did do entry, we were all available.

Uh, it would be, you know, a couple of deputies, a couple of the CIU units out on patrol -- I mean, not "on patrol" -- out on perimeter, uh, particular,

(Page 109)

a canine officer.

Uhm, and then you would have, uh, your command structure, which particular would be, uh, the major and the -- and the sergeant.

Q. Did you participate in the tactical entries because you were a canine handler?

A. No, ma'am.

I participated in the tactical unit because of my training and experience in the Military.

Q. So at the tactical entries, your canine was not present?

A. No, ma'am.

Either we would leave him back -- either we would leave him back in my -- in -- in my running Tahoe or, if we used my Tahoe, he would stay inside the vehicle and then they would use one of the other, uhm, canines for the perimeter.

Q. And the officers that are in, I'll call it, tactical entry formation --

A. Yes, ma'am.

Q. -- are they single file or how are they grouped?

A. It's single file stacked, yes.

Q. Okay.

And how tall are you?

A. Five eleven.

**Bert W. Whittington, III**

(Page 110)

Q.   And is it your testimony, according to Paragraph 31 of the Complaint, that you were the front point routinely on tactical entries at police scenes?

A.   Any -- any -- any entry of a residence or of a building that was a target of -- in our investigations that we had wrote up a search warrant for, gotten a search warrant for it, my testimony is, is that I was either in Position No. 1 or Position No. 2.

Q.   So this statement:  "The front point," is that Position 1 or Position 2?

A.   Both.

Q.   So the No. 1 officer and the No. 2 officer are both considered front point?

A.   Yes, ma'am.

Q.   And do they ever put -- Do they ever, uh, take into account or based on your training, is account -- is -- I'm sorry -- is height taken into account to determine who is the front point on a tactical entry?

A.   No, ma'am (indicating).

Q.   Yes.

A.   Should I say something about that last question you just said?  What -- Answer -- I said, "No, ma'am," but I would like to change my --

Q.   Okay.

A.   Uhm, I would say yes and no.

(Page 111)

Uh, and why I say "yes and no" is because, in order for that tactical team to enter, uh, that building or that residence, uh, that front -- that front door has to be breached.

Q.   And what do you mean by that?

A.   That front door has to be, uhm, manipulated open --

Q.   Okay.

A.   -- in order for the tactical team to enter, uhm, without any hesitation for the tactical team's safety and, uhm, that was one of the biggest, uhm, plus, uh, when discussing David Johnson, uh, uh, if he came to the unit.

Because of David Johnson size, obviously, his strength, uh, he would be -- he would have been utilized for, uh, any future, once he became part of the department, uh, or part of the unit to, uh -- to be the breacher for those tactical entries.

Q.   And what about his size made him a good breacher?

A.   Uh, David Johnson is about six three, uh, David Johnson's about two seventy-five, maybe two eighty, uhm, and, uh, that was the discussion in the -- in the CIU unit.

Q.   So is a good breacher typically the front point on a tactical entry?

(Page 112)

A.   Uh, no.

Q.   Okay.

A.   The breacher is actually to breach that door and then step aside, initially.  The tack -- The stack would enter.  Uh, sometimes, he would come on the tail end, or he would stay and secure that area, depending on what the, uhm, the OP Order stated for him to do in the Op Order.

Q.   Okay.

So the only time --

THE REPORTER:  Can you repeat that again. Did you say "Op R"?

THE WITNESS:  Uh, Operations Order.

THE REPORTER:  Thank you.

Q.   (BY MS. MARTIN) So the only time size is taken into account with -- with regard to tactical entries is to determine who is going to be the breacher?

Is that correct?

A.   It plays a big factor.  Yes, ma'am.

Q.   Is there any other time that size is a factor in determining who would be the front point for tactical entries?

A.   In our unit, that was the only time.

Q.   And on the next, uh, sentence, it says:  (As read)  "These circumstances made it clear that they wanted -- that, uh, Major Villarreal and Barringer wanted

(Page 113)

you to be harmed."

Did you believe that?

A.   Initially, I didn't believe that.

Uhm, and I said I initially didn't believe it because I loved -- I loved being part of the team; I loved what we did.  I mean, I've -- I've -- I've -- I've done that when I was in the Marine Corps.

And so -- But then after you start realizing or start looking at the Op Order and the stacking which you in all the time and the way they are treating you and, you know, the way they are talking about this race rhetoric and all this craziness, you begin to wonder.  You know, why is it that who everybody in the unit considered may -- uh, uh, uh, Isaac Villarreal's, uh... uh... uhm... son, boy; you know, child; you know, he cuddled -- he cuddled this individual.  He was always in the rear or he --

Q.   What individual?

A.   This is, uh, Ely -- Ely Pereda.

He was always in the rear.  He was never -- he was never involved in anything where it was, you know, dangerous situations or, you know, he never made any traffic stops.

Or, you know, the only time he was involved in something, if he was, you know, processing, you know,

**Bert W. Whittington, III**

(Page 114)

narcotics or he was writing up an Op Order or, uhm, you know, everybody complained about him not being in uniform or, you know, he would -- he would check in on duty but he wouldn't show up for duty. And if he did show up to duty, it was, you know, 1:00, 2:00 o'clock in the afternoon.

And when it became an issue and everybody started talking about it in the unit, they -- you know, Isaac got a freaking -- Isaac Villarreal got wind of it and he had a meeting about it.

And, uh, you know, people was frustrated that, you know, we're out here making traffic stops, putting ourselves out here, you know, for the community, doing what the community expects us to do, and he didn't even show up for work and he's always in civilian clothes.

Q. Okay.

Did Major Villa -- uh, Villarreal and/or Sergeant Barringer ever threaten you?

A. Threaten me?

Q. Yes.

A. When you say -- Explain what you mean by "threaten." I mean, what -- In what context do you mean, "threaten" me?

Q. Well, what do you mean? What do you think "threaten" means?

A. Well, it could -- it could be different.

(Page 115)

You know, it could be threaten to harm somebody physically or it could be threatening, "If you don't do this, this is going to be happen to you."

Q. Well, the statement is that they wanted you to be harmed. So we'll go with what you just said.

Did they ever threaten to harm you?

A. They never threatened to harm me but I brought it up to their -- to their attention, how I felt.

Q. You brought what up to their attention?

A. How I felt. I was tired of being the -- the point guy.

Q. Okay.

A. And -- and --

Q. What did you say?

A. I said, "Listen. I'm tired of being the point guy." I said, "I'm a canine officer. Put me on the perimeter."

And my whole purpose was that -- was to get Pereda behind up there and get Watson behind up there.

Q. And what did they say?

A. Oh, they was angry.

Q. What did they say?

A. Sometimes, you don't have to say it. It's just your actions afterward.

Q. Well, we're talking about what they said.

(Page 116)

A. Yeah. I -- It -- it was -- it was obviously -- It was obvious that they were mad because it was, like, "You're not a team player." And, you know, "Okay. You don't want to be -- You want to be on the perimeter? Okay. You can be on the perimeter," uh, uh, uh, uh, "but don't ask for this" or "don't ask for that" or "you won't get this" and "you won't get that."

And I looked at them and said, "I don't get it anyway," and that really made them mad.

And, uh, uhm, that's basically what -- what was said.

Q. Did they say anything else?

A. Uhm, I remember Villarreal doing there, "Okay. If your vehicle breakdown, don't worry about it. Don't -- don't call here and ask for no vehicle." You know, "If you have got to take your vehicle down to the DMV, drop it off at the DMV and you need to catch a ride."

Now, that's -- that's the kind of stuff they did. When you -- when you -- when -- when -- when you didn't go along with them, oh, they was going to find a way to make your -- make -- make -- make it difficult for you.

Q. And in what way at that moment were you not going along with them?

A. Because they wanted me being their pointman.

(Page 117)

They didn't like the fact that I wanted to go on -- on the perimeter and that way that would -- that's going to open up room for Ely or -- or -- or -- or, uh, Watson to come up there now.

Q. Did you tell them anything else with regard to being the pointman?

A. No.

We just had that -- that conversation, that I just had enough. And I went in there and told them, "Hey, I don't no longer want to be on -- on the stack team no more. I want to be out there on the perimeter. I'm a canine officer." And they didn't like it.

Q. But did you stop being a point person on the tactical entries?

A. Yes.

Q. Okay.

And when did you complain about that?

A. I don't know the exact -- the exact date. It -- I -- I -- I don't recall the exact date.

I -- I -- Whenever on the record that I was in the -- in -- in the stack and then I no longer was in the stack -- excuse me. If you don't see me on an Op Order in the stack, shortly after that or whenever the last one was, is when -- in between those two is when I -- I had a conversation with them about it.

**Bert W. Whittington, III**

(Page 118)

Q.   Well, it started in 2019, the tactical entries.

A.   Yes, ma'am.

Q.   Was it in the same year?

A.   Ma'am, I -- I -- I can't recall that.

I -- If you look at the records when the last time I was in the stack and the next time they had a -- an entry and I'm not in that stack, that -- that will tell you when.  Between those two is when we had that conversation.

Q.   So your -- your testimony is that, as soon as you stopped being on the list, that's when you stopped doing tactical entries; that the reason you would not be on the list is because you stopped doing tactical entries --

A.   Oh.

Q.   -- is that correct?

A.   I would be on the list but I would be on the list as a perimeter officer --

Q.   Okay.

A.   -- yes, ma'am.

I would be on the actual Op Order.  I just wouldn't be in the stack lineup.  I would be some other duty, yes, ma'am.

Q.   Okay.

So if you're on the documents not in the

(Page 119)

stack line -- lineup, then your testimony is that the reason that you're not in the stack lineup is because that's when you stopped participating in the tactical, in the tactical entries as front point?

A.   That's when I went to Sergeant -- to Barringer and -- and -- and Major Villarreal and -- and expressed that I no longer want to be there, that I want to be on the perimeter because I was canine unit.

That's my testimony, yes, ma'am.

Q.   Okay.

So just to reiterate, once you're no longer on the stack list --

A.   Uh-hm.

Q.   -- you were no longer front point in the tactical entries.  Is --

A.   Yeah.

Q.   -- that correct?

A.   Yes.

MR. ORTH:  Objection.  Asked and answered.

Q.   (BY MS. MARTIN) Is that correct?

A.   Uh, thereabouts, yes, ma'am.

Q.   Now, when were you assigned a canine?

A.   Uh, I was on FTO.

I was about -- approximately about four to six months on FTO when I was approached about becoming a

(Page 120)

canine officer.

Q.   And who takes care of the, uh, canines, once you're assigned a canine?

A.   What do you mean by "taking care of the canines," ma'am?

Are you talking about -- I mean, I don't understand what you mean by "taking care of the canines".

Q.   Okay.

Uhm, who takes them to the doctor?

A.   Oh.

Q.   Who takes the canines, uh -- canine dogs to the doctor?

A.   Yes, ma'am.  Uh --

Q.   Who -- who does that?

A.   Uh, the -- the handler does that --

Q.   Okay.

A.   -- yes, ma'am.

Q.   And the canine -- Who is responsible for the care and cleaning of the canine?

A.   Uh, the handler, yes, ma'am.

Q.   And when one of the canine's soils one of the vehicles, who's responsible to clean that up?

A.   The canine handler, yes, ma'am.

Q.   Okay.

If we go to Page 10, uhm, 36, uh:  "The

(Page 121)

cameras," uh, "assigned to Whittington were often defective and inoperable."

How often were the cameras inoperable?

A.   My Tahoe unit, I had some issues with, uh, my in-car cam; I had some issues with my, uh -- with the wiring; I had issues with, you know, most of the -- the majority of the, uhm, patrol units.

When you activate your overhead emergency lights, your body -- body-worn camera automatically comes on.  Uh, I had had some issues where I lost my body cam.  I had some issues where, uhm -- Because of what I did, uhm, I'm looking for hands; I'm looking for how many heads in the car, uh, that I would forget to turn on my body cam.

So, uhm, I went -- I went to DMV and spoke to the, uh, technician that wired up the canine unit vehicles and explained to him that, uhm, I was having issues with my body cam syncing with my in-car -- vehicle, and that I needed that to be, uhm, fixed.  And, uh, he took a look at it, he found out what the issue was and explained the issue to me.  I asked him to write it up and to email it to me.

Q.   Okay.

And this states that the body-worn cameras were often inoperable.

**Bert W. Whittington, III**

(Page 122)

Is that what you just described?

A.  Yes, ma'am.

Q.  Okay.

And then how were they defective?

A.  How it was defective, as far as my operations, doing my day-to-day, uh, patrol, my day-to-day position, is that, again, uh, I'm not stopping people like you, people like mother and father or young children going to school.  I'm looking for hard criminals.  I'm looking for people that are either known or I suspect that is in or has -- has -- has committed a high crime.

And so, uhm, when I turn on my overhead lights, I'm looking at hands, I'm looking at heads and I'm looking at body language.

And so I'm out.  I'm trying to get out of my -- my -- my Tahoe.  I'm trying to unbuckle my seatbelt.  If I have it unbuckled after I already made a determination that I'm going to make a traffic stop or I'm going to make a personal contact and I'm trying to get out as fast as I can because I do not want that cop picker, that vehicle, to hinder me from being able to do my job effectively.  And so I'll forget to turn my body cam on.

And a lot of times, once I get up there and I either look down or something, I realize that red button ain't on, I'll turn it on.

(Page 123)

Q.  Do the cameras protect the officers?

A.  Absolutely.  Without a doubt, 100 percent, yes, ma'am.

I am an advocate for body cams.  I am an advocate for in-car cameras, yes, ma'am.

Q.  So the policy to have a body-worn camera makes sense?

A.  Absolutely, yes, ma'am.

Q.  And without enforcement of the policy, officers wouldn't follow the policy.

Correct?

MR. ORTH:  Objection.  Speculation.

THE WITNESS:  I -- I -- I -- I would say that.  I -- I would say most officers -- The -- the most officers who, uhm -- who, uhm, love what they do, who un- -- who understand what they are doing, is to serve and protect the -- the citizens that -- that -- that -- that they patrol in, who, uhm, understand the -- the benefit that he gets from that body-worn cam, if they don't turn on that body-worn cam or if there is an issue where, you know, he could utilize someone else's body cam, uhm, uhm, would not, uh, uh, intentionally, uhm, uhm, violate that policy.

Q.  (BY MS. MARTIN) And the policy also gives the public trust in police officers.

(Page 124)

Correct?

MR. ORTH:  Objection.  Speculation.

Q.  (BY MS. MARTIN) Let me ask it differently.

When an incident happens between a police officer and a suspect, do you routinely hear on the news that either the attorney or the victim's family wants the release of the body-worn camera?

A.  Yes, I do hear that.

Q.  Okay.

I am going to Page 38, uhm, or -- I'm sorry -- not "page".  Page 10, let's start with Paragraph 37.

Uhm, actually, strike that.  Let's go to Paragraph 38.

Uhm, it states:  "Whittington's qualifications as a police officer," uhm, "were unquestionably superior to the vast majority of his coworkers."

What were the qualifications of your coworkers?

A.  Not -- not necessarily the qualifications.

What I was trying to express here is that I don't care what your background was; I don't care if you have been to prison; I don't care if you was a murderer, I'm going to treat with you respect.  And by me treating

(Page 125)

you with respect and talking to you like you're a human being, I expect that back.

But if you didn't, I would explain to you everything that's on my belt, I have been authorized to use and, at the end of the day, I'm going home to my wife and kids.

And once I express that to folks who decided to swell or thought about doing something else, they would respect that and, nine out of ten, by the time I got them to jail, they would say, "Thank you for talking to me like a human."  I never, ever, uh, talk to anybody with any disrespect.

Now, however, if you disrespect me and you got on that level after I explained that to you, sometimes when you're dealing with folks out there, uhm, the only way they understand you, if you talk like them or if you act like them, after you have been a professional.

That's what I was trying to convey in that sentence.

Q.  So when you say -- When you speak of "qualifications," am I correct in that, how you treat people?

A.  How you -- how -- The -- the -- the qualification on how you are able to effectively communicate with people and to deescalate the situation

**Bert W. Whittington, III**

(Page 126)

where it, uhm -- on any given situation to deescalate the situation, that's what I was talking about, about that.

Q.   Anything else?

A.   Uhm, the only thing that I -- I could think of is that I know that my unit was pretty upset with me when I got my -- my Master Peace Officer license.  They weren't happy about that.

Q.   What unit?

A.   CIU unit.

Q.   Was upset with you for...

A.   Was, you know, pretty vexed that, you know, for my short period of time that I was in law enforcement, here it is I got a Master Peace Officer's license already.

Q.   What's a Master Peace Officer license?

A.   It's the highest, uhm, license, uhm, under, uhm, TCOLE, if I'm not mistaken, and I have my Master Peace Officer's license.  And I -- At the time, I think I was -- I think -- I think I was only about four years as a law enforcement officer.

Q.   And why were they upset?

A.   Uhm, they didn't like the fact that my Military time went towards my license period for, uhm -- to get my Master Peace Officer's license.

Q.   How do you know they were upset?

A.   Because they conveyed it, they said it.

(Page 127)

You know, they -- It was a joke.

Q.   Who said it?

A.   Uh, Barringer was one of them.

Q.   What did Barringer say?

A.   How did he say it?  Uh, how did he say that?

Uhm, something to the fact that, you know, "That's bullshit.  That's bullshit, that, you know, you got your Master Peace Officer's license.  You only have X-amount of years and they're using your Military time."  And I just looked at him and started laughing and kind of walked off on him.

Q.   Okay.

Anyone else that was mad?

A.   Hmm.  Maybe -- maybe Pereda said something right along with him.

Q.   What did he say?

A.   I don't recall.  He -- he made some comment.

I never paid much -- paid much attention. I just let Pereda say what he had to say because, you know, he had the backing of Isaac Villarreal and -- and -- and -- and -- and Troy Barringer.

So it was no use.  We -- we -- we -- we knew it was no use to say anything to him because wasn't nothing going to happen to him.  So he would say something.  Whether it was negative or positive, I just

(Page 128)

never paid attention to him.  I just walked off.

Q.   So they were upset that your Military time got counted toward your years of service to become a Master Peace Officer?

A.   Yes, ma'am.

Q.   Okay.

Any other reason that they were mad?

