EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | [X] FEPA [X] EEOC | 460-2021-03518 |

| Texas Workforce Commission Civil Rights Division | | and EEOC |
|---|---|---|
| State or local Agency if any | | |

| Name (Indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| Mr. Bert Whittington III | 281-726-6939 | |

| Street Address | City, State and ZIP Code |
|---|---|
| 5111 Landon Lane, Baytown, TX 77523 | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| Harris County Precinct 3 Constable Office | | 713-274-2500 |

| Street Address | City, State and ZIP Code |
|---|---|
| 904 Dell Dale St., Channelview, TX 77530 | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON (Check appropriate box(es).)

[X] RACE   [ ] COLOR   [ ] SEX   [ ] RELIGION   [ ] NATIONAL ORIGIN
[X] RETALIATION   [ ] AGE   [ ] DISABILITY   [ ] OTHER (Specify below.)

| DATE(S) DISCRIMINATION TOOK PLACE | |
|---|---|
| Earliest | Latest |
| 01/2017 | 04/2021 |

[X] CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I.      I, Officer Bert Whittington III, began working for Precinct 3 on January 17, 2017, as a patrol officer. From the beginning of my tenure with Precinct 3, I wholeheartedly dedicated myself to serving the community and representing Precinct 3 to the very best of my abilities. However, I was profoundly disappointed that my effort and dedication, as well as that of other African American officers, was not respected by Precinct 3.

II.     In April of 2017, I was elated to be recruited by Precinct 3's K-9 unit after just four months on the job. I saw the position as a great opportunity to serve my community and expand my skillset as a part of a specialized unit and happily join the team. As a member of the K-9 unit, I worked with a specially trained service dog, Zena, to detect and confiscate illicit drugs. Zena was a stellar service dog and alongside, we were able to successfully detect illicit drugs and apprehend suspects without incident.

III.    Zena also served as a loyal companion through the frequently harsh working environment that Precinct 3 nourished. I was one of the few African Americans on staff and was frequently made painfully aware of it. I often found myself as the butt of many jokes by my non-African American coworkers that typically centered around my race. I knew the jokes were designed to make me aware that I stood out from everyone else and that although they shared a uniform, I was still an outsider. I also regularly witnessed officers at Precinct 3's indifference to shootings and instances of violence directed towards African Americans and open hostility to human rights movements advocating for African Americans.

IV.     Furthermore, Precinct 3 also took decisive action to ensure that I was alienated from the other staff members. As an office tradition, Precinct 3 would throw office parties for officers on their birthday. I would watch one non-African American coworker after another be celebrated by Precinct 3. However, when my birthday would come around, Precinct 3 would ignore the day altogether. To add insult to injury, Precinct 3 would become upset with me if I missed an officer's birthday even though they were unmistakably apathetic to

   CONFIDENTIAL

mine and indifferent to the effect that it would have on my morale.

V.      In March 2019, I was devastated to learn that Zena had heartworms and could no longer serve on the K-9 unit. I was left with no choice but to adopt a new service dog. After a long search and deep consideration, I chose a newborn puppy named Zane to serve as my service K-9. As a young puppy, Zane was a friendly, quiet, and intuitive dog that showed promise with the proper training. I made sure that Zane received such training by training him according to the policy set forth by the Harris County Sherriff Training Unit. Zane responded well to his lessons and quickly displayed the ability to effectively apprehend suspects.

VI.     Although I hoped that I would receive the same support in acclimating Zane to active duty as K-9's owned by non-African American owners, I was quickly proven wrong. I required a special vehicle to transport Zane to ensure that he has space, proper ventilation and shelter from severe weather conditions. However, Precinct 3 would often refuse to accommodate my need for such vehicles when my regular work vehicle was out of service for repairs. As a result, I occasionally found myself having to take Zane to trainings and other official events in my personal vehicle, which would leave Zane vulnerable to heat exhaustion. The rare times that Precinct 3 would provide an alternate vehicle it would still be soiled with excrements from the K-9 before Zane, which made the vehicle unsanitary for Zane and myself. I would bring the conditions of the vehicles to Precinct 3's attention but I would be met with overwhelming indifference and Precinct 3 would instruct me to clean the vehicle myself despite personnel being available to clean the vehicle as is normally the case with my non-African American coworkers.

