| | | |
|---|---|---|
| **BERT W. WHITTINGTON, III** | § | |
|    **PLAINTIFF** | § | |
| | § | |
| **- VERSUS -** | § | **CIVIL ACTION NO. 4:21-CV-03220** |
| | § | |
| **KIRK WAYNE BONSAL, JR., ET AL** | § | |
|    **DEFENDANTS** | § | |

## PLAINTIFF'S RESPONSE TO DEFENDANT HARRIS COUNTY'S MOTION FOR SUMMARY JUDGMENT

Respectfully submitted,

/ s / Philip J. Orth, III

**Philip J. Orth, III**
Attorney-in-Charge

Texas BCN 15323070
Federal BCN 14065
16406 Lamplighter Street
Crosby, Texas 77532
(713) 520-8333
(772) 217-8162 Fax
philip.orth@yahoo.com

Attorney for:
Bert W. Whittington, III

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. Civ. P. § 5(b) and Loc. R. § 5.3, I hereby certify that a true and correct copy of these papers has been served on all interested parties by either hand delivery, facsimile, express mail, certified mail return receipt requested, or electronic delivery on January 5th, 2023.

/ s / Philip J. Orth, III

**Philip J. Orth, III**
Attorney-in-Charge

# TABLE OF CONTENTS

Table of Exhibits …………………………………………………………………… 3

Table of Authorities …………………………………………………………………… 4

Summary of Argument …………………………………………………………….... 5

Statement of Facts …………………………………………………………………….. 7

Arguments and Authorities …………………………………………………………... 13

      The EEOC charge of discrimination includes a 'color' claim ………..…………….….. 20

      The defendant's de facto discriminatory practices had the force of law ………..…….. 21

      The facts and evidence support a cause of action under Section 1983 …………….... 22

      The facts and evidence support a cause of action under Title VII ………………… 24

Closing Summary ………………………………………………………………….... 28

Rule 56(d) Declaration ………………………….…………………………………… 28

Conclusion …………………………………………………….……………………... 29

# TABLE OF EXHIBITS

Exhibit 1         Report to the Texas Commission on Law Enforcement dated August 28th, 2020 documenting employment termination of Bert W. Whittington, III.

Exhibit 2         Sworn internal affairs complaint dated June 15th, 2020 made by Chief Kirk Wayne Bonsal, Jr. against Bert W. Whittington, III.

Exhibit 3         Sworn internal affairs complaint dated July 28th, 2020 made by Chief Kirk Wayne Bonsal, Jr. against Bert W. Whittington, III.

Exhibit 4         K9 Handler Course – Level 1 certification issued to Bert W. Whittington, III on June 27th, 2019 by the Sheriff's Office for Harris County, Texas.

Exhibit 5         Deposition transcript of testimony given on October 27th, 2022 by Bryan Anthony Skero.

Exhibit 6         Deposition transcript of testimony given on October 28th, 2022 by Kelvin Dewayne Jason.

Exhibit 7         Deposition transcript of testimony given on June 22nd, 2022 by David Joseph Johnson.

Exhibit 8         Deposition transcript of testimony given on October 28th, 2022 by Jimmy Evans, III.

Exhibit 9         U.S. Equal Employment Opportunity Commission definition of race/color discrimination as of December 24th, 2022.

Exhibit 10       U.S. Equal Employment Opportunity Commission definition of color discrimination as of December 24th, 2022.

Exhibit 11       Deposition transcript of testimony given on September 23rd, 2022 by Kirk Wayne Bonsal, Jr.

# TABLE OF AUTHORITIES

Case Law

*Connick v. Thompson*,
   563 U.S. 51, 61 (2011) ……………………………………………….… 21

*Culwell v. City of Fort Worth*,
   468 F.3d 868, 873 (5th Cir. 2006) …………………………………………. 25


Constitutional Law

U.S. Const. art. 1 ………………………………………………………... 24

U.S. Const. art. 14 § 1 ………………………………………………….... 24


Statutory Law

42 U.S.C. 1981(a) ……………………………………………………… 24

42 U.S.C. 2000e …………………………………………………….. 24

Tex. Pen. Code § 39.02(a)(1) …………………………………………….... 22

Tex. Pen. Code § 39.02(a)(2) …………………………………………….... 22

Tex. Pen. Code § 39.03(a)(2) …………………………………………….... 22

Tex. Labor Code § 52.031(b) …………………………………………….... 22

**TO THE HONORABLE JUDGE OF THE UNITED STATES DISTRICT COURT:**

Into court comes the plaintiff Bert W. Whittington, III who files this Plaintiff's Response to Defendant Harris County's Motion for Summary Judgment and in support thereof would respectfully show the court as follows:

## SUMMARY OF ARGUMENT

1. The plaintiff Bert W. Whittington, III ("Whittington") is a member of a protected class namely, African American with dark skin color. Unlike what the defendant Harris County, Texas ("Harris County") portrays and as is more greatly detailed hereinafter, Whittington was subjected to open and pervasive workplace racial discrimination which included, but is not limited to, the following:

   - African Americans being referred to as a "bunch of monkeys" by Sergeant Jason Hutchins ("Hutchins") who was (is) light skin color.
   - Having his private parts referred to in group text messages as a "black mamba snake" by Major Isaac Villarreal ("Villarreal"), Sergeant Troy Barringer ("Barringer"), and others, all of which were (are) light skin color.
   - Having to endure the word "nigger" being routinely used by Barringer and others, all of which were (are) light skin color.
   - Having to endure racial slurs which include on one occasion a police vehicle being characterized as a "slave transport" by Sergeant Jeff Gonzalez ("Gonzalez") who was (is) light skin color.