A.   Not that I know of, I mean, on that particular issue.

Q.   Okay.

Going to Page 12, uhm, Paragraph 45, uhm, on the unemployment benefits, you said:  "Benefits were denied based on false information given by the defendants."

What false information was given to the Texas Workforce Commission by Harris County?

A.   I don't know what information was given.

What I do know is that I received a phone call that said that, uh -- that I was denied by Precinct 3, and I was -- and I -- and I didn't assume. I -- I know it came from Bonsal.

THE REPORTER:  It came from, uh...

THE WITNESS:  Bonsal.

THE REPORTER:  Oh.  Thank you.

Q.   (BY MS. MARTIN) So you don't have any

(Page 129)

information that, whatever Harris County gave to the tax force -- Texas Workforce Commission, was false?

A.   No, I don't.

Q.   All right.

Uh, Paragraph 47:  "During the application," uh, "process, Villarreal convinced the agency to deny Whittington employment."

What did Major Villarreal say?

A.   I was told that, uhm, Villarreal called, uh -- at the time he was working for us -- Lieutenant Garcia. Lieutenant Garcia, uh, was a newly elected constable for Precinct 2.  And, uh, I was told that Villarreal told, uh, uhm, now-Constable Garcia that, "Don't hire Whittington because you ain't seen what he done done," blah-blah-blah-blah-blah.

Q.   Did, uh, Constable Garcia tell you this?

A.   Uh, Constable Garcia did call me.

Q.   And what did Constable Garcia tell you?

A.   Uh, he wasn't constable at the time.  He was lieutenant.  Lieutenant Garcia did call me --

Q.   Okay.

A.   -- newly-elected constable.

Q.   And what did he tell you?

A.   And he said, "Hey, man.  I hear they are fucking you over there."  He said, uh, you know, "Don't worry

**Bert W. Whittington, III**

(Page 130)

about it. Keep your head down low. When I get in there, put in your application, I'll hire you". That's basically what he said.

Q. Did he say why he didn't hire you?

A. Uhm, no.

They sent a letter to me saying that, uh, "Because of the investigation or the inquiry from Precinct 3, we sent you a letter saying we're not going to hire and you don't ask why because we're not going to tell you," is basically what he said, paraphrasing.

Q. So did he ever say that Major Villarreal told him anything?

A. Uh, he didn't specifically tell me that, but there was a deputy sitting in his office that heard Major Villarreal call.

Q. So --

A. And he -- After he got -- He said he could hear Villarreal on the phone while he was talking to him, and then the deputy and Lieutenant Garcia, at the time, discussed it in his office.

Q. But Garcia never told you this?

A. Only what -- Only what Lieutenant Garcia told me is -- And I'll para -- And I say what he said, "Hey, I hear they are fucking you over there. Just keep your head low down, and when I get over to Precinct 2, put in your

(Page 131)

application and I'll hire you," and --

Q. Which --

A. -- that was prior to the phone call.

Q. But he didn't hire you.

Correct?

A. No.

Q. And who is the one that told you they heard, uh, on the -- through the phone, Major Villarreal tell --

A. Uh --

Q. -- uh, Constable Garcia not to hire you?

A. Oh. Uhm, I know his name. I don't have -- His -- his proper name, I don't have it front of me. We called him "Leo". Leo was -- was -- was working with -- was part of Precinct 3. Now he works over there with, uh -- with Constable Garcia.

Q. And you don't recall his first name?

A. No, ma'am.

I don't -- I don't recall Leo's first name. I'm -- No, ma'am, I don't.

Q. You don't call -- recall his last name?

A. I -- I don't, ma'am.

Q. How did he tell you?

A. He called me on the phone.

Q. He has your phone number?

A. Yes, ma'am.

(Page 132)

Q. Do you have his phone number?

A. Yes, ma'am.

Q. And you don't recall his name?

A. "Leo". That's -- that's what we all called him.

Ma'am, I'm from the Military. We don't go by first names. We -- Everything we do is rank and last name. So I use mostly everybody's last name, unless you're a real close friend of mine.

Uh, even David Johnson is a real close friend of mine, I call him "Johnson".

Q. How many times have you talked to Leo?

A. Since that phone call?

Q. Correct.

A. Hmm, maybe two times after that phone call. Possibly three, after that phone call.

And those conversations about me not getting hired or about, you know, Villarreal calling, you know, Constable, uh, Garcia.

Q. Does he call you by a Military name?

A. Uh, I think he called me "Whittington". Like -- Yeah, he just called -- Yeah, he called me "Whittington. Whittington."

Q. And "Leo" is his first name or his last name?

A. Ma'am, I have no idea.

He introduced hisself to me "Leo". That's

(Page 133)

how it stuck with me. That's how I called him, "Leo".

But I know he has a name. I'm just not sure what his name is. But we call him "Leo". Everybody knows him by "Leo".

Q. Okay.

Uhm, Page 13, uh: (As read) "Converse" -- Uh, "They have done so chiefly through confidential conversations with perspective employers."

A. What number are you at, ma'am?

Q. Uhm, it's still continuing 47 at the top of the page.

A. Okay.

Q. (As read) "Unjustly hinder Whittington from gaining -- obtaining gainful employment. They have done so through confidential conversations with prospective employers."

What employers?

A. Precinct 2, on what we was talking about with, uh, Lieutenant Garcia -- I mean, now-Constable Garcia.

Q. Is that the only employer that you're referring to in this paragraph?

A. Absolutely.

Because I never applied to anybody else for a full-time job because I was afraid that Bonsal and his crew was going to call in and just eat that up, and so it

**Bert W. Whittington, III**

(Page 134)

was a waste of time for me to apply to anybody else.

Once I realized that that -- that was what they were doing, there was no need for me to apply anywhere else.

Q. Were you eligible for rehire with Chambers County?

A. What do you mean, was I "eligible"?

Q. Did you ever work for Harris County -- I'm sorry -- Chambers County Police Department?

A. Yes.

Q. Were you eligible for rehire by Chambers County Police Department?

A. Ma'am, I was -- I was a rehire with anybody.

But based on what they put in my records, based on how I got an F5, would they hire me? I don't know.

Q. Did you apply with Chambers County Police Department?

A. Absolutely not.

Q. Where else did you apply besides Precinct 2?

A. Uh, I applied with, uh, Daisetta PD.

Q. And did you get that job?

A. As a reserve.

Q. Okay.

And how long did you work there?

(Page 135)

A. I'm currently a reserve with them.

Q. Okay.

When did you start?

A. I don't recall.

I -- I'll have to look at my records. I don't recall when I started there.

Q. Okay.

Did you apply anywhere else besides those two police departments?

A. No, ma'am.

Q. Did you apply at any other non-law enforcement job?

A. Oh, yes, ma'am, I did.

Q. Okay.

Where did you apply?

A. Oh, let's see.

Uhm, I applied, uhm, a couple of logistical jobs; I applied for a job, uhm, back on Camp Pendleton; I applied for a golf course job.

Q. How many logistics jobs did you apply to?

A. Oooh, man. That's -- When I got to California, it was -- I -- I can't even count. Just --

Q. Are all the jobs that you just described that are non-law enforcement, are all of these jobs -- did you apply to all these jobs in California?

(Page 136)

A. Yes.

Q. Did you apply for any non-law enforcement jobs in Texas?

A. No. Not that I remember, no.

Q. And what is the result of the application to one of the logistic jobs?

A. Uhm, uhm, I didn't get the position.

Q. Did anyone from Precinct 3 know anybody at the logistics company in California?

A. I -- I have no idea.

Q. Did you apply for any law enforcement jobs in California?

A. I did not.

Q. Are you eligible to apply for law enforcement jobs in California?

A. Can you rephrase that question.

Q. Is there anything that prevents you from being a police officer in California?

A. Yes, something that does prevent me from being a police officer in the state of California.

Because I have a Texas Peace Officer's license, I would have to get a, uh, California Peace Officer's license, yes.

Q. Have you looked into getting a California Peace Officer license?

(Page 137)

A. No, I have not.

Q. Have you researched how to do that?

A. Uh, yes, I have.

Q. Okay.

And what's involved?

A. Uhm, you can either challenge, uhm, their, uhm, their state or you would have to, uhm, you know, go -- go back through a -- what they call a, uh -- a, uh, modified program, uhm, but, uhm, no, I haven't -- I haven't applied. I didn't apply.

Q. When is the last time you looked into becoming a police officer in California?

A. It was sometime this year.

I -- I was, uh -- I was walking, uh, exercising, and I saw a, uh, canine patrol unit pass by and, uh, I'll look into it.

Q. How did you look into it?

A. I went online.

Q. And what did you do?

A. Uhm, got frustrated and shut it down and -- and didn't think about it after that.

Q. So you never took any steps to become a peace officer in California?

A. No.

Q. Where are you working now?

**Bert W. Whittington, III**

(Page 138)

A.    Uhm, I'm working at a golf course.

Q.    Okay.
      And is that full-time?

A.    No.

Q.    How many hours a week do you work?

A.    A week?  Uhm, maybe 12 to 18 hours.

Q.    Okay.
      And are you paid hourly?

A.    Yes.

Q.    How much do you make an hour?

A.    You really want to know the truth, ma'am?

Q.    Yes.

A.    I really don't know and I'll tell you why I don't know.  Because it wasn't important to me, number one, and the only thing I want to do was play golf for free and hit for free-range balls.  Uhm, if I had to guess, it's probably about 15 bucks or so.

Q.    Okay.
      Do you work every week?

A.    Uhm, no, not every week.

Q.    How often do you work?

A.    Uhm, maybe twice a week, sometimes three.
      If, uh, somebody don't show up or somebody take vacation or, uhm, some situation like that happens.

Q.    What's the name of the golf course?

(Page 139)

A.    It's called Menifee Lakes.

Q.    How many hours would you say per month you work?

A.    Gosh.  Well, it's kind of hard to say.
      Sometimes, I work five hours; sometimes, I work six hours.  Like I say, I don't pay attention to that.  My -- my thing is getting the -- the perks behind it.  So I -- I -- I don't want sit here and give you a number and it's not correct.  I -- I just don't know.

Q.    Uhm, do you work anywhere else besides the golf course?

A.    No, ma'am.

Q.    Are you retired?

A.    Have been since 2012, yes, ma'am.

Q.    What do you mean by that, that you have been retired since 2012?

A.    I did 24 years in the Marine Corps and, 2012, I retired.

Q.    You worked full-time for Precinct 3, correct, after the Marine Corps?

A.    Assuming you're saying that was I retired, I'm thinking, yes, I retired from the Military.
      Again, work for Precinct 3, I didn't know how much I got paid at Precinct 3.  I never looked at it.
      I didn't because that is something that I wanted to do to give back to the community.  I wanted to

(Page 140)

continue to protect and serve like I did in the Military because that would fulfill my soul.  That's what fed what I did for 24 years.  So I never knew how much I got paid.  My wife did that.

Q.    Do you have intention to seek full-time employment in the near future?

A.    I loved what I did, ma'am.  Every bit of it.
      I love serving people.  I didn't care what time of day or what time of night it is.  Them folks over there in the precinct know -- know if they called my phone, I was getting up out of my bed and I was coming to them.  I will be in the movies with my family and I will leave my wife and my kids in the movies to come to them.
      So would I?  If the situation -- right situation would come up and I had an opportunity to do what I love to do, absolutely, I would.  But right now, in the situation that I'm in, there is no use for me even applying for any law enforcement job.  And until my head can get cleared from what's been going on with me since this thing been over, I would not even think about it.  It disgusts me.  So that's my answer to that, ma'am.

Q.    What about a non-law enforcement job?

A.    I'm working at the golf course right now.

Q.    Do you have any, uh, any intention of pursuing a non-law enforcement job full-time?

(Page 141)

A.    Absolutely.
      But, again, you know, I feel as though, uhm, I'm not going to lie on my application.  I'm not -- I'm not going to lie on my application.  I'm -- I'm going to tell them what happened here.
      It took me two times to get into Menifee Lakes.  My wife was upset at me because I put on there that I was terminated.  I said, "Babe, I don't lie. I'm not going to lie.  I was terminated."
      It wasn't until I was playing golf with somebody that end up being one of the folks that hire there and I told them my situation.  I told them what happened to me here at Precinct 3, that he told me to put in an application and come talk to us, and I told him everything.

Q.    Do you believe it's possible to get a -- a job after termination?

A.    Do I --

MR. ORTH:  Objection.  Speculation.

THE WITNESS:  Do I believe it's possible to get a job after speculation -- after termination?  Uhm, it's possible if you're not blackballed.

THE REPORTER:  It's possible to...

THE WITNESS:  It's possible if you're not blackballed.  Yes, it's possible.

**Bert W. Whittington, III**

(Page 142)

Q.   (BY MS. MARTIN) And you believe you're blackballed in California?

A.   No.

I believe I'm blackballed in law enforcement, period.

Q.   And you believe Precinct 3 has contacts in California?

A.   I believe if I apply for a law enforcement job in California and I put on my application what I put on every application since I left Precinct 3 and they go back and they do what a law enforcement officer, uh -- agency is supposed to do, is to check your background with that agency, and the stuff that I know that they do, that he does (indicating), yeah, I won't get the job.

Q.   But you haven't pursued that at this time, in the state of California.

Correct?

A.   I have not pursued it based on what had happened with me when I tried to get on with Precinct 2 here in Harris County, yes.

MS. MARTIN:  Let's go ahead and take a quick break, about ten minutes.

MR. ORTH:  Okay.

THE VIDEOGRAPHER:  Okay.  The time it 2:23 p.m. and we are off the record.

(Page 143)

(Recess from 02:22:55 p.m. to 02:41:02 p.m.)

(Henceforth, Kirk Bonsal is not present)

THE VIDEOGRAPHER:  The time is 2:41 p.m. and we are back on the record.

Q.   (BY MS. MARTIN) Okay.

Mr. Whittington --

A.   Yes, ma'am.

Q.   -- let's continue with the Complaint and go to Paragraph 48, and I would like to talk to you about, uhm, the damages that are listed.

Uhm, are you currently seeing a psychologist or a psychiatrist?

A.   Yes, ma'am, I am.

Q.   Okay.

And what is the name of that doctor?

A.   It's a funny name.  Uhm, it's a funny name, ma'am.  I'm horrible with names.

I just know when I get my, uh, my notifications on my phone that I got an appointment and I do my psychology over -- over the videoconference.

Q.   Okay.

When did you first start seeing a psychologist or a -- Is it a psychologist or a psychiatrist?

(Page 144)

A.   Uhm, I was seeing both, a psychiatrist, and, uh, I think -- I think her assistant that was assisting and that was a psychologist.  I'm not sure what his -- I just know he was a doctor.  We used to call him "Dr. Bell".  So I'm not sure what his position was, but he was assisting her, yes, ma'am.

Q.   What was his name?  Doctor...

A.   Dr. Bell?

Q.   B-A-L-E?

A.   B-E-L-L, Dr. Bell.

Q.   Oh, Bell.  Okay.

And you're not sure if he -- if Dr. Bell is a psychiatrist or psychologist?

A.   That's correct.

Q.   Okay.

Do you see a therapist?

A.   Uh, yes.

Q.   And what's the therapist's name?

A.   That's the name I'm not sure.  It's a, uh -- it's a -- She's of Indian descent and it's hard.  We call her "Dr. T."  That's what we call her.

Q.   Where is Dr. Bell located?

A.   Uhm, Dr. Bell is, uh, located here in Texas City.  And I'm assuming Dr. T. as well is out in Texas City.

(Page 145)

Q.   Are Dr. Bell and Dr. T. in the same -- do they practice in the same office?

A.   Yes.

It's at the VA Hospital.

Q.   When did you first start seeing Dr. Bell?

A.   I don't know.  I can't give you an exact time or an exact month.

But it started happening, uhm, when I started having, uh, depression issues; it started happening when I couldn't sleep, uhm, and, uh, I was having some other issues.

Q.   When did you start having depression issues?

A.   My depression was, like, immediately, when I found out I was terminated and I just had nobody to turn to.  I didn't know how to get help because this is the first time I have ever been in a situation like this.

Q.   Were you ever treated for depression before your termination?

A.   No.

Q.   Did you ever see a therapist before your termination?

A.   Yes.

Q.   When was that?

A.   Like, 2012.

Q.   And did you see a different therapist or did you

**Bert W. Whittington, III**

(Page 146)

start seeing Dr. T. in 2012?

A.   No.  A different therapist.

Q.   Do you recall the name of that therapist?

A.   I do not.

Q.   How many therapists did you see before Dr. T.?

A.   Before Dr. T.?  Two.

Q.   So the first one, you started seeing in 2012?

A.   Uh-hm.

Q.   What was that person's name?

A.   I don't remember her name.

She's with the VA Hospital as well.

Q.   And you left her, and who did you see?

A.   (Indicating).

Q.   Okay.

When you said "two" doctors, are you including Dr. T.?

A.   No.

Q.   Okay.

Who is the other therapist?

A.   Well, you -- you -- you was about to ask me a question.  I was just trying to clear my head.

Q.   Okay.

A.   I'm sorry.

Q.   So the first therapist you began seeing in 2012.

Is that correct?

(Page 147)

A.   Yes, ma'am.

Q.   Okay.

And how long did you see that therapist?

A.   I -- I don't recall how long it was.

Q.   How often did you see that therapist in 2012?

A.   I don't know.  I don't recall.

Q.   Do you -- Was it more than once a month?

A.   I just don't recall.

It's so long ago.

Q.   And after that person in 2012, when did you start seeing the second therapist?

A.   Shortly after I was terminated.

Q.   And that therapist's name is?

A.   I don't recall her name.  Uhm...

Q.   Was she with the VA?

A.   No, ma'am.

Q.   Where was she located?

A.   In Humble.  Oh, I'm sorry.  I'm sorry.  It wasn't Humble.  It was Kingwood.

Q.   How often did you see her?

A.   One time.

Q.   And then when did you start seeing Dr. T.?

A.   I started seeing Dr. T. shortly after, uhm -- shortly after I saw that -- that doctor one time because she immediately prescribed me medications and, uhm...

(Page 148)

Q.   When you say, "She immediately, uh, prescribed medication," who?

A.   The one doctor I can't remember her name.  She immediately assigned me medication and I wasn't comfortable with that.