VII.    Despite Precinct 3's inattentiveness to Zane and my needs, Zane still remained an intuitive and attentive service dog that adhered to his training and commands. On December 10, 2019, I observed a Jeep fleeing a traffic stop. I wasted no time joining the pursuit and when the suspect exited the vehicle and began to flee on foot, Zane and I followed suit with Deputy Ross Wood (hereafter, "Deputy Wood") following behind in his patrol car pursuant to Department protocol. However, as Zane and I pursued the suspect on foot, Deputy Woods broke protocol by getting out of his vehicle and running in between Zane and myself. As the suspect crossed a busy intersection, Zane and I followed closely behind, however, Deputy Wood cut between us. I had the scene under control until Deputy Wood arrived and began yelling and flailing his arms for traffic to stop. Deputy Wood's frantic yelling and aggressive body language alarmed Zane and I warned Deputy Woods that yelling would distract Zane. However, Zane had already observed Deputy Wood and perceived him as a threat to me. As a result, his trained response had been activated. Zane grabbed Deputy Wood and released him upon my command. After Zane released Deputy Woods, Zane and I continued the pursuit and were able to apprehend the suspect who had jumped over a fence. Deputy Woods received minor cuts and scrapes, but I lost my bodycam in the brush as a result. It took me two days and six hours to locate it.

VIII.   Due to the rough and tumble nature of my job, I experienced some difficulty maintaining the activation of my bodycam during arrests. This was an issue common to all officers who do not have bodycams that automatically turn on. Seeking to remedy my bodycam issues, I began an independent search for solutions. I found out that I could have his bodycam synced with my car to automatically turn on when I exited my vehicle. I received a quote and presented it to the Precinct 3, but my request was ultimately denied with no offer of alternative accommodations. I informed Precinct 3 of my troubles with my bodycam, but they were unmoved and chose not to offer me any assistance. I was left to continue to independently find ways to secure my bodycam.

IX.     Although I was disappointed that Precinct 3 would not offer me the support I needed to effectively do my job, I remained committed to properly and effectively serving my community. I hoped that my hard work and dedication would earn me the same support and reverence that my non-African American colleagues had become accustomed to receiving. However, I quickly became disillusioned when Precinct 3 began looking for a new officer to join the K-9 unit in December 2019. I was initially elated when I learned that Precinct 3 wanted their new hire to bring more diversity to the K-9 unit staff and I quickly referred a reputable deputy named David Johnson (hereafter, "Deputy Johnson").

X.      Initially, Precinct 3 was receptive to my suggestion to hire Deputy Johnson. However, I was shocked

CONFIDENTIAL

when Precinct 3 decided not to offer Deputy Johnson the position after they learned Deputy Johnson was romantically involved with a white woman. I was outraged with this decision and complained to Major Isaac Villareal (hereafter, "Major Villareal") to no avail. The most responsive acknowledgement that I received came from Deputy Pereda, a favorite of Major Villareal, who advised me to stop making everything about race.

XI.     I knew from that point that Precinct 3 would not truly commit to becoming a more diverse workplace, I nonetheless remained dedicated to doing my job. Zane and I completed numerous apprehensions and drug searches. I hoped that Precinct 3 would notice my hard work and dedication, but that quickly proved not to be the case.