2. Barringer was the lead instigator of rhetoric that African Americans with dark skin color were an inferior race. Whittington was not treated to birthday parties like other employees. Whittington was further put in dangerous positions as compared to those not in his protected class. All these things were known to Whittington's supervisors as they committed most of the discriminatory acts against him. Whittington was terminated from employment as a result of the discriminatory acts of his supervisors and treated differently than those not in his class.

3. As to the issue with his police canine, all three canine bites were in full compliance of agency policy, recognized training, and state law according to Whittington's immediate police canine supervisor. In fact, the deputy constables bit in the first two instances were the ones who violated agency policy. Even the investigator assigned to the issue could not conclusively establish that Whittington had violated any agency policy.

4. As to the missing cocaine, the investigator assigned to this issue could not establish what happened to the cocaine. A fellow employee outside the presence of Whittington admitted to taking the cocaine as part of the evidence and could not account for it when he returned the evidence back to Whittington, yet this fellow employee was not disciplined.

5. Whittington was later denied new employment based on the actions of the employees of Harris County. Chief Deputy Kirk Wayne Bonsal, Jr. ("Bonsal") was the same individual that started the investigations on Whittington, picked the board members sitting on Whittington's termination board, and chaired the board as well as knew about the discriminatory issues within the police canine unit and the agency itself.

6. Whittington's immediate supervisor, who was (is) light skin color, admitted to his police canine biting many fellow deputies and never being disciplined for any of the incidents. Whittington was the only one disciplined and terminated for the missing cocaine but was not alone with the cocaine until it was packaged and sealed, yet other light skin color deputies were alone with the cocaine and not disciplined.

7. Other light skin color deputies were allowed to get haircuts and run personal errands while on-duty being paid by Harris County without disciplinary action. Whittington's light skin color sergeant let the suspect in the cocaine case handle the evidence, a clear violation of agency policy and he was not disciplined for it. The same sergeant hit the handcuffed

juvenile that Whittington's canine bit and he was not disciplined for it.

8. These cases in point give a glimpse of the hostile workplace environment that Whittington and other African Americans with dark skin color had to endure during the relevant time in this case. A harsh environment that likely still exists today and a culture of racial animus that unquestionably harms the community as a whole.

### STATEMENT OF FACTS

9. After retiring from serving honorably for 24 years in the United States Marine Corps, Whittington was hired on or about January 30th, 2017 to work as a police officer for the Precinct 3 Constable's Office for Harris County, Texas ("Constable's Office"). [Def.'s Ex. 24, RR Pg. 14; Pl.'s Ex. 1]. He was eventually assigned to the police canine unit. His police canine – Zane – was trained, certified, and approved in accordance with the requirements of the Constable's Office and the National Narcotic Detector Dog Association ("NNDDA") which included a minimum of 360-hours of handler training. [Pl.'s Ex. 5, RR Pg. 90-92; Pl's. Ex. 4].

10. Whittington was the only deputy in his unit that was African American with dark skin color. [Def.'s Ex. 24, RR Pg. 28]. He felt that he was a "standalone". [Def.'s Ex. 24, RR Pg. 30]. He felt that he had no one to support him mentally or physically. Id. He experienced workplace racial discrimination during his entire time in the police canine unit. [Def.'s Ex. 24, RR Pg. 56]. Key testimony given by Whittington in this case includes:

    (a) Whittington testified that he was subjected to "a lot" of racial undertone by fellow light skin color deputies. [Def.'s Ex. 24, RR Pg. 28]. That, he would be subjected to political and racial conversations that he believed were inappropriate. [Def.'s Ex. 24, RR Pg. 29].

(b)     Whittington testified that he would be subjected to racial text messages by and amongst light skin color deputies that he believed were inappropriate. [Def.'s Ex. 24, RR Pg. 30]. That, text messages would include jokes about officer-involved shootings with African Americans. [Def.'s Ex. 24, RR Pg. 54].

(c)     Whittington testified that the candid consensus of his fellow light skin color members of his unit believed that the George Floyd death was justified and deserved. [Def.'s Ex. 24, RR Pgs. 76-78]. In response to Whittington disagreeing, he received a text message from Barringer that, in relevant part, read: "I love you anyway". [Def.'s Ex. 24, RR Pg. 78].

(d)     Whittington testified that it was Barringer who was the lead instigator of rhetoric that African Americans with dark skin color were an inferior race. [Def.'s Ex. 24, RR Pgs. 72-73].

(e)     Whittington testified that all of the light skin color deputies in his unit would be treated to birthday parties, but he was excluded and never given a birthday party. [Def.'s Ex. 24, RR Pg. 29].

(f)     Whittington testified that very often he didn't receive backup from the light skin color members of his unit and that he would have to rely on far off deputies in other divisions or outside police agencies for backup. [Def.'s Ex. 24, RR Pg. 30].

(g)     Whittington testified that very often he would be required to transport prisoners and complete vehicle inventories when other light skin color members of his unit were available to perform these tasks. [Def.'s Ex. 24, RR Pg. 94].

(h)     Whittington testified that very often he would be used as a front point on high-risk tactical entries where other light skin color members of his unit would not be

required to perform such dangerous tasks. [Def.'s Ex. 24, RR Pgs. 107-108].

11. Deputy Constable Bryan Skero ("Skero") was, at the relevant time in the case, a Corporal with the Constable's Office and was the first line supervisor over the police canine unit that Whittington worked in. [Pl.'s Ex. 5, RR Pg. 10]. Skero was (is) White with light skin color. [Pl.'s Ex. 5, RR Pg. 116]. Key testimony given by Skero in this case includes:

(a) Skero testified that he witnessed racial discrimination and racial harassment within the Constable's Office during his employment with the Constable's Office. [Pl.'s Ex. 5, RR Pg. 105].