Q.   What did she prescribe?

A.   I think it was, like, sleep medication.  Uh, it could have been depression but I know it was sleep medication.

Q.   Did you take the medication?

A.   No.

I was afraid to.

Q.   Did Dr. T. prescribe any medication?

A.   Yes.

Q.   What did she prescribe?

A.   Trazodone.

Q.   What is Trazodone for?

A.   Uhm, Trazodone was for, uh, sleep.

Q.   And what else did Dr. T. prescribe?

A.   And, uhm, uhm, sataline, saytaline [sic] and that was for depression.

Q.   Saytaline [sic] or Sertraline?

A.   Sertraline?  Sertraline.

Q.   Anything else besides Trazodone or Sertraline?

A.   No, ma'am.

(Page 149)

Q.   Now, did you take those medications?

A.   Yes, ma'am.

Q.   Do you still take those medications?

A.   Yes, ma'am.

Q.   Was there ever a gap in the medications, uh, between when you first started seeing Dr. T. shortly after your termination and today?

A.   No, ma'am.

Q.   Do you know the dose of the Sertraline?

A.   Yes, ma'am.

Q.   What's the dose?

A.   100 milligrams.

Q.   Do you know the dose of the Trazodone?

A.   Yes, ma'am.

Q.   What's the dose?

A.   100 milligrams.

Q.   Do you take those medications every day?

A.   Yes, ma'am.

Q.   Did Dr. Bell ever prescribe any medications?

A.   No, ma'am.

He taught me -- Dr. Bell just taught me how to, uh -- He just taught me how to, uhm -- taught me to control my anger.  He taught me how to help, help me communicate with my wife, my kids; taught me how to find other activities to occupy my mind.

**Bert W. Whittington, III**

(Page 150)

Q. Do you still see him?

A. No, ma'am.

Q. Do you know the last time you stopped seeing Dr. Bell?

A. It was a short time after he recommended me -- recommended to me that, uh, I should consider, uhm, moving to California to get myself away from all this mess.

Q. And when did you move to California?

A. In November of last year.

Q. So was it Dr. Bell's recommendation to move to California?

A. No, ma'am.

It was his recommendation after I spoke to him, uhm, because I was struggling with the fact that -- I was struggling with the fact that my wife wanted to -- wanted to move to California, and I was struggling with the fact that I was concerned or we were both concerned about her safety behind all this mess, and it was Dr. Bell who kind of helped me walk me through it, and me and my together decided that it was best to move for her safety and move for my mental health.

Q. Why were you concerned for your wife's safety?

A. Well, when your wife has to pass by con- -- by Eagleton's house every day, and your wife is, uh, afraid of retaliation, I had to consider it.

(Page 151)

Q. What does your wife believe Constable Eagleton will do?

A. I -- I don't know what she believe.

I just know that she was, and she still is, you know. And she felt more comfortable back in California because, you know, that's where she's from, her people are there. And at the time when I was talking to Dr. Bell, I was steadfast on not going anywhere and, you know, this is my home. You know, twenty-four years away from this place and I finally got back here and this mess happens. So I was pretty -- I was pretty bullheaded about it.

And I -- I recognize -- I recognize her concerns. Uhm, I believe in her concerns. But I just -- I was just bullheaded and Dr. T. -- Dr. Bell, after several counselings, I was able to put away my selfish reasons, and me and my wife made a decision for -- like I said, her -- her, uhm -- her safety or our safety and my mental health to take her back home, and so that's what we did.

Q. Did Constable Eagleton or anyone from Precinct 3 threaten your wife or you?

A. Nobody ever really threatens.

It's just, you know, they knew some people that I knew and they would say little things. Those

(Page 152)

people will come back and say it to me. They would say little things at events and it would get back to my wife. And, uh, I didn't recognize it at the time, but I wasn't myself. I stopped going to the gym, whatever.

Q. What type of things would they say?

A. Oh, uh, they would say, you know, "Hey, you got -- Whittington still working for Precinct? We haven't seen him for a while. He hasn't stopped by the house." "Oh, no. We fired him because of, you know, you know, mishandling evidence and cocaine came up missing."

Of course, that stuff gets spread around, get backs to my wife or get back to me, or got back to me and I would talk to my wife and not realizing, because I wasn't talking to nobody else; I was talking to her, and it was affecting her like that. So that type of stuff.

Q. Did your wife ever work for Harris County?

A. No. Uh, uh, I don't know.

Because when we first got here, I -- she worked for somebody and I can't remember who it was. So I -- I cannot answer that question.

Q. Was she working for Harris County when y'all decided to move to California?

A. Oh, move to California? No.

Q. Was she working for Cal- -- uh, Harris County when you were employed by Harris County Precinct 3?

(Page 153)

A. Uhm, let me say this: I think she was working for Harris County. I just don't know what part, where -- whereabouts she was working for Harris County. It was only a short period of time. Let me -- let me say that, I think.

I don't know. I know she -- I don't know. She will have to answer that or -- Yeah. I -- I -- I don't know.

Q. But did she work for Harris County Constable Precinct 3 at any time?

A. No. No, no.

Q. Going back to Dr. T. --

A. Uh-hm.

Q. -- and you -- I apologize because you may have told me this, but I forgot, so I'm going to have to ask it again.

Do you still see Dr. T.?

A. Uh, videoconference.

Q. Okay.

How often do you see Dr. T.?

A. So how can I explain this?

It will be -- It would be once a month and then anytime that I need her, I had access to her --

Q. Okay.

A. -- is the best way to explain that.

**Bert W. Whittington, III**

(Page 154)

Q. So you decide on how often, based on what?

A. Not me.

Oh, I decide on when I need to contact the psychiatrist? It's -- It just depends on my depression or my mood or, you know, if my wife, you know, she'll say, "You're acting strange," or, "You're not -- You're not looking yourself," and I would just call the hotline or I would send a text message through the VA.

Q. And in 2012, when you first started seeing the therapist --

A. Uh-hm.

Q. -- did you ever take medication back in 2012?

A. I don't -- I don't recall. I don't recall if I did or not.

Q. When Dr. T. prescribed the antidepressant, was that the first time you have ever taken an antidepressant?

A. I don't -- I don't know because I can't recall if I was taking medicine in 2012. I'll answer it like that.

Q. Okay.

And the same question for the sleeping pill, the Trazodone.

Was that the first time that you took a prescription for a sleeping aid?

A. I don't -- I -- I've never taken a prescription

(Page 155)

for a sleeping aid, no. That was the first time, yes.

Q. And about how much have you paid to Dr. T.?

A. Zero.

Q. And is it covered through the VA?

A. Yes.

Q. So when you say "zero", is it covered through your insurance and you pay zero out of pocket or explain that.

A. The reason why I'm hesitating, because I don't deal with that. My wife handles all that, insurance and bills, and so I don't -- At that particular time, I don't know how it was really taken care of. Uhm, so that's how I have to answer that.

Q. But at the time of service, you don't pay any money to Dr. T.?

A. No.

Q. And what about the other doctor before Dr. T. that you don't recall the name?

A. Uhm --

Q. The one -- The therapist in Kingwood.

A. Yes.

Uhm, so that therapist was referred by my primary care doctor, by my primary care doctor. I went out there, so, uhm, I don't know the, uhm -- how she got paid.

(Page 156)

Q. And that was the therapist that you have only seen one time?

A. Yes.

Q. Okay.

And the very first therapist that you started seeing in 2012 --

A. Yes.

Q. -- do you recall whether you paid that therapist?

A. No.

That therapist also was through the VA.

Q. So just to be clear, that therapist, you did not pay any money to that therapist at the time of service?

A. That is correct, yes.

Q. And did you pay any money to Dr. Bell at the time of service?

A. No.

Q. Do you still see Dr. Bell?

A. No.

Q. When did you stop seeing Dr. Bell?

A. Shortly after I made the decision -- or we made the decision as a family to move back to, uh, California.

Q. And so are the only therapists, psychologists, psychiatrists that you see, is the only one Dr. T.?

A. Yes.

(Page 157)

Q. Are there any others that you haven't mentioned that you can recall?

A. Currently?

Q. Currently.

A. No. Dr. T. currently is -- is -- is my psychiatrist, yes.

Q. And let's talk about not necessarily currently, but in your history.

We have Dr. Bell --

A. Uh-hm.

Q. -- we have the person in 2012 that you can't recall --

A. Uh-hm.

Q. -- we have the one right before Dr. T. that you can't recall.

A. Uh-hm.

Q. Are there any others that I haven't just mentioned?

A. No, ma'am.

Q. Okay.

Are there any other medications besides the Trazodone or the Sertraline that you take?

A. Are there any other medications?

Q. Correct.

A. For what?

**Bert W. Whittington, III**

(Page 158)

Q. Anything.

Are you on any other medications besides Sertraline or Trazodone?

A. Yes.

Q. And what are those medications?

A. Uhm, I take, uhm -- It's awfully personal, but I take, uhm, Viagra --

Q. Okay.

A. -- because of the medication I'm taking is affecting that. Uhm, I take, uh, prostate, prostate medication. I take, uhm, Tylenol and I take arthritis medication.

Q. How long have you had arthritis?

A. Uh, it started affecting me right after, uhm, I got terminated. I started recognizing arthritis.

Q. So prior to your termination, you had no history of arthritis?

A. I have had a history of it. I mean, I've -- I've had several surgeries, so, you know, been in the Marine Corps for 24 years but it didn't affect me like -- you know, like that.

I mean, I didn't -- As long as I was active, as long as I was, you know, in that mill -- in that -- The Military -- Law enforcement fed my Military desire, my Military livelihood. So as long as I was in

(Page 159)

that, you know, "protecting and serving," uhm, in that capacity, as long as that adrenaline was high, I didn't feel no pain. It was --

Q. What surgeries have you had?

A. Uhm, I have had knee surgery, back surgery, hip surgery, shoulder surgery.

Q. Were those surgeries caused by arthritis?

A. No.

Q. Where do you have arthritis?

A. My hands.

Q. And what do you take?

A. I got it on my phone, the name of that medication.

Q. The name of the medication?

A. I have it on my phone.

Q. Okay.

(Witness using smartphone)

THE WITNESS: Uhm, can I spell it to you?

Q. (BY MS. MARTIN) Yes.

A. It's M-E-T-H-O-T-R-E-X-A-T-E.

And I also take, uhm, fluoride acid because that medication has a problem -- has a problem making you have an upset stomach.

Q. Any other medications?

A. No, ma'am. That's it.

(Page 160)

Q. And let me just -- Uhm, because you remarked earlier that -- that it was, uhm, very personal and I apologize on having to get personal.

I'm just wanting to find out, uh, because, uh, on the Complaint, uhm, you mentioned that you're suffering, uh, physical ailments manifested from the mental anguish, uhm, and that's the reason that I'm getting into additional medical, just because I want to make sure that, you know, we have a better understanding of what else is going on, uhm, that has manifested from the mental anguish, uh, with regard to what's, you know, been pled.

A. Yes, ma'am.

Q. Now, you, uh -- One of the things pled is, uh, injury to reputation.

Can you describe -- Can you explain that.

A. Yes, ma'am, I can. Very much so, I can.

I was raised as a young man that, uh, your word is everything. I was always raised to be honest and, if you make a mistake, hey, you live up to your mistake, tell -- be honest, be upfront about it. That's everything I have done throughout my life.

I have never got in trouble in my Military career, never got in trouble.

Everywhere I have been, I tell people,

(Page 161)

"Hey, if I make a mistake, I'll come and tell you I made a mistake. You will be the first to know."

Uhm, I worked for the sheriff in Chambers County while I worked for Precinct 3. And those same people that I mentioned would ask Sherman because Sherman lives in Chambers County. He lives right down -- He lives on the next block over from me in Chambers County. He lives at that ranch house. The same people that he know in Chambers County, I know in Chambers County.

So when Sherman goes to running his mouth, especially in my old neighborhood, it got back to me, it got the back to my wife, it got back to my sisters, it got back to my entire family.

I didn't know Sherman. I didn't know who Sherman was, because when I graduated high school, I went straight to the Military -- I say "straight". One year after, I went to Military. I didn't know who Sherman was.

Everybody in my family know who Sherman is. Everybody I'm associated knew who Sherman was before I knew him, and Sherman knows that.

So he runs his mouth and it's been getting back to him. And so people are either texting me, Facebook me or contacting my wife about these narcotics. That's how.

Q. Is there anyone else besides the constable that

**Bert W. Whittington, III**

(Page 162)

has, uh, damaged your reputation?

A.   Villarreal, Barringer, Bonsal.  That little group there, oh, yeah.

Q.   And what did, uh, Barringer do to damage your reputation?

A.   The same thing Sherman doing, running his mouth, you know.

Q.   What did he say?

A.   Oh, I mean, it's -- it's the same thing.  What else can he say?  You know, "Oh, he" -- You know, one time he was saying I took the narcotics or else I mishandled the narcotics, or whatever they say.

I mean, people from Chambers County work in Harris County.  People from Chambers County eat at the same places they eat.  So, I mean, it started spreading.  Of course, you know, Chambers County is small.  It's embarrassing.

Q.   And what about Chief Bonsal?

What did he do to damage your reputation?

A.   The same thing; running his mouth, you know.

I can't prove it, but... I don't know if you believe this or not but blackball is huge.  It's huge in law enforcement.  I mean, it's -- it's huge.

Bonsal was trying to get me on the Brady list.  Bonsal was threatening me with the Brady list.

(Page 163)

Q.   What did he say?

A.   Bonsal said, "Do you know you're on the Brady list," and it floored me.  I didn't even know what to say.  Absolutely floored me.  Especially after everything I have done for them.  Not -- not just what I do out in the community, but I wasn't even there -- I wasn't even there less than a year when Chief Greenwood got shot and assassinated.

They came to me because of my Military experience to ensure that we send Chief Greenwood off properly.  I was the one who picked the deputies.  I wasn't even there a year yet -- or maybe a year.  I picked the deputies for those details.  I'm the one who trained those deputies for Green -- for Chief Greenwood's details.  I did that.

And then for you to turn around and do me the way you did me?  I mean, you know that I have handled kilos and kilos of cocaine, and this one incident come up after all this other stuff to get rid of me?  Wow.

THE REPORTER:  Which list did you say that was?  The Brady list?

THE WITNESS:  The Brady list.

THE REPORTER:  Thank you.

Q.   (BY MS. MARTIN) What -- Can you describe what the Brady list is.

(Page 164)

A.   Yes, ma'am.

The Brady list is a list that officers put on when they are untruthful and when they are unethical, and that Brady list then will not allow them to go into court and testify as a professional, as a law enforcement officer, because they are untrustworthy.

Q.   Okay.

Is there any other way to get on the Brady list?

A.   I have no idea.

Q.   And the threat of putting you on the Brady list, was that as a result of, uhm, the loss of the cocaine or the termination itself or the dog bite cases?

A.   The termination itself, ma'am.

Q.   How does somebody get put on the Brady list?

A.   Exactly how to get put on the Brady list, I do not know the steps --

Q.   Okay.

A.   -- uhm, but I have heard how it's possibly done.  Uhm, I have heard how Bonsal in the past has done it.

Q.   Now, do you have a fee agreement, uhm, for legal services with your attorney?

A.   Uh, yes.

Q.   And have you paid anything to your attorney for your representation?

(Page 165)

A.   Uh, both, yes.

Q.   Have you -- Let's -- I know there was two attorneys involved.  So let's start with Mr. Robinson.

For his representation, how much did you pay him?

A.   I think I initially paid Mr. Robinson, uh, I think it was 7,000 or 7500, somewhere up in there.  I don't remember exactly, but I think it was around 7,000, 7500, somewhere up in there.

Q.   Okay.

And how much have you paid Mr. Orth?

A.   From myself to my current, uhm, uhm, attorney, I don't think there was -- I haven't paid anything except for, uhm, the filing fees at this point --

Q.   Okay.

A.   -- and -- and also the, uhm, the economist.

Q.   Okay.

Do you know how much that amounts to?

A.   No, ma'am.  Uh, not off the top of my head.

I -- I'll get an email or a text message and then I'll just send money.  I haven't sat down and itemized it.

Q.   Is your current agreement contingency or do you get a invoice every month?

A.   Uhm, I don't know.  I don't remember what that

**Bert W. Whittington, III**

(Page 166)

contract said.

Q. Okay.

Do you get an invoice --

A. Every month?

Q. -- every month?

A. No.

Q. Are you billed hourly?

A. I don't know.

Q. And --

MR. ORTH: Do you want to take a break?

MS. MARTIN: Oh.

THE WITNESS: Yes, please.

MS. MARTIN: Oh, okay. Yeah.

I was looking at you (indicating), and I wasn't missing -- I wasn't seeing him. All right.

THE VIDEOGRAPHER: Okay. The time is 3:25 and we are off the record.

(Recess from 03:25:56 p.m. to 03:47:27 p.m.)

THE VIDEOGRAPHER: The time now is 3:47 p.m. and we are back on record.

Q. (BY MS. MARTIN) All right.

Mr. Whittington --

A. Yes, ma'am.

Q. -- you have brought, uhm, a claim under what's

(Page 167)

called Section 1983, and if you want to, uh, flip to 15, Page 15, uh, Claim for Relief No. 4.

A. (Witness complies).

Q. What constitutional rights do you contend were violated?

A. Freedom of Speech --

Q. And would Freedom --

A. -- due process.

Q. Okay. I apologize.

A. (No audible response).

Q. Are those the two or is there another one?

A. Fair Employment. Uhm...

Q. And I would only be asking about the U.S. Constitution.

A. Yes, ma'am.

Q. And on the Freedom of Speech, the speech that you contend was violated --

A. Yes, ma'am.

Q. -- which speech was this?

A. Can you rephrase that.

Q. Yeah. That's a -- not a good question. I agree.

So let me, uhm, ask it this way: Was, uhm, the subject of the speech that you contend, uhm, was violated, uhm, the George Floyd toxicology meeting?

(Page 168)

A. That, and as well as, uhm, not given the opportunity to, uhm, meet with/speak with Constable Eagleton to inform him of what was going on because he was in the -- he -- he wasn't in the know.

Q. Okay.

Any other speech?