XII.     On January 4, 2020, I responded to a call for backup from Corporal Kyle Cornelius (hereafter, "Corporal Cornelius"). A robbery suspect began to flee after Corporal Cornelius showed up to respond to the call and he needed help from Zane and I with apprehending the suspect. When I came on the scene, I saw the suspect and began to pursue him with Sergeant Bryant Howard (hereafter, "Sergeant Howard") assisting me by following me in his vehicle. The suspect ran through a pond and into the woods. Determined to apprehend the suspect, Zane followed the suspect into the pond while I was still holding onto his leash. I lost my balance and as a result, lost control of Zane's leash while going through the pond. However, Zane remained undeterred and continued the pursuit. Meanwhile, Corporal Cornelius, who did not want to get wet, ran around the pond and out of sight.

XIII.     As Zane continued his focus on apprehending the suspect, Sergeant Howard broke protocol by exiting his vehicle and cutting through the woods to apprehend the suspect instead of staying behind Zane and myself in his vehicle as he was supposed to do. As a result, Sergeant Howard got in Zane's path and Zane wound up grabbing Sergeant Howard instead of the suspect. Sergeant Howard suffered minor scrapes but was otherwise unharmed. The suspect, however, managed to flee. Although, I had not broken protocol by letting go of Zane's leash while apprehending a suspect, Precinct 3 was on a mission to show otherwise. They asked Sergeant Howard to say that I let my dog off the leash while Sergeant Howard was apprehending the suspect, when that was not the case. Sergeant Howard, however, admitted that he was in the wrong and refused to place any wrongdoing on Zane or myself.

XIV.     I was disturbed that Precinct 3 would try to place blame on me instead of Sergeant Howard, who had admittedly gotten in the way of a service k-9 in pursuit of a suspect. However, I placed any indignation I felt aside and continued to focus on doing my job to the best of my ability.

XV.     However, on May 28, 2020, the work environment at Precinct 3 for me went from bad to worse. I started the day by making a routine traffic stop. While conducting the stop, Zane picked up the smell of narcotics which I later found in a backpack and confiscated. I took the narcotics and the suspect back to the sheriff's office to be identified and stored away as evidence. I was careful to make sure that the evidence was not handled without witnesses present; Sergeant Troy Barringer (hereafter, "Sergeant Barringer"), Deputy Johnson and the suspect all witnessed me handling the narcotics.

XVI.     In an effort to be thorough, I received permission from Sergeant Barringer to interview the suspect and have him identify the narcotics, which would involve the suspect touching the narcotics. I carefully followed the plan and while the suspect was handcuffed, I had the suspect identify the narcotics with which he was caught. As I interrogated the suspect, Deputy Johnson interrupted and asked to speak to me. Mr. Whittington stepped outside of the doorway while the witness remained handcuffed and in full view and I briefly spoke to Deputy Johnson. Afterwards, I continued interrogating the suspect and presented the narcotics for the suspect to identify. Once the suspect identified the narcotics, I walked the evidence to the evidence room. On the way to the evidence room, I entrusted Sergeant Vega with the narcotics while I briefly ran to the restroom. I then logged the evidence with the assistance of Deputy Amanda Watson (hereafter, "Deputy Watson"). Once the evidence was properly logged, I securely placed the evidence in its appropriate locker. With the evidence properly logged and the suspect transported to county jail by Deputy Salagado, I saw that the situation was under control and resumed my duties responding to calls.

XVII.    My next call was to assist Deputy Watson apprehend a fleeing suspect. I attentively listened to the suspect's description and acted quickly when I spotted the suspect. Despite my pleas with the suspect to stop running, the suspect continued to flee the scene. I was left with no choice but to let Zane off his leash and to give him the command to pursue the suspect. Zane followed the suspect quickly and attentively. After an intense pursuit and blatantly ignoring my pleas to surrender, the suspect relented and stopped running. The suspect announced that he was surrendering but by then it was too late. Zane strictly adhered to his training and grabbed the suspect so that I could apprehend him. I recognized that the suspect was no longer fleeing and called for Zane to let go of him. Caught up in the excitement of the pursuit, Zane held on to the suspect for a moment longer before he responded to my command and released him. The suspect received minor scrapes but was otherwise unharmed.