(b) Skero testified that he knew of Whittington being excluded from "a lot" of assignments and activities. [Pl.'s Ex. 5, RR Pg. 105]. Exclusion included birthday parties. Id.

(c) Skero testified that on occasion, group text messages discussed Whittington's "private parts". [Pl.'s Ex. 5, RR Pg. 26]. That, the text messages included a cartoon meme of a black snake intended to represent a black penis. [Pl.'s Ex. 5, RR Pgs. 107-108]. Villarreal and Barringer would both participate in spreading these messages. [Pl.'s Ex. 5, RR Pg. 27].

(d) Skero testified that racial slurs including the word "nigger" would be used in the workplace, particularly by Barringer. [Pl.'s Ex. 5, RR Pgs. 107-109].

(e) Skero testified that Hutchins referred to African Americans as a "bunch of monkeys" in a group text message. [Pl.'s Ex. 5, RR Pgs. 23-25]. When asked if he was aware of anyone in the workplace being offended by Hutchins' reference, Skero responded: "Pretty much every one of them that I talked to that were African American". Id.

(f)     Skero testified that racial slurs concerning the George Floyd murder were made by fellow deputies at the Constable's Office, including Villarreal and Barringer, who opined that Floyd's death was "deserved". [Pl.'s Ex. 5, RR Pg. 109].

(g)     Skero testified that fellow deputies at the Constable's Office made comments about Whittington like: "I don't understand how somebody that's Republican can stoop down to that level and become -- or talk the way he does about George Floyd, knowing that he was wrong". [Pl.'s Ex. 5, RR Pgs. 109-110].

(h)     Skero testified that he wasn't aware of any member of the police canine unit, other than Whittington, who had been disciplined for not having a body worn camera active as required by agency policy. [Pl.'s Ex. 5, RR Pg. 63].

12.     Deputy Constable Kelvin Jason ("Jason") was, at the relevant time in the case, a Deputy with the Constable's Office and a training officer. [Pl.'s Ex. 6, RR Pgs. 7-8]. Jason was (is) African American with dark skin color. [Pl.'s Ex. 6, RR Pg. 39]. Key testimony given by Jason in this case includes:

(a)     Jason testified about the group text message where Hutchins referred to African Americans as "monkeys". [Pl.'s Ex. 6, RR Pgs. 42-43]. Jason said the reference angered him and hurt his feelings. Id.

(b)     Jason testified that he believed he was discriminated against because he had a Hispanic light skin color girlfriend who was a co-worker. [Pl.'s Ex. 6, RR Pgs. 39-41]. He also said that on one occasion he was surprised by an unusual confrontation by Bonsal who counseled Jason about how he should give advice to his girlfriend in personal matters. Id.

(c)     Jason testified that he believed he was discriminated against because he was treated

differently after having a vehicle crash, specifically being assigned to an old substandard police vehicle while Barringer was assigned to a brand-new vehicle after he had totaled two police vehicles and a civilian vehicle in a single crash. [Pl.'s Ex. 6, RR Pgs. 10-13].

(d) Jason testified that he believed he was discriminated against because he was denied a promotion for reasons that did not prevent a light skin color co-worker, namely Bill Warden, from being promoted to a similar position. [Pl.'s Ex. 6, RR Pgs. 11-12].

13. Deputy Constable David Johnson ("Johnson") was, at the relevant time in the case, a Deputy with the Constable's Office. [Pl.'s Ex. 7, RR Pg. 7]. Johnson was (is) African American with dark skin color. [Pl.'s Ex. 7, RR Pg. 10]. Key testimony given by Johnson in this case includes:

(a) Johnson testified about the group text message where Hutchins referred to African Americans as "monkeys". [Pl.'s Ex. 7, RR Pgs. 14-16]. Johnson said the reference offended him. Id.

(b) Johnson testified that he was aware of a fellow deputy being dissatisfied about not being treated equally. [Pl.'s Ex. 7, RR Pg. 13].

(c) Johnson testified that he was aware of a light skin color sergeant – Jeff Gonzalez – using a racial slur at a subordinate deputy, specifically saying that the back seat of the deputy's police vehicle looked like the deputy was transporting slaves. [Pl.'s Ex. 7, RR Pg. 69].

(d) Johnson testified that he was aware of Whittington being excluded from and never being given a birthday party. [Pl.'s Ex. 7, RR Pgs. 60 and 93].

(e)     Johnson testified that he was denied a transfer to Whittington's police canine unit and that he was told by co-worker Steven Dugat the reason was because Johnson was in an interracial marriage with a White light skin color woman who was also employed at the Constable's Office. [Pl.'s Ex. 7, RR Pgs. 63-65 and 93].

14.     Deputy Constable Jimmy Evans, III ("Evans") was, at the relevant time in the case, a Lieutenant with the Constable's Office [Pl's. Ex. 8, RR Pgs. 17-20]. Key testimony given by Evans in this case includes:

(a)     Evans testified that he believed he was intimidated in violation of the agency policy, namely "Section 4. Non-Discrimination and Anti-Harassment". [Pl.'s Ex. 8, RR Pgs. 17-20]. Evans' grievance was against Captain Henry Elkin who was (is) light skin color. Id.

(b)     Evans testified about the group text message where Hutchins referred to African Americans as "monkeys". [Pl.'s Ex. 8, RR Pgs. 13-15]. Another deputy standing next to Evans at that moment saw the message and told Evans, with profane reaction, that she was offended by it. Id.