A. At this time, ma'am, I can't think of any.

Q. And you're aware that the Court has dismissed all claims against Chief Bonsal, Constable Eagleton, Major Villarreal, Troy Barringer, and that the only claim that's still alive is the one against Harris County.

Are you aware of that?

A. No, ma'am.

Q. Okay.

MS. MARTIN: I have no further questions. I'll pass the witness.

MR. ORTH: I reserve questions for time of trial.

MS. MARTIN: Thank you so much for your time.

THE WITNESS: Thank you, ma'am.

THE VIDEOGRAPHER: Okay. The time is 3:52 p.m. and we are off the record.

(Deposition concluded at 03:52:07 p.m.)

(Page 169)

CHANGES AND SIGNATURE

ORAL DEPOSITION OF BERT W. WHITTINGTON III AUGUST 22, 2022

PAGE LINE  CHANGE                        REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

**Bert W. Whittington, III**

(Page 170)

I, BERT W. WHITTINGTON III, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted herein.

_____
BERT W. WHITTINGTON III

THE STATE OF _____)

COUNTY OF _____)

Before me, _____, on this day personally appeared BERT W. WHITTINGTON III, known to me (or proved to me under oath or through _____)(description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office on this _____ day of _____, 2022.

_____
NOTARY PUBLIC IN AND FOR
THE STATE OF _____

My Commission expires: _____

(Page 171)

STATE OF TEXAS

COUNTY OF HARRIS

I, JAMES M.PLAIR, a Certified Shorthand Reporter in and for the State of Texas, do hereby certify that, pursuant to the notice issued and the agreement hereinbefore set forth, there came before me on the 22nd day of August, A. D., 2022, at 9:49 a.m., in the Second Floor Conference Room of 602 Sawyer Street, Houston, Texas 77007, the following named person, to-wit:  BERT W. WHITTINGTON III, who was by me duly cautioned and sworn to testify the truth, the whole truth, and nothing but the truth of his knowledge touching and concerning the matters in controversy in this cause; and that he was thereupon carefully examined upon his oath and his examination reduced to typewriting under my supervision; that the deposition is a true record of the testimony given by the witness; that the witness has requested a review pursuant to Rule 30(e)(2), same to be sworn to, and subscribed, by said witness before any Notary Public, pursuant to the agreement of the parties.

I further certify that I am neither attorney nor counsel for, nor related to or employed by, any of the parties to the action in which this deposition is taken; and further that I am not a relative or employee of any attorney or counsel employed by the parties hereto, or

(Page 172)

financially interested in the action.

I further certify that the amount of time used by each counsel at the time of the deposition is as follows:

Mr. Philip J. Orth III - (00:00:00)
    Attorney for PLAINTIFF
Ms. Melissa G. Martin  - (05:17:08)
    Attorney for DEFENDANTS

GIVEN UNDER MY HAND AND SEAL OF OFFICE on this the 2nd day of August, A.D., 2022.

_____
JAMES M. PLAIR
Texas CSR 4409
Expiration:  12-31-2022

Bert W. Whittington, III      Index: 01:09:18..account

**0**

**01:09:18** 93:6
**01:10:46** 93:6
**02:22:55** 143:1
**02:41:02** 143:1
**03:25:56** 166:18
**03:47:27** 166:18
**03:52:07** 168:24
**05-28-21** 3:15
**06-24-21** 3:17

**1**

**1** 3:13 4:22,23 5:9 108:14,15 110:8,10, 12
**10** 30:24 31:3,4,12 33:13 120:25 124:11
**100** 123:2 149:12,16
**1019** 2:11
**11:05** 53:24
**11:05:20** 53:25
**11:19** 54:2
**11:19:32** 53:25
**12** 128:11 138:6
**12:01** 77:21
**12:01:34** 77:23
**12:44** 77:25
**12:44:40** 77:23
**13** 18:16 25:13 133:6
**15** 138:17 167:1,2
**16406** 2:5
**169** 3:6
**171** 3:7
**18** 138:6
**1968** 9:10
**1983** 167:1

**1987** 14:4,9 15:4
**1988** 14:12 15:5
**1:00** 114:5
**1:09** 93:5
**1:10** 93:9
**1st** 25:14

**2**

**2** 3:15 22:8,9 24:6,20 26:18 108:14,15 110:8,10,12 129:12 130:25 133:18 134:20 142:19
**20** 12:5
**2000** 21:18
**2012** 14:21 18:2,3 139:13,15,16 145:24 146:1,7,24 147:5,10 154:9,12,18 156:6 157:11
**2013** 18:17
**2014** 19:6
**2016** 21:2
**2019** 107:23,24 108:2 118:1
**2020** 25:14
**2021** 10:6 22:18 23:18 26:20 27:1
**2022** 4:2
**21** 27:8
**22** 3:15 49:1
**226** 2:17
**22nd** 4:2
**23** 3:16 53:18 54:11 72:21
**24** 14:14,16 74:9 139:16 140:3 158:20
**24502** 9:13
**24th** 9:10 23:18
**25** 3:18 83:10

**26** 84:18 88:21 89:21
**27** 93:11
**281.457.9999** 2:18
**28th** 22:18
**2:00** 114:5
**2:23** 142:25
**2:41** 143:4

**3**

**3** 3:16 21:8,12,15,17 23:10,13 24:6,21 26:18 29:3 35:10,19, 25 38:22 45:16,19 57:18 63:21 74:7 76:1 96:20 103:12 105:11 128:20 130:8 131:14 136:8 139:18, 22,23 141:13 142:6, 10 151:21 152:25 153:10 161:4
**31** 107:1 110:2
**32** 13:3,20
**330** 31:13
**36** 120:25
**37** 124:12
**38** 124:10,14
**3:25** 166:16
**3:47** 166:21
**3:52** 168:23

**4**

**4** 3:13,18 25:2,4,11 167:2
**45** 128:11
**47** 129:5 133:10
**48** 143:10

**5**

**5** 3:5

**50/50** 74:3
**54** 9:7

**6**

**6** 27:5 88:14

**7**

**7** 26:19
**7,000** 165:7,8
**713.520.8333** 2:6
**713.755.5101** 2:12
**7500** 165:7,9
**77002** 2:11
**77530** 2:17
**77532-5154** 2:5
**7th** 26:15

**9**

**904** 89:7
**9:49** 4:2

**A**

**a.m.** 4:2 53:24,25 54:1,2
**abdicating** 85:6
**ability** 7:24 8:3
**absent** 93:14
**absolutely** 40:15 41:6 69:2 78:18 99:8 105:3 106:9 123:2,8 133:22 134:19 140:16 141:1 163:4
**Academy** 18:12,14, 18,19
**access** 153:23
**accomplish** 60:9
**accomplished** 60:7
**account** 110:16,17

**Bert W. Whittington, III** Index: accountant..automatically

112:15

**accountant** 11:23

**accurately** 22:23 24:2

**accused** 86:14

**acid** 159:21

**act** 125:17

**acting** 154:6

**actions** 115:24

**activate** 121:8

**active** 14:16 158:23

**activities** 149:25

**activity** 35:18 47:4,6 69:5

**actual** 118:21

**additional** 15:22 28:24 78:11 160:8

**address** 9:12,13,17, 22 10:13

**adjacent** 30:18

**adjudication** 43:10

**administration** 27:11

**adrenaline** 159:2

**advised** 21:8

**advocate** 123:4,5

**advocating** 28:24 29:13

**affect** 7:24 8:3 50:4 102:11 158:20

**affected** 48:22 51:4 92:9

**affecting** 152:15 158:10,14

**affirm** 4:8

**afraid** 133:24 148:12 150:24

**African** 29:18

**African-american** 27:10,17 28:23 29:3

36:24 43:8 44:4 76:19 82:18 90:4 97:3 98:4,12 100:23 103:17,20,22

**African-americans** 28:25 29:18 44:19, 21,25 45:6 54:13,19 56:1 72:22,24 84:24

**afternoon** 114:5

**afterward** 115:24

**age** 46:1

**agencies** 36:1 65:17 67:6

**agency** 30:18 64:16 67:16 96:20 129:7 142:11,13

**agree** 99:6 105:2,3,4 167:22

**agreed** 98:22

**agreement** 164:21 165:23

**ahead** 6:4 7:9,22 25:3 92:20 107:1 142:21

**aid** 154:24 155:1

**ailments** 160:6

**alive** 168:11

**all-around** 53:10

**amended** 3:16 24:2, 25 26:25

**amendment** 23:23

**amounts** 165:18

**Anahuac** 14:2 15:19

**and/or** 114:16

**anger** 149:23

**angry** 69:12,13,15 115:21

**anguish** 160:7,11

**ans-** 65:10

**answering** 6:6,11 7:4

**answers** 91:8 93:1

**antidepressant** 154:15,16

**anytime** 44:3 60:12 64:12 72:16 153:23

**apologize** 54:5 153:14 160:3 167:9

**APPEARANCES** 2:1

**apple** 34:1

**application** 21:12 129:6 130:2 131:1 136:5 141:3,4,14 142:9,10

**applied** 133:23 134:21 135:17,18,19 137:10

**apply** 21:17 134:1,3, 17,20 135:8,11,15, 20,25 136:2,11,14 137:10 142:8

**applying** 140:18

**appointment** 143:20

**approached** 21:7 31:17,18 33:19 68:4 119:25

**approximately** 9:18 13:3,20 14:14 17:22 18:23 19:9 119:24

**area** 30:15,17 33:1 34:18 35:4 47:11,12 64:17 65:17 112:6

**areas** 29:1 36:23 83:2

**arrest** 70:13 94:4

**arrive** 65:14 66:24 67:4,6

**arrived** 33:2 65:15

**arthritis** 158:11,13, 15,17 159:7,9

**asks** 66:11

**assassinated** 163:8

**assign** 94:18

**assigned** 19:2 20:2 35:9,11 36:2,3,15 94:5 97:4 119:22 120:3 121:1 148:4

**assignment** 35:23 36:3,12

**assignments** 35:24

**assist** 30:19 63:21 64:1,2 93:20

**assistance** 36:25 37:4 64:10 96:22

**assistant** 51:19 144:2

**assisted** 25:19 36:1 63:19,23

**assisting** 29:13 62:20 63:6 144:2,5

**associate's** 16:7,8

**assume** 32:8 128:20

**assuming** 139:20 144:24

**attend** 15:22 16:11 38:19 39:7

**attended** 17:3 39:10 83:23

**attending** 39:8

**attention** 105:23 115:8,9 127:18 128:1 139:5

**attorney** 23:1,4,6 24:24 25:19,22,23 26:5 124:6 164:22,24 165:12

**ATTORNEY'S** 2:10

**attorneys** 165:3

**attractive** 105:16

**audible** 71:15 106:14 167:10

**August** 4:2

**Austin** 12:7

**authorized** 125:4

**automatically** 121:9

Bert W. Whittington, III        Index: aware..business

**aware** 27:18 168:8, 12

---

**B**

---

**B-A-L-E** 144:9

**B-E-L-L** 144:10

**B-E-R-T** 5:17

**Babe** 141:8

**bachelor's** 16:7,9

**back** 31:23 32:7,16 38:20 49:24 54:3 55:1,8 56:15 59:3 65:14,15 67:19 71:20 72:20 74:18 78:1 83:8 88:18 89:17 90:25 91:1 93:9 94:3 101:10 104:5 106:23 109:13,14 125:2 135:18 137:8 139:25 142:10 143:5 151:5, 10,19 152:1,2,12 153:12 154:12 156:22 159:5 161:11, 12,13,22 166:21

**background** 124:23 142:12

**backing** 37:8 93:14 127:20

**backs** 152:12

**backseat** 33:22,23

**backup** 30:17 34:7 35:5 65:1,6,8,12,22, 25 66:15,20,24 67:4, 6,9,20 93:16

**bad** 49:25 60:8

**balls** 138:16

**Barrett** 47:12 98:7 102:21

**Barringer** 42:7,8 44:6 45:7 46:7,14 49:7,14,22 55:4 61:16 68:7 69:23 70:3,9 73:1,13 77:6 78:11,25 79:10 80:14 82:3 84:10 88:24 90:21 97:7 99:23,25

101:15 107:2 112:25 114:17 119:5 127:3, 4,21 162:2,4 168:10

**base** 10:15 11:17

**based** 24:10 28:25 29:1 110:16 128:13 134:14,15 142:18 154:1

**basically** 44:25 82:5,21 83:20 87:19 99:17 105:1,22 116:10 130:2,10

**Baumgart** 2:16

**Baytown** 30:18 67:11

**beat** 101:7

**beating** 73:3

**bed** 140:11

**began** 34:3 88:15 102:19 107:2,24 146:24

**begin** 43:25 107:19 113:12

**beginning** 41:8

**behavior** 34:5

**behinds** 44:12

**believed** 27:15,20, 23 77:1,4,11 78:17

**Bell** 144:4,8,10,11, 12,22,23 145:1,5 149:19,21 150:4,18 151:8,15 156:15,18, 20 157:9

**Bell's** 150:10

**belt** 125:4

**benefit** 123:18

**benefits** 128:12

**Bert** 3:4,13,15,17 5:1,17 12:13 13:17

**Bible** 43:19

**big** 44:6 51:12,16 52:1 72:16,17 75:7 94:18 102:16,17

112:18

**biggest** 44:7 111:11

**billed** 166:7

**bills** 155:11

**Biological** 11:4

**birth** 9:9,10

**birthday** 29:15,16 39:5,6,7,12,18 40:17, 18 41:17 42:3 43:2 62:18 90:18,19,22

**birthdays** 38:17,21, 25 63:5

**bit** 140:7

**bite** 164:13

**black** 43:18 47:8,12 52:16 55:15,17 74:17 101:4 102:14,21 104:13

**blackball** 162:22

**blackballed** 141:22, 25 142:2,4

**blah-blah-blah-blah-blah** 129:15

**blank** 51:6

**blew** 43:22

**block** 161:7

**boast** 43:17

**body** 6:12 32:1 34:5 38:8,9 84:11 121:9, 10,13,18 122:14,22 123:4,21

**body-worn** 121:9,24 123:6,19,20 124:7

**bombing** 43:19

**Bonsal** 2:20 49:3,6, 20,23 74:13 86:15,16 88:2 100:13 128:21, 23 133:24 143:3 162:2,18,24,25 163:2 164:20 168:9

**Bonsal's** 49:13 76:25 86:9

**borderline** 67:16

**bottle** 33:23

**box** 24:7,15,18,20

**boy** 12:17,24 73:17 102:16,17 113:15

**boy's** 12:12

**boys** 11:4,5 12:11 13:4,5,11

**Brady** 162:24,25 163:2,21,22,25 164:2,4,8,11,15,16

**brag** 44:10

**brain** 85:22

**breach** 112:3

**breached** 111:4

**breacher** 111:17,19, 24 112:3,16

**break** 7:15,18,19 10:21 54:7,8 71:16 77:17 78:3 86:7 142:22 166:10

**breakdown** 116:14

**bring** 8:7 40:19,21 61:19 101:22

**bringing** 101:25

**Bro** 61:17,23

**brought** 84:25 115:7,9 166:25

**BS** 105:1

**Buc-ee's** 30:25

**bucks** 138:17

**bud** 69:11

**building** 110:5 111:3

**building/residence** 107:10

**built** 10:3

**bullheaded** 151:11, 15

**bullshit** 127:7

**business** 12:9 15:8, 12,15

Bert W. Whittington, III    Index: busting..command

busting 103:25

busy 89:12

button 122:24

**C**

cadet 18:21,22,24

cake 39:16 40:1 41:14

cakes 39:3 40:22 41:2

Cal- 152:24

California 9:14 10:14,15 11:15,16 135:21,25 136:9,12, 15,18,20,22,24 137:12,23 142:2,7,9, 16 150:7,8,11,16 151:6 152:22,23 156:22

call 20:23 30:17 53:4 63:3 64:1,3,4 65:22 71:1 81:9,10,11 87:18 96:21 105:19 108:14 109:18 116:15 128:19 129:17,20 130:15 131:3,20 132:10,12, 14,15,19 133:3,25 137:8 144:4,20,21 154:7

called 15:9,17 24:19 28:20 32:16 34:6 57:10,12 64:22,23 81:1,11 87:19 129:9 131:13,23 132:4,20, 21 133:1 139:1 140:10 167:1

calling 132:17

calls 93:16

calvary 65:24 66:4

cam 38:8,9 121:5,10, 14,18 122:22 123:19, 20,21

camera 121:9 123:6 124:7

cameras 121:1,3,24 123:1,5

Camp 10:14,15 135:18

cams 123:4

candidate 18:20

canine 29:5 44:13 70:21 71:10 94:8,21, 22 95:8,9,16 96:1,2, 4,10,18,19,22,23 109:1,6,10 115:16 117:12 119:8,22 120:1,3,11,18,19,23 121:16 137:15

canine's 120:21

canines 94:7 109:16 120:2,5,7,11

capacity 159:2

car 31:21 32:12 121:13

care 49:22 64:15,16 120:2,4,7,19 124:23, 24 140:8 155:12,23

career 160:24

cars 103:24

case 5:13 25:18 38:6 43:9 86:19 94:18

cases 68:4 164:13

catch 116:17

Caucasian 105:9

caused 159:7

Central 16:2,11 17:2

Certificate 3:7

certification 16:24

chair 84:11

challenge 137:6

Chambers 20:23,25 21:3,6,21 67:12 134:6,9,11,17 161:3, 6,7,9 162:13,14,16

change 68:20,21 69:1 110:23

changed 68:23 69:19

Channelview 2:17 33:1

character 104:21

charge 3:15,16 22:14 24:2,25 26:15, 19,25 51:9

charges 26:22,23 79:14

check 24:7,15 34:21 45:14 114:3 142:12

checked 24:20 35:17

chemicals 16:19

chief 2:20 49:6 51:18,19 88:2 100:13 162:18 163:7,10,14 168:9

chiefly 133:7

child 37:3 42:14 113:15

children 122:8

chill 31:25

chime 45:9 73:18

chimed 59:1

chiming 82:4 84:9

chose 43:12

Christian 13:1

Christopher 12:25 13:1,17

CI 98:18

Circle 9:13

circumstances 84:19,20 112:24

citizens 123:17

City 144:24,25

CIU 28:20 35:14 37:3 38:12 39:1,15 45:15, 17 46:2,3 56:11 57:16,17 65:11,16,19 66:5,8,22 67:18 74:7,

8 77:7 79:1 80:11,21 94:4 100:5 103:4 107:17,20 108:7,20, 24 111:22 126:9

Civil 5:11

civilian 114:14

claim 24:3 166:25 167:2 168:10

claims 22:23 25:10 168:9

class 17:5,7,8,9

clean 120:22

cleaning 120:19

clear 59:15 81:12 91:22 107:9 112:24 146:21 156:12

cleared 140:19

clique 49:3,5,13 77:1 86:9

clo- 52:19

close 132:8,9

closed 52:20

clothes 114:14

cocaine 152:10 163:18 164:12

code 66:12

collection 41:8,9,13

college 11:25 14:6 16:2,11,14,15,16,22 17:2,3 20:14,19,22

college-age 10:20

colleges 16:12 17:3, 11

color 24:7,15,19 27:10 72:23 93:13 97:3

combination 103:10

comfortable 148:5 151:5

command 31:24 109:3

comment 48:14 55:25 79:16 127:17

comments 29:24 43:25 44:18 45:8 47:14,15 48:12 54:13 72:22 77:12,13 79:17 88:16,20 89:20