XVIII.    I was able to complete my workday by successfully apprehending two suspects and securing damning evidence. I was sure that my hard work and strong results would be appreciated by Precinct 3. However, I was quickly made aware just how wrong I was. On May 29, 2020, one of the officers sent a group text to the rest of Precinct 3 and myself, attachment an article that accused George Floyd of being on drugs when he was murdered by a Minneapolis police officer. I was appalled by the text and the Precinct 3's cavalier attitude towards the murder of yet another African American man. I was still coming to grips with the events surrounding the George Floyd murder and what that would mean for me and my African American sons.

XIX.    I thought that the text was particularly egregious because the accusations that George Floyd was on drugs had not been confirmed. I also saw the text as a furtherance of Precinct 3's indifference to the brutality and cruelty that African Americans face at the hands of the police and the public at large. I was hurt that my coworkers could have conversations devaluing the lives of African Americans while never once asking me how I felt about the situation. I knew I could no longer stay silent and told Precinct 3 in the group text that I was uncomfortable with the groups' conversation and with the rhetoric that had been a fixture at Precinct 3 since I began working there. Major Villareal saw my text and called for a staff meeting to be held.

XX.    I saw the meeting as an opportunity for Precinct 3 to grow and implement positive change that would improve the work environment for African Americans like myself. However, Precinct 3 quickly made it clear that that was not the purpose of the meeting. As soon as the meeting was convened, Major Villareal announced that he was calling the meeting because he did not want Precinct 3 to discuss race. He said that he would not tolerate racist language not because it was wrong, but because he was not willing to get fired over it. The officers stated that they felt like they were being attacked for stating their opinion and they took turns doubling down on their previous rhetoric. I tried to explain to the staff that I had long suffered through racially insensitive and hostile language at Precinct 3 and pled with the staff to be mindful about what they say. However, Precinct 3 immediately disregarded my plea without giving it any consideration. After making my discomfort clear, I was forced to bear witness to a staff discussion about different ways to attack Black Lives Matters protestors such as using water hoses and tear gas. I was deeply disturbed by the conversation and diverted my attention to my work.

XXI.    I hoped that with time my words would sink in with Precinct 3's officers and staff. However, on July 28, 2020, just six weeks after the meeting, I was disheartened and devastated to learn that Precinct 3 had opened an obviously retaliatory investigation into arrests that I had previously been involved in. Precinct 3 accused me of allowing the suspect from my May 28th drug arrest to consume narcotics that I had confiscated despite not having conducted a drug test or investigating the other officers who also had contact with the narcotics and the suspect.

XXII.    Precinct 3 took things a step further by accusing me of failing to properly train Zane. Precinct 3 claimed that Zane was inadequately trained because he did not respond to my first call to release the suspect. Precinct 3 blatantly ignored that Zane was a live animal, which would only afford me a finite amount of control despite Zane's strict and successful training regimen as prescribed by Precinct 3. Furthermore, Precinct 3 had not warned or counseled me on any potential flaw in my training practices prior to opening the investigation. Precinct 3 also ignored the fact that not even the suspect had not filed a complaint about the

incident.

XXIII.   Precinct 3 also made the unfounded claim that I verbally and physically threatened the suspect. The accusation disturbed me because it was demonstrably false. The suspect was assaulted by an officer, but he identified a plain clothes officer as the assailant. I was in uniform and the only plain clothes officer on site was Sergeant Barringer.

XXIV.   Additionally, Precinct 3 used my prior issues with my bodycam as a basis to open of the investigation. I was perplexed as to why Precinct 3 would use my bodycam as one of the bases to launch a formal investigation when I had been vocal about having issues with my bodycam staying on when I was pursuing suspects and Precinct 3 failed to provide me with any help or accommodation despite my repeated requests. However, Precinct 3 did not shy away from using the time I lost my bodycam while pursuing a suspect during the December 10, 2019 foot chase as an example of me not wearing my bodycam even though the camera fell off while I pursued the suspect. Contrastingly, Precinct 3 managed to take a more understanding approach to their white officers such as Deputy Watson. Deputy Watson had repeatedly violated Precinct 3's bodycam policy and was only given a reprimand letter as a result. I was devastated to see Precinct 3's bias in favor of non-African American officers being unabashedly put on clear display.