15.     In documents dated August 28th, 2020, Bonsal personally terminated Whittington's employment with the Constable's Office. [Def.'s Ex. 22 and Pl.'s Ex. 1]. As grounds for termination, Bonsal specifically cited:

- that, Whittington failed to submit evidence properly;
- that, Whittington failed to handcuff a prisoner behind the back;
- that, Whittington allowed a prisoner to handle narcotics evidence;
- that, Whittington left a prisoner unattended in the presence of narcotics evidence;
- that, Whittington left a prisoner unattended giving an opportunity for escape; and
- that, Whittington violated police canine use of force policy.

Bonsal based this employment termination supposedly on a decision made by an administrative disciplinary committee that he personally convened and chaired. [Def.'s Ex. 20]. And, this committee's adverse decision was based on complaints made by Bonsal himself. [Pl.'s Ex. 2 and 3]. And, the complaints were handled by investigators selected and appointed by Bonsal. [Def.'s Ex. 8, Pg. 1 and 10, Pg. 1].

16. At deposition, Bonsal admitted that he added grounds for Whittington's termination after-the-fact that exceeded the scope of what the administrative disciplinary committee considered. [Pl.'s Ex. 11, RR Pgs. 98-99]. This illustrated that the convened disciplinary committee was a shame.

17. Bonsal initiated, controlled, and led to conclusion every aspect of Whittington's demise as a deputy constable with the Constable's Office. As pled, Whittington was experiencing workplace racial bias and hostility prior to the George Floyd murder. [Doc. #1, ¶¶ 23-34; Def.'s Ex. 24, RR Pgs. 56-57]. Bonsal's complaints against Whittington came immediately after Whittington complained about the racial divide within the Constable's Office in the wake of the George Floyd murder.

### ARGUMENTS AND AUTHORITIES

18. The defendant Harris County, Texas begins its summary judgment motion with a narrative portraying the plaintiff Bert W. Whittington, III in a manner designed to discredit him professionally and personally. [Doc. #28, ¶¶ 5-9]. This narrative is later used by Harris County in its motion in an effort to distance itself from its unlawful conduct. [Doc. #28, ¶ 47].

19. Harris County grossly mischaracterizes and understates the nature of this case by saying that the sole basis of Whittington's complaint arose from "Plaintiff's comments during a

discussion following the George Floyd murder". [Doc. #28, ¶ 1]. To the contrary, Whittington's complaint arose from persistent discrimination during his employment with Harris County and retaliation afterwards.

20.    Harris County has pretextually portrayed Whittington as an incompetent police canine handler who mishandled evidence. [Doc. #28, ¶¶ 5-9]. This portrayal includes six specific events neatly lumped into four categories.

**"The first dog bite."**

(a)    Harris County states as a matter of undisputed fact that on or about December 10th, 2019 Whittington's police canine bit a fellow deputy constable during an active pursuit of a suspect. [Doc. #28, ¶ 6]. The event was documented, in part, by an internal report authored by the deputy who was bit. [Def.'s Ex. 3]. In this report, the deputy admits that he was running along with the canine when bit. Id.

Perspective Facts

(1)    In its statement of fact, Harris County does not accuse Whittington of any wrongdoing in connection with this event.

(2)    Having personal knowledge relevant to the aforementioned event, key testimony given by Skero at deposition included:

(i)    that, the deputy who was bit violated agency policy being close to and running along with the canine. [Pl.'s Ex. 5, RR Pgs. 71-72].

(ii)    that, it was not the first time that the deputy who was bit violated this particular policy. [Pl.'s Ex. 5, RR Pg. 71].

(iii)    that, Whittington and his police canine acted appropriately according to agency policy, recognized training, and state law. [Pl's Ex. 5, RR Pg. 72].

(iv)    that, his police canine had previously bitten other deputies and on no occasion was he ever disciplined for his canine biting the fellow deputies. [Pl.'s Ex. 5, RR Pg. 71].

(3)     Having personal knowledge relevant to the aforementioned event, key testimony given by Johnson at deposition included:

(i)     that, deputies were supposed to stay in their vehicle while a police canine was in pursuit of a suspect so the canine would not mistake the deputy for the suspect. [Pl.'s Ex. 7, RR Pgs. 58-59].

**"The second dog bite."**

(b)     Harris County states as a matter of undisputed fact that on or about January 24th, 2020 Whittington's police canine bit a fellow deputy constable and a citizen bystander during an active pursuit of a suspect and that during this event Whittington's body worn camera was not active as required by agency policy. [Doc. #28, ¶ 7]. A month after this event, Whittington was reprimanded by Villarreal for violating agency policy concerning body worn camera usage. [Def.'s Ex. 7].

Perspective Facts

(1)     In its statement of fact, Harris County does not otherwise accuse Whittington of any wrongdoing in connection with this event.

(2)     Having personal knowledge relevant to the aforementioned event, key testimony given by Skero at deposition included:

(i)     that, the deputy who was bit violated agency policy being close to and running along with the canine. [Pl.'s Ex. 5, RR Pgs. 73-74].

(ii)    that, he never saw Whittington's sergeant – Troy Barringer – wear or use a body worn camera as required by agency policy. [Pl.'s Ex. 5 RR, Pgs. 40-42].

(iii)   that, it was common for deputies to not have their body worn camera active when required by agency policy and that he himself violated said policy "quite a few times" without ever being reprimanded. [Pl.'s Ex. 5 RR, Pgs. 62-63].

(iv)    that, to his knowledge, Whittington was the only deputy in the police canine unit to have been reprimanded for not having an active body worn camera. [Pl.'s Ex. 5, RR Pg. 63].

(v)     that, there were times that Villarreal and Barringer ordered deputies to keep their body worn cameras off despite agency policy requiring

the cameras to be on. [Pl.'s Ex. 5, RR Pg. 64].