Commission 128:16 129:2

committed 53:11 75:22 122:11

communicate 125:25 149:24

communities 29:3, 11 89:16

community 114:12, 13 139:25 163:6

company 11:11,15 17:16,17 136:9

company's 11:17

comparing 56:23

complain 51:8 57:4, 6 82:11,16,17,21 117:17

complained 51:10, 22 82:12 114:2

complaining 51:24

complaint 3:18 25:4 27:7 51:23 76:16 88:21 89:21 110:2 143:9 160:5

complaints 83:5

complies 25:12 27:6 167:3

comply 44:9

complying 77:13

computer 73:22

con- 150:23

concerned 150:17, 22

concerns 151:14

concluded 168:24

conduct 38:13 48:5, 11

conducted 38:11,25 75:17

conducting 29:2 70:23

conference 75:7 76:9

confidential 133:7, 15

Congress 2:11

consequences 77:2,5,11 78:17 79:2

considered 110:13 113:14

consistent 19:25

console 34:2

constable 21:9 27:9,18 97:9,22 98:21 129:11,16,17, 18,19,22 131:10,15 132:18 151:1,21 153:9 161:25 168:3,9

constable's 27:12 49:4

constantly 43:20 101:2

Constitution 167:14

constitutional 167:4

contact 67:15 122:19 154:3

contacting 161:23

contacts 142:6

contend 167:4,17,24

context 114:21

contingency 165:23

continue 6:7 140:1 143:9

continued 33:4

continuing 93:12 133:10

continuous 84:21

contract 38:12 166:1

control 107:11 149:23

conversation 27:16 117:8,25 118:9

conversations 59:3 132:16 133:8,15

Converse 133:6

convey 125:18

conveyed 126:25

convinced 129:6

cooking 39:4

cop 122:20

Copeland 12:18 13:7

copy 22:13 25:6 26:1,4

core 72:21

Cornelius 46:9 66:19,21,22 101:16, 19 102:2,3

Corporal 46:8,9 66:19,21,22 101:19 102:3

Corps 10:15 14:7,13, 24 15:4,21,23 17:13, 24 113:7 139:16,19 158:20

correct 7:20 10:8,12 15:20 19:5,7 22:13, 20,22 23:22 24:12 25:5,8 27:3,4,21 41:5 55:20 71:12,13 78:9 112:17 118:16 119:17,20 123:11 124:1 125:21 131:5 132:13 139:8,18 142:17 144:14 146:25 156:14 157:24

correctly 33:1 51:18 55:3 58:9,12

Counsel 4:15 53:19

counselings 151:16

count 135:22

counted 128:3

counterpart 99:3

County 2:10 5:13 20:23,25 21:3,6,21 22:24 24:4 67:12 128:16 129:1 134:6, 8,9,11,17 142:20 152:16,21,24,25 153:2,3,9 161:4,6,7,9 162:13,14,16 168:11

couple 10:2 46:16, 17 85:25 88:23 106:16,19 108:23,24 135:17

court 4:5 6:9 25:6 78:2 164:5 168:8

courthouse 21:10

cousin 21:7

cousin's 21:13

covered 92:13 155:4,6

coworkers 93:13,19 124:18,20

craziness 113:12

created 85:16

crew 49:10 133:25

crime 38:23,24 97:4 98:4 122:11

crimes 47:8

criminal 16:4 29:5,7 35:18 47:3,6 48:5,11 103:15 107:7

criminals 122:9

Crosby 2:5

crys 36:8

crystal 36:9

cuddled 113:16

Cummings 19:22

cup 33:24 34:3

**current** 9:12,13 25:23 165:12,23

**cut** 102:15

---

**D**

**Daisetta** 134:21

**Dajuan** 13:7,18,19

**damage** 162:4,19

**damaged** 162:1

**damages** 143:11

**dangerous** 108:16 113:22

**dark** 27:10 31:4 72:22 97:3 98:3

**date** 4:1 9:9,10,24 10:3 22:19 23:21 26:17 38:7 56:13 97:11 117:18,19

**dated** 3:15,17 22:18 23:18

**dating** 104:24 105:13

**David** 63:24 89:7 97:12 99:4,6 100:20, 21 101:1,3,6,25 102:4 104:3,5,6,7,9, 11,18 105:13,18 106:7,11 111:12,13, 20,21 132:9

**Davis** 86:12,13,21, 25 87:2,8,18,19

**Davis'** 86:23

**day** 35:2,15 44:5 67:14 80:12 101:12 125:5 140:9 149:17 150:24

**day-to-day** 27:11 122:6

**days** 67:18,19

**daytime** 33:14

**DEA** 35:23,24 36:3 96:21

**deal** 73:11 99:21

155:10

**dealing** 125:15

**decide** 154:1,3

**decided** 125:8 150:20 152:22

**decision** 151:17 156:21,22

**declined** 69:1

**deescalate** 125:25 126:1

**defective** 121:2 122:4,5

**defend** 61:9

**defendants** 2:8 128:14

**defending** 61:7

**degree** 16:5,6,9

**demote** 74:19

**denied** 100:15,24 128:13,19

**Denny's** 33:4

**deny** 129:7

**department** 27:17, 19 28:1,2,4,6,8,16 44:12,23 51:21 100:20 105:12 106:4 111:16 134:9,12,18

**departments** 135:9

**depend** 70:24

**depended** 66:10

**depending** 35:6,7 65:24 67:11,13 108:21 112:6

**depends** 154:4

**deposition** 3:13 5:8, 10,21 8:12,16,25 9:3 168:24

**depression** 145:9, 12,13,17 148:8,21 154:4

**deputies** 27:15,17 29:12 41:14 44:11

45:23 66:9 76:19 83:4 90:4 94:24,25 100:22,23 103:14,17 108:24 163:11,13,14

**deputy** 37:6,10,14 39:2,3 40:24 41:3,9, 14 42:5 45:23 63:24 67:1 82:18,24 84:13 100:11,12 130:14,19

**descent** 144:20

**describe** 93:24 160:16 163:24

**describes** 93:12

**DESCRIPTION** 3:11

**deserved** 77:1,4,11 78:17 79:1

**desire** 158:25

**details** 53:16 163:13,14

**determination** 122:18

**determine** 102:11 110:18 112:16

**determining** 112:20

**Devaney** 2:23

**devo.1111@icloud. com** 2:24

**Diamond** 2:23

**differently** 124:3

**difficult** 116:21

**dig** 86:4

**directions** 35:16

**disappointed** 42:9, 16

**disapproval** 45:12

**disapprove** 72:10

**disapproved** 62:25 70:16

**discharge** 14:22 19:15,16,18 21:24

**discipline** 75:20

**discovery** 8:18 48:19 59:24 85:14 91:1,7,11,14,18,25 92:5,14,24

**discredit** 59:9

**discrimination** 3:15,16 24:10 51:9, 22 52:1,3

**discuss** 48:18

**discussed** 80:25 81:24 103:7 130:20

**discussing** 79:8,9 101:21 111:12

**discussion** 46:1 80:1 111:22

**discussions** 46:4, 14 80:1

**disgusts** 140:21

**dismissed** 168:8

**dispatch** 32:17 67:9, 15

**disposed** 50:2

**disrespect** 125:12, 13

**disrupt** 50:11

**distress** 83:12

**diversity** 85:7 103:3

**DMV** 116:16,17 121:15

**doctor** 120:9,12 143:16 144:4,7 147:24 148:3 155:17, 23

**doctors** 146:15

**document** 22:11 23:12,14,15 24:8 25:7 26:10 68:9 70:6

**documents** 8:16,17 51:5 62:23 67:25 68:2,5 69:24 70:9,10 92:4 118:25

**dog** 94:8,11,14 96:9, 23 164:13

**Bert W. Whittington, III**                    Index: dogs..fact

**dogs** 120:11

**door** 31:22 107:7 111:4,6 112:3

**doors** 52:20

**dope** 47:17

**dose** 149:9,11,13,15

**doubt** 69:4 123:2

**Downplaying** 60:19

**DPS** 18:12,13,18,19 19:3,4,8,15,20 20:13, 14

**drawers** 102:16,17

**drawing** 51:6

**drew** 32:2,3

**drill** 14:25

**driver** 31:16 33:17 34:3

**drop** 116:16

**dropped** 64:4

**drug** 72:17

**drugs** 64:5 79:14

**drum** 73:15,25

**drumming** 73:2 82:3

**dual** 50:7

**due** 167:8

**Duffy** 86:17 88:9,11

**Duffy's** 86:18 88:3

**Dugat** 46:8 101:17, 19

**duly** 5:2

**duties** 81:19

**duty** 14:16 39:18 114:3,4 118:23

———————
**E**
———————

**Eagleton** 27:10,18 97:6,10,25 151:1,21 168:3,9

**Eagleton's** 97:22

150:24

**ear** 60:13

**earlier** 80:25 93:15 160:2

**early** 21:14 44:1

**earshot** 47:22 89:7

**east** 30:25

**eat** 73:20 88:25 89:1 133:25 162:14,15

**economist** 165:16

**edge** 84:11

**education** 15:22

**EEOC** 22:14 26:16

**effect** 55:16

**effectively** 122:22 125:24

**effort** 83:12

**eighty** 111:21

**elaborate** 30:11

**elected** 21:8,9 27:9 129:11

**eleven** 109:25

**eligible** 134:5,7,11 136:14

**else's** 40:18 123:21

**Ely** 46:10 100:4,12 101:16 102:13 113:19 117:3

**email** 2:7,13,19 121:22 165:20

**embarrassing** 162:17

**emergency** 121:8

**employed** 20:24 152:25

**employer** 133:20

**employers** 133:8, 16,17

**employment** 129:7 133:14 140:6 167:12

**encounters** 35:20

**end** 69:9 112:5 125:5 141:11

**ended** 34:9 81:5

**enforcement** 18:8 123:9 126:12,19 135:11,24 136:2,11, 14 140:18,22,25 142:5,8,11 158:24 162:23 164:5

**enforcers** 49:12,15

**English** 32:4,10,13

**ensure** 163:10

**enter** 107:7,8 111:2, 9 112:5

**entire** 14:16 57:16 161:13

**entries** 107:3,15,25 108:6,10 109:5,10 110:3 111:17 112:15, 21 117:14 118:1,12, 14 119:4,15

**entry** 107:5,6 108:4, 16,20,22 109:19 110:4,18 111:25 118:7

**environment** 85:17, 19

**equipment** 53:6

**Eric** 2:16

**Eric.baumgart@ texasinvestigation s.us** 2:19

**evening** 100:19

**events** 152:2

**everybody's** 132:7

**evidence** 93:22 94:17,18,19,25 95:3 152:10

**exact** 9:24 10:3 18:4 117:18,19 145:6,7

**examination** 3:5 4:17 5:4

**examined** 5:2

**excited** 100:23 101:2

**excuse** 44:16 117:22

**excuses** 73:19 100:25

**exercising** 137:15

**exhibit** 3:11,13,15, 16,18 4:22,23 5:9 22:8,9 23:10,13 24:6, 20,21 25:2,4 26:18 72:20

**EXHIBITS** 3:10

**expect** 125:2

**expectations** 60:11

**expects** 114:13

**experience** 45:25 109:9 163:10

**experienced** 28:10

**expired** 47:18

**explain** 93:24 114:20 125:3 153:21, 25 155:7 160:16

**explained** 30:7 32:18 121:17,21 125:14

**exposure** 54:12

**express** 20:9 69:15 82:19,23 124:22 125:7

**expressed** 27:25 100:19 119:6

**expressing** 90:5

———————
**F**
———————

**F5** 134:15

**face** 50:19,22,23

**Facebook** 161:23

**fact** 43:1 60:19 106:16 117:1 126:21 127:6 150:14,15,17

**factor** 112:18,19

**facts** 24:3

**fair** 6:14 40:7 167:12

**false** 128:13,15 129:2

**falsify** 62:23 68:5,8, 10,11,14,19 70:6

**falsifying** 62:23 67:25 68:2 69:8,24

**falsing** 69:24

**family** 10:1 15:8,15 50:7,12 124:6 140:12 156:22 161:13,18

**family's** 50:5

**fast** 122:20

**father** 122:8

**fault** 81:18

**Fax** 2:6,12,18

**FBI** 96:21

**February** 9:10

**fed** 140:2 158:24

**Federal** 5:11

**fee** 164:21

**feeder** 30:24

**feel** 35:15 42:25 43:7,24 60:2,6,15 78:16,25 82:22 141:2 159:3

**feeling** 78:20 90:6

**feelings** 40:3 82:20

**fees** 165:14

**felt** 20:7 27:17 30:2,5 42:24 58:25 59:10,11 60:17 79:1 82:23 83:25 84:1,4 88:7 90:2 115:8,10 151:5

**female** 31:15

**field** 44:5

**Fifteenth** 2:11

**fight** 44:14

**file** 23:23 51:9 109:21,22

**filed** 5:14 22:14 23:2, 25 24:25 25:6,15 26:1,2,15,19,25

**filing** 22:21 26:22 165:14

**finally** 151:10

**find** 42:23 44:16 64:9 116:20 149:24 160:4

**finger** 61:11 102:4

**finish** 6:22 92:22

**finished** 6:20 20:21

**fired** 152:9

**firing** 75:8

**firm** 2:16 23:5,9

**fit** 102:5

**fixed** 121:19

**flip** 167:1

**Floor** 2:11

**floored** 105:22 163:3,4

**Florida** 11:18

**Floyd** 43:23 55:1 57:1 58:3 59:18 73:4 77:1,4,11 78:8,17 79:1 81:4 84:24 97:17,18,19 167:25

**Floyd's** 56:14 60:23 61:3 79:14 90:8

**fluoride** 159:21

**folks** 29:8 47:8 53:3 86:10 125:7,15 140:9 141:11

**follow** 123:10

**force** 129:2

**forget** 80:7 121:13 122:22

**forgot** 153:15

**forgotten** 59:25 91:2

**form** 83:24

**formal** 26:15,22

**formation** 109:19

**foul** 89:25

**found** 78:4 121:20 145:14

**fourth** 106:21

**freaking** 114:8

**free** 96:12,15 138:16

**free-range** 138:16

**Freedom** 167:6,7,16

**frees** 94:16

**friend** 132:8,10

**front** 107:3 108:9 110:2,9,13,18 111:3, 6,24 112:20 119:4,14 131:12

**frustrated** 36:6,18 101:9 114:10 137:20

**FTO** 19:24 20:2,3,4, 5,7 53:2 119:23,25

**fuck** 52:16

**fucking** 52:12 129:24 130:24

**fulfill** 140:2

**full** 5:15 94:21

**full-time** 133:24 138:3 139:18 140:5, 25

**fully** 92:15

**funny** 143:17

**furious** 104:9,17,21

**future** 111:15 140:6

---

**G**

---

**gainful** 133:14

**gaining** 133:14

**gang** 45:12

**gap** 149:5

**Garcia** 129:10,11,13, 16,17,18,20 130:19,

21,22 131:10,15 132:18 133:19

**Gatorade** 34:1

**gave** 36:12 129:1

**general** 16:6

**gentle** 104:19

**gentleman** 31:1

**George** 43:23 55:1 56:14 57:1 58:3 59:18 60:23 61:2,3 73:4 77:4,11 78:8,17 79:1,14 81:4 84:24 90:8 97:17,18,19 167:25

**giant** 104:19

**GILLESPIE** 2:16

**girlfriend** 102:9

**give** 4:9 40:1 43:3 49:16,23 50:22 72:3, 7 95:4 139:7,25 145:6

**giving** 13:6 31:23 41:12

**God** 4:11

**golf** 135:19 138:1,15, 25 139:9 140:23 141:10

**good** 4:21 5:6,7 6:11 18:9 19:12,13 21:22 32:13 49:25 53:5 102:5 111:18,24 167:21

**Gosh** 50:23 139:3

**graduate** 13:23 14:1

**graduated** 14:5 161:15

**graduation** 15:3

**great** 6:6 53:10

**greatly** 84:19

**Green** 163:14

**Greenwood** 163:7, 10

**Greenwood's** 163:14

**ground** 6:5 98:8

**group** 57:7 74:2,5 81:11 162:3

**grouped** 109:21

**guard** 15:1

**guess** 55:7 138:17

**guns** 29:9

**guy** 53:10 61:18,25 115:11,16

**gym** 152:4

---

**H**

**hand** 4:7 31:21 106:20,21

**handle** 106:2,3

**handled** 163:17

**handler** 109:6 120:15,20,23

**handles** 155:10

**handling** 81:23 93:22 94:17

**hands** 31:24 32:8,12 121:12 122:13 159:10

**hanging** 89:9

**happen** 33:8 37:4 64:8 71:14 75:2 82:25 115:3 127:24

**happened** 20:6 30:22,23 35:2 41:24 50:13 56:9 57:9,20 58:5 72:1 74:17,25 75:9 79:5 80:2 81:4 82:20,25 87:21 90:19 104:4,7 141:5,13 142:18