XXV.   Precinct 3 went so far as to transform the December 10th arrest into a case of excessive force and police brutality. Precinct 3 accused me of verbally and physically threatening the suspect despite Deputy Wood not corroborating Precinct 3's claim. Precinct 3 also accused me of being indifferent to the suspect's ankle injury despite the suspect being in the care and control of Deputy Wood after he was apprehended. The final blow came from Deputy Wood, who accused me of breaking protocol by releasing Zane after Deputy Wood had begun pursuing the suspect. However, Deputy Wood's recount of the events was a gross mischaracterization of the facts. Deputy Wood broke department protocol by getting out of his vehicle after Zane launched into pursuit and began yelling and flailing his arms, which is what led Zane to perceive him as a threat. Deputy Wood had a history of intervening in K9 pursuits in violation of protocol and December 10th was merely an extension of his habitual misbehavior.

XXVI.   I was profoundly hurt and upset that Precinct 3 would create performance issues in my file that did not exist simply to punish me for raising awareness to the racially intolerant workplace culture that Precinct 3 had facilitated. However, I hoped that Precinct 3 would give my performance record a fair review and properly see that I had spent three years going above and beyond to serve my community. However, I was quickly made aware that this would not be the case.

XXVII.   Chief Deputy Kirk Bonsal (hereafter, "Chief Bonsal") stepped in and sought to ensure that I would not be given a fair chance by acting as the chair of my performance review board. Chief Bonsal picked who would serve on the board and although he did not vote in the proceedings, he still exercised control over the outcome by advising the voting members of the panel how to vote.

XXVIII.   Throughout the performance review board's investigation, it became painfully clear that the entire proceeding was no more than a pretext and a "show trial" conducted to fire me for my previous racial discrimination complaints against Precinct 3. Precinct 3 introduced accusations without evidence and ignored any response or explanation that I offered. Precinct 3 even asked Corporal Cornelius to claim that I wrongfully let go of Zane's leash during his January 24th suspect chase, despite Corporal Cornelius not personally witnessing the event.

XXIX.   I couldn't believe that Precinct 3 was taking three years of my hard work and dedication and throwing it out of the window. On April 28, 2020, Precinct 3 notified me that they had decided to terminate me despite lacking evidence to support the accusations against me. I was despondent and tried fervently to appeal the decision, but Precinct 3 had gotten the result that they had sought and would not consider changing the decision. As a result, I was left without the job that I cherished simply because I spoke up against societal discrimination and advocated for a fairer, not racially charged, work environment.

                         CONFIDENTIAL

XXX.    In the aftermath of my termination, I tried to move forward by finding subsequent employment with Harris County Precinct 2 (hereafter, "Precinct 2"). I saw the opportunity to work for the Precinct 2 as an opportunity to have a fresh start. However, Major Villareal snatched that opportunity away from by calling hiring personnel within the department and bad-mouthing me. As a result, Precinct 2 declined to advance me through the employment process on April 9, 2021. Precinct 3's incessant harassment and retaliation has extended beyond my tenure with the department and has robbed me of any chance to continue my career anew.

XXXI.    For these reasons, I believe I was discriminated and retaliated against, in violation of Title VII of the Civil Rights Act of 1964, as amended, and 42 U.S.C. § 1981 ("Section 1981")

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information, and belief. SIGNATURE OF COMPLAINANT |
| _____    _____ Date        Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) 5/28/2021 |

EEOC Form 5 (5/01)

SAMANTHA LOCKWOOD
Notary Public, State of Texas
Comm. Expires 01-12-2023
Notary ID 130073864

4:21-cv-03220 BWW PROD RESP 000389                    CONFIDENTIAL