**"The third dog bite."**

(c)     Harris County states as a matter of undisputed fact that on or about May 28th, 2020 Whittington's police canine bit a fleeing suspect and that during this event Whittington's body worn camera was not active as required by agency policy. [Doc. #28, ¶ 8]. Two months later, on July 28th, 2020, Bonsal lodged a formal complaint against Whittington accusing him of violating agency policies. [Pl.'s Ex. 3].

(d)     In this particular event, Harris County identifies dialogue between Whittington and the suspect which was recorded by Whittington's body worn camera. In this dialogue Whittington was heard saying that his dog was young and "did not know what he was doing". [Doc. #28, ¶ 8; Def.'s Ex. 11, at 05m 24s]. While being a true word-for-word recount, Harris County took this statement out of context.

(e)     In this dialogue the suspect remarks beforehand to Whittington: "it was not as bad as I thought" – referring to the dog bites that the suspect sustained. [Def.'s Ex. 11, at 05m 02s]. Whittington responded that a more mature police canine would have bitten harder. [Def.'s Ex. 11, at 05m 15s]. Putting this dialogue in perspective, Whittington didn't say that his police canine acted inappropriately.

(f)     Deputy Constable Paul Simpson ("Simpson") was, at the relevant time in the case, a Lieutenant with the Constable's Office who was directed by Bonsal to investigate Whittington with regards to the aforementioned event. [Def.'s Ex. 8, Pg. 1; Def.'s Ex. 13, RR Pg. 8].

Perspective Facts

(1)     Having personal knowledge relevant to the aforementioned event, key testimony given by Simpson at deposition included:

(i)     that, he had no experience handling a police canine nor had he ever worked with a police canine officer. [Def.'s Ex. 13, RR Pgs. 10 and 15].

(ii)    that, he interviewed Skero who was the police canine trainer for the Constable's Office and that Skero told him that "it was not common for an actively engaged K-9 to listen to the command to stop biting once engaged due to stress, anxiety, and adrenalin". [Def.'s Ex. 13, RR Pg. 13].

(iii)   that, he interviewed a deputy sheriff sergeant with the police canine training program at the Sheriff's Office for Harris County, Texas and that this sergeant told him that canines are basically just like people and act differently depending on the circumstances. [Def.'s Ex. 13, RR Pg. 13].

(iv)    that, he never verified whether Whittington's police canine was appropriately trained and certified. [Def.'s Ex. 13, RR Pg. 16].

(v)     that, he believed Whittington's police canine was "within feet" of the suspect and that the suspect turned around to surrender as the canine launched into the air. [Def.'s Ex. 13, RR Pg. 19].

(vi)    that, he heard an audio recording that documented Whittington trying to recall the police canine and that the canine was ignoring the recall. [Def.'s Ex. 13, RR Pgs. 20 and 22].

(vii)   that, he was unaware and didn't inquire if Whittington's immediate police canine supervisor – Troy Barringer – had conducted a use of force investigation as required by policy of the Constable's Office. [Def.'s Ex. 13, RR Pgs. 25-28].

(2)     Having personal knowledge relevant to the aforementioned event, key testimony given by Skero at deposition included:

(i)     that, Whittington's police canine bit the suspect consistent with the policies of the Constable's Office and professionally recognized police canine handling standards. [Pl.'s Ex. 5, RR Pgs. 55 and 65].

(ii)    that, when a police canine crosses a certain threshold – typically being about 10 feet from the target – a canine will not recall. [Pl.'s Ex. 5, RR Pg. 54].

**"The mishandling of evidence."**

(g)     Harris County states as a matter of undisputed fact that on or about May 28th,

2020 "14.8 grams of cocaine" confiscated by Whittington as evidence in a case disappeared under suspicious circumstances. [Doc. #28, ¶ 9]. Two weeks later, on June 15th, 2020, Bonsal lodged a formal complaint against Whittington accusing him of violating agency policies. [Pl.'s Ex. 2].

(h)     Deputy Constable Robert Duffy ("Duffy") was, at the relevant time in the case, a Lieutenant with the Constable's Office who was directed by Bonsal to investigate Whittington with regards to the aforementioned event. [Def.'s Ex. 10, Pg. 1].

Perspective Facts

(1)     Having personal knowledge relevant to the aforementioned event, key testimony given by Duffy at deposition included:

   (i)     that, after considering everything found in his investigation, he was unable to determine what happened to the cocaine. [Def.'s Ex. 12, RR Pg. 87].

   (ii)     that, there was "more than one" individual that had sole custody of the cocaine at different points in time. [Def.'s Ex. 12, RR Pg. 88].

   (iii)     that, he could not place blame on Whittington or anyone else for the missing cocaine. [Def.'s Ex. 12, RR Pgs. 87-88].

   (iv)     that, he did not obtain all of the body worn camera recordings available at the time of his investigation despite his own belief that obtaining all of the recordings would be important to his investigation. [Def.'s Ex. 12, RR Pg. 39].

   (v)     that, there was no recordings from Johnson's body worn camera that documented him packaging the drug evidence by himself as Johnson didn't have his camera on as required by agency policy. [Def.'s Ex. 12, RR Pgs. 62-65].

   (vi)     that, Barringer allowed the suspect to handle the drug evidence while handcuffed which was a violation of agency policy. [Def.'s Ex. 12, RR Pgs. 19 and 27].

(2)     Having personal knowledge relevant to the aforementioned event, key testimony given by Johnson at deposition included:

(i)      that, the cocaine was taken out of the backpack at the police station while he, Whittington, and Barringer were all present. [Pl.'s Ex. 7, RR Pgs. 29-30].