**happening** 28:2,21 39:14 45:19 87:20 101:5 145:8,10

**happy** 105:22,25 126:7

**harass** 83:12 84:3, 16

**harassed** 83:18,23 84:5

**hard** 122:9 139:3 144:20

**harm** 115:1,6,7

**harmed** 113:1 115:5

**Harris** 2:10 5:13 128:16 129:1 134:8 142:20 152:16,21,24, 25 153:2,3,9 162:14 168:11

**head** 48:23 56:6 84:25 86:1 130:1,24 140:18 146:21 165:19

**heads** 121:12 122:13

**health** 150:21 151:19

**hear** 7:5,10 45:22 52:20 53:15 64:19 65:5 76:18 99:21 100:1 101:9 124:5,8 129:24 130:17,24

**heard** 45:19 65:11 87:15,16 101:1,22 130:14 131:7 164:19, 20

**Heating** 15:9,18

**height** 110:17

**helped** 150:19

**helpful** 26:11 91:22

**helping** 26:11 53:3

**henceforth** 143:3

**hesitating** 155:9

**hesitation** 111:10

**hey** 37:11 45:24 46:18 53:8 68:10 71:21,22 81:21 88:25 89:8,25 117:10 129:24 130:23 152:6 160:20 161:1

**high** 13:23 14:2,5,8 15:4 29:6 122:11

159:2 161:15

**high-risk** 107:3

**highest** 126:15

**highly** 108:15

**highway** 65:16

**hinder** 122:21 133:13

**hip** 32:11 159:5

**hire** 129:13 130:2,4,9 131:1,4,10 134:15 141:11

**hired** 132:17

**Hispanic** 98:17 102:25

**Hispanics** 44:19

**hisself** 132:25

**history** 88:8 157:8 158:16,18

**hit** 73:16 138:16

**hits** 48:18

**hm** 78:10

**Hmm** 127:14 132:14

**Hollins** 100:18

**home** 10:20 11:21 125:5 151:9,19

**honest** 51:2 160:19, 21

**honorable** 14:22 19:15,18 21:24

**hope** 60:9

**hoped** 60:7

**horrible** 143:18

**Hospital** 145:4 146:11

**hostile** 85:17,19

**hotline** 154:7

**hour** 138:10

**hourly** 138:8 166:7

**hours** 40:10 89:14 138:5,6 139:2,4,5

**house** 10:3,4 103:2 150:24 152:8 161:8

**household** 50:7

**Houston** 2:11

**huge** 162:22,23

**human** 125:1,11

**Humble** 147:18,19

**hurt** 40:2

**hurtful** 29:22

**Hutch** 58:5 84:6

**Hutchins** 58:5 74:10,13 75:18,22,25

**HVAC** 15:12,13,14

---

**I**

**I-10** 34:16

**idea** 26:21 53:13 75:19,24 132:24 136:10 164:10

**identified** 44:24

**identify** 47:4

**III** 2:4 3:4,15,17 5:1, 19

**illegal** 70:18,21,22, 23 72:8

**immediately** 14:8 32:7 58:9,12,13 76:9 145:13 147:25 148:1, 4

**important** 86:4 138:14

**in-car** 121:5,18 123:5

**inappropriate** 29:20,23,25 30:1

**incident** 30:23 37:13 38:5,6 41:24 42:1 58:4 69:23 81:3,23, 24 84:7,25 124:4 163:18

**including** 146:16

inconsistent 20:8

increased 54:14

INDEX 3:1

Indian 144:20

indicating 92:11 110:19 142:14 146:13 166:14

individual 34:6 66:11 71:2 98:11 113:16,18

individual's 66:1,2

individuals 90:2

inferior 72:23,25

inform 168:3

information 88:6 128:13,15,17 129:1

initial 74:18

initially 39:8 74:16 87:16 112:4 113:3,4 165:6

injury 160:15

inoperable 121:2,3, 25

inquiry 25:15,16,20 26:2,8 130:7

ins- 69:24

insensitive 83:25

inside 33:19 34:11 46:2 77:7 107:9 109:15

insinuating 79:13

instance 37:12 86:12

instances 38:10 69:24 85:18 86:10

instantly 98:10

instructor 15:1

insurance 155:7,10

intention 3:13 140:5,24

intentionally 123:22

interdiction 29:6 38:23,24 97:4 98:4

interest 27:11,24 28:7,17

interested 28:11

interracial 106:16, 18

interrupted 58:9,13

interstate 30:24 31:3,4,12 33:13 34:23 35:3

introduced 132:25

inventories 93:21

inventory 94:6

investigation 42:19,22 72:17 75:11,13,17 86:19 98:8 102:23 103:15 130:7

investigations 29:2 72:11 110:5

Investigator 2:16

invited 97:21,24

invoice 165:24 166:3

involved 45:5 113:21,24 137:5 165:3

involving 45:5

irritated 44:15 84:4

irritating 43:21

Isaac 97:7 99:12 100:16 113:14 114:8 127:20

island 30:5

issue 30:9 53:15 62:9 69:20 73:4 104:3 106:7,12,15 114:6 121:20,21 123:20 128:9

issues 43:16 73:24, 25 121:4,5,6,10,11, 18 145:9,11,12

itemized 165:22

IV 12:13

_____

J

_____

Jabron 12:18,19,23 13:7,17

jail 37:10 125:10

James 2:22

Jason 74:10 75:18, 22,25

job 6:6,11 17:14,15 29:5 40:10,11,13 47:16 96:18 122:21 133:24 134:22 135:12,18,19 140:18, 22,25 141:16,21 142:8,14

jobs 135:18,20,23, 24,25 136:2,6,11,15

Johnson 63:24 67:1 89:7 97:12 99:4,6 100:20,21 101:1,6,25 102:4 104:3,5,6,7,9, 11,18 105:13,18 106:11 111:12,13,20 132:9,10

Johnson's 106:7 111:21

joined 14:7 107:19

joining 15:4

joke 55:25 89:14 127:1

jokes 54:13,15,18 72:21 88:16,20 89:20

Jones 86:14

Julia 86:25 87:2,8,18

jumped 59:2,6

June 23:18 26:15,19, 25

justice 16:4

_____

K

_____

K-9 71:1,21

Katrina 11:8,10

kennel 94:21,22

kick 82:8

kids 10:25 11:3 50:9 125:6 140:13 149:24

kill 61:25 78:13 79:11,12,15 84:13

killed 61:17 79:15

kilos 163:18

kind 11:22 41:11 44:14 45:20,21 47:17 50:12 73:8 82:8 83:2 84:25 89:10,18,24 92:8 99:17 116:18 127:10 139:3 150:19

Kingwood 147:19 155:20

Kirk 2:20 143:3

knee 159:5

knew 21:10 32:25 50:9 60:11 95:18 127:23 140:3 151:24, 25 161:19,20

knowledge 75:10, 20 87:23 91:10 105:10

_____

L

_____

lady 105:9,16

Lagos 17:6

Lakes 139:1 141:7

Lamplighter 2:5

language 6:13 52:7, 9,15 98:19 103:1 122:14

large 29:8 34:10

laughing 127:10

law 2:4,16 18:8 23:5, 8 126:12,18 136:11, 14 140:18 142:4,8,11 158:24 162:23 164:5

lawsuit 22:1

**Bert W. Whittington, III**          Index: laying..Martin

laying 33:23

laziness 96:6,11

lazy 96:7

lead 49:12

leader 73:15

leaked 75:6 76:9

learn 73:11,12

leave 18:6,9 19:10,
12 21:6,21 45:14
71:4,7,9,25 109:13,
14 140:13

led 28:6,16 49:3

Lee 16:15,16,22 17:3
20:14,19,22

left 10:1,6 15:21
18:7,11 19:13 20:13
31:21 46:8 69:11
92:3 142:10 146:12

legal 164:21

legitimate 71:3

Leo 131:13 132:4,11,
23,25 133:1,3,4

Leo's 131:18

letter 130:6,8

level 125:14

Liberty 67:12

license 31:14 126:6,
13,14,15,17,22,23
127:8 136:22,23,25

licensed 15:10

lid 33:24

lie 141:3,4,8,9

lieutenant 86:17,18
88:3,9,11 100:9
129:10,11,20 130:19,
22 133:19

life 51:6 160:22

light 93:13

lights 121:9 122:13

lineup 118:22 119:1,
2

list 118:11,13,17,18
119:12 162:25 163:3,
20,21,22,25 164:2,4,
9,11,15,16

listed 38:10 92:9,11
143:11

listen 6:19 65:25
66:2 102:23 104:11
115:15

listening 64:13
65:17 67:8

live 10:25 160:20

lived 9:16 10:9

livelihood 158:25

livelihoods 50:5

lives 10:17 11:25
43:18 55:15,17
161:6,8

located 144:22,23
147:17

location 10:10

logistic 136:6

logistical 135:17

logistics 14:25
135:20 136:9

long 9:16 11:13
13:21 14:13 16:22
17:21 18:22 19:8
21:3 32:21,24 50:23
51:3 53:1 54:6 56:20,
22 76:4,7 134:25
147:3,4,9 158:13,22,
23,25 159:2

longer 117:10,21
119:7,11,14

looked 32:3 33:22
37:15 53:1 116:8
127:10 136:24
137:11 139:23

Lopez 32:17,18,19,
21 33:2,3

loss 164:12

lost 121:10

lot 28:21 29:10 33:4
43:16 45:24 73:7

74:17 122:23

love 44:13 78:14
105:24 106:4 123:15
140:8,16

loved 113:5,6 140:7

low 130:1,25

lunch 73:20 83:1
85:25

---

**M**

M-E-T-H-O-T-R-E-
X-A-T-E 159:20

mad 49:23 104:10,20
116:2,9 127:13 128:7

made 30:24 31:13
36:7 43:1,6 51:20
60:15 70:25 71:19
77:10 78:24 79:17
100:25 104:16
111:18 112:24
113:22 116:9 122:17
127:17 151:17
156:21 161:1

Magana 49:8

major 34:9 36:13,14
46:7 49:7,13,21
51:15 57:13,15,21
63:14,16 64:5 84:5
86:14 89:6,12 90:10
99:11 101:15 102:15,
16 109:4 112:25
114:16 119:6 129:8
130:11,15 131:8
168:10

majority 91:11 121:7
124:17

make 6:19 7:2,3,14
29:24 30:13 35:24
36:22,24 39:3,4
42:21 45:2,3,8 46:23
47:13 48:12 62:21
68:21 76:16 83:5
91:21 104:20 107:9
116:21 122:18,19
138:10 160:9,20
161:1

makes 7:7 13:15

49:5 94:15 123:6

making 6:18 73:19
103:24,25 114:11
159:22

male 31:16,19

Mama 87:19

man 37:11 43:15
44:1,5 50:23 78:12
84:12 85:11 88:25
89:1,8,14,25 96:8
104:11 105:23,24
129:24 135:21
160:18

manager 17:15

Mandy 102:4,12
104:25 105:8,9,12,
14,16,17

Mandy's 106:6,7

manifested 160:6,
10

manipulated 111:6

manpower 35:9

Manvel 19:1,2,4,8

Marine 10:15 14:7,
13,24 15:4,21,23
17:13,24 113:7
139:16,19 158:20

marine's 15:1

Marines 14:20

mark 22:7 25:4

marked 3:10 4:22
5:9 22:9 23:10,13
24:7,15 25:2

married 13:21

marry 106:5

Martin 2:9 3:5 4:18,
21,23 5:5,12 22:7,10
23:11,17 24:12 25:3,
5,9 48:7 53:21 54:4
57:25 71:9 72:8
77:16,19 78:2,6 88:5
92:22 93:3,10 95:11
96:24 112:14 119:20
123:24 124:3 128:25
142:1,21 143:6

159:19 163:24 166:11,13,22 168:15, 19

**Master** 49:13 126:6, 13,14,16,23 127:8 128:3

**matter** 40:3,6,9 43:18 55:15,18 64:6 93:2

**mattered** 40:5,6

**Mcnair** 31:4 47:13 98:6 102:20

**meal** 39:21

**meaning** 20:2 63:17 100:22

**means** 6:2 114:24

**meant** 78:13,16 79:12 105:7

**media** 75:7

**medical** 160:8

**medication** 148:2,4, 7,9,10,13 154:12 158:9,11,12 159:13, 14,22

**medications** 8:2 147:25 149:1,3,5,17, 19 157:21,23 158:2,5 159:24

**medicine** 154:18

**medium** 79:17,18

**meet** 8:11 83:1 101:6 168:2

**meeting** 57:10,12, 14,20,21,23,24 59:14 60:3,4,6,10,16 61:19 62:10,13 78:21 79:18,20,23 80:1,21, 24,25 81:5,9,10,11, 12,15 82:2,11,16 83:5,11,14,15,19,23 84:16 98:2 101:21 114:9 167:25

**Melissa** 2:9 5:12

**Melissa.martin@ cao.hctx.net** 2:13

**member** 100:5 103:4

**members** 80:11 89:23 98:6 108:19

**Menifee** 9:13 139:1 141:7

**mental** 150:21 151:19 160:7,11

**mentally** 30:4

**mentioned** 34:15 38:16 63:6 72:9 157:1,18 160:5 161:5

**merit** 60:20

**mess** 150:7,18 151:10

**message** 43:23 55:19,22,25 59:17 61:23 62:3,8,12 74:22 75:11,18,23 76:1,5,8,10,11,16,18, 21,22 78:12 154:8 165:20

**messages** 30:1 54:17

**messing** 52:15

**meth** 36:9

**methodically** 107:8

**midday** 33:15

**middle** 5:18

**Miles** 12:2,4,5,6 13:10,15

**Military** 45:25 53:5 109:9 126:21 127:9 128:2 132:5,19 139:21 140:1 158:24, 25 160:23 161:16,17 163:9

**mill** 158:23

**milligrams** 149:12, 16

**mind** 53:2 58:2,25 94:12 149:25

**mine** 132:8,10

**Minneapolis** 84:7

**minute** 45:13 53:20 101:24 105:6

**minutes** 142:22

**mishandled** 162:11

**mishandling** 152:10

**missed** 62:18 75:14 85:14 86:1

**missing** 152:10 166:15

**mistake** 160:20 161:1,2

**mistaken** 51:25 92:8 126:16

**misunderstanding** 32:15

**modified** 137:8

**moment** 116:23

**moments** 92:14

**money** 41:12 155:15 156:13,15 165:21

**month** 10:4 71:16 72:14,15 139:2 145:7 147:7 153:22 165:24 166:4,5

**months** 9:19 10:2 14:15 18:23,24 19:9 87:5,6 119:25

**mood** 154:5

**morning** 5:6,7 34:22

**mother** 122:8

**motherfucking** 102:8

**mouth** 161:10,21 162:6,20

**move** 9:21 25:3 48:25 51:5 67:24 150:8,10,16,20,21 152:22,23 156:22

**moved** 33:3

**movies** 140:12,13

**moving** 53:18 69:11 76:24 93:11 150:6

**multiple** 31:2 64:14, 23 65:3

**murder** 60:23 61:3 90:9,16

**murderer** 124:24

---

**N**

---

**name's** 5:12

**named** 39:2 46:22 70:2

**names** 51:8 132:6 143:18

**narcotic** 55:9

**narcotics** 29:8 30:15 31:2 34:11 63:17 64:23 65:4 104:1 114:1 161:23 162:11,12

**nature** 29:4 65:24

**nearest** 67:9,16

**necessarily** 45:18 124:21 157:7

**needed** 62:14 64:9 65:5,11 66:14,20 67:20 121:19

**negative** 127:25

**negligence** 81:23

**negligent** 81:19,20

**nei-** 103:19

**neighborhood** 34:24 98:17 102:22, 25 103:22 104:13 161:11

**neighborhoods** 98:13 103:6,20

**nerve** 73:9,12

**nerve-racking** 31:6

**nervousness** 34:4

**newly** 21:8,9 51:12 129:11

**newly-elected** 129:22

Bert W. Whittington, III                Index: news..patrol

news 73:16,25 124:5

nice 40:16

Nigeria 17:6

night 8:22 31:5,14 50:10 74:20 75:4 140:9

nipped 69:11

nods 6:10

non-law 135:11,24 136:2 140:22,25

north 31:3

northeast 47:12 98:7 102:21

notes 8:7

notice 3:13 5:10

notifications 143:20

November 10:1,6 150:9

now-constable 129:13 133:19

nuh-uhs 6:10

numb 73:8,9

number 25:18 72:3, 7,19 108:12 131:24 132:1 133:9 138:14 139:8

O

oath 4:6 5:25

object 88:16,19

objected 89:19

Objection 48:6 72:5 88:4 92:18 95:10 96:16 119:19 123:12 124:2 141:19

objections 89:5 90:8

observed 33:16,17

obtaining 133:14

obvious 116:2

occasion 88:23

occasions 37:6 68:25 88:24

occupant 33:19 36:8

occupants 31:15 64:14,24 65:4

occupy 149:25

occur 30:20 33:7 72:12

occurred 34:19 59:19,21

occurrences 59:22

occurring 36:19,21

October 13:22

offended 56:25 84:19

offenses 47:2

offensive 43:11,14 54:12,15 55:25 88:16,20 89:20

office 2:10 27:12 49:4 51:15 73:20,21 100:18 101:10,12,13, 14,20 130:14,20 145:2

officer 20:24 21:1,4 29:5 61:17,24 71:1 78:13 81:19 109:1 110:12 115:16 117:12 118:18 120:1 124:5,16 126:6,14,19 128:4 136:18,20,25 137:12,23 142:11 164:6

officer's 81:22 126:13,17,23 127:8 136:21,23

officer-involved 29:17 43:8 44:4 54:18 84:23 89:3

officers 44:13 45:4 64:1,19 67:4 74:17 96:18 109:18 123:1, 9,14,15,25 164:2

OFFICES 2:4

oil 16:20

ongoing 75:11

online 17:5 137:18

Oooh 135:21

Op 112:7,11 113:9 114:1 117:22 118:21

open 111:7 117:3

openly 88:16 89:19

operations 103:6, 19,21 112:12 122:5

opinion 19:13 60:13 81:22 82:23 95:12,22

opinions 29:19

opportunity 86:3 140:15 168:2

Oral 3:13

order 13:6 111:2,9 112:7,12 113:9 114:1 117:23 118:21

Original 3:18

Orth 2:4 4:19 27:1 48:6 72:5 88:4 92:18, 25 95:10 96:16 119:19 123:12 124:2 141:19 142:23 165:11 166:10 168:17

out-of-state 31:14

overhead 121:8 122:12

overlooked 83:25

P

p.m. 77:21,23,24,25 93:5,6,7,9 142:25 143:1,2,4 166:18,19, 21 168:23,24

paid 127:18 128:1 138:8 139:23 140:3 155:2,25 156:8 164:24 165:6,11,13

pain 159:3

para 130:23

paragraph 25:13 27:8 49:1 53:18 54:11 74:9 76:24 83:10,15 84:18 88:13,14,21 89:21 93:11 96:25 107:1 110:2 124:12,14 128:11 129:5 133:21 143:10

paraphrase 55:6

paraphrasing 130:10

parent 50:7

park 101:7

parked 10:10

parking 33:4

part 39:15 40:23 43:12 46:15,20 76:13,15 89:10 99:6 111:15,16 113:5 131:14 153:2

partial 94:22

participate 46:13 107:14 108:6,20 109:5

participated 108:8 109:8

participating 46:4 107:24 119:3

parties 29:15 39:5,6, 12 41:10,17

party 29:16 39:7 40:7,14 42:3,4 43:3

Pasadena 108:2

pass 137:15 150:23 168:16

passenger 31:16, 18,19 33:20

past 164:20

patrol 20:24 21:1,4 29:12 30:15,17 32:16 35:8,12 37:5,6,7,24 49:25 65:16,23 66:9

67:4 76:13 104:14 108:24,25 121:7 122:6 123:18 137:15

**pause** 77:15

**pay** 105:23 139:5 155:7,14 156:13,15 165:5

**PD** 134:21

**peace** 126:6,13,14, 16,23 127:8 128:4 136:21,22,24 137:22

**penalty** 4:8

**Pendleton** 10:14,15 135:18

**Penn** 17:5,9

**people** 43:9 46:22 47:16,17 73:10 82:4 103:25 105:17 106:23 114:10 122:7, 8,10 125:22,25 140:8 151:7,24 152:1 160:25 161:5,8,22 162:13,14