(ii)      that, he, Whittington, and Barringer all "observed", "looked at", and "touched" the drug evidence as it was taken out of the backpack. [Pl.'s Ex. 7, RR Pg. 30].

(iii)      that, prior to him taking custody of the drug evidence, he and Whittington together put all of the evidence from the table back into the suspect's backpack. [Pl.'s Ex. 7, RR Pgs. 37-38].

(iv)      that, after he took custody of the drug evidence, he went to a different building and transferred the evidence into separate sealed evidence bags that were connected in a "train". [Pl.'s Ex. 7, RR Pg. 41].

(v)      that, he could not recall with certainty after-the-fact whether he had secured the cocaine in the evidence "train". [Pl.'s Ex. 7, RR Pg. 45].

(vi)      that, he was unaware of anytime that Whittington left the suspect alone without being supervised by either himself or someone else. [Pl.'s Ex. 7, RR Pg. 36].

(vii)      that, he did not believe it was possible for the suspect to have gained access to the cocaine in the backpack. [Pl.'s Ex. 7, RR Pg. 55].

(viii)      that, he did not turn on his body worn camera as required by agency policy when he offered assistance to package the drug evidence and was not disciplined for that. [Pl.'s Ex. 7, RR Pgs. 38-39 and 41-42].

(ix)      that, after learning of the missing cocaine, he reviewed Whittington's body worn camera recordings from the day and saw him receiving what appeared to be cocaine from Whittington. [Pl.'s Ex. 7, RR Pgs. 40-41].

(3)      Having personal knowledge relevant to the aforementioned event, key testimony given by Skero at deposition included:

(i)      that, an arresting officer would not be responsible for another deputy who has taken custody of a suspect and then leaves that suspect unattended. [Pl.'s Ex. 5, RR Pg. 85].

(ii)      that, an arresting officer would not be responsible for misfeasance of another deputy packaging drug evidence outside their presence. [Pl.'s Ex. 5, RR Pgs. 85-86].

21. The limited discovery in this case has already ratified Whittington's prima facie case that unlawful employer practices and other employer-related crimes were commonplace within the workplace of the Precinct 3 Constable's Office for Harris County, Texas during the relevant time in this case.

**The EEOC charge of discrimination includes a 'color' claim.**

22. In its first argument for summary judgment, Harris County contends that Whittington's "color claim exceeds the scope of his EEOC charge" – referring to the charge filed with the U.S. Equal Employment Opportunity Commission ("EEOC"). [Doc. #28, ¶ 15]. For this reason, Harris County believes that any 'color' claim in this case should be dismissed as a matter of law. [Doc. #28, ¶ 21]. Notably, Harris County is completely silent as to Whittington's integral race discrimination claim.

23. Harris County correctly points out that Whittington did not check the 'color' box on his EEOC charge, nor did he mention the word 'color' in the narrative of his charge. [Doc. #28, ¶ 21; Def.'s Ex. 25 and 26]. There is no dispute that the 'race' box was checked though. In checking the 'race' box, the charge – by EEOC definition – included both race and color. In verbatim, the EEOC defines race/color discrimination as follows:

> "Race discrimination involves treating someone (an applicant or employee) unfavorably because he/she is of a certain race or because of personal characteristics associated with race (such as hair texture, skin color, or certain facial features). Color discrimination involves treating someone unfavorably because of skin color complexion." [Pl.'s Ex. 9, Pg. 1].

The EEOC further affirms that race and color overlap, but that color discrimination is limited to the "pigmentation, complexion, or skin shade or tone". [Pl.'s Ex. 10, Pg. 2]. In short, the definition of race discrimination encompasses color discrimination.

24. Harris County does not otherwise challenge Whittington's EEOC charge in its summary

judgment motion and to deny Whittington a trial on the merits simply because the word 'color' was not expressly used would be unjust and it would undermine the protections that the discrimination laws are intended to afford.

**The defendant's de facto discriminatory practices had the force of law.**

25. In its second argument for summary judgment, Harris County contends that "there is no evidence that an official county policy or custom was the moving force or direct cause of any injury complained of by Plaintiff". [Doc. #28, ¶ 15]. Harris County fails to put this contention into proper context since four of the five claims for relief made by Whittington in this case do not require an element of 'official policy'.

26. To the extent of a claim under 42 U.S.C. § 1983, Whittington does not dispute the case law cited by Harris County which sets forth the elements of a claim under 42 U.S.C. § 1983. However, Harris County skirts around the fact that an official policy includes "practices so persistent and widespread as to practically have the force of law". *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

27. The lawmakers and policymakers of Harris County, Texas would be foolish to publish written policies that are knowingly unlawful and, therefore, the unlawful polices in this case can only be proven through persistent and widespread practices.

28. As detailed throughout this response, discriminatory practices based on race and color were prevalent in the workplace at the Constable's Office. Senior leadership at the Constable's Office created the racially charged workplace environment and openly fostered racial discrimination, harassment, and animus. Harassment by these bad actors would continue after employment termination through efforts of senior leadership to blacklist from new employment those who challenged this culture.

**The facts and evidence support a cause of action under Section 1983.**

29. In its third argument for summary judgment, Harris County contends that Whittington "fails to meet his burden to show any causes of action under Section 1983 [of Title 42 of the United States Code]". [Doc. #28, ¶ 15]. Harris County focuses on two of the three basic elements of a 42 U.S.C. § 1983 claim, namely: whether an official policy existed and, if so, who was the policymaker. Id.