**percent** 123:2

**Pereda** 46:10 80:15 100:4,12 101:16 102:13 104:2 113:19 115:19 127:14,19

**perimeter** 108:25 109:17 115:17 116:4, 5 117:2,11 118:18 119:8

**period** 76:2 126:12, 22 142:5 153:4

**perjury** 4:9

**perks** 139:6

**person** 34:8 98:13 100:2,3,4 117:13 147:10 157:11

**person's** 146:9

**personal** 29:19 87:23 95:22 122:19 158:6 160:2,3

**personally** 28:8 106:17

**perspective** 133:8

**pesticide** 17:16

**Petition** 83:8 92:6

**Philip** 2:4

**Philip.orth@yahoo. com** 2:7

**phone** 20:23 128:18 130:18 131:3,8,23,24 132:1,12,14,15 140:11 143:20 159:12,15

**physical** 160:6

**physically** 30:4 115:2

**picked** 98:10 163:11,12

**picker** 122:20

**piece** 53:5 76:13

**pill** 154:22

**pinpoint** 103:1

**place** 98:18 151:10

**places** 162:15

**plaintiff** 2:3 3:13 25:14 26:15

**Plaintiff's** 3:18

**Plair** 2:22

**plant** 16:19 17:15

**plate** 31:14

**play** 138:15

**player** 116:3

**playing** 141:10

**plays** 112:18

**pled** 160:12,14

**plumb** 96:5

**plumber** 15:10

**plumbing** 15:8,9,18

**pocket** 155:7

**point** 66:23 107:3 108:9 110:3,9,13,18 111:24 112:20

115:11,15 117:13 119:4,14 165:14

**pointing** 61:11

**pointman** 116:25 117:6

**police** 93:14,20 107:4 110:3 123:25 124:4,16 134:9,12,17 135:9 136:18,20 137:12

**policy** 53:11 75:21 123:6,9,10,23,24

**political** 48:11

**politics** 29:21 43:11, 13 47:3 48:4 85:4,5

**popped** 85:25 86:7, 11

**position** 32:8 108:14,15,16 110:8, 10 122:6 136:7 144:5

**positive** 91:25 127:25

**possibly** 91:6 132:15 164:19

**potshots** 47:21,23, 25

**pout** 37:3

**practice** 145:2

**pre-charge** 25:15, 16,20,24 26:2,4,8

**precinct** 21:8,12,15, 17 29:3,12 35:10,19, 25 36:4 38:22 45:16, 19 57:18 63:21 67:17 74:7 76:1 96:20 103:12 105:11 128:20 129:12 130:8, 25 131:14 133:18 134:20 136:8 139:18, 22,23 140:10 141:13 142:6,10,19 151:21 152:7,25 153:10 161:4

**predominantly** 36:23 47:12 98:17 104:13

**prepare** 8:11,16,25 9:2 91:18

**prepared** 80:19

**prescribe** 148:6,13, 15,19 149:19

**prescribed** 147:25 148:1 154:15

**prescription** 154:24,25

**present** 2:15 46:23 48:7,10 57:14,18 74:4 101:14 109:11 143:3

**presidency** 43:16

**President** 43:15

**press** 75:7 76:9

**pressure** 106:3

**pretty** 56:7,13 126:5, 11 151:11

**prevent** 95:22,25 136:19

**prevents** 136:17

**primary** 155:23

**prior** 96:9 131:3 158:16

**prison** 124:24

**prisoner** 37:10,24 93:21 94:6

**prisoners** 94:20

**probable** 71:3,22,23

**problem** 89:12 98:15 106:18 159:22

**problems** 53:7

**Procedure** 5:11

**proceed** 4:17,18

**proceedings** 77:15

**process** 16:17,19 94:19,25 95:3 129:6 167:8

**processing** 93:20 113:25

**produce** 102:10

**professional** 125:17 164:5

**profile** 29:7

**program** 137:9

**proper** 131:12

**properly** 163:11

**prospective** 133:15

**prostate** 158:10

**protect** 74:15 123:1, 17 140:1

**protected** 74:13

**protecting** 159:1

**protesters** 43:19

**protocol** 64:3

**proud** 94:20

**prove** 162:21

**provide** 35:5 76:14 96:19

**provided** 39:16,20 40:22 41:2 59:24

**providing** 76:14

**psychiatrist** 143:13, 25 144:1,13 154:4 157:6

**psychiatrists** 156:24

**psychologist** 143:13,24 144:3,13

**psychologists** 156:23

**psychology** 17:6 143:21

**public** 123:25

**pull** 104:15

**pulled** 31:1

**pulse** 35:6,7,8

**purpose** 6:9 25:24 115:18

**pursuant** 5:9,10

**pursue** 18:8

**pursued** 142:15,18

**pursuing** 105:17 140:24

**push** 69:20

**put** 4:5,15 31:25 32:7 49:25 50:3,10 51:16 55:24 72:19 74:20 91:10 108:12 110:15 115:16 130:2,25 134:14 141:7,13 142:9 151:16 164:2, 15,16

**putting** 114:12 164:11

**Q**

**qualification** 125:24

**qualifications** 124:16,19,21 125:21

**quantity** 34:10

**question** 6:7,21,22, 23 7:6,17 8:3 20:4 36:14,17 60:8 65:10 78:3,7,20 92:10 102:17 110:21 136:16 146:21 152:20 154:21 167:21

**questions** 7:3,4,5 34:3 91:5,8,17,19 92:15,24 168:15,17

**quick** 142:22

**quiet** 105:18

**R**

**race** 24:16,18 29:25 45:2,3 46:24 48:15 72:23,25 106:6,7,8, 13 113:12

**race-related** 47:2,3, 6

**races** 44:19,20

**racial** 28:22 30:1

43:16 59:17

**radio** 50:1 64:11,14, 20,25 65:12,18 66:14 67:8,10,20

**raise** 4:7

**raised** 51:12 52:21 160:18,19

**ramming** 73:17

**ranch** 97:12,22 98:2 161:8

**rank** 132:6

**rare** 62:24

**read** 4:20 51:5 78:3, 5,7 97:2 112:24 133:6,13

**ready** 10:4 102:14

**real** 132:8,9

**realize** 54:6 122:24

**realized** 32:4,5,9,13, 14 33:20 134:2

**realizing** 113:9 152:13

**rear** 113:17,20

**reason** 7:23 19:17 27:23 43:5 56:12 58:16 59:13,19 62:11 70:21 71:2 81:5 86:16 91:16 104:23 118:12 119:2 128:7 155:9 160:7

**reasons** 151:17

**recall** 17:20,23 18:4, 13 19:16 20:11 21:18,19 23:7,24 25:15,17,25 26:6,9, 11,22 30:23 31:9 32:23,25 33:9,10 34:14 35:1 36:11 38:3,7 39:13 41:7,23 48:23 49:17,18 50:20,24 51:8,17 54:24 55:3,21 56:9, 18,24 58:9,12,23 63:3 80:13,22 84:8, 17 86:11 87:4,5,15 108:11 117:19 118:4

127:17 131:16,18,20 132:3 135:4,6 146:3 147:4,6,8,14 154:13, 17 155:18 156:8 157:2,12,15

**receive** 19:15 21:24 41:14 76:10,11 102:17

**received** 8:17 20:23 40:6 43:23 128:18

**receiving** 40:8

**recess** 53:25 77:23 93:6 143:1 166:18

**recognize** 22:10 23:14 43:4 62:2,7 151:13 152:3

**recognized** 27:9 40:17

**recognizing** 158:15

**recollection** 92:7

**recommendation** 150:10,13

**recommended** 150:5,6

**record** 4:3,16 5:16 53:20,22,24 54:3 59:15 77:20,22 78:1, 4 81:13 93:1,2,3,5,9 107:16 117:20 142:25 143:5 166:17, 21 168:23

**recorded** 108:7

**records** 118:5 134:14 135:5

**red** 122:24

**reference** 90:25 91:1

**referenced** 83:14 88:20 89:20

**referred** 155:22

**referring** 38:21,22 69:25 70:8 72:10 75:21 77:3 80:24 133:20

**refers** 92:5

**Bert W. Whittington, III**        Index: reflect..secure

reflect 89:24

refused 93:20

regard 38:11 78:7,8 93:16 98:3 104:3 112:15 117:5 160:11

registrations 47:18

regularly 34:18

rehire 134:5,11,13

reiterate 119:11

related 48:15

relating 47:1

relationship 86:14 102:12 105:8

relaxing 73:22

release 124:7

released 81:8

Relief 167:2

remarked 160:1

remember 10:3,4 48:20 52:6,9 54:25 56:12 59:4,23 79:13 80:17 85:23 86:6,8 91:4,8,14 101:23 102:1,2 116:13 136:4 146:10 148:3 152:19 165:8,25

remove 56:21

reoccurrence 71:18

repeat 7:9 48:8 58:11 70:1 112:10

repercussions 82:23

rephrase 7:9 136:16 167:20

replied 102:6

reply 58:20,22 102:5

report 55:10,16 56:14 68:11,15,19,20 69:3,5,8 81:6 94:15 95:23,25 96:2,4,12, 15

reporter 2:21 4:4,5,

13 6:10 53:19 57:22 71:5,8 78:2 112:10, 13 128:22,24 141:23 163:20,23

Reporter's 3:7

reports 62:23 70:9, 11,12,13 73:23

represent 5:13

representation 164:25 165:4

represented 24:24 27:1,2

representing 2:3,8 23:1

reprimand 42:11,12

reprimanded 42:2,6

reputation 160:15 162:1,5,19

request 37:5 65:24 67:15 86:17 100:15

requested 32:17 50:3

requires 102:10

researched 137:2

reserve 134:23 135:1 168:17

residence 107:7,8 110:4 111:3

resign 19:23

resigned 19:11,24 75:9

resolve 62:9

respect 124:25 125:1,9

respond 62:4 65:20, 21

responded 61:13 78:23 84:14

response 62:6 71:15 89:17 106:14 167:10

responses 60:17,18 91:7

responsible 120:18, 22

rest 94:13

restate 60:5

result 26:8 60:2 136:5 164:12

resulted 36:8

retaliation 24:16 150:25

retired 139:12,15,17, 20,21

retreated 32:2

retrospect 55:7

returns 10:20

revelish 43:17

review 8:15,20 22:21 23:25 91:3

reviewed 8:22,25

reviewing 23:15 24:8 25:7 91:7 92:24

revisit 92:23

reward 86:18 88:3

rhetoric 47:5 48:11 61:12 73:2 80:20 81:4 89:2 113:12

rid 163:19

ride 116:17

riding 47:17

rights 167:4

ringleader 44:7

riot 55:8,13,15

road 2:17 30:25 74:20 75:3

roads 66:13

Robinson 23:5,8 27:2 165:3,6

room 117:3

Ross 46:10

routinely 107:2 110:3 124:5

ru- 8:15

rules 5:11 6:5

rumors 105:11

run 71:21 94:8,14 96:2,10,23

running 31:2 70:21 94:10 109:14 161:10 162:6,20

runs 161:21

RV 10:2,9,11

**S**

safety 28:25 30:9 32:9 111:10 150:18, 20,22 151:18

Sarge 37:25 90:20

sat 32:7 84:10 165:21

sataline 148:20

saytaline 148:20,22

scene 65:14,15 96:8

scenes 72:11 93:14, 21 107:4 110:3

schedule 50:8

school 12:6 13:23 14:2,5,8 15:1,4 122:9 161:15

scold 42:14

scolding 42:13

screw 50:10

search 34:10 110:6

searches 70:18,22, 23 72:8

seat 32:7 94:23

seatbelt 33:18 122:16

seated 4:14

Section 167:1

secure 32:10 107:13 112:6

**Bert W. Whittington, III**        **Index: security..start**

security 15:1 76:14

seek 140:5

selfish 151:16

sell 47:17

semester 16:23 20:17,21

send 29:25 54:17 154:8 163:10 165:21

sense 7:7 66:3 123:7

sentence 49:12 54:12 72:21 76:25 112:23 125:19

sep- 15:22

separated 92:2

September 25:14

sergeant 19:22 32:17,18,19,21 33:2, 3 37:13,15,18,19,20, 21,23,25 42:7,8 44:6 45:7 46:7,14 49:8,9, 14 55:4 58:5 61:16 68:7,17 69:23 70:3,9 73:1,13 75:4 78:11, 25 84:10 86:12,13, 21,23,25 87:2,8,18 88:24 99:25 100:7 109:4 114:17 119:5

sergeants 37:5,7 95:5

Sertraline 148:22, 23,24 149:9 157:22 158:3

serve 14:13 123:16 140:1

service 128:3 155:14 156:13,16

services 96:19 164:22

serving 140:8 159:1

settle 85:25

seventy-five 111:21

SFA 12:7

shape 83:24

she'll 154:5

Sheldon 2:17

sheriff 44:12 161:3

sheriff's 44:23

Sherman 27:9 97:6, 25 161:5,10,14,15, 17,18,19,20 162:6

shift 35:8 41:11 50:3, 11 74:20 75:4 104:14

shock 105:14,15

shocked 36:5

shooting 44:4 84:23 89:4

shootings 29:17 43:8 45:5 47:2 54:18

short 76:2 126:12 150:5 153:4

shortly 39:14 117:23 147:12,23,24 149:6 156:21

shot 44:9 47:22 163:7

shoulder 159:6

show 31:24 41:12 42:3,10,17 43:2 44:17 45:11 66:17 67:2 96:8 114:4,14 138:23

showed 32:18 34:8 71:20

shut 137:20

sic 20:3 43:18 148:20,22

side 29:12 31:18,19 33:20

sign 4:20 97:3

signature 3:6 22:16, 17 23:19

signed 22:19 23:21

signs 34:4

Simple 43:1

single 33:19 36:7

50:6 109:21,22

sisters 161:12

sit 7:24 45:13 73:22 89:13 139:7

site 76:15

sitting 34:2 48:16 91:23 94:10 130:14

situation 125:25 126:1,2 138:24 140:14,15,17 141:12 145:16

situations 113:22

size 111:13,18 112:14,19

Skero 46:9

skin 27:10 72:22 93:13 97:3 98:3

skip 29:16

sleep 145:10 148:7, 8,18

sleeping 154:21,24 155:1

slighting 54:13 56:1

slow 93:13

small 49:3 162:16

smartphone 159:17

sniff 96:4

so-and-so 101:22

soils 120:21

son 113:15

sons 13:5

Sosa 2:10

soul 140:2

Sounds 4:21

Spanish 32:17

speak 32:4,10,13 98:19 102:25 125:20

speaker 32:17

speaking 4:5 31:23

spearheaded 86:15,16

specialized 28:20 103:15

specific 45:2,3 46:23,25 47:11 49:18 97:11

specifically 28:13 37:21 48:16 58:23 74:23 79:19,23 81:16 98:25 100:15 130:13

speculation 48:6 88:4 95:10 96:16 123:12 124:2 141:19, 21

speech 167:6,16,19, 24 168:6

spell 40:25 159:18

spelled 5:17

spoke 121:15 150:13

spouse 50:9

spread 152:11

spreading 162:15

stack 107:6 112:4 117:10,21,22,23 118:6,7,22 119:1,2, 12

stacked 109:22

stacking 113:10

Staff 2:16

stake 98:14

staking 103:2

stance 84:9

stand 73:10

standalone 30:2

stare 31:25

start 17:19 39:11 44:7 82:10 89:8 107:22,23 113:8,9 124:11 135:3 143:23 145:5,12 146:1 147:11,22 165:3

**started** 7:22 34:4 39:8,13,14 57:21,22, 23,24 73:19 80:19,20 82:5 84:9 103:11 108:3 114:7 118:1 127:10 135:6 145:8,9 146:7 147:23 149:6 154:9 156:6 158:14, 15 162:15