30. Whittington did not and does not assert any cause of action under the Texas Constitution, the Texas Penal Code, or the Texas Labor Code. [Doc. #1, ¶ 15-17]. In Texas, a person has the right and/or privilege to be free from being a victim of abuse of official capacity, official misconduct, and employment blacklisting by a government employer. Tex. Pen. Code. §§ 39.02(a)(1), 39.02(a)(2), and 39.03(a)(2); Tex. Labor Code § 52.031(b).

31. Remarkably, Whittington's complaint here merely references the state constitutional and criminal statute violations as a basis of standing under applicable federal law. Nowhere in the complaint does Whittington seek relief under state law in the instant case.

    **Free Speech**

    (a) Harris County has seized on deposition testimony from Whittington where he did not understand the legal definition of free speech; and, therefore, he was cornered into a very narrow answer. [Def.'s Ex. 24, RR Pgs. 167-168].

    (b) Withstanding this, Harris County presents the five case law elements necessary to prevail on a "free speech retaliation claim". [Doc. #28, ¶ 34]. Whittington agrees with the case law cited by Harris County in this matter, but disagrees with how the facts selected by Harris County were matched to the case law. Expanding on the select facts better show the true circumstances.

(1)    <u>Whittington was not speaking pursuant to official job duties</u>. He was on-duty and made, as a condition of employment, to attend a racially charged meeting about his dissatisfaction of racial rants by his light skin color co-workers and supervisors.

(2)    <u>Whittington was speaking as a citizen on a matter of public concern</u>. Although Whittington was on-duty as a police officer, he was speaking as a citizen who was deeply concerned about the racial animus against African Americans with dark skin color – in this instance George Floyd – that his light skin color co-workers and supervisors had. A police officer working in the community with racial animus is a serious matter of public concern.

(3)    <u>Whittington's interest in speaking outweighed the employer's interest in workplace efficiency</u>. Whittington's interest in speaking in this matter most certainly outweighed an interest in workplace efficiency at the Constable's Office, particularly given that the nature of the mandatory meeting was patently counterproductive to workplace efficiency. In the end, the meeting merely singled Whittington out amongst racially hostile co-workers and supervisors in a harassing and intimidating manner.

(4)    <u>Whittington suffered an adverse employment action</u>. Fourteen days after the meeting, Bonsal filed his first internal affairs complaint against Whittington which was followed 43-days later by Bonsal's second internal affairs complaint against Whittington. As discussed earlier, these complaints were pretext intended to further harm Whittington based on his race and color. The timing of these complaints was obvious.

(5)    <u>The adverse action was substantially motivated by the protected speech</u>. As just previously stated, Whittington's speech in this matter was both personal and a matter of public concern. It was not related to official public duties. Subjectively and objectively, raising concerns about racial animus within a police workforce is a matter of public concern and is protected speech.

**Equal Protection**

(c)    Harris County contends that no evidence exists to support Whittington's equal protection claim. [Doc. #28, ¶ 33]. The facts developed in discovery show otherwise. Key testimony identified above and below clearly shows that Whittington and other African Americans with dark skin color at the Constable's Office were treated differently (in an unfavorably way) than similarly situated light skin color co-workers and disparaging treatment was racially motivated.

32. It is clearly established law that an employer cannot discriminate in employment based on race or color. Such discrimination is prohibited under 42 U.S.C. 1981(a) and 42 U.S.C. 2000e, et seq. It is also clearly established law that a government actor may not deprive a person of life, liberty, or property without due process of law or deny a person the equal protection of laws. Such deprivations are prohibited under U.S. Const. art. 14 § 1. It is also clearly established law that a government actor may not abridge a person's freedom of speech. Such abridgement is prohibited under U.S. Const. art. 1.

33. Acting through the senior leadership of the Constable's Office, Harris County established a systemic culture of racial discrimination, harassment, and animus designed and used to oppress employees who were African American with dark skin color. Whittington was one of these victims. Whittington maintained his employment at the Constable's Office by keeping quiet about his suffering, but he was swiftly targeted as soon as he openly complained about the racial divide within the agency.

34. Bonsal and his clique tried, and are trying now, to mask this racially oppressive culture. Once Whittington became openly critical about this culture he was targeted by Bonsal whose objective was to eliminate Whittington from the workforce, discredit him to hinder his ability to obtain new employment elsewhere, and discredit him as a complainant. To achieve this objective, Bonsal and his clique conspired and abused their police power and government resources at their disposal.

**The facts and evidence support a cause of action under Title VII.**

35. In its fourth and final argument for summary judgment, Harris County contends that Whittington "fails to meet his burden to show any causes of action under Title VII [of the Civil Rights Act of 1964]". [Doc. #28, ¶ 15]. In making this argument, Harris County

erroneously suggests that unlawful discrimination and legitimate business reasons are mutually exclusive.

**Pretext Events are Unlawful Discrimination**

(a)     The pretext events described earlier in this response are now said by Harris County to have been "legitimate business reasons" for terminating Whittington's employment. [Doc. #28, ¶ 47]. However, as described earlier, Whittington has highlighted perspective facts that show the pretext events were unlawful discrimination in of themselves intended to conceal past and future unlawful discrimination by Harris County against Whittington.

(b)     Because of the pretext events alone, Harris County's summary judgment on Whittington's unlawful discrimination claims should be denied. *Culwell v. City of Fort Worth*, 468 F.3d 868, 873 (5th Cir. 2006) (affirming that to survive summary judgment on a claim of unlawful racial discrimination in employment, a plaintiff must prove, at least, that there is a genuine dispute of material fact concerning the plaintiff's prima facie case). Disputed facts can either be a showing of pretext or that non-discriminatory reasons were mixed with reasons based on racial animus. Id.