**starting** 25:13 27:8

**state** 5:15 10:1,7 17:5,9 66:14 67:19 136:20 137:7 142:16

**stated** 70:15 72:24 95:11,15 112:7

**statement** 61:16 78:11,16 110:9 115:4

**statements** 45:2,3 46:23,25 47:1 60:22 84:15

**states** 14:7 121:24 124:15

**stating** 64:20 79:11

**Station** 98:7 102:21

**stay** 109:15 112:6

**stayed** 10:2

**steadfast** 151:8

**step** 34:6 66:11 112:4

**stepchildren** 13:8

**Stephen** 12:7

**steps** 137:22 164:17

**stink** 51:12,16,20 52:1

**stipulation** 4:19

**stipulations** 4:16

**stomach** 159:23

**stood** 56:6,7,13,15

**stop** 29:4,7,8 30:13, 14,24 31:13 33:5 36:7 42:21 62:21 63:13,14,15,16 70:25 71:10,19,22,23 80:9 94:4 117:13 122:18

156:20

**stopped** 33:18 41:12,17,22 68:23 101:23 118:11,13 119:3 150:3 152:4,8

**stopping** 71:2 122:7

**stops** 34:19 38:11, 13 63:6,8,9 70:18 103:24,25 104:1 113:23 114:11

**straight** 161:16

**strange** 154:6

**straw** 33:25

**Street** 2:5

**streets** 47:25 89:15 98:14

**strength** 111:14

**strike** 38:19 73:8 124:13

**strong** 56:7,13,15

**struck** 73:12

**structure** 107:13 109:3

**structured** 108:17, 18

**struggling** 150:14, 15,16

**stuck** 58:2 133:1

**student** 10:20 11:25

**studies** 16:6

**study** 16:3,16,22 18:19

**studying** 12:8 16:4

**stuff** 43:20 44:8,14 45:21 47:17,19,20 50:12 62:22 72:11 73:8 74:16 82:14 89:10 90:1 101:10 103:25 116:18 142:13 152:11,15 163:19

**Styrofoam** 33:24 34:3

**Suarez** 39:2 40:23, 24,25 41:3 46:11

**Suarez'** 39:3

**subject** 56:17 69:19 167:24

**subjects** 48:14 56:18

**submitted** 21:11 85:14

**sued** 22:1,4

**suffering** 160:6

**suggestions** 36:22, 24

**Sullivan** 49:9

**summarize** 22:23 24:3

**summer** 10:21

**sums** 29:8

**superior** 124:17

**supervisor** 19:20 35:17

**supervisors** 35:24 67:10,15

**support** 24:3 30:4 50:8,9

**supposed** 142:12

**surgeries** 158:19 159:4,7

**surgery** 159:5,6

**surveillance** 98:8 102:22

**Susana** 2:10

**Susana.sosa@ harriscountytx.gov** 2:13

**suspect** 64:20 122:10 124:5

**suspect's** 81:18

**suspects'** 44:11

**swear** 4:8

**swell** 125:8

**sworn** 5:2

**syncing** 121:18

**system** 79:15

---

**T**

---

**table** 7:17 73:3

**tack** 112:4

**tactical** 107:3,5,6,8, 15,24 108:4,6,10,16, 20 109:5,8,10,19 110:3,18 111:2,9,10, 17,25 112:15,20 117:14 118:1,12,13 119:3,4,15

**Tahoe** 101:4 109:14, 15 121:4 122:16

**tail** 112:5

**takes** 120:2,9,11

**taking** 41:8,13 72:11 120:4,7 154:18 158:9

**talk** 6:18 28:3 29:17, 21 30:6 43:6,7,10 45:4 48:4,12 54:15 58:3,4,8,17 62:18,20, 21,22,24 70:22 74:18 82:24 83:2 86:3 89:13 90:24 97:5,9 98:9 105:18 125:11, 16 141:14 143:10 152:13 157:7

**talked** 56:3 59:22 63:5 73:4 90:6,7 91:24 93:15,23 97:6, 7,12 132:11

**talking** 6:23 24:10 43:18 44:22 55:6 60:22 70:17 80:10 82:1,7 83:4 84:6,20, 21,22,23 89:3 90:4 91:24 101:13,14 106:23 113:11 114:7 115:25 120:6 125:1, 10 126:2 130:18 133:18 151:7 152:14

**tall** 109:24

**target** 110:5

Bert W. Whittington, III        Index: taught..trooper

**taught** 20:5 149:21, 22,23,24

**tax** 129:1

**TCOLE** 126:16

**teached** 20:3

**team** 57:16,17 89:10 94:13 107:8 108:4,16 111:2,9 113:5 116:3 117:10

**team's** 111:10

**teams** 108:17

**tear** 66:13

**technician** 121:16

**technology** 16:17

**Telephone** 2:6,12, 18

**television** 82:7,8

**telework** 11:19

**telling** 35:1 76:19

**ten** 72:18 125:9 142:22

**tenure** 39:1

**terminated** 141:8,9 145:14 147:12 158:15

**termination** 141:17, 21 145:18,21 149:7 158:16 164:13,14

**terms** 18:9 19:12,13 21:22

**test** 76:15

**testified** 5:2

**testify** 164:5

**testimony** 3:4 4:9 83:22,24 110:1,7 118:10 119:1,9

**Texas** 2:5,11,17 10:1,7 16:2,11 17:2 128:16 129:2 136:3, 21 144:24,25

**text** 30:1 43:22 54:17,22,23,25 55:2,

19,25 56:23,24 57:4, 7 59:17 61:23 62:3,8, 12 74:2,5,10,14,22 75:11,18,22 76:1,5,8, 10,11,15,16,18,21,22 78:11,19 81:1,11 154:8 165:20

**texting** 55:22 161:22

**texts** 56:17,19

**that-a-boy** 86:19

**therapist** 144:16 145:20,25 146:2,3, 19,24 147:3,5,11 154:10 155:20,22 156:1,5,9,11,12,13

**therapist's** 144:18 147:13

**therapists** 146:5 156:23

**thereabouts** 119:21

**thing** 7:16 36:18,20 38:16 44:5,8 51:4 52:20 61:15,22 67:24 71:18 81:17,21 84:4, 25 96:5 98:5 99:15 100:1 105:4 126:4 138:15 139:6 140:20 162:6,9,20

**things** 27:16 28:1, 16,20 30:6 43:6 45:19 48:17,22 58:2, 17 62:24 70:15 72:9 84:21 85:13,23,25 86:8 92:9 151:25 152:2,5 160:14

**thinking** 51:11 139:21

**Thirty-five** 12:15,20

**thought** 29:19,22,25 30:1 43:9 91:10 101:25 125:8

**threat** 107:9 164:11

**threaten** 114:17,18, 21,22,24 115:1,6 151:22

**threatened** 115:7

**threatening** 115:2 162:25

**threatens** 151:23

**time** 4:2,15 19:21 21:15 30:22 31:9 32:19 33:10,14 36:2 39:9,16,20 41:15,18 46:3,8 48:16,21 53:1, 23 54:2,23 55:24 56:10 58:25 59:5 72:16 77:8,21,25 79:18,25 80:5 84:9, 17 85:11 87:13 89:6 91:17,18,20 93:4,8 96:1 97:11 103:16 112:9,14,19,22 113:10,24 118:6 125:9 126:12,17,22 127:9 128:2 129:10, 19 130:19 134:1 137:11 140:9 142:15, 24 143:4 145:6,16 147:21,24 150:3,5 151:7 152:3 153:4,10 154:16,23 155:1,11, 14 156:2,13,16 162:10 166:16,20 168:7,17,20,22

**timely** 25:15 26:15

**times** 29:10 34:15 68:24 69:1,22 70:2,5, 8 71:14,16 72:1,2,18 89:19 106:1 108:21 122:23 132:11,14 141:6

**tired** 52:13 115:10, 15

**today** 5:8 7:23 8:8 38:5,6 43:24 59:19 91:23 149:7

**Today's** 4:1

**told** 21:9 42:18 56:21,23 68:8,17 69:8 85:18,20 86:11, 13,15,16,20,21 87:8, 13,21,24 88:7 96:17 98:5,20 99:15,23 100:2 104:5,7,8 105:13,21,22 106:11 117:9 129:9,12 130:11,21,22 131:7

141:12,13,14 153:15

**toll** 74:20 75:3

**tone** 59:17,18 65:25 66:2

**top** 48:23 133:10 165:19

**topics** 45:1

**torqued** 84:11

**total** 13:10,12 105:14

**totally** 50:11 61:4

**tough** 43:15,16

**toxicology** 55:1,8, 10,16 56:14 77:12 81:6,12 83:15,23 84:16 167:25

**tracks** 68:23

**traffic** 30:13,14,24 31:13 33:5 34:19 36:7 38:11,13 42:21 70:18,25 71:9,19 94:4 104:1 113:23 114:11 122:18

**trained** 163:13

**training** 19:25 20:7 108:3 109:9 110:16

**transfer** 94:23

**translated** 33:3

**transport** 37:10,24 94:6,22,23,24

**transports** 93:21

**traveling** 33:16

**Trazodone** 148:16, 17,18,24 149:13 154:22 157:22 158:3

**treat** 124:25 125:21

**treated** 28:18 145:17

**treating** 113:11 124:25

**trial** 168:18

**trimmings** 39:5,21

**trooper** 18:20 19:3, 4,8

**trouble** 32:6 105:5 160:23,24

**Troy** 49:14 97:7 99:23 127:21 168:10

**true** 22:13 25:5 61:12,14

**Trump** 43:15 89:2

**trust** 98:19 123:25

**truth** 4:10 6:1 7:25 8:4 138:11

**turn** 25:11 61:6 121:13 122:12,22,25 123:19 145:14 163:16

**turned** 31:20 32:7 61:3,7

**TV** 47:10

**twenty-four** 14:14 151:9

**Twenty-three** 13:22

**twins** 12:21

**Tylenol** 158:11

**type** 47:15 61:12 70:9,12 73:22 79:15 82:14 99:21 152:5,15

**typically** 111:24

**U**

**U.S.** 167:13

**Uh-hm** 34:17 63:7 119:13 146:8 153:13 154:11 157:10,13,16

**uh-huhs** 6:11

**uhm** 5:8,9,13,25 6:2, 7,10,12,17,20,22 7:2, 3,6,11,14,15,18,22, 23 8:15,17,24 9:18, 21 10:6,21 11:12 15:3,15 18:7,16,20 21:11,21 22:4,10 24:3 25:4,10,13,23 26:14 27:17 28:3,5, 19 29:4,6,13,15,16, 21,24 30:13 31:12,

14,17 32:2,5,23 33:2, 3,4,14,16 34:5,6,15, 20 35:8,20,23 36:5,6, 8,9,23 38:10,16 39:1, 5,14 40:21 41:7,11 43:5,7,11 46:7,10,20 47:3,4 48:3,4,17,21, 25 49:3,7,8,18 50:18, 19,21 51:2,4,5,8,14, 21 52:1 53:2,9 54:5, 11,12,18 55:13,14, 21,24,25 56:7,20 57:4 58:4 59:23 60:2, 6,20 63:6 65:23 66:19 67:24,25 70:17 72:20 73:24 74:4,10, 20 75:1 76:2,7,8,19, 24,25 78:10,12 79:8, 10,12,13,19 80:13 81:3,10 83:8,10 84:4 85:1,6,11,13,23 86:4, 6,9,10,11,13,15,18 88:7,13,15,22 89:6 90:6,14 91:5,8,25 92:4 93:11,12,24 94:6,7,9,17 95:7 96:5 97:2,4 101:12,16,17 105:11,12 107:2,7,10 108:1,11,15,16 109:2,16 110:25 111:6,9,11,22 112:7 113:4,15 114:1 116:10,13 120:9,25 121:7,11,12,15,17,19 122:12 123:15,18,21, 22 124:10,13,15,16 125:15 126:1,4,15, 21,22 127:6 128:11 129:9,13 130:5 131:11 133:6,10 135:17,18 136:7 137:6,7,9,20 138:1,6, 16,20,22,24 139:9 141:3,21 143:10,12, 17 144:1,23 145:8,10 147:14,23,25 148:18, 20 149:22 150:6,14 151:14,18 153:1 155:12,19,22,24 158:6,7,10,11,14 159:1,5,18,21 160:1, 2,5,7,10 161:3 164:12,19,20,21 165:12,14,16,25 166:25 167:12,23,24,

25 168:1,2

**un-** 123:16

**unaware** 28:1

**unbuckle** 122:16

**unbuckled** 122:17

**uncomfortable** 42:24,25 43:7 46:17

**understand** 6:2 7:4, 7 8:3 32:5 65:9 120:7 123:16,18 125:16

**understanding** 74:16 160:9

**undertone** 28:22

**unemployment** 128:12

**unethical** 164:3

**uniform** 114:2

**unit** 28:20,22,23,25 29:6,11 30:16 32:16 35:7 37:3,8,11 38:23, 24 39:15 44:2 46:2,3 47:11,23 49:25 63:20,25 64:1,16,19 66:20 67:14 71:25 74:8 82:19,25 85:7 89:23 90:3 94:22 96:23 97:4 98:4,6,12, 13,18 99:7 100:20,22 102:10 103:3,10 105:17 107:17 108:3, 7 109:8 111:12,16,23 112:22 113:14 114:7 119:8 121:4,16 126:5,8,9 137:15

**United** 14:7

**units** 35:4,11 65:16, 23 108:24 121:7

**Univar** 17:18,19,21 18:3,6,7,11,12

**Unjustly** 133:13

**unquestionably** 124:17

**untrustworthy** 164:6

**untruthful** 164:3

**upfront** 160:21

**upset** 52:21 90:20, 21 126:5,10,20,24 128:2 141:7 159:23

**upstairs** 80:6,7

**urgency** 66:3

**utilize** 123:21

**utilized** 111:15

**V**

**VA** 145:4 146:11 147:15 154:8 155:4 156:11

**vacation** 138:24

**varied** 66:18

**vast** 124:17

**Vega** 37:20,23

**veh-** 36:7

**vehicle** 31:2,15,17, 18 33:16,19,20 34:6, 10,11 36:8 64:15,24 71:4,7,24 73:23 93:21 94:6 96:3 109:15 116:14,15,16 121:18 122:21

**vehicles** 120:22 121:17

**verbal** 42:11,12 74:2,4

**verbally** 6:12 42:2,6

**verdict** 79:3,5,7,8,9

**Verified** 3:18

**verify** 30:4

**veteran** 52:25

**vexed** 126:11

**Viagra** 158:7

**victim's** 124:6

**Video** 3:13

**videoconference** 143:21 153:18

**Bert W. Whittington, III**          Index: Villa..young

**Villa** 37:19 114:16

**Villarreal** 34:9 36:13,14 46:7 49:7, 13,21 52:14 57:13, 15,21 77:6 84:5 89:6 90:10 97:7 99:12 100:16 101:15 107:2 112:25 114:8,16 116:13 119:6 127:20 129:6,8,9,12 130:11, 15,18 131:8 132:17 162:2 168:10

**Villarreal's** 51:15 113:14

**violate** 123:22

**violated** 167:5,17,25

**violation** 75:22

**violations** 53:12

**visit** 91:20

**vividly** 52:21

**voice** 4:4 66:1,3

**voices** 52:21

———————

**W**

———————

**W-H-I-T-T-I-N-G-T-O-N** 5:19

**wait** 6:20 101:24

**walk** 37:2 89:4 98:14 150:19

**walked** 32:12 37:16 51:15 85:24 89:18 100:18 101:20 127:11 128:1

**walking** 43:18 137:14

**wanted** 68:14,20,23 96:14 104:10 112:25 115:4 116:25 117:1 139:25 150:15,16

**wanting** 160:4

**warrant** 110:6,7

**waste** 134:1

**watching** 103:24

**Watson** 46:10 90:18 115:19 117:4

**Watson's** 42:5 90:18,19 94:11

**Wayne** 2:20

**ways** 42:23

**weapon** 32:2,3,10 64:13,21,22

**weapons** 30:14 63:17 64:5 65:3

**wearing** 33:18

**week** 138:5,6,19,20, 22

**west** 31:13

**westbound** 33:17

**whereabouts** 153:3

**White** 102:14

**Whittington** 3:4,14, 15,17 5:1,18 12:13, 25 15:9,18 54:5 77:16 83:13 84:19 88:15 93:14,20 97:2 107:3 121:1 129:7,13 132:20,21,22 133:13 143:7 152:7 166:23

**Whittington's** 124:15

**whoop** 44:10

**wife** 10:18 39:3 90:7 102:8 125:5 140:4,13 141:7 149:24 150:15, 23,24 151:1,17,22 152:2,12,13,16 154:5 155:10 161:12,23

**wife's** 11:7,8 13:4,7 150:22

**William** 5:18 12:13

**Williams** 21:14

**wind** 114:8

**window** 31:20

**Winter** 9:13

**wired** 121:16

**wiring** 121:6

**with/speak** 168:2

**Woods** 46:10

**word** 51:25 52:2 74:18 76:8 100:21 160:19

**words** 68:17 69:15

**work** 6:17 7:11 11:10,22 15:5,7 16:19 17:21 18:3,18 20:19 21:3,12 34:18, 20,22,24 75:25 76:4 83:2 85:17,19 114:14 134:8,25 138:5,19,21 139:2,4,5,9,22 152:16 153:9 162:13

**worked** 11:13 36:23 139:18 152:19 161:3, 4

**Workforce** 128:16 129:2

**working** 17:19 29:1, 5,11 31:12 33:13 35:2 47:11 67:13 70:24 80:12 104:13 105:11 129:10 131:13 137:25 138:1 140:23 152:7,21,24 153:1,3

**works** 11:12,21 131:14

**workspace** 47:24

**worry** 116:14 129:25

**Wow** 163:19

**wrapped** 102:4

**write** 94:15 96:1,2,4, 12,15 121:21

**writing** 95:22,25 114:1

**wrote** 110:6

———————

**X**

———————

**X-AMOUNT** 127:9

———————

**Y**

———————

**y'all** 89:1,2,3,13 105:25 152:21

**Yang** 105:20

**year** 14:3,11,19,21 17:19,22,23 18:1,4, 13 20:25 21:5,17,19 31:7 39:11,13 41:21, 23 51:13 87:9,12 97:15 118:3 137:13 150:9 161:16 163:7, 12

**years** 13:22 14:14,16 126:18 127:9 128:3 139:16 140:3 151:9 158:20

**Ying** 105:19

**young** 105:9,16 122:8 160:18