**A Prima Facie Case of Discrimination Exists**

(c)     Whittington was (is) a member of a protected group, namely African American with dark skin color. Harris County has not disputed Whittington's qualifications for employment, especially given Whittington's near quarter century of honorable service in the United States Marine Corps and his prior police service which includes employment with the Texas Department of Public Safety. [Doc. #1, Pgs. 5-6]. Whittington was well qualified for his employment at the Constable's Office.

(d)     Whittington was wrongly terminated from employment at the Constable's Office and therefore suffered an adverse employment action. Whittington, as well as others in his protected class, were treated less favorably than those outside the protected class. This is seen by the testimony of Evans in that a White light skin color deputy crashed into another police vehicle and was not disciplined unlike Jason, an African American with dark skin color, who was disciplined. [Pl.'s Ex. 8, RR Pg. 21 and Pl.'s Ex. 6, RR Pg. 11]. Jason was not promoted unlike another light skin color co-worker. [Pl.'s Ex. 6, RR Pgs. 12-13].

(e)     Skero testified that light skin color deputies had special privileges to work private extra jobs while simultaneously getting paid by Harris County such as Villarreal. [Pl.'s Ex. 5, Pgs. 29-30]. Skero also testified that he, being light skin color, was never disciplined for his canine biting fellow deputies and suspects on numerous occasions. [Pl.'s Ex. 5, RR Pg. 71].

(f)     Barringer, a light skin color deputy, was not disciplined for unjustly hitting a handcuffed juvenile suspect while Whittington was disciplined for his police canine biting the same suspect who attempted to evade arrest. [Pl's Ex. 5, RR Pgs. 44-45; Def.'s Ex. 13, RR Pg. 35]. Barringer also received a new police vehicle after a major vehicle crash while Jason had to drive an "old piece of crap". [Pl.'s Ex. 6, RR Pg. 13].

(g)     A light skin color sergeant – Patrick Sullivan – had an intimate relationship with a female subordinate deputy against agency policy and was not disciplined. [Pl.'s Ex. 8, RR Pgs. 22-23]. Barringer allowed a suspect to handle drug evidence while handcuffed in violation of agency policy and there is no indication that he was

disciplined. [Pl.'s Ex. 11, RR Pgs. 69-70].

(h)   Other light skin color deputies – Marie Mora and Rebekah Mason – respectively received minimal discipline, a one-day suspension and supervisory counseling respectively, for violating agency policy concerning body worn cameras, yet Whittington was terminated for the same. [Pl.'s Ex. 11, RR Pgs. 97, 118, and 120].

36.   Whittington has further shown that the so-called "legitimate or nondiscriminatory reason" for his employment termination was not justified as advocated by Harris County. As such, Whittington can easily prove a claim of discrimination much less substantiate a fact issue defeating Harris County's summary judgment motion.

**A Prima Facie Case of Hostile Work Environment Exists**

37.   Whittington has shown above that he was (is) a member of a protected class who was subjected to unwelcome harassment in the form of texts using the word "nigger", a text involving the reference a "bunch of monkeys", texts describing his private parts as a "black mamba snake", putting him unnecessarily in dangerous situations, and wrongfully terminating his employment.

38.   As the individuals that committed the majority of the harassment were command personnel and their supervisors, they knew of the harassment and failed to take prompt remedial action. As such, Whittington can easily prove a claim of harassment much less substantiate a fact issue defeating Harris County's summary judgment motion.

**Continued Harassment by Chief Deputy Kirk Wayne Bonsal, Jr.**

39.   There is no dispute that Bonsal was involved with the termination of Whittington's employment at the Constable's Office as he personally made the complaints against Whittington; he started the internal investigations against Whittington; he chose who

investigated Whittington; he chaired the disciplinary review board judging Whittington and chose its members; and he personally terminated Whittington's employment with a less than honorable discharge. Bonsal intended to prevent Whittington from future employment.

40. Whittington later applied to the Precinct 2 Constable's Office for Harris County, Texas and was told that he was being hired as a deputy constable; however, afterwards he was denied employment based on interference from Bonsal and Villarreal. [Def.'s Ex. 24, RR Pgs. 129-134 and Pl.'s Ex. 5, RR Pg. 110-111]. As such, there is a fact issue as to the retaliation claim thus preventing summary judgment on same.

## CLOSING SUMMARY

41. The facts and evidence developed thus far in discovery overwhelmingly support each of Whittington's causes of action. This case does not simply involve victimization isolated just to Whittington. It involves corrupt police officials at senior levels who openly violate employee rights and retaliate against employees who threaten to expose them. It involves harm to the community as a whole.

42. A jury trial in this case is not only warranted, but also absolutely necessary to fully expose these bad actors and to hold them accountable. With accountability, the hostile culture within the Constable's Office would hopefully be eradicated and trust of police officials within the agency might be bolstered.

## RULE 56(d) DECLARATION

43. Pursuant Fed. R. Civ. P. § 56(d), the plaintiff [nonmovant] Bert W. Whittington, III declares that he cannot present facts essential to comprehensively justify his opposition to the defendant's summary judgment motion because of the extensiveness of relevant physical and testimonial evidence.

44. To date, discovery in this case has included required disclosures; cross interrogatories; admissions; eight oral depositions; and cross production of more than 1,500 pages of documents and 12+ gigabytes of digital media. Whittington alone has identified at least 28 potential witnesses in the case, deposition of which in sum would either be cost prohibitive or adverse to trial strategy.

45. The court is requested to permit additional limited discovery on any issue related to the defendant's summary judgment motion that would aid the court in appropriately disposing of said motion.

## CONCLUSION

46. For the reasons set forth herein, genuine issues of material facts exist and the summary judgment motion filed by the defendant Harris County, Texas should be denied.