**BRYAN SKERO - October 27, 2022**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

BERT W. WHITTINGTON, III §
          Plaintiff, §
vs. § CIVIL ACTION 4:21-cv-03220
KIRK WAYNE BONSAL, JR., §
ET AL §
          Defendants. §

*********************************************

ORAL DEPOSITION OF

BRYAN SKERO

October 27, 2022

*********************************************

ORAL DEPOSITION OF BRYAN SKERO, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on the 27th day of October, 2022, from 10:05 a.m. to 3:16 p.m. , before Lucy Johnston, CSR in and for the State of Texas, reported by machine shorthand, at 602 Sawyer Street, 2nd Floor conference room, Houston, Texas, pursuant to the Federal Rules of Civil Procedure and any provisions stated on the record or attached hereto; Rule 30(b)(5) requiring an on-record reporter's statement was waived.

---

A P P E A R A N C E S

FOR THE PLAINTIFF:
     Mr. Philip J. Orth, III
     Law Offices of Philip J. Orth, III, P.C.
     16406 Lamplighter Street
     Crosby, Texas  77532
     Phone:    (713) 520-8333
     Fax:      (772) 217-8162
     E-mail:   philip.orth@yahoo.com
FOR THE DEFENDANTS:
     Ms. Susana G. Sosa
     Ms. Melissa G. Martin
     Harris County Attorney's Office
     1201 Franklin Street, 13th Floor
     Houston, Texas  77002
     Phone:    (713) 274-6700
     Fax:      (713) 368-9278
     E-mail:   susana.sosa@harriscountytx.gov

ALSO PRESENT:

     Mr. Bert W. Whittington, III
     Mr. Eric L. Baumgartner
     Chief Kirk W. Bonsal, Jr.

---

I N D E X

|  | Page |
|---|---|
| Appearances ................................... | 2 |
| Stipulations ................................. | 1 |
| Certificate .................................. | 129 |

EXAMINATION | Page |
| By Mr. Orth .................................. | 5 |
| By Ms. Sosa .................................. | 111 |

EXHIBITS

| Number | Description | Page |
|---|---|---|
| 1 | Notice of Intention to Take the Oral Deposition of Bryan Skero ............. | 6 |
| 2 | Harris County Precinct 3 Policies and Procedures, Section 4: Non-Discrimination and Anti-Harassment ....................... | 17 |
| 3 | ABC 13 News report, "Pct. 3 sergeant resigns after questionable text message with 'racial undertone.'" ..... | 23 |
| 4 | NNDDA guidelines regarding police service dogs (HC-0096 through HC-0104) ............................. | 57 |
| 5 | Report to Chief Deputy K. Bonsal regarding incident of 5/28/20 (HC-0086 through HC-0095) ............. | 86 |
| 6 | Supplemental Voluntary Statement of Bryan Skero (HC-0080 through HC-0083) . | 88 |

---

EXHIBITS (continued)

| Number | Description | Page |
|---|---|---|
| 7 | Harris County Sheriff's Office Certificate of Completion of K9 Handler Course - Level 1 for Bert W. Whittington, III ..................... | 90 |
| 8 | Harris County Sheriff's Office Certificate of Completion of Basic Narcotics K9 Handler: Scent Discrimination for Bert Whittington ... | 91 |

**EXHIBIT 5**

**BRYAN SKERO - October 27, 2022**

BRYAN SKERO, having been first duly sworn, testified as follows:

EXAMINATION

BY MR. ORTH:

Q. Please state your full name for the record.

A. Bryan Nathan Skero.

Q. And is it Captain Skero?

A. Yes, sir.

Q. And, Captain Skero, have you ever given a deposition before?

A. Yes, sir.

Q. And how many times?

A. Twice.

Q. And were they related to your work?

A. Yes, sir.

Q. I'd like to make some agreements with you prior to continuing with your deposition to make it easier for you, me, and the court reporter; the first one being that if you allow me to finish my question before you give your answer, I'll give you the same common courtesy of allowing you to finish your answer before, you know, talking so the court reporter -- it makes it easier for her to get down everything. Okay?

A. Yes, sir.

Q. And you're doing great so far, as far as giving verbal responses, because the court reporter can't take down shakes of the head or nods or anything like that. So I need you to give a verbal response. Okay?

A. Yes, sir.

Q. And the last agreement I'd like to make with you before we proceed is that if you don't understand a question, please indicate to me that you don't understand the question. I'll be more than happy to rephrase it. If you answer the question, I will assume that you have understood the question. Okay?

A. Yes, sir.

(Exhibit #1 marked.)

Q. (BY MR. ORTH) Let me hand you what's been marked as Exhibit Number 1 to your deposition and ask you whether you've seen that before (handing).

A. Yes, sir, I have.

Q. And what is that?

A. It's just the civil action number -- I mean, the citation of the deposition of when I'm supposed arrive.

Q. Okay. It's a notice of your deposition indicating where you're supposed to be and what time you're supposed to show up. Correct?

A. Yes, sir.

Q. Now, who is your current employer?

A. City of Coffee City.

Q. So where is Coffee City?

A. East Texas. We're on Lake Palestine just south of Tyler.

Q. So you had a long way to drive coming into Houston, then?

A. Well, I live in Houston, so I commute back and forth to work.

Q. Okay. Is there some reason why you chose Coffee City to work in?

A. I was given -- a phone call was made to me by the chief there, one, asking me if I could come help them out. They knew I was looking for employment.

Q. And when did you start working for Coffee City?

A. It was the beginning of December 2021.

Q. And what are your duties there?

A. I'm a captain there. I oversee patrol, day-to-day operations of basically all the employees there.

Q. And approximately how many employees are you supervising?

A. Forty-eight.

Q. And have your duties changed since you started working there in December of 2021?

A. Other than more tasks added on, no, sir.

Q. Did you receive any training while you were at Coffee City?

A. Yes, sir.

Q. In what areas did you receive training?

A. I still do the continuing education for TCOLE, on top of additional classes at my choosing that I take; and then more supervisory classes.

Q. And when you talk about supervisory classes, can you describe those for the ladies and gentlemen of the jury?

A. It would be anything ranging from basically doing IAD investigations, as well as terminations, changes in TCOLE, their operating procedures, and just your basic classes.

Q. Were you given an employee manual while you were there?

A. Yes, sir.

Q. And in that employee manual, does it discuss discrimination at all?

A. Yes, sir.

Q. When was last time you reviewed that manual?

A. Almost on a daily basis, believe it or not.

Q. Did any of the classes that you received, either as a supervisor or basically any class that you received since December of 2021, involve discrimination

**BRYAN SKERO - October 27, 2022**

in any way, shape, or form?

A. Yes, sir.

Q. And what would those have been?

A. We have in-house through the City that -- actually through TML that would put on classes via Zoom or in person, or other local agencies that put those classes on we'll attend if we're available.

Q. And prior to working at Coffee City, who was your employer?

A. Harris County Precinct 3.

Q. And when approximately did you start working for Harris County Precinct 3?

A. I believe it was January 2017.

Q. And when you initially started working for Harris County Precinct 3, what were your duties assigned at that time?

A. After I completed my FTO on the toll -- which my FTO consisted of two weeks; it may have been shorter than that -- I immediately went into I want to say patrol very briefly. And then I ended up starting CIU with -- at the time I believe it was Lieutenant or Captain Villarreal and Pereda -- Eliel Pereda, I believe is his name.

Q. And you mentioned CIU. Can you explain what that is?

A. CIU is abbreviated for Crime Interdiction Unit. It's basically a unit outside of the patrol division. We dealt with narcotics to -- we're more fast-paced than the actual patrol. We're not call-responsive at all. We do help out if need be, but we'll do the undercover work, kicking in doors on search warrants; just a fast-paced unit basically.

Q. And just briefly, how many years have you had in the area of police work?

A. I'm coming up on 19 years roughly, if I'm not already there.

Q. So you had a lot of experience in police work before you even became a member of -- or I should say an employee of Harris County Precinct 3?

A. Yes, sir.

Q. When you went to Harris County Precinct 3 in January of 2017, did you start out as a deputy there?

A. Yes, sir.

Q. And did that ever change before you left?

A. Yes, sir.

Q. When did that change?

A. I believe 2020, 2021 maybe. 2020, I believe.

Q. And what did that change to?

A. I was a corporal. By rank, I was a corporal, and then I was a supervisor over canine.

Q. And when did you become supervisor over the canine unit?

A. It was, I want to say, around 2020. Mid 2020 roughly.

Q. And when you became supervisor over the canine unit, did you actually supervise employees, or just the canine units?

A. I was responsible -- ultimately Sergeant Barringer oversaw the canine. I was the front line, so I would actually oversee the training, make sure the records are complete -- training records are complete, their deployments, the dog food, their shots, medical. Everything.

Q. Well, can you describe your duties when you became the canine supervisor?

A. It was just that. It would include, like I said, everything. Over see them in the field, make sure they were within policy and procedures.

Q. Did you get any training in regards to your position as canine supervisor?

A. Yes, sir, a lot of training.

Q. Okay. What kind of training?

A. I went through the Harris County Sheriff's Department 13-week academy, did theirs, on top of every week we'd do the training. I would be responsible for my guys when they showed up. I'd be there for that. Just attending as classes came up, first aid classes, stuff like that, I would be responsible for taking.

Q. And you indicated earlier, I think, that when you were there -- was it Sergeant Barringer that was your immediate supervisor at that time?

A. Yes, sir. He was actually the supervisor over CIU. He was a sergeant. And then you had Major Villarreal who was you over it all, over that sergeant. So it's just a chain of command.

Q. And who would have been over Major Villarreal, if you know?

A. Chief Bonsal.

Q. Chief Bonsal?

A. Yes, sir. And then all three constables.

Q. And that would have been Constable Eagleton?

A. Sherman Eagleton, yes, sir.

Q. Now, when you first started in January of 2017 with Harris County Precinct 3, did you receive any training regarding discrimination at that time?

A. I believe during that time we would have to take mandatory discrimination classes, as TCOLE mandated.

Q. Were you given an employee manual at that time when you started with Harris County Precinct 3?

A. Yes, sir.

Q. And did you read that over?

A. Yes, sir.

Q. And do you recall whether or not that had a section involving discrimination?

A. Yes, sir.

Q. And during the time that you were at Precinct 3 for basically almost four years, how much time did you spend or how frequently did you have interactions with Constable Eagleton?

A. At the department, or just in general?

Q. In general.

A. A handful of times. In a four-year period, it would be safe to say about six to eight times.

Q. And how many of those occurred at work while working, during working hours?

A. One.

Q. And how often would you have interaction at work with Chief Bonsal during that four-year period?

A. Very few.

Q. Now, did Harris County Precinct 3 have written policies and procedures?

A. Yes, sir.

Q. Okay. And did you review those?

A. Yes, sir.

Q. On a weekly or, you know, a daily basis?

A. As needed.

Q. Okay. Were there any unwritten rules and policies and procedures while you were at Precinct 3?

A. Yes, sir.

Q. And what unwritten rules do you recall there being while you were employed at Harris County Precinct 3?

A. The best way to describe it, it was a little bit different being in CUI. We were allotted a lot more leeway than an average deputy was. We got take-home -- had take-home vehicles. We had a schedule, but our hours weren't set in stone like a normal 8:00 to 4:00, 8:00 to 5:00. We were allowed to receive more comp time than an average deputy. We were allowed to, I guess you'd say, bend the policies a lot more.

Q. What do you mean by "bend the policies"?

A. Well, what deputies would get if trouble for, as far as, I know, like, the handcuffing, the policy says, you know, they've got to be handcuffed behind their back. We were allowed to not only handcuff them up front, but me personally, I've transported people handcuffed up front to the jail from scenes and never -- supervisors knew about it, and I never got in trouble for it.

Q. When you say supervisors, which supervisors knew about it, that you were aware of?

A. Both Sergeant Barringer and Major Villarreal.

Q. And neither Sergeant Barringer nor Major Villarreal ever disciplined you regarding having a suspect cuffed in the front. Correct?

A. No, sir. As a matter of fact, they instructed me to do it.

Q. And on how many occasions, if you can recall, that you were instructed by either Major Villarreal or Sergeant Barringer to handcuff a suspect in the front?

A. I know three that I can recall. I know it was more, but what I can recall is at least three of them. And majority of the time, it was because, you know, we didn't have a transport unit or something like that.

Q. Okay. Is there anything else that you recall, as far as unwritten policies or procedures, that you indicated earlier at Precinct 3?

A. I mean, I can't think of it offhand. It was just so different, especially being in CUI. Like I said, the leeway was just totally different. You know, like showing up late to work, that was common. No issues there half the time. Like body cam stuff, I didn't have to activate my body cam all the time for certain stuff. I was instructed not to by supervisors.

One policy clearly stated to activate it when you're interacting with the public.

Q. Go ahead.

A. No. I'm trying to think of things. I'm sure I'll think of some more later.

Q. Okay. Prior to working at Harris County Precinct 3, did you have any experience in internal affairs investigations?

A. Yes, sir.

Q. What experience did you have?

A. Not only -- I was able to sit in with Montgomery County. When I was worked there, I was able to have interviews, as with well as interview officers that would get complaints filed against them.

Q. Did you ever go to any training, prior to working for Harris County Precinct 3 or while at Harris County Precinct 3, involving internal affairs investigations?

A. We did a lot of in-house investigations with our internal investigations. And then I know incorporated with a lot of my narcotics classes and some supervisors classes I chose to take on my own had IAD, internal affairs stuff and issues in it.

Q. Are you aware of any qualifications that an individual would need to do an internal affairs

**BRYAN SKERO - October 27, 2022**

investigation?

A. I mean, the basics. Go to -- attend some type of class, internal affairs class, interrogation techniques, interview techniques. Just your basic.

Q. Is there any certification involved that is needed to do an internal affairs investigation?

A. I think it depends on the department. But as far as mandatory, I don't think so. I know attending a class is maybe one of them, but I know departments just send you through them anyway.

Q. In any investigation that you either participated in or did yourself, did you hand out questions for witnesses to answer?

A. Like a questionnaire?

Q. Like a questionnaire.

A. No, never.

Q. Based upon your experience and training in IAD, would you think that would be normal or acceptable as far as doing an investigation?

A. No, sir. In 19 years of doing this, I've never seen or heard of a questionnaire.

(Exhibit #2 marked.)

Q. (BY MR. ORTH) Let me hand you what's been marked as Exhibit Number 2 to your deposition and ask you whether or not you've seen that before.

A. Yes, sir, I have.

Q. And what is it?

A. It's from the policies and procedures of Precinct 3.

Q. And it's specifically involving harassment. Correct?

A. Yes, sir.

Q. And it gives a definition, if you look at Section 4.013. And I'm not going to read it, but it does give a definition of what harassment is?

A. Yes, sir.

Q. And we're going to be working with that definition in the next questions that I ask you. Okay?

A. Okay.

Q. Have you ever been discriminated against in any of the places that you've worked?

A. Yes, sir, I have.

Q. Which places?

A. Starting at Precinct 3. Harris County Precinct 3.

Q. And how have you been discriminated against at Harris County Precinct 3?

A. Based on my -- I guess my political ties, as well as my color.

Q. And starting with the political ties, how were

you discriminated against at Harris County Precinct 3 regarding your political ties?

A. There were admins at Precinct 3 that I ran against their friends in Montgomery County for a constable's position. And friends of friends. And they didn't like it.

Q. And what did they do to show or indicate they -- or what was their discrimination activity that involved you?

A. Basically, from what I -- what I gather, after I left and everything, falsifying documents, lying. Just what we call it in police work was trying to dirty up our file.

Q. Now, when you say falsifying documents, what do you mean by that?

A. Putting documents in personnel's file after the fact, after they left without their knowledge, that's not true.

Q. And what documents were you aware of that were put in your personnel file after you left?

A. That I was dishonest, and I was put on the Harris County District Attorney's Brady list.

Q. And how do you know that they were put in your file after you left?

A. I lost a potential job employment with the

Jersey Village Police Department. And the background investigator, the lieutenant there, personally went to Precinct 3 and looked at my files and advised me of it.

Q. And what did he advise you of?

A. That Chief Bonsal had correlation -- written communication with the DA's office requesting me to be on the Brady list.

Q. And prior to your employment with Jersey Village, did you receive a copy of your personnel file?

A. Yes, sir. November 23rd, 24th of 2021, I did a PI request, an open records request for my file. It was provided through emails -- County emails and through Shirley Morrison, a deputy there. I think she's a corporal now or a sergeant maybe. But she ended up sending my personnel file back to me with nothing in it.

And then in December when I got hired on with Coffee City, TCOLE mandates that they do a background investigation, as well, through a new site called TCOLE Secure Share. Well, that site -- so basically he would let Precinct 3 know that he had an applicant and they need to send every file they have on me, whether it's IAD, any background files, any investigation files, anything on me; all employment files when I first hired on there, everything, and which they're required by TCOLE to do. They sent it over.

**BRYAN SKERO - October 27, 2022**

There was nothing in my files. And that was in the beginning of December 2021.

And then in June or July, I believe, I was going to go dual commission with Surfside Police Department. I completed the application there, and they also sent a request to Precinct 3 for the same thing, my files. They received my files, which there was nothing in it.

And then shortly after that, Jersey Village did it, and that's when they found it.

Q. Now, you indicated also that you were discriminated against because of your color. Can you explain what you meant by that to the ladies and gentlemen of the jury?

A. Whenever I was at the Precinct 3 -- and like I said, I was one of the initial crime interdiction unit guys starting up the task force basically. I was due up for -- which even Major Villarreal told me that I was getting the next corporal position, because we had two corporals in the unit left, which was Kyle Cornelius and Steven Dugat.

So I was up for the corporal position, and months and months went by. I never received it. And then all of a sudden one of his good friends, Pereda, a Hispanic guy, got the corporal position over me.

Shortly after that, it made a lot of the team members mad. Mr. Whittington and several other guys that looked up to me, they started saying something. And eventually I got promoted after I said something about discrimination.

And shortly after that, I was -- we were in communications with the DEA, Drug Enforcement Agency. They wanted me over as a TFO, a Task Force Officer, which I would be directly assigned to the DEA office, report to them. I was in line to go. About three or four months later is when the election cycle happened. I kept -- I kept getting told they were putting everything on hold, nobody was going anywhere until they got fully staffed.

Within a week of when Constable Diaz with Precinct 2 lost his position there, a lot of his guys had to go to other agencies. Well, Isaac has a good friend, Juan Delacruz, that was a TFO in DEA with Precinct 2. Whether he quit or got fired, I don't know. So Precinct 3 hired him on and not only put him in CUI without doing an interview like we always do with the applicants, they put him in CUI and put him in DEA over me.

And then, of course, it made a lot of the guys mad, as well. They started saying something. Then

I brought up the discrimination to them, and I was in DEA. But it took basically threatening them to get, you know, the right thing to happen.

Q. While you were at Harris County Precinct 3, did you know a Jason Hutchins?

A. Yes, sir.

Q. And who was he?

A. He was a deputy at first, and then his ultimate title was a sergeant.

Q. Do you have any knowledge about a text message that was sent by Sergeant Hutchins --

A. Yes, sir.

Q. -- that was referring to a group of African Americans as "a bunch of monkeys"?

A. Yes, sir.

(Exhibit #3 marked.)

Q. (BY MR. ORTH) Let me hand you what's been marked as Exhibit 3 and ask you whether you've seen Exhibit Number 3 before.

A. No, sir. This is my first time.

Q. Okay. Now, when is the first time that you actually were aware of the text of "a bunch of monkeys"?

A. I heard it throughout the department. And then it had to be well over a year ago I physically called Officer Hutchins and talked to him, and he told me about it.

Q. And what did Hutchins say to you concerning that?

A. He just --

MS. SOSA: Objection. That's hearsay.

A. He explained to me basically what transpired of the situation, that he wasn't referring it to a racial comment, but he did put that in there. He was just saying it was like a circus.

And then he went into detail on, you know, what happened afterwards, that he was receiving a lot of issues, not only with the media and everything, so the department had to fire him basically.

But in that process, he spoke to Deputy Chief Bonsal, who Bonsal reached out to one of his good friends, which is the police chief of Roman Forest, Chief Carlisle. And Chief Carlisle hired him on.

Q. (BY MR. ORTH) Did you yourself receive the comment by Hutchins as being racially motivated?

MS. SOSA: Objection; calls for speculation.

A. Yes, sir. I wouldn't have said it.

Q. (BY MR. ORTH) And why wouldn't you have said it?

A. Because, I mean, if I look at the black and

white, it looks racist.

Q. Were there any individual deputies at Harris County Precinct 3 when this was going on that you're aware of that took it offensively as a racial comment?

A. Yes, sir.

Q. And how many do you know of?

A. Pretty much every one of them that I talked to that were African-American.

Q. Do you know if there was an investigation done concerning the issue with Sergeant Hutchins or Deputy Hutchins?

A. I mean, I heard. I never personally saw them.

Q. Do you know what, if anything, ABC did regarding this or did regarding the comment made by Sergeant Hutchins?

A. Did I know -- I'm sorry?

Q. Okay. Let me rephrase the question. Were you aware of anything that Channel 13, ABC, did regarding the Jason Hutchins comment of "a barrel of monkeys"?

A. Yes, sir. I knew that they were, I guess, poking around about it and asking questions.

Q. Are you aware of whether that had anything to do with an internal affairs investigation that was started regarding Jason Hutchins?

A. I believe that's what sparked everything.

Q. And what is your understanding while you were at Precinct 3, as far as the reporting of discrimination that was observed by anybody or being a victim of discrimination, how they were supposed to report that?

MS. SOSA: Objection; confusing, compound, calls for speculation.

Q. (BY MR. ORTH) Well, let me direct your, to Exhibit Number 2, which has the information as far as how to report violations under 4.02. Is that your understanding of how you were supposed to report a hostile work environment situation or harassment?

A. Yes, sir, to the immediate supervisor.

Q. Okay. And while you were at Harris County Precinct 3, did you ever make or report any violations of discrimination?

A. I didn't make an official report. I mean, I've said stuff like, "Hey, you don't need to talk about that or say stuff like that."

Q. Well, I mean, when you said you said stuff about that, what do you mean by that?

A. Text messages that would come in on our group texts throughout the unit referring to -- in one particular case, it was Mr. Whittington's private parts.

Q. And what do you recall regarding a text message that was sent regarding Deputy Whittington's private parts?

A. They would -- they would send memes, they were called, of a snake, a black mamba snake, and call his private parts a black mamba snake.

Q. And who was sending these texts?

A. It's both Villarreal and Barringer.

Q. And did it happen on one occasion or more than one occasion?

A. It was ongoing. It was a lot.

Q. And did you say anything to Major Villarreal or Sergeant Barringer concerning this?

A. Yes, sir, we talked about it.

Q. And when you say you talked about it, what did you discuss?

A. Well, I just told them that "Hey, you know that's distasteful, man. We don't need to be sending stuff like that in a text."

Q. Were there any other instances that involved texting that you would perceive as discrimination, based upon Exhibit Number 2's definition, while at Harris County Precinct 3?

A. I can't think of any off the top of my head. I know there has. I just can't think of any off of top of my head right now.

Q. Okay. In general, how would you describe the work environment while you were at Precinct 3 during your time there?

A. It would depend on the day honestly. Sometimes it was good. Sometimes it was toxic. You know, a lot of guys didn't even want to be there, didn't even want to show up for work.

Q. And what would differentiate, in your opinion, between good and toxic?

A. It all depends. I know like during election times, we hated being there. We were forced, you know, either to have to do something we didn't want to do or -- and in not so many words forced to do something we didn't want to do. The tension was just so high during the election times that a lot of us either called off or just stayed away completely.

Q. Other than during election times, what other things at Precinct 3 would make the work environment toxic, in your opinion?

A. Just misleadership with the supervisors, for one thing.

Q. What do you mean by that?

A. They would allow other members of the unit to do things but not let the other ones.

Q. And do you know of any incidents involving that or what you meant by that?

A. Yeah. A lot of times when it would come to extra jobs, Villarreal would let Pereda or somebody, I guess, he liked work the extra jobs with them, give them the option to work it and not let the other ones.

Q. Is there a specific one that Lieutenant Villarreal at that time would allow to work extra jobs compared to others?

A. I know there was a -- I want to say it was a -- not a -- not a trash place, but a scrap metal place. I don't know the name of it.

Q. Okay.

A. He would let -- I know he would let Suarez -- him, himself; Suarez; and Pereda, they'd all go get haircuts all the time on duty while us other officers had assignments we would have to do.

Q. Okay. Other than getting haircuts while on duty, was there anything else that Lieutenant Villarreal would allow certain individuals to do but not others?

A. I mean, they'd use their take-home cars for personal use.

Q. Anything else?

A. Basically using County equipment and personnel for their financial gain at their extra jobs. I got called out to the scrap place to run my County vehicle -- my County dog on vehicles that he was working

29

an extra job on.

Q. When you say "he was working an extra job," who are you talking about?

A. Major Villarreal.

Q. And do you know, while working these extra jobs that -- whether these individuals who were doing that were also getting paid by Harris County at the same time?

A. I know -- I couldn't tell you dates, but I know on a couple of instances that they were. They were supposed to be on County time but were working extra jobs.

Q. And would that have been a violation of the policies and procedures of Harris County Precinct 3 at the time?

A. Yes, sir, as well as falsifying -- I mean, a State law, falsifying government documents.

Q. So it would be a criminal offense against policy?

A. Yes, sir.

Q. And Major Villarreal would have been aware of that, if not participating in it. Correct?

A. Yes, sir. He was the coordinator of that particular extra job.

Q. And where was this yard that you were

30

discussing, the scrap place?

A. It's a scrap yard I know off 610 somewhere in Houston. I don't know the physical address or the name.

Q. Would that have been in the jurisdiction of Harris County Precinct 3?

A. I don't think that -- it's right on the borderline if it is.

Q. Now, you said -- you mentioned an incident that you had to take your dog out. Can you explain what happened there?

A. Apparently they got a car in from border patrol that they seized narcotics out of. It was in their possession. They had it up on a lift when he called me out. I didn't know why I was going out there to begin with.

When I did get out there, he explained to me about the car. I met with the owner, as well as Major Villarreal, saw that there was a compartment -- an after-market compartment in the car. They lowered it back down. I was ordered to run my dog on it, which my dog alerted. And then I began searching the vehicle to see if I could find more compartments.

Q. And why would that have been unusual?

A. Because the comment made was that there was money in there when border patrol got it. And maybe

31

they could -- maybe border patrol could have missed another compartment full of money.

Q. And would that have been part of your duties and responsibilities while at Harris County Precinct 3?

A. No, sir.

Q. And did you locate any other compartments in the vehicle?

A. No, sir.

Q. And who was the one that told you to go out there?

A. Major Villarreal.

Q. And this would have been while you were on Harris County Precinct 3 time. Correct?

A. Yes, sir, I was.

Q. Were you aware while you were out at Harris County Precinct 3 whether there were any employee clicks out there or groups of individuals that were friends or more than friends?

A. Yes, sir.

Q. Okay. And which clicks were you aware of or which click were you aware of while at Precinct 3?

A. I knew Major Villarreal, Sergeant Barringer, Pereda, and Juan Delacruz when he came on, they would attend football games -- Texan football games. They would do the tailgate party before the game, which they

32

would -- Constable Eagleton's brother had a booth and everything set up. Along with them was the owner of the scrap shop that they worked the extra job at.

And, I mean, there's many photos and everything of them all together all the time.

Q. And other than outside activities, you know, or going to football games or whatever, did you observe these clicks do anything against the policies and procedures of Precinct 3?

A. Yeah, I observed some stuff.

Q. And what did you observe?

A. It falls back to, you know, showing up late and not getting in trouble, dipping on -- I'm sorry. While they're on duty with Precinct 3, they would do personal stuff on their own with the knowledge of Sergeant Barringer and Major Villarreal and --

Q. Well, what kind of personal stuff would you see them do?

A. Whether they had to go grocery shopping or whether they had to go pick their daughter up or their kids up from school. Just whatever errand they had come up.

Q. And this would have been while they were on duty getting paid for Harris County Precinct 3 time. Correct?

A. Yes, sir. And I'm -- and I've done it before, too, and they knew about it and didn't have a problem with it.

Q. Okay. Now, if there was a disciplinary board while you were at Harris County Precinct 3, who would normally choose the board members for that, if you know?

A. I don't know who the ultimate decision-maker was. Whenever I did a couple of disciplinary boards, Villarreal instructed me to under -- telling me that Deputy Chief Bonsal was the one that was inquiring about the disciplinary boards.

Q. Now, during -- while you were at Precinct 3, were there any occasions where Chief Bonsal wanted to improve the morale in the workplace there, if you recall?

A. Improve the morale?

Q. Yeah.

A. Not to my knowledge.

Q. Okay. Now, you know Deputy Whittington. Correct? Bert Whittington?

A. Yes, sir.

Q. And did you work with Deputy Whittington while you were at Precinct 3?

A. Yes, sir. I was his immediate supervisor.

Q. And during what time frame were you his immediate supervisor?

A. When I got promoted to corporal and then immediate supervisor over canine and he became canine.

Q. And how often would you -- once you became Deputy Whittington's supervisor, how often would you have contact with him?

A. Every day.

Q. And how would you characterize your relationship with Deputy Whittington? Was it just work-related, or would you do outside activities together?

A. I mean, it started work-related. And then, of course, when he came into the CUI unit, it became a lot more tight knit like a family. So, I mean, we talked and did stuff afterwards, too.

Q. And during the time that you were at Precinct 3, especially supervising Deputy Whittington, did you form any opinion as to his character?

A. Yes, sir. We all did.

Q. And what was that?

A. Everybody loved him. He was -- I mean, he was known as one of the hard workers that if he wasn't on a DEA deal with us or something, he was out making his own cases.

Q. And while you were there at Harris County Precinct 3 working with and supervising Deputy Whittington, did you form any opinion as far as his honesty, whether he was an honest person or not?

A. Yes, sir.

Q. And what was that?

A. He was a very honest guy, straightforward.

Q. And did you have any specific instances that you observed regarding Deputy Whittington that form those opinions of his honesty and his character?

A. Yes, sir.

Q. And what were those?

A. I remember one time on a call he didn't have his body cam on, and instead of giving me some BS excuse why, he just -- he was honest and said, "Man, I just forgot to turn it on." And same thing during training. You know, he'll admit his faults when he was wrong in training.

Q. And is that like the other deputies that you were working with at Harris County Precinct 3 or unlike them?

A. It all depends. Some were like that. Some were just ones that I didn't even want to be around, honestly.

Q. And which ones were the ones that you wouldn't want to be around while you were at Harris County

Precinct 3 because of their character?

A. That I knew personally, Pereda, Suarez, Villarreal -- Major Villarreal, and Sergeant Barringer.

Q. The individuals of the click that you mentioned earlier. Correct?

A. Yes, sir.

Q. Now, directing your attention to 5/28/20, there were two incidents involving Deputy Whittington on that day. Do you recall that?

MS. SOSA: Objection; leading.

A. Yes, sir, I do.

Q. (BY MR. ORTH) Okay. Now, were you involved in either one of the incidents that happened on 5/28/20?

A. Yes, sir.

Q. Which incident or incidents were you involved in?

A. Where his canine bit a suspect, a fleeing suspect.

Q. Okay. And would the suspect have been an adult or a juvenile?

A. He was a juvenile.

Q. Okay.

A. I'm not 100 percent sure, but maybe 14 or 15, I think it was.

Q. Okay. And what was your first involvement with that incident?

A. I was -- it was close to the end of my shift when I was getting off. I was headed home. And I was in Huffman when I believe it was Deputy Watson, Amanda Watson, called out. She had somebody running from her and gave her location, which was in Highlands. So when that happened -- and I want to say she was on the back channel giving that.

Q. What do you mean by "back channel"?

A. We have a -- we've got several different channels in our handheld radios and our car radios. The primary channel is for us talking to dispatch, and other agencies can hear us. The back channel was specifically for Precinct 3 personnel only. And that's what the unit -- the majority of the time the unit would conduct business on that back channel.

Q. So when you -- and what did you recall hearing on the back channel that night of 5/28/20?

A. I heard Deputy Watson saying she had one running from her in a vehicle. They were headed, I wanted to say, east on San Jacinto.

And so then I immediately -- I turned around. All the other units were going around. And I can't remember if she said it on primary or back channel, but we ended up switching to our back channel.

I know that. But she said that one bailed out of the vehicle and he's running down the railroad tracks behind the Subway.

Q. And what did you do when you heard that?

A. I didn't hear anybody say they got them. So when I got there, I stopped -- I went into a driveway before the Subway that I knew backed up to the train tracks to see if I could see them. And when I pulled around and got around the corner, that's when I saw Deputy Whittington, Sergeant Barringer, and then the suspect juvenile.

Q. Okay. And when you saw Deputy Whittington, Sergeant Barringer, and the juvenile, what were they doing at that time?

A. They were actually almost to Deputy Whittington's -- they were walking back to his vehicle.

Q. And was the suspect handcuffed at that time?

A. Yes, sir, he was.

Q. In the front or the back?

A. I want to say in the back.

Q. Okay. And after you saw that, what did you do?

A. I began walking the train tracks seeing if -- called for EMS, and then I began walking the train tracks to see if he threw any evidence, the suspect.

Q. And was there somebody with you at that time?

A. Deputy Pereda was -- or Corporal Pereda.

Q. And did you find anything on the train tracks?

A. No, sir.

Q. And when you stopped walking the train tracks, what did you do then?

A. Returned back to my vehicle or that staging area. EMS cleared the juvenile from having to go to the hospital. And everybody from that scene went to the original scene where the truck came to a stop, which was on San Jacinto Street. I believe it was San Jacinto Street.

Q. At that point in time before you left of the scene, did you get to notice the suspect as far as any reason why the EMS was showing up?

A. Mainly, we call them for every canine encounter dog bite, as well as, you know, if we ever tazed anybody, for them to remove the prongs. Just general checking them out to make sure they didn't hit their head or anything like that. And, I mean, as far as that, I'm sure it was for the dog bite itself.

Q. Okay. And you didn't notice -- you didn't have an opportunity to check out the suspect at all, as far as any marks that the dog had left or any bites or anything that happened to the suspect based upon what the dog -- the canine did?

**BRYAN SKERO - October 27, 2022**

A. Not on that initial scene, not until we went to the second scene.

Q. Did you then go -- after you left there, did you go to the second scene?

A. Yes, sir, we all did.

Q. And when you saw "we all," who are you including?

A. Everybody that was on the initial scene; Sergeant Barringer, the suspect, Deputy Whittington, myself, Corporal Pereda. And that's all I remember, because I think the rest of them were already over there.

Q. Okay. And if you can recall, at the initial scene were there -- what individuals, if any, had body-worn cameras on them?

A. Myself -- no, I did not have one. I lost it. I can't remember if anybody had them on or not. I knew Sergeant Barringer was in plain clothes. He never wears his body cam that's provided to him. I lost mine. I want to say, Deputy Pereda -- or Corporal Pereda was in plain clothes, as well. He may or may not have. And I can't remember if Deputy Whittington had his.

Q. Now, you mentioned Sergeant Barringer having been issued a body-worn camera. How do you know that?

A. When I lost mine chasing after a subject in the woods, I had to do a memo on it, a report for losing County property. He offered to give me his body cam until I got a new one.

Q. While you were at Precinct 3, have you ever known or observed Sergeant Barringer to wear and use his body-worn camera?

A. I've seen it, but I've never seen him wear it or use it before that I can recall.

Q. And are there rules and regulations concerning body-worn cameras while at Precinct 3 that you're supposed to wear the camera while you're on duty?

A. Yes, sir. When we got issued body-worn cameras after my initial swear-in, they came out with the policy. We actually had to attend a class on body-worn cameras and adhere to the -- read the policies and procedures on it. And it was required that any interaction you make with the public you're supposed to be recording.

Q. Now, you mentioned two individuals being in plain clothes. That would have been Sergeant Barringer and I think Deputy Pereda?

A. Yes, sir. 100 percent for sure Sergeant Barringer and Deputy Pereda. I know he may have been in his pullover shirt and some different style he used, but it wasn't departmental approved.

Q. And was he at the initial scene or was he ever -- when did he show up, if you know, at the scene, either the first scene or the second scene?

A. He showed up right after I did on that scene that I was on by the railroad tracks.

Q. So he was not involved, to your knowledge, at the initial scene with the suspect and Deputy Whittington and Sergeant Barringer?

A. No, sir. He was not there at that time. He got there right after I did. And I was the third person there.

Q. Okay. Now, moving from the first scene to what you called the second scene, who was at the second scene?

A. Everybody.

Q. Okay.

A. Basically all the CUI units that responded. Maybe a couple of deputies that were in the area that assisted. Of course, myself, Sergeant Barringer, the suspect, Corporal Pereda, Major Villarreal showed up, Deputy Watson. And, I mean, just everybody that was in the area. I couldn't keep track of everybody.

Q. And what happened at the second scene?

A. When they got him out of the vehicle, that's when I was looking at his bites. They were superficial. I mean, nothing to them. There wasn't no need to go to the hospital, so I verified that.

He was -- he was being a butthole, yelling, just -- you know, just making comments that he shouldn't and MF'ing us. And then he kept saying that somebody punched him. And --

Q. And when he was talking, was he talking in English or Spanish or some other language?

A. He was talking in English that time.

Q. All right.

A. He was -- when they left where he was in the vehicle he was transported in, they walked him to the front of the driveway to his mom's house, which that's where the initial truck that ran ended up in the backyard.

Q. Okay.

A. His mom was there, the uncle that he was with, and the sister. And then he started telling his sister in Spanish that one of the guys hit him, somebody hit him, one of the officers punched him.

Q. All right. And did he indicate or describe the officer that hit him?

A. He tried. He was -- he had eyes and, I mean, it's clear he was looking at Sergeant Barringer as he was throwing a tantrum. He never -- he couldn't

**BRYAN SKERO - October 27, 2022**

physically point because of his handcuffs, but he made a head motion, which caused his sister to start yelling and throwing a fit.

Q. And what was the sister saying at that time?

A. Yelling "Why did you punch my brother when he was handcuffed?" Just she wanted his name, badge number.

Q. And did she get the name and badge number?

A. Not from me or not in my presence.

Q. Okay. Were there any other discussions other than what you've told us so far concerning a constable hitting or contacting the juvenile suspect while in handcuffs?

A. Well, I know Barringer denied hitting him. He said that on scene to me. I know when Major Villarreal showed up, they walked off. And I know Bert -- well, I'm sorry. When Major Villarreal got there, Bert told Major Villarreal that the kid was struck.

And then shortly after that, Major Villarreal and Sergeant Barringer walked off away from everybody and then returned.

Q. And how long were they gone approximately?

A. When they -- honestly I couldn't tell you. When they walked off, I walked up to the house to the vehicle and did an investigation on that.

Q. When you said you "did an investigation on that," what do you mean by that?

A. I was searching it to make sure there wasn't no narcotics and making sure the vehicle wasn't stolen.

Q. Okay. And during that time, you could not have heard what was said between Sergeant Barringer and Major Villarreal at the time. Correct?

A. No. Yes, sir, nobody could.

MS. SOSA: Phillip, excuse me. Is it okay to take a break? We've been going over an hour.

MR. ORTH: Yeah, we can take a break.

MS. SOSA: Thank you.

(Recess from 11:16 a.m. to 11:37 a.m.)

Q. (BY MR. ORTH) Now, Captain Skero, when we left off, we were talking about that you were moving to the second scene and what was going on there. And you indicated that you were investigating or looking at the car at the suspect's home, I believe. Did you find anything during your investigation of the vehicle?

A. No, sir.

Q. Okay. What did you do next?

A. I just -- I remember I stayed on scene helping -- well, I'm sorry. I tried asking Major Villarreal to tow the vehicle because the keys weren't present and we couldn't get inside the vehicle. But I

was told we're not towing it, so ultimately I ended up leaving the scene.

Q. Okay. And do you recall why you weren't allowed to tow the vehicle or why that decision was made by Major Villarreal at the time?

A. Well, I mean, I had my reasons, but I don't know what the formal reason was.

Q. Okay. And what were your reasons?

A. That it was already -- the scene was already basically a shit show to begin with, so they didn't want nothing else to come out of it.

Q. Okay. When you say or use the term "shit show," what do you mean by that?

A. The accusation of an officer hitting a kid, a kid being bit by a dog, to they found out that the initial officer never even turned the lights on to pull the vehicle over from the get-go.

Q. Okay. And why would that be a problem, as far as turning the lights on when you stop a vehicle or when you're looking for somebody or going after a suspect?

A. Because if your lights aren't on to pull somebody over, they can run all they want. They don't know you're trying to stop them, so there's no law being broke.

Q. And was there any discussion concerning the

lights not being on in the vehicle while you were at the second scene?

A. Not with me.

Q. All right. And when you discussed the hitting of the suspect by a constable, that would obviously be against the policies and procedures of Precinct 3. Correct?

A. Depending. Handcuffed prisoner, yes.

Q. Okay. And that was when the suspect -- the juvenile suspect was handcuffed. Correct?

A. Yes, sir.

Q. To your knowledge, would that be a criminal offense?

A. Yes, sir.

Q. While you were at Precinct 3, do you know if that ever was investigated, the hitting of the juvenile suspect while in handcuffs?

A. I physically never did any type of investigation on that particular aspect itself, but I heard and I know there was one held.

Q. Okay. Do you know who did it?

A. Honestly, I thought that Major Villarreal did it, because him and Sergeant Barringer talked about it. And when Sergeant Barringer was writing up his statement to the facts of what happened, Villarreal was next to

**BRYAN SKERO - October 27, 2022**

him basically coaching him on how to word things in the report.

Q. And is that typical that you have a supervisor coaching a deputy or a sergeant in doing their report while you were at Precinct 3?

A. No, sir.

Q. And did you overhear any of the conversation between Major Villarreal or Lieutenant Villarreal at the time and Sergeant Barringer while this was going on?

A. While he was doing the report?

Q. Yeah, while he was doing the report. Correct.

A. I mean, I knew it was in reference to that incident, but I don't know the specifics of what he was trying to get into.

Q. So you couldn't hear it?

A. I could, but I wasn't paying attention honestly.

Q. Okay. And after you left the scene -- the second scene because there was nothing else to do at that point in time, did you have any other involvement regarding what happened on 5/28/20 that we just discussed?

A. Yes, sir.

Q. And what was your next involvement?

A. I can't remember the exact date. It was very much shortly after the incident took place. I was instructed by Chief Bonsal to review the video, to go to the -- I don't know the name of the -- it's a plastic plant where the juvenile was bit, where that scene happened, gather video, and write up a report, and listen to -- and I'm sorry. And also listen to Deputy Whittington's video of him sending his canine after the suspect.

Q. And what instructions do you recall now that Chief Bonsal gave you concerning that?

A. Just to basically list everything that I saw, the policy and procedures on deploying a canine, when to, when not to; just that aspect of the canine part.

Q. And you would have been a good person to ask to do that, since you were the supervisor of the canine unit at Precinct 3 at the time. Correct?

MS. SOSA: Objection to speculation; leading --

A. Yes, sir. I was --

MS. SOSA: -- and compound.

A. I was the supervisor over the canine portion, and I was the -- as a matter of fact, I think I was most qualified of any deputy at that department in general of the canine, the policies and everything when it comes to Precinct 3.

Q. (BY MR. ORTH) And why do you think you were the most qualified involving canine units at Precinct 3 at that time?

A. I've been doing it a long time. As of 2021, I was probably about eight years into being a canine handler, not only with that department, but prior departments, all the training I went through, and the responsibilities that Precinct 3 laid on me involving the canine program of Precinct 3.

Q. Okay. Was there anybody, to your knowledge, at Precinct 3 that had more time with canine units and more training than you at that time that Chief Bonsal asked you to do that investigation?

A. There was nobody. It was just me.

Q. Okay. So after you received those instructions -- well, let me rephrase that. When Chief Bonsal asked you to do the investigation, was that a formal investigation or an informal, or is there a difference between the two?

A. I mean, if a supervisor asks a subordinate to do something, they do it. So, I mean, to me it's done, whether it's in writing, over the phone, or text message.

Q. Okay. Do you know if there was anything in writing?

A. Email form, yes, sir.

Q. Okay. And that was from Chief Bonsal to you?

A. Yes, sir.

Q. Was that on a personal email?

A. County.

Q. Okay.

MR. ORTH: Let me go off the record for a second.

(Discussion off the record.)

MR. ORTH: Going back on the record.

Q. (BY MR. ORTH) So after you received the email from Chief Bonsal asking you to do this investigation, what did you do?

A. Initially, I reviewed Deputy Whittington's dash camera and his audio of the incident.

I went to the plastic plant place, reviewed their surveillance cameras, which I later instructed Deputy Chief Bonsal that it didn't -- they went off scene, so there was actually no video of the bite. It was initially of them running, the dog chasing them, and then you couldn't see anything after that, which I also sent in email form because it was too big of a file to text.

I returned back to the office, reviewed Deputy Whittington's video again, the audio, and was

writing notes of basically how many times he tried calling the canine off before it made an initial contact with the suspect; and then after it went ahead and made contact with the suspect, how many times he tried calling the canine off of the bite.

Q. Now, how many times do you recall listening to the audible of Deputy Whittington's car or his vehicle unit at that time? How many times did he call the dog off --

A. It was --

Q. -- from the suspect?

A. It was his in-car audio. And five or six, I believe it was. I mean, I listened to word for word and counted how many times, and I put it in my report.

Q. Okay. And would that -- based upon your experience with canine units, would that be unusual?

A. No, sir.

Q. And why not?

A. The majority of the time -- I mean, they're dogs. They're canines. They have a brain. They think, you know, the way humans do. They get angry. They don't want show up for work sometimes or they don't want to work. They're basically almost the same behavior as a human. You know, they have feelings and everything else.

And my particular canine, although mine was very much obedient, when it came to a bite, he wouldn't listen. I would physically have to choke him off a suspect, which is common. 90 percent of the canines I've seen in Harris County when we're training, verbal doesn't work because they're in the moment way too much. They're not listening. You've physically got to get them off the suspect.

Q. And after you listened to the audible and were writing notes, was there anything else that you did regarding your assignment from Chief Bonsal?

A. I wrote it up in a report form. I included in that, I want to say -- but I also want to put on record, though, when we -- in canine, when we send our dog after a suspect, there's a threshold. It's an imaginary line that we know. Our depth perception, we can see if that dog crosses that threshold, there's no calling him back. If it is, let him go. And it's usually about 10 feet from the initial placement of the canine before he's told to go after the suspect. A canine should be able to call off within that 10 feet. But once he passes that threshold, they don't -- NNDDA, the National Narcotics Detection is what we went under, what we certify under and we maintain every year. We've got to train our dogs and certify them, and the State

recognizes them. The Supreme Court recognizes them. And that's who we use. Their qualifications to certify a dog is that threshold. And if the dog passes that threshold before the officer -- the handler recalls them, you don't get deemed for it or anything. I mean, it's just that's life.

But to certify a canine in actual bite work, he is supposed to have recall off one or stop in a mid run, but that's before the threshold.

And watching Deputy Whittington's video, he was well past -- he was almost on the suspect when he was called off, and there's no calling a dog off on that whatsoever.

The initial -- when the dog did make contact and bit, like I said, you can call a dog off all you want and he's not -- you would like for them to come off because it looks good on video and if any civilians are around watching, but it's not practical at all.

Q. Is there anything that you saw or heard in your investigation that would indicate that Deputy Whittington or his dog Zane did anything wrong in their activities, as far as involving the juvenile?

A. Not at all. Initially when I did the report on it, you know, I put the Garrity warning. Because like I said, I watched Deputy Whittington's video and pieced it

apart, and he did nothing wrong, nothing against policy. And when I was told to do that, I knew right then and there the reason I was told to do it.

Q. And what was that reason?

A. They were going after him to try to --

Q. And when you say "they were going after him," who are you talking about?

A. The administration. In particular, Deputy Chief Bonsal.

Q. And who were they going after?

A. Bert. Deputy Whittington.

Q. Okay. And you mentioned a guarantee warning (sic). What is that?

A. It's a Garrity warning.

Q. Garrity?

A. It's basically a CYA for officers that are instructed to do something. They're -- in my case, I wasn't comfortable doing it. It's a save-me in case they don't like what I have to say and they try coming after me for some type of perjury or something.

Q. And why specifically did you do that involving this investigation?

A. Because I knew what they were trying to do, so...

Q. And did you make any conclusions in your

report?

A. The only conclusion I made was that he was within -- Deputy Whittington was within policy. And I even added in the report I did a copy-and-paste straight from NNDDA's website of the qualifications and the mandates that they require for canines.

(Exhibit #4 marked.)

Q. (BY MR. ORTH) Let me hand you what's been marked as Exhibit Number 4 and ask you whether you can identify that.

A. This actually look like the NNDDA's -- or, I mean, it's a lot of the verbiage the NNDDA has on their website, as well. Yeah, I think that's what it is.

Q. And based upon what the NNDDA indicates, to your knowledge, Deputy Whittington and his dog Zane did not violate the policies and procedures of Harris County Precinct 3 while involved in the incident on 5/28/20 involving the juvenile. Correct?

A. Not to my knowledge. Not that I saw.

Q. Okay. And when you were done with the report, what did you do?

A. I sent the email back -- the report back in email form to Deputy Chief Bonsal, and I CC'd Major Villarreal and Sergeant Barringer.

Q. So you sent the report back to those three

individuals?

A. Yes, sir. And I even spoke to Sergeant Barringer about it and told him, "Hey, just to cover myself, I put the Garrity warning in there, and they're probably going to get ticked off because they're not going to like my response."

Q. And what did Sergeant Barringer reply to, if that at all?

A. He said "It's fine."

Q. And once you sent this report back to Chief Bonsal, do you know what, if anything, happened to it?

A. Never heard of anything since.

MR. ORTH: Off the record.

(Discussion off the record.)

MR. ORTH: Back on the record.

Q. (BY MR. ORTH) After you returned the report to Chief Bonsal and you gave a copy to Major Villarreal or Lieutenant Villarreal at the time and Sergeant Barringer, did you have any more discussions with any one of those three individuals after you returned the report concerning anything in that report?

A. I know I can tell you, before -- before I completed the report, Deputy Chief Bonsal knew all about this because we talked in person about it. He's the one that instructed me to go watch video. And I instructed

him that the only video there is they run off scene. So he knew about it 110 percent. I can tell you that right now.

Q. All right. But did you have any conversations after the fact with any of those three after you turned in the report?

A. Just me telling Sergeant Barringer what I did, the Garrity warning and everything.

Q. Okay. Do you know if any other investigations were done after -- concerning the same incident involving the juvenile and the dog bite after you completed your report?

A. I knew later on there were. I couldn't tell you exactly who was involved and what their role was in it, but I knew the investigation was still going on.

Q. Okay. And you've never seen -- to this day, you haven't seen a copy of Deputy Simpson's report regarding the dog bite, the same dog bite with the juvenile?

MS. SOSA: Objection; leading.

A. No, sir. No.

Q. (BY MR. ORTH) Okay. Earlier in your testimony you indicated your file or the contents of your file were changed from one time to another that you requested it or had it compared to another time when you went to

apply for Jersey Village Police Department. Can you explain how in detail that your personnel file was changed?

A. It was physically -- somebody physically placed documentation in my file after I left.

Q. Okay. And do you recall specifically what documentation that was added in?

A. When I knew about it, nothing. Coffee City knew about it, nothing. Surfside, nothing in my file. As soon as Jersey Village went and looked, the lieutenant told me there was correspondence emails between Bonsal and the county attorney -- or I'm sorry, the district attorney's office. He said there was more stuff in there. I've forgotten exactly what all he said, but that was the main one.

Q. Okay. And approximately what time did you apply for employment with Jersey Village?

A. That was within two months ago.

Q. And was there -- is there anything that was going on at that time in your life that would have preceded or would have been around that time that that occurred?

A. Yes, sir.

Q. And what was that?

A. This, the depositions of Bert Whittington's

case.

Q. And why do you believe your personnel file was changed at that time?

A. To dirty my file, to make me be an non-credible witness, which is the MO for departments.

Q. And did it have that effect at that time, as far as your deposition was concerned?

A. Yes, sir. It cost me the job at Jersey Village.

Q. Do you know of any other times, based upon your observations, that personnel files were changed at Precinct 3 concerning other individuals?

A. No, sir. Afterwards, I've heard people tell me.

Q. Did you have any conversations with Deputy Whittington surrounding the event with the juvenile and what happened on 5/28/20 that you haven't discussed or you haven't indicated so far?

A. Yeah. Yes, sir. We've talked about it before after the -- during the incident, obviously, and then afterwards.

Q. Okay. When you -- and when you discussed the incident with Deputy Whittington right after the incident, what did he say, if anything?

A. He made a claim that --

61

MS. SOSA: Objection; hearsay.

A. He made a claim that Sergeant Barringer struck the kid.

Q. (BY MR. ORTH) Did Deputy Whittington indicate how he knew that to you at all?

A. He --

MS. SOSA: Objection; hearsay.

A. He witnessed it, because it was just himself and Sergeant Barringer with the juvenile.

Q. (BY MR. ORTH) In your discussions with Deputy Whittington after the incident, did he tell you anything about why his body camera was not activated that you couldn't see evidence of at the scene of the juvenile on 5/28/20?

MS. SOSA: Objection; hearsay, compound.

A. I'm trying to remember. I know he lost one before. I don't know if it was during that time, that he just didn't have one or whether he just forgot to turn it on.

Q. (BY MR. ORTH) Okay. And based upon your experience at Precinct 3, was it normal or abnormal for constables or deputies to not have their body-worn cameras functioning or turned on while they were dealing with the public or with suspects?

A. I mean, it was policy to have it on.

62

Q. Okay.

A. You know, whether deputies did or not, it happened plenty of times.

Q. And were you aware of any other officer or deputy being disciplined for not having their body-worn camera on when they should have?

A. Me personally, I've done it quite a few times, and I never -- I forgot to turn my body cam on. I never got in trouble for it.

Q. Do you know of any other deputy that got in trouble for not having a body-worn camera on while in Precinct 3?

A. In trouble?

Q. Disciplined for that.

A. Not to my knowledge. When it comes to the CUI guys, I don't think any except Deputy Whittington.

Q. Was everybody, to your knowledge, in the CUI unit while you were at Precinct 3 issued a body-worn camera?

A. Yes, sir. And we all had to attend the class for it.

Q. Okay. And that would include supervisors also, such as Lieutenant or Major Villarreal and Sergeant Barringer. Correct?

A. Yes, sir.

63

Q. And are you aware, while you were at Precinct 3, whether there were any policies or procedures that would exclude supervisors such as Major Villarreal or Sergeant Barringer from using or wearing their body-worn cameras?

A. Not the policies and procedures I got, no.

Q. And you were a supervisor at that time. Correct?

A. Yes, sir. But I can tell you, I mean, that there are situations that Sergeant Barringer or Major Villarreal would order the deputies not to turn their body cam on.

Q. When would that happen?

A. For instance, one of my DEA deals involving kilos of narcotics, Deputy Cassandra Garcia was ordered not to have her body cam on during the interaction with the take-down.

Q. Do you know why that happened?

A. No clue.

Q. Should that have happened, according to the policies and procedures at Precinct 3?

A. No, sir, it shouldn't have happened at all, I mean.

Q. And approximately when did that happen?

A. I was already in DEA; so -- I mean, it was

64

2021, but I couldn't tell you the exact date.

Q. And do you know who ordered that deputy to turn off the body-worn camera?

A. Sergeant Barringer.

Q. Okay. Now, did you talk to anybody, after you did your report to Chief Bonsal, about the incident that happened on 5/28/20 involving the juvenile that you were involved in?

A. I mean, we talked about it, myself, Sergeant Barringer, and Major Villarreal. And, you know, I expressed my concerns that there was nothing to violate policy, nothing wrong. I mean, we just went back and forth. Nothing was ever actually formal.

Q. Do you have any -- other than what you've testified to already, do you have any knowledge concerning the investigation that was specifically done in this case regarding Deputy Whittington?

A. I'm sorry. Can you repeat it?

Q. Sure. What knowledge, if any, do you have other than what you've testified to regarding the investigations -- the two investigations done regarding -- for Deputy Whittington involving this case, involving the 5/28/20 issues?

A. The only one that I was privy to was the juvenile being bit.

Q. Okay.

A. Now, the other ones, I did hear -- if you're referring to one where he made a narcotics arrest and allegedly cocaine or something come up missing, I knew they conducted an investigation on that one. And along with that was a prisoner being handcuffed up front and brought back to the office.

Q. But you didn't have any involvement in that?

A. I watched the video of that one.

Q. Okay.

A. But writing something down formally on paper, no.

Q. Now, you said you watched the video. What video are you talking about?

A. The entire -- the body cam footage from Deputy Whittington. Because I believe allegations of money was missing, taken from the vehicle, so I was watching that and pretty much debunking that allegation. And the body cam remained on the entire scene, the entire transport, all the way back to 904 Dell Dale, the office, and up to the -- all the way through the interview with the suspect.

And then that's when I -- I quit watching it after they grabbed the suspect, did what they did with him. And I believe it was Deputy Whittington went

into the computer room and started physically tagging the evidence.

Q. If you watched that video, did you notice or do you remember on that video any times where Deputy Whittington was standing at the door and nobody but -- well, he was standing at the door to the interrogation room where the suspect was in?

A. Well, it --

MS. SOSA: Objection; calls for speculation.

A. It wasn't an interrogation room. It was our conference training room, to begin with. So I'd seen Deputy Whittington on his -- from his body camera at the threshold of the doorway on two occasions.

Q. (BY MR. ORTH) Okay. And based upon your experience at Precinct 3, when you're talking about that room, what is your opinion as to somebody standing at the threshold of the door outside there, whether they can look into and observe everything in that room?

A. It's basically a room like this. It's open. There's no adjoining walls or office walls or anything like that. It's wide open. It has tables just like this and chairs, so the visibility, I mean, is -- you can see it.

From that particular threshold of that door, you can see the entire room, including the corners of the four walls.

Q. And do you recall, as you sit here today, based upon your viewing of the camera -- body-worn camera footage of Deputy Whittington when he was standing at the threshold, whether it panned in and indicated or showed any part of that room on the inside on that video?

MS. SOSA: Objection; calls for speculation.

A. There was -- I mean, when you watch the video, there was plenty of times that Deputy Whittington would adjust his body and move towards the opening of the door. And you could see the entire room. And, I mean, that was just slight movement. He didn't have to walk around a corner or, you know, turn and do a complete 180. I mean, he just barely moved and you can see the room. And his peripheral is better than that camera lens, I guarantee you that.

Q. While you were at Precinct 3, did your body-worn camera activate when you left the vehicle, your vehicle?

A. Yes, sir. I ended up getting a new vehicle. We call them shops. When my overheads were manually turned on or my speed was turned on -- or I'm sorry.

**BRYAN SKERO - October 27, 2022**

When my camera was activated by too high of speeds without turning my actual lights on physically, or if I turned my lights on physically, it would automatically turn my body cam on.

Q. Were you one of the only deputies that had that capability, or were there other deputies that had that capability?

A. I'm not sure. Honestly, I didn't even know I had that capability. It was pointed out to me by Deputy Whittington.

Q. And when did Deputy Whittington point that out to you?

A. I couldn't tell you. I mean, it was a while after I had received that new vehicle.

Q. Did Deputy Whittington ever point out to you that he had requested that capability himself?

A. Yes, sir.

Q. And did he indicate to you whether he received it or not?

MS. SOSA: Objection; leading.

A. When he initially brought it up, he brought it up not only to me, but to Major Villarreal and Sergeant Barringer. He even -- I know he even took it upon himself to take it to VMC, which is the vehicle maintenance center on the east side, and do a request to

have that switch or whatever they call it, that button installed.

Q. (BY MR. ORTH) Do you know whether he ever received it?

A. No. The only thing he received, which we all received, was a nasty email from Major Villarreal.

Q. And what did the email say?

A. Basically telling us don't be trying to get add-ons to the vehicles without approval. It was either an email or text message. I mean, we did a lot throughout the work days in texts and emails.

Q. Now, I think you indicated earlier that not only were you a supervisor of the canine unit at Precinct 3, but you also had a dog?

A. Yes, sir.

Q. A canine dog. Correct?

A. Yes, sir.

Q. And how many dogs did you have while you were there?

A. One.

Q. And during the time that you were there and had the dog, did the dog ever bite any other deputy or suspect?

A. Yes, sir.

Q. On how many occasions?

A. He's bit a couple of suspects. He's bitten me. He's bitten other officers. I couldn't tell you an exact number.

Q. And during any of those occasions in which your canine bit somebody other than yourself, were you disciplined for that action?

A. No, sir.

Q. Other than Deputy Whittington, are you aware of any canine officer while you were at Precinct 3 that was disciplined for their canine biting either another deputy or a suspect?

A. No, sir, not for biting.

Q. Are you aware or do you have any knowledge of a Deputy Ross Wood being bit by Deputy Whittington's canine?

A. Yes, sir.

Q. And what knowledge do you have concerning that incident?

A. Deputy Wood was -- and it wasn't the first time he was instructed, and it was policy -- that whether it's a vehicle chase or a foot pursuit, bail out, that the canine is supposed to be the lead vehicle. And the reason we do that is because if there is a bail-out from a pursuit, that the canine has the line of sight of the suspect and there will not be any objects in his way via

officers or anything else. The canine's got to get deployed and go right after the suspect. That was the whole purpose of that policy.

Deputy Woods, he was fast on feet. He couldn't outrun a dog, but he thought he could and he attempted that. He tried that a couple of times. And in one instance he ran after a suspect that the canine -- that Deputy Whittington deployed the dog on, and he got bit.

Q. And to your knowledge, was it serious enough to go to the hospital and have medical treatment for it?

A. No. I know -- I mean, it was a good bite. Don't get me wrong. If he didn't go to the hospital, I can't remember, but he should have. But I know that I verbally reprimanded him for it, for running after a suspect when a canine was already released.

Q. So you verbally reprimanded Deputy Ross Woods?

A. Yes, sir.

Q. Do you know if -- did you say anything or indicate to Deputy Whittington that he did anything wrong in that situation regarding his canine?

A. Regarding the canine?

Q. Yeah.

A. No. No, sir. I didn't see any policy violations, as far as I know.

Q. And would you have been -- since you were the supervisor of the canine unit at that time, would you have been the person that would have instructed Deputy Whittington whether he did something wrong or did something that he shouldn't have against policies and procedures regarding his canine?

A. I would have been one of them, as well as Sergeant Barringer.

Q. Okay.

A. But since I had all the knowledge in canine handling, it was always brought on my shoulders.

Q. Do you know what experience Sergeant Barringer had with canine units at that time?

A. I don't think he ever handled a canine. He's been around them when he was in sheriff's department. I mean, he's been around them. That's about it.

Q. Do you have any knowledge of a Sergeant Bryant Howard being bit by Deputy Whittington's canine at a scene at some point?

A. I heard about that.

Q. Did you do any investigation or did you talk to Deputy Whittington regarding that incident?

A. I wasn't instructed to do any type of investigation on it. I just -- I found out, and I believe I asked him about it, what happened.

Q. When you say "him," who are you talking about?

A. I'm sorry. Deputy Whittington.

Q. And what do you recall, if anything, Deputy Whittington telling you about that incident?

A. That the canine -- everybody knew the canine was already deployed. They were supposed to hold perimeter, which a perimeter is obviously what it means. If the canine's actively on the ground, nobody -- no deputy is supposed to get involved in the scene itself. Just hang your perimeter around so the suspect doesn't go through. And I believe he didn't listen to that. He actually went into the path of the canine.

Q. And you've mentioned several times now that other deputies are not supposed to be in the vicinity of a canine when the canine is released. How is that disseminated, if at all, to the other deputies in Precinct 3?

A. Well, I'll clarify it up a little bit more. There is supposed to be another deputy. He's called a -- basically, he's like a spotter. Because the policy is if we're tracking somebody in the woods with our dogs, we've got to have somebody, another officer with us, but they're behind us. They're not up next to us or not in front of us. And it's in policy. And emails were disseminated out, as well. Because that was one of my big issues I had with the department, so I made sure that I passed my concerns on. And an email did get sent out department-wide about officers not interacting with the canines during while they're on the ground.

Q. Now, you indicated earlier in your testimony that once a canine is released and passes the perimeter, I believe you indicated about 10 feet out, that it's hard to recall the canine at that point in time when he's got eyes on a suspect or when he starts going after a suspect. Correct?

A. Yes, sir.

MS. SOSA: Objection; mischaracterizes testimony.

Q. (BY MR. ORTH) Did I say anything wrong that you didn't indicate earlier? Correct me if I'm wrong.

A. I think it was just you said perimeter line. It was just -- I forget what I called it.

Q. Okay.

A. I don't know the correct verbiage for it, but it's basically an imaginary line that at a certain distance.

Q. And once the canine passes that imaginary line at a certain distance and it's hard to call the canine back, would that also pertain to a suspect who puts their hands up or surrenders at that point in time?

MS. SOSA: Objection; leading.

A. Yes, sir. I mean, there's plenty of situations that I know personally a suspect goes to give up, but by then it's too late. They get hit by the dog. That's just the price of doing business.

Q. (BY MR. ORTH) Well, when you had your canine at Precinct 3, did you ever have an occasion where you released the dog and the suspect -- before the dog reached the suspect, the suspect surrendered or indicated in any way, shape, or form that they were surrendering?

A. Not in a live scenario. In training, yes.

Q. Okay. In training, is the dog trained stop at that point in time, or what is the dog trained to do?

A. I mean, it's a dog. If he listens, he listens. If he doesn't, he doesn't. And honestly, a lot of us canine handlers, you've got to understand the dog. When they pass that imaginary line, they're almost in full stride. So their speeds are pretty great. And for a dog just so come to a sudden stop, it's very hard for them. That's why they don't -- NNDDA and everything doesn't hound on you about it. But is it against policy violations or anything if a dog still bites them afterwards? Not at all.

Q. And do you recall in the incident involving the

**BRYAN SKERO - October 27, 2022**

juvenile in which you did an investigations of that, Deputy Whittington actually tried to call his dog off before it got to the juvenile suspect?

MS. SOSA: Objection; leading.

A. Yes, sir. I think I testified earlier that he did try calling the dog off five or six times --

Q. (BY MR. ORTH) Okay.

A. -- while the dog was in stride.

Q. And being the supervisor of the canine unit at Precinct 3, to your knowledge, should a deputy be disciplined if their dog does not respond in that situation where the dog is deployed already on a suspect and the individual deputy or the canine officer calls the dog back but the dog doesn't listen?

A. Not at all.

Q. Now, back around the time frame in May of 2020, were there policies and procedures of Precinct 3 as to where individuals should be handcuffed?

A. I believe so.

Q. Okay. And where would that have been, as far as where should they be handcuffed?

A. With their hands behind their back.

Q. And to your knowledge -- and I think you testified about this earlier -- the CUI unit didn't always comply with that policy and procedure. Correct?

A. Correct.

Q. And, in fact, I think you mentioned -- and correct me if I'm wrong -- that you even on several occasions were instructed or ordered to handcuff a suspect in front?

A. Yes, sir.

Q. And was this when you were with a canine or you had a vehicle with a canine unit in it or a dog in it?

A. Yes, sir.

Q. Did they only have one, or did they have more than one type of canine unit out at Precinct 3?

A. I mean, they had several canine units. If I'm not mistaken, the structure of the actual cage that goes inside the vehicle, there was two different types. It's called a 60/40, and then a full cage. 60/40 is 60 percent of it is the canine's, and then 40 percent is prisoner transport.

Q. And which kind of unit did you have, or did it vary?

A. I had the full canine kennel, no back seats.

Q. Okay. So if a suspect was transported in your vehicle while the canine was there, it would have had to be in the front seat. Correct?

A. Yes.

Q. Okay. And how many times were you asked to --

or did you need to transport a suspect while you had that canine in the back of your vehicle?

A. It was rare, but I did it two or three times that I can remember within that four-year span.

Q. Okay. And do you know what kind of unit that Deputy Whittington had, whether it was a 60/40 or the full cage or which one he had?

A. I want to say he had both at one time.

Q. Okay. Was it unusual for a deputy -- or I should say for a canine unit to transport suspects if, in fact, they had didn't have the back seat in them?

A. We were not supposed to. We're supposed to call out a district unit to come transport for us.

Q. And if there was another unit at the scene, would they normally transport the suspect, then, if the canine unit was there at the scene and couldn't transport because they didn't have a back seat?

A. Yes, sir.

Q. Now, what is your understanding as far as if you were a supervisor or another deputy at Precinct 3 and you saw a deputy break a policy or procedure? Would you have to report that, or is there a rule regarding reporting that to somebody?

A. I mean, it all depends on what the policy was. If I was going by the guidelines, yes, you report everything; but, you know, we had discretion. If it was just something minor, we would verbally correct them, maybe tell them "Hey, don't do that again. Just do this or, you know, whatever."

If it was something that was pretty major, then obviously, yeah, it would have to get documented.

Q. Do you recall what the policy and procedure was as far as suspects handling evidence while in custody?

A. Never. They're not supposed to. A suspect is not supposed to handle evidence.

Q. So that would be against policy and procedure?

A. Yes, sir.

Q. And would that be against policy and procedure if a supervisor such as Sergeant Barringer allowed that to happen?

A. Yes, sir. I don't -- honestly, I don't see why a suspect should ever handle narcotics unless it's an undercover operation and you've got to cooperate with a suspect. That, we do sometimes.

Q. There wouldn't be, to your understanding and knowledge, a reason that a suspect should handle narcotics, that's handcuffed, to identify the narcotics that are there. Correct?

MS. SOSA: Objection; compound and confusing.

**BRYAN SKERO - October 27, 2022**

A. No. There's no reason why they should be even touching the narcotics at all when they're handcuffed.

Q. (BY MR. ORTH) Well, since there's an objection, I'll reask the question in a different form. Is there any reason why a suspect should handle narcotics while handcuffed, to your knowledge?

A. No, sir.

Q. To your knowledge as a supervisor at Precinct 3, how is the arresting officer determined when there are multiple officers at the scene involving a suspect at Precinct 3?

A. Normally, the way that works is if there's an incident that occurs and there's multiple officers assisting, the deputy that initiated it is normally the lead deputy. He's the one that's going to, you know, be doing the charges, arresting the person basically, and writing the report up.

Q. And we're going to get into that. What duties would an arresting officer have regarding a suspect?

A. It ranges. It's different. It all depends on the situation. If it's a pretty good scene where a lot of deputies are involved -- like in our situation with the CUI, when I did a lot of my DEA deals, it involved such a large amount of narcotics that there would be multiple deputies on scene with me. We've done it to

where one deputy takes the narcotics evidence and one transports. Me being the initial officer, I would write the narrative up in word form. Sometimes another officer would go ahead and do the charges, and I'll just copy and paste my narrative over to him and he'll fill everything in for me.

I mean, everybody's got a different role, and we never really had to tell each other what to do. Everybody just kind of jumped in and did their little thing, tried making the process a lot faster.

Q. And according to the policies and procedures of Precinct 3, would the arresting officer then be responsible for all the other actions that the other deputies are doing, such as you indicated in processing narcotics, you know, arresting, booking, and all the other stuff?

A. A deputy?

Q. Yeah.

A. No, not at all.

Q. So the arresting officer is not responsible for other deputies that assist them in the booking, the dealing with the narcotics, all that stuff that happens with a suspect?

MS. SOSA: Objection; leading, compound, confusing.

Q. (BY MR. ORTH) Let me rephrase the question. What is an arresting officer responsible for that arrests a suspect at Precinct 3?

A. They're responsible for, obviously, the suspect getting put in jail, and then the charges filed, and the case report completed.

But like I said, during an incident like that, a supervisor is ultimately responsible for all the deputies. I mean, another deputy cannot tell another deputy what to do. He could, but there's no repercussions if he doesn't do it. I mean, who's that guy to tell him to do something? There's no rank structure for them to listen to.

Now, a supervisor, yes. That's different, which in many case on my scenes involving my incidents, Sergeant Barringer will show up and he'll have deputies do specific tasks, although I was the arresting officer, I was the initialing officer. But as far as an officer being responsible for other officers' actions, no, not at all.

Q. And in any of the arrests in which you were an arresting officer at Precinct 3 and a supervisor was present, did you have the responsibility or would you have the responsibility to tell the supervisor what to do or not to do?

A. Responsibility? No. Could I? Yes. Responsibility? No. I mean, I'd get laughed at basically.

Q. Have you ever told a supervisor when you were the arresting officer to do something involving the investigation?

A. Not told. I asked. Not told. Because I already knew what the answer would be. And it's insubordination, so...

Q. So it would be insubordination in an investigation if you were the arresting officer and you told the supervisor to do something involving that investigation?

MS. SOSA: Objection; leading, compound, confusing.

A. Yes, it would.

Q. (BY MR. ORTH) And to your knowledge, would an arresting officer be responsible if he asked another deputy to supervise a suspect while he's going to the bathroom and the deputy that's supervising does something that's against policies and procedures --

MS. SOSA: Objection; leading.

Q. (BY MR. ORTH) -- while the arresting deputy is in the bathroom?

MS. SOSA: Objection; confusing.

A. What was the first part of it?

Q. (BY MR. ORTH) Sure. Let me rephrase it.

A. I'm sorry.

Q. To your knowledge, would an arresting officer, while they're in the bathroom and they asked another deputy to take care of the suspect or to be with the suspect while they're in the bathroom, and the deputy that's watching the suspect decides to walk away or leave the suspect unattended, would the arresting officer then be responsible for that deputy's actions?

A. Not at all.

Q. You indicated that other deputies help you when you're the arresting officer, as far as packaging narcotics or dealing with narcotics. Correct?

A. Yes, sir.

Q. And if that was done outside your presence, would you be responsible for any misfeasance or violations of policies and procedures the deputy that was packaging the narcotics did?

A. I don't think so, no, sir.

Q. Okay.

A. If they were asked and they accepted that task, they're ultimately responsible for it.

Q. And then would that also pertain to if a deputy was asked or volunteered to package narcotics and some of the narcotics went missing while in the possession of that deputy? Would the arresting officer then be responsible for that deputy's -- the missing narcotics while that deputy had sole control of it?

A. No, sir.

MS. SOSA: Objection; compound and confusing.

A. No, sir.

MR. ORTH: We're at a point now that I can stop. And since it's 12:40, we can do lunch.

MS. SOSA: Sounds good.

(Lunch recess from 12:42 p.m. to 1:55 p.m.)

(Exhibit #5 marked.)

Q. (BY MR. ORTH) Let me hand you what's been marked as Exhibit Number 5 to your deposition and ask you to look through that and see whether you've ever seen that before or parts of it before. And I'm mainly focusing on the pages numbered 87 through 94.

A. Yes, sir, I recognize it.

Q. And what is it?

A. It is the report that I typed that I was instructed to by Chief Bonsal in regards to the incident that took place on May 28th involving Deputy Whittington.

Q. And this is, except for Page 87 and Page 95, what you handed to Chief Bonsal after you completed it. Correct?

A. This is, but it's missing a page. And as I believe I stated earlier, it was the Garrity warning.

Q. Now, directing your attention to Page 87, in the middle of the page, do you see where it says "Note"?

A. Yes, sir.

Q. Okay. And you wrote, "it is not common for an actively engaged canine to listen to the command to stop biting once engaged due to the stress, anxiety, and adrenaline, and therefore isn't normally frowned upon." Where did you get that information?

A. That's just common knowledge throughout canine schools, academies, whatever.

Q. And have you found that out in your own experience?

A. Yes, sir.

Q. And in your opinion, is that what happened regarding the incident that you were investigating in Exhibit Number 5?

A. Yes, sir.

Q. Okay. And the incident we're talking about in Exhibit Number 5 would be the one dealing with Deputy Whittington and K9 Zane. Correct?

A. Yes.

(Exhibit #6 marked.)

Q. (BY MR. ORTH) Let me hand you what has been marked as Exhibit Number 6 and ask you whether you've ever seen that before.

A. Yes, sir.

Q. Okay. And what is it?

A. It's my supplemental report.

Q. The supplemental report to what?

A. The actual incident that occurred on May 28th.

Q. Okay. And first of all, is everything in there that you've read true and accurate, to the best of your knowledge?

A. Yes, sir.

Q. Turning to Page 2 of the exhibit, looking at the third-to-last sentence where it starts with "The male suspect made small talk," do you see that?

A. Yes, sir.

Q. And we may have talked about this earlier. Did you understand, you know, the small talk or the conversations that were being discussed at that point in time that you're referencing there?

A. Where it said "The suspect made small talk where he advised he was shot several times," he spoke that in English.

Q. Okay.

A. And then the second part he began speaking in Spanish to his sister.

Q. And you understood what he was saying to his sister. Correct?

A. Yes, sir.

Q. And is that what we had talked about earlier?

A. Yes, sir.

Q. Does Exhibit Number 6 refresh your memory as to anything else that was said between the suspect and his sister other than what you've testified to already?

A. Other than, you know, him using vulgar language during it, this was pretty much it.

Q. And I don't know if I asked you this before, but did you have a body-worn camera on during this part of the investigation?

A. I don't think I did. The only thing I had on was my in-car that was recording, because my disk, since I had to activate my lights, which, in turn, it kicks your -- automatically it turns your recorder on. So it was recording from the time I was driving until the time I physically shut it off when I was going home after that incident, after that scene.

Q. Okay. Now, during your investigation concerning this incident on 5/28/20 as exhibited in Exhibit Number 6, did you view any -- and Number 5, I'm sorry -- did you view any other deputy's video that was in their car that was taken concerning the scene of any of those deputies that were on the scene?

A. The only one I was privy to was Deputy Whittington's.

Q. Do you know whether there was any other video available to you from any deputy regarding the incident in Exhibit 5 and 6?

A. Not that was available to me.

Q. Okay.

(Exhibit #7 marked.)

Q. (BY MR. ORTH) Let me hand you what's been marked as Exhibit Number 7 and ask you whether you've seen that before.

A. Yes, sir, I've seen this.

Q. Okay. And what is it?

A. It's a certification of completing the canine handler course class.

Q. Okay. And would this be a class that was certified by NNDDA?

A. Actually, that class is certified by Harris County Sheriff's Department.

Q. Okay.

A. The after portion when it comes to certifying the canine, the instructor, which is Sergeant Moore, Chris Moore, he is a certified NNDDA instructor, as well.

So as soon as we complete the class, the academy, he will go ahead and certify the handler and the canine as being NNDDA certified as long as they passed.

Q. Okay. And according to Exhibit Number 7, Deputy Whittington did pass. Correct?

A. Yes, sir.

Q. Is that a requirement for canine units to pass the course exhibited in Exhibit Number 7 before they're actually able to use a canine at Precinct 3?

A. At Precinct 3, yes, sir.

(Exhibit #8 marked.)

Q. (BY MR. ORTH) Let me hand you what's been marked as Exhibit Number 8 to your deposition and ask you whether you can identify that or whether you've seen it before.

A. Yes, sir. I believe that's the first half of the academy.

Q. Okay.

A. The actual narcotics side of it.

Q. Okay. So would this be something also that Deputy Whittington would have had to pass in order to have a canine at Precinct 3?

A. Working on the streets, yes, sir. It would be the -- actually, you've got to pass the academy itself and then the NNDDA, as well.

Q. So would this 120 hours of course instruction be included in the 360 in the prior exhibit?

A. I believe it's separate, if I'm not mistaken. The way they do the class is typically the first two or three weeks of it, the 120 hours is narcotics-based. And then the second portion of it is, if your canine is a tracking canine or a bite canine, you continue with the class. Because there are some guys that attend it that their dogs are only going to be certified narcotics, so that's why they break the class up in two.

Q. Okay. And this 480 hours would not have been all that a deputy such as Bert Whittington would have had to go through to operate as a canine unit in Precinct 3. Correct?

A. Yes, sir. That was one of the stipulations we put on canine handlers.

Q. Now, in your experience at Precinct 3, was it common for the administration, since you were a supervisor, to require deputies to modify their incident reports?

A. To modify them? No. Make corrections, yes.

Q. Okay. And what do you mean by "make

**BRYAN SKERO - October 27, 2022**

corrections"?

A. Misspelled words, just any dates that are out.

Q. All right.

A. Because the way that process works is we'll complete the report, and we will submit it for approval. A supervisor looks at it. If he sees something that needs to come corrected such as misspelled words or something like that, he'll send it back. The deputy will make the corrections, forward it back for approval, and then it gets approved.

Q. Now, if you do an IAD investigation and you were -- the officer that's doing the investigation receives a written statement by one of the witnesses and doesn't like the statement or it needs some more information, it would be typical for them to go back to the witness and ask them to redo the statement or add additional information that was not in the first one?

A. I think it would all depend on the situation. I know in the past, I've -- that happened to me and I'd have the -- the witness explain it in detail what they were talking about.

But if I provided them another statement form, I would -- obviously I would keep the original one and put it in the file. And then the second one they complete, that would go in the file, as well.

93

Q. So if a witness was asked to do more than one statement in an IAD investigation, both -- how many statements they make should be incorporated or part of the file. Correct?

A. Yes, sir. It's all evidence.

Q. Now, to your knowledge, who was the custodian of records for Precinct 3 while you were there?

A. I dealt with three different personnel, civilians on that.

Q. Would one of them have been Paulette Green?

A. Yes, sir.

Q. And did you have any experience in whether the civilians could release records without the approval of somebody in a command position at Precinct 3?

A. No. They would have to get approval. And then they -- if it had to be redacted, then obviously they had to get permission -- approval to get it redacted.

Q. And who had the authority at Precinct 3 while you were there to authorize what documents would go out or what would be redacted?

A. Deputy Chief Bonsal.

Q. Now, while you were at Precinct 3, based upon your knowledge of the policies and procedures, would it be a violation of the policies and procedures of Precinct 3 for deputies to have sex with each other on

94

government property while on duty?

A. Yes, sir.

Q. Are you aware of that ever happening while you were at Precinct 3?

A. I've heard -- I heard stuff, yes, sir.

Q. And what did you hear?

A. Deputies in CUI that slept with another deputy on the couches up there, to other deputies going to other people's houses while they're on duty and having sexual relationships with other people.

Q. And would it also be a violation of the policies and procedures if that happened, instead of on government property, on someplace else, as long as if it was on company time or what you would call whether they were on the clock as far as Precinct 3 was concerned?

A. Yes, sir. It didn't matter if it was, I mean, a government building or if it was somebody's house. But if they were on County time, yes.

Q. And the few times that you had knowledge of that, do you know whether these individuals were ever disciplined for that or not?

A. I'm not -- I don't believe they were, that I know of.

Q. Okay. Were there any limitations that you're aware of as far as working off duty while at Precinct 3?

95

And I'm not talking about being on the clock at the same time. Were there restrictions as far as what you could or couldn't do?

MS. SOSA: Objection; confusing.

A. As far as working extra jobs, we were -- it had to get approved. There was extra jobs that -- I mean, you know, we couldn't work strip clubs. They really tied our hands on anywhere that would have -- might give a bad eye on the department if they were caught working it or if they got involved in an incident.

Q. (BY MR. ORTH) And I know you've talked about sex clubs. Would that involve also a swinger wife-swapping sex group party?

A. Yes, sir.

MS. SOSA: Objection; mischaracterizes prior testimony.

A. Yes, it would.

Q. (BY MR. ORTH) So if an individual deputy was doing that as an extracurricular job while being at Precinct 3, they would be violating the policies and rules of Precinct 3. Correct?

A. Yes, sir. I'm familiar with what you're --

Q. Are you familiar with any incident involving that?

A. Yes, sir.

96

Q. And what knowledge do you have?

A. Deputy Suarez, which is CIU, that was an extra job that he worked. Apparently he's been working it for some time, for years. I know that. And he was -- I know he was told not to work it one incident when they were local, and he worked it anyway.

Q. And who told -- if you know, who told him not to work that job?

A. Both Major Villarreal and Sergeant Barringer.

Q. And are you aware of whether they knew that he worked it anyway or not?

A. Yes, they knew. It was in texts.

Q. And do you know if Deputy Suarez was disciplined at all for that?

A. I know they talked to him; but as far as any discipline, I'm not sure. I doubt it. I never saw any lost days that you had to get suspended without pay or anything.

Q. Would it be a violation of the policies and procedures at Precinct 3 for a deputy to buy any type of prescription pills from someone not legally authorized to sell them?

A. And against the law, both.

Q. Are you aware whether that happened at any time while you were at Precinct 3?

A. Yes, sir.

Q. And what were the circumstances involving that?

A. I had a deputy that contacted, I guess, somebody he knew that dealt with stuff like that, pharmaceutical narcotics, and invited them to the 904 Dell Dale at the police station.

What we call the drug dealer shows up. The deputy went out there. They did a transaction in the vehicle in the parking lot of the police station. He came upstairs and two administrative individuals gave him $20 apiece for the product that he purchased.

Q. And who was the Deputy that did this, if you know?

A. Suarez.

Q. And who are the ones -- the individuals that gave him the $20?

A. Sergeant Barringer and Major Villarreal.

Q. And do you know if any of those individuals were disciplined for that action?

A. Not at all.

Q. Now, are there any policies and procedures regarding if you're driving your police car at Precinct 3 and you run into another police vehicle, as far as reporting that?

A. Yes, sir. It's considered a fleet, which is a reportable incident.

Q. And if a police officer doesn't immediately report that, would that be a violation of policies and procedures at Precinct 3?

A. Yes, sir.

Q. Are you aware of any deputies that did that while you were at Precinct 3?

A. Yes, sir.

Q. And what information or circumstances do you have knowledge of?

A. Deputy Johnson, Doug Johnson, was at 904 and struck Major Villarreal's vehicle -- patrol vehicle, and failed to notify anybody and then left the scene.

Q. And do you know whether he was disciplined for that or not?

A. I know that Sergeant Barringer was starting an investigation on it. I attempted to pull the video from 904, but it was not working at the time. I personally never heard of any discipline coming down on him except just talking to him.

Q. Now, we talked a little bit earlier about a Brady list. And can you explain for the ladies and gentlemen of the jury, you know, concerning Harris County, what the Brady list is?

A. Well, I would like to clarify. There's two different Brady lists. There's the Texas Brady list, which that's through, I guess, the governor's office. It's on the website. You can check an officer to see if he's on the Brady list. That's public information.

And apparently, to my knowledge, I just found out that the district attorney of Harris County has their own list that they may reference it as their Brady list. And from my knowledge of how that works is a department would take a -- I guess, type up a -- do an investigation, type up a recommendation to the district attorney's office to have that certain deputy put on a list for various reasons. Dishonesty, I know, is one of them.

And then from what I understand, the district attorney's office is supposed to do their investigation and not just take the word of an untruthful department and figureheads and do their own diligence duty and decide if that person should be on the list.

Q. And what is the consequence, to your knowledge, of being on Harris County's so-called Brady list?

A. Ultimately, it -- the officer or deputy, whoever, it hurts them to where they can't get a job anywhere in Harris County, even outside of Harris County, depending on the agency.

**BRYAN SKERO - October 27, 2022**

Q. And did you find out whether you were on the Harris County's Brady list?

A. Yes, sir, I did. I found out I was.

Q. And when did you find out?

A. Soon after Jersey Village visited Precinct 3 to pull my file.

Q. And do you know who put you on the list or recommended that you be on the Brady list for Harris County?

A. Bonsal.

Q. And did you find out why Chief Bonsal had you or recommended that you be put on the Brady list for Harris County?

A. Untruthful stories he told.

Q. And do you know what untruthful story that he was referencing to put you on the list?

A. Lieutenant Hawley with Jersey Village, when he looked at the files, he saw corresponding emails between Bonsal and the DA's office putting me on that list, and he said I was dishonest.

Q. Was there any or did you learn of any reason or circumstances of how you were dishonest?

A. Apparently it was because I hurt Major Villarreal's feelings for looking at other employment somewhere else without giving him heads up on it.

Q. And how did that happen?

A. What started it was I was working -- I was in DEA. I was assigned an Enterprise lease vehicle. I ended up crashing it, totaling it out. Bonsal ended up giving me a three-day suspension, which I felt was unfair, seeing that Sergeant Barringer totaled out two patrol vehicles and a civilians's car and got a slap on the hand, which I made that known.

And then, you know, I told some -- the DEA what happened, the reason I wasn't going to be at work for three days. They -- you know, they had choice words to say, as well. But another gentleman, a guy that worked up there, said that the sheriff of Wharton County was interested in me coming over there.

So I didn't make any -- the only plans I made was just to go visit and talk to them. The DEA asked if they could go with me because they wanted to get a working relationship with Wharton County, as well.

So I got a phone call from Major Villarreal, I think it was Sunday or Monday, asking me if I was happy at the department. And I said yes and no. I said, "I don't appreciate how" -- and I'll say it -- "Bonsal's screwing everybody over, all the deputies, when they try leaving or the way he's firing them." I said, "And the way he did me with the crash,"

I said, "I'm not happy with that."

He asked me if I recently applied at -- I think it was Splendora, and I told him no. I made inquiries. I talked to the chief and the captain there, but I never applied.

So that pretty much ended the conversation. It was found out that the next day, Villarreal spoke to DEA. They made the comment that they were going with me on a Thursday to Wharton County to talk to the sheriff.

And the DEA called me immediately afterward and said, "Hey" -- just giving me a heads up, saying, "Hey, we didn't know they didn't know about Wharton." And their exact words were, "Isaac's pissed off and he's taking you out of DEA." So they knew it before I knew it.

And then about 30 minutes later I get a phone call from Sergeant Barringer telling me to report to 904 on a -- I believe that was a Tuesday. And he was -- they're going to want a meeting with me, Isaac-- or Villarreal and Barringer.

So unbeknownst to them I showed up, had the meeting. Isaac -- or Villarreal advised me that he was -- I hurt his feelings and that I lied to him about looking for employment somewhere else; and that because I hurt his feelings, he's pulling me out of DEA, out of

canine, demoting me from supervisor, and putting me on duty on patrol.

Q. Okay. Now, first of all, you mentioned Isaac. Is that the same as Villarreal?

A. Yes, sir, Isaac Villarreal.

Q. Okay. And did any of that happen that they told you what was going to happen?

A. Immediately.

Q. And when you left Precinct 3, what type of discharge were you given?

A. Honorable.

Q. And would that be something that you should have received if you were -- or an officer receives when they're untruthful or they lie about certain things when they're being discharged, to your knowledge, if you know?

A. No. I mean, if they were either terminated or left on conditions that they were -- they lied, it shouldn't be an honorable discharge.

Q. So were you surprised when you found out you were on the Harris County Brady list?

A. Yes, sir.

Q. Other than Chief Bonsal recommending that individual deputies be on the Harris County Brady list, is there anybody else at Precinct 3 that you're aware of

that has the ability to do that?

A. No, sir, except I'm sure the constable himself, but that's if he ever shows up.

Q. Now, going back to Exhibit Number 2, remember the definition of harassment or -- let me let you look it up there. Have you got it there?

A. Yes, sir.

Q. Okay. Based on that definition or using that definition, have you ever witnessed or observed discrimination or harassment as far as race is concerned at Precinct 3 while you were there?

A. Yes, sir.

Q. And give me the first instance that you observed as far as racial discrimination at Precinct 3.

A. Well, like I explained earlier with mine, that what I wasn't privy to, that other races were. I know of a couple of times that I know Deputy Whittington was left out of a lot of assignments and different activities, as well.

Q. And when you say assignments, what assignments and activities are you talking about?

A. I mean, it would be to off-duty stuff, going over to people's house for a party, going to games. Sports games, parties, birthday parties, stuff like that.

Q. When officers were sent out to a dangerous situation, are they assigned different positions as far as, you know, whether they're in the front of the assaulting unit or the unit that's going out there or in the rear? Are they assigned different positions like that at Precinct 3?

A. It all depends on what the assignment is. For instance, if we're doing a search warrant on a house, we have a predisposition of who's going to be where and what their duties are. You've got a door kicker, somebody that kicks the door open. If we had flashbangs, you know, somebody who could pull the flashbangs. People that break the window and give you entry into.

Q. And what position would a canine unit be involved in something like that?

A. Canines are usually three to four behind the stack, which a stack is the entry team.

Q. And would it be unusual for a canine unit to be in front of the stack?

A. Tactically, it's ignorant. Ignorance on whoever make that plan. I can tell you that it's unusual to have a canine up front.

Q. And would that be one of the most dangerous positions in the stack, in the front?

A. Yes. Altogether, yes. And especially with a canine, yes, because one of your hands is always on that canine.

Q. Now, you talked about as far as discrimination with Deputy Whittington, as far as off-duty parties and not being involved in other things. Were there any racial slurs that were used by any deputies there that would involve race discrimination that you were aware of?

A. Yes, sir.

Q. What racial slurs can you remember at this point in time?

A. We have group texts just made up of the CUI units. Then we have individual text messages of supervisors, myself, Sergeant Barringer, and Villarreal, Corporal Pereda. So we had separate messages, but it's mainly -- I can't remember if it was in the group or the supervisor one, but Sergeant Barringer using the N word.

Q. All right. Other than Sergeant Barringer using the N -- when you say the N word, what are you talking about?

A. N-I-G-G-E-R.

Q. Other than Sergeant Barringer using the N-I-G-G-E-R word, was there any other racial slurs that you were aware of while at Precinct 3?

A. I mean, what I testified earlier, the memes where everybody knew what it was. You know, when it was a black snake, like a cartoon snake, everybody knew what it was because Bert was the only African-American in the group.

Q. And do you know who Kelvin Jason is?

A. Yes, sir.

Q. And who is he?

A. He was a deputy.

Q. And what race was Kelvin Jason?

A. African-American.

Q. And are you aware of any racial discriminatory actions taken against Kelvin Jason while he was a deputy at Precinct 3?

A. Not off the top of my head, that I can remember.

Q. Okay.

A. I knew he -- something happened and he's no longer there. I don't know if that had anything to do with it, though.

Q. All right. Was there a specific reason why some deputies would get newer cars compared to other deputies getting older vehicles? Do you know how that was determined at all?

A. It's supposed to be through seniority or who --

**BRYAN SKERO - October 27, 2022**

I mean, seniority when it come to, you know -- with my part, that's how I got a new vehicle. But also the -- whoever had the oldest vehicle or the worst-off vehicle, maintenance-prone vehicle.

But normally on something like that, it would boil down to seniority. Because it would be like if I had an older -- a little bit older model vehicle and Bert had the most maintenance-problem vehicle, if a new one comes up, I would get the new one. Bert would get mine because I had the seniority.

But when it came to canines, that division, it was a little bit different, because that was a must that we had to have proper working equipment by federal law.

Q. Do you recall any racial discrimination or slurs that happened involving the George Floyd murder at Precinct 3?

A. Yes, sir.

Q. And what were the circumstances?

A. The other ones were -- when I say the other ones, the other officers, including Sergeant Barringer and Major Villarreal, everybody had their different opinions on what happened. Some were more verbal with it more than others, to the effect of saying that he deserved what he got. And even making comments about

Bert, "I don't understand how somebody that's Republican can stoop down to that level and become -- or talk the way he does about George Floyd, knowing that he's in the wrong."

Q. Well, was there any racial comments that were involved in that at all?

A. I mean, it was all -- everybody knew what it was over, but it wasn't come out and said right out.

MR. ORTH: Could we take a ten-minute break at this point in time? I may be done.

MS. SOSA: Yes.

(Recess from 2:36 p.m. to 2:50 p.m.)

Q. (BY MR. ORTH) Are you aware that Deputy Whittington applied to Harris County Precinct 2 for employment?

A. Yes, sir.

Q. And how did you become aware of that?

A. I talked to Deputy Whittington himself. And then I made a phone call to the new constable, Garcia, you know, as a friend. I told him that I know Deputy Whittington applied. And he said, "He's hired on. He's good to go. We've just got to do the formalities."

Q. And did Deputy Whittington get hired on at Precinct 2, to your knowledge?

A. No, sir.

Q. Do you know why?

A. From what I understand, a phone call was made to his office by Precinct 3 bad-mouthing him.

MR. ORTH: Pass the witness at this time.

MS. SOSA: Okay. Can we go off the record for two minutes and let me organize my notes?

MR. ORTH: Sure.

(Recess from 2:52 p.m. to 2:53 p.m.)

EXAMINATION

BY MS. SOSA:

Q. Okay, Captain Skero.

A. Yes, ma'am.

Q. So my name is Susana Sosa. I'm an assistant Harris County attorney, and I represent Harris County in this lawsuit, along with my co-counsel.

And so let me ask you this. What did you do to prepare for today's deposition?

A. I showed up early and just had a short meeting with Phil and them, and that was it.

Q. Okay. And so besides having a short meeting with -- with Mr. Whittington's attorney, did you speak with any other person?

A. Mr. Baumgartner was present, as well.

Q. Okay. And did you review any documents in preparation for today's deposition?

A. No, I don't -- I mean, I have -- like after we started, I had. I looked at these that were provided, but not beforehand.

Q. Okay. All right.

A. I'm sorry. The only one I saw or looked at was this Exhibit 1, the email I had.

Q. Okay.

A. Saying to be here. That was it.

Q. Okay. Now, looking at that email which, you know, we're referring to Exhibit 1, which is the notice of intention to take your deposition, were you subpoenaed to appear for today's deposition?

A. Yes, ma'am. As far as being provided to me?

Q. A subpoena? Yes.

A. Yes.

Q. By subpoena were you required to be here?

A. Yes, ma'am.

Q. Okay. Good.

MS. SOSA: Off the record.

(Discussion off the record.)

MS. SOSA: Okay. Back on the record.

Q. (BY MS. SOSA) All right. So after receiving the subpoena -- so that means that you're testifying voluntarily at today's deposition. Correct?

A. Yes, ma'am.

Q. All right. And you are a captain with -- is it the city of Coffee City, Texas. Right?

A. Yes, ma'am.

Q. Okay. Are you on duty right now?

A. No, ma'am.

Q. Okay. I see you're wearing your uniform, so I was wondering. So what are your duty days and hours?

A. I make up my own, honestly.

Q. Okay. How is that?

A. As long as I get 40 hours in a week, I can come in Monday, Tuesday, Wednesday; Wednesday, Thursday, Friday; whenever I want, honestly.

Q. Okay. So do you get paid by the hour?

A. Salary.

Q. Salary? Okay. And you have to report 40 hours?

A. Yes, ma'am.

Q. And who do you report those 40 hours to?

A. My chief of the department.

Q. Okay. What's the name of the chief?

A. John Portillo.

Q. John Portillo? Okay. And so going back to the chronology, when you were -- when you were part of the CUI unit, you testified that you were part of the CUI -- I guess the crime interdiction unit. Correct?

A. Yes, ma'am.

Q. With Harris County Constable Precinct 3. All right. So you testified that you were also kind of like, I guess, in a supervisory position?

A. Yes, ma'am.

Q. Since you were in the canine situation, since you were kind of like supervising the canine aspect?

A. It was a little bit more. It was the canine, and then also a corporal with the department, CUI.

Q. Okay. And you would agree with me that's kind of like a supervisor position?

A. Yes, ma'am, it is.

Q. Like over deputies, I guess?

A. Yes, ma'am.

Q. Okay. So back in the time when -- so going back through the chronology when you testified that when you were in that position, you had a lot of leeway because, you know, you were part of that CIU unit. And so you testified that you also -- you know, there was another -- the testimony went long and I cannot remember exactly the chronology, so help me out. So when you were in that -- during that time period. Okay? You mentioned that you testified that you observed several things and, you know, name-calling and things like that. So going back to Exhibit 2 with regards to reporting

violations, during that time, you mentioned you did not report any of the items that you witnessed to anybody, did you?

A. I didn't have to.

Q. You didn't have to report discrimination?

A. No, ma'am.

Q. Okay. Let me refer you back to Exhibit 2.

A. And the reason was that the supervisors were already present over me.

Q. Okay. And so when you witnessed those supervisors allegedly discriminating or having inappropriate behavior against County policy and against TCOLE policy, you chose not to actually go ahead of them and go beyond your command to report those actions, didn't you?

A. It wasn't my place to do that.

Q. It was not your place to do that?

A. No, ma'am.

Q. And even though you were a supervisor?

A. Yes, ma'am.

Q. Even though you were not a supervisor where you witnessed discrimination, including harassment or retaliation, you actually chose not to report it or go beyond that?

MR. ORTH: Objection; asked and answered.

A. It was already reported. The supervisors were privy to the same conversation and everything I was.

Q. (BY MS. SOSA) And you understand that the supervisors are the ones that were actually discriminating against Mr. Whittington?

A. On some occasions, yes.

Q. Okay. Which were the other occasions?

A. Oh, I mean, I couldn't even give you dates or nothing, but it was through small talk, common talk, either in the office or on text, group text.

Q. And you didn't go beyond your chain and report that?

A. No.

Q. Okay. Then during that time, you also testified that you felt discriminated by Major Villarreal at some point based on your color or your race. Is that right?

A. Yes, ma'am.

Q. Okay. And just to clear up the record, your race is Caucasian. Right?

A. Yes.

Q. And the color White. Correct?

A. Looking at me, yes.

Q. Okay. All right. And so, but you never filed a complaint like a formal complaint of discrimination

against, you know, major Villarreal or against the County. Correct?

A. Just the verbal to him.

Q. To him? Okay.

A. Yes.

Q. And you were actually promoted. You mentioned that you were promoted to corporal. Right?

A. Eventually, yes.

Q. Okay. Right. So you never filed an EEOC charge?

A. No.

Q. Okay. So with regard to Sergeant Hutchins, you mentioned that you were not part of his -- you didn't review his investigation. Right? His IAD investigation?

A. No, ma'am.

Q. Okay. But you were aware that he actually resigned and you knew pretty much he was going to be terminated. Correct?

A. Yes, ma'am.

Q. Because of his comments?

A. Honestly, I thought he was fired. I thought he got fired.

Q. Right.

A. I didn't know.

117

Q. Okay. I cannot testify, so I'm going to stop right there.

Now, I'm going to continue trying to stay in the chronology. So when you were asked by Chief Bonsal to review the canine incident involving, you know, Deputy Whittington and you were -- and you completed your review and you reviewed, you know, the body-worn camera and then you communicated your findings, that -- you weren't actually -- after completing that report, you were actually not part of the entire -- you actually did not sit on the review board, the disciplinary review board pertaining to Mr. Whittington's case?

A. Correct.

Q. Mr. Whittington's disciplinary case. Okay. You were not in charge of the actual IAD investigation pertaining to that canine bite. Correct?

A. For the actual bite?

Q. Correct. The entire IAD investigation.

A. To me, when it was presented to me by Chief Bonsal, that's what I thought I was doing was the canine portion of it.

Q. Okay. And he went to you because of your experience with the canine and he just wanted to get you to review the canine situation. Correct?

118

MR. ORTH: Objection as to speculation.

A. That, and I'm, you know, the supervisor of the canine.

Q. (BY MS. SOSA) Okay. And so you testified that, you know, as a canine, you know, with a lot of experience with canines -- an officer with a lot of experience with canines, you -- you know, when canines pretty much, you know, pass certification, they're pretty much canine and they are basically on the job with a handler. So would you agree with me that the same way, you know, when a canine -- even though a canine is actually certified, there can still be, you know, trouble with them. Correct?

A. What do you mean?

Q. So let me explain this. I mean, let me give you the comparison. Just because an officer or a law enforcement officer is a certified law enforcement officer, it doesn't mean that -- they can still need improvement, there can still be actual areas in which they may have issues and that require them to go back to traditional training?

A. Yeah. I think that's consistent with life in general.

Q. Okay.

A. Not just canine law enforcement stuff like

119

that.

Q. So you would agree with me that if an officer has knowledge that a canine -- you know, based on some issues with a canine, that they have a duty to report that. Correct?

A. Issues with a canine?

Q. Yeah.

A. I mean, it depends on what issues. I mean, it's so broad.

Q. Well, if a canine actually is not -- is defective -- that is, not responding to commands or there are some issues, you would agree with me that you have a duty as a canine handler to report a deficiency pertaining to the canine that you handle. Correct?

A. Yes, if it involves -- yes.

Q. Okay. And that's just basically just to -- you know, to promote if there's anything that needs to be improved on the canine. And at the end of the day, it's to prevent liability. Correct?

A. Yes.

Q. Okay. So you testified also that you witnessed -- I mean, again I may have jumped in the chronology a little bit, but I'm sure this happened when you were still in the CUI unit, in the crime interdiction unit. You mentioned that you witnessed

120

**BRYAN SKERO - October 27, 2022**

Deputy Flores and other deputies doing some inappropriate actions, having sex or things like that. You didn't report those items. Right?

A. No. The supervisors knew about it, too.

Q. Okay. But even if the supervisors knew about it, you actually didn't go and through the chain of command to report that issue. Right?

A. No. I mean, there's nobody else I could go to.

Q. No?

A. No.

Q. Not Chief Bonsal or a constable?

A. No. I mean, I don't trust him. I never have.

Q. Okay. What about the constable?

A. No. He was never at the office.

Q. Okay. That makes sense. But what about even filing an anonymous complaint with the Harris County Fraud Hotline, you know, or something like that. You didn't even think about that. Right?

A. No, because the supervisors knew about it, so I figured they would do something about it. I go through the chain of command. I'm not the type to jump chain of command.

Q. Okay. But in this particular case, you didn't go to the chain of command. You didn't say anything about it -- right? -- at the time.

A. Because they knew about it already.

Q. Okay. All right. So now coming back to the more recent times, so I know that you left the County and joined the city of Coffee City, Texas, as a captain in December of 2021. But -- so you actually received -- in September of 2021, you actually received a three-day suspension. You were actually removed from the crime interdiction unit, sent back to patrol. And then you were actually demoted to deputy. Is that correct?

A. Because of the accident?

Q. Yes, I believe it was.

A. No, that's not correct.

Q. Okay. So tell me, what is your recollection as to why you were -- you received a three-day suspension, you were demoted, and you were actually removed from the CIU unit in September of 2021.

A. I was -- for the crash -- my crash I had already received a three-day suspension and that was it.

Q. All right. So nevertheless, you received a suspension, you were removed from -- at the end of the day, you were actually removed from the crime interdiction unit and placed on patrol and demoted to deputy. And that was by Major Villarreal. Correct?

A. He was the one that relayed the information, yes.

Q. Okay. All right. So -- and that happened in September?

A. What? I'm sorry. September, which one now?

Q. September of 2021.

A. I don't know the exact date when the crash was and then when the demotion and everything was, because that was a separate incident than the crash.

Q. Okay. All right. So -- but anyway, so if you -- so that would basically -- that basically shows that you -- you know, starting in September or after that time when you were actually taken out of the crime interdiction unit, things were not the same as the time when you were in the unit and, you know -- and you received a lot of leeway. Correct? Things had started to become more difficult for you. Correct?

A. No.

Q. No?

A. No.

Q. So your relationship with Major Villarreal and Sergeant Barringer and, you know, I guess with your superiors was actually fine after you were removed from the CUI unit?

A. After I left?

Q. After you were removed from the crime interdiction unit.

A. I mean, we never -- there was never any issues. I mean, I don't know what you're referring to.

Q. The fact that you were demoted, you have no -- you would say that you had no issues with that?

A. Oh, yeah. No, no. I did on that, yeah.

Q. Okay.

A. The demotion and getting taken out of DEA and canine, yes.

Q. Okay. All right. So going back to my original question, things were not the same after that with Major Villarreal pretty much. Correct?

A. Correct.

Q. Okay. Now, you also mentioned that you noticed, when you were asked by Chief Bonsal to review the canine incident, that they were -- this is -- I'm using your words, they were after Whittington. So when -- I mean, you would agree with me that whenever there is an investigation, a department investigation, that there is a subject employee who is related to that investigation. Correct?

A. Yes, I believe so.

Q. And that the person related to that incident, the subject employee, was Mr. Whittington. Correct?

A. Yes.

Q. And that may be the reason why you were asked

to review Mr. Whittington's footage. Correct?

MR. ORTH: Objection; speculation.

A. Why? I don't understand. Why I was asked that?

Q. (BY MS. SOSA) Right. So if you were asked to review Mr. Whittington's footage because he was the subject of the IAD investigation. Okay? So it was normal for you to have been asked to review that footage. Correct?

MR. ORTH: Objection; speculation.

A. I assumed it was because I was a supervisor and I was over the whole canine program for Precinct 3.

Q. (BY MS. SOSA) Okay. And they relied on you for that?

A. Yes.

Q. Okay. And so you have been -- you mentioned that you have been a police officer -- I mean in law enforcement for over 17 years. Correct?

A. Eighteen, almost nineteen.

Q. I apologize. Nineteen. Okay. And I know that -- I mean, I understand, when it comes to BWCs, that they haven't been around for that long. Okay. And when it comes to BWCs --

A. Body-worn camera. Correct?

Q. Body-worn cameras, yeah.

A. Okay.

Q. So my understanding is that -- yeah, BWCs. My understanding is they haven't been around that long. Now, you mentioned that you actually had gotten away with a lot of things with regard to BWCs. When was that?

A. Ma'am?

Q. When was that you were saying that you were actually told not to turn on your BWC?

MR. ORTH: Objection as to mischaracterizing his testimony. Go ahead.

A. I mean, I couldn't tell you when. I don't know. I mean, it was throughout just times that -- I mean, it would depend on the situation sometimes.

Q. (BY MS. SOSA) Right. And you would agree with me that an officer has discretion -- correct? -- in certain circumstances.

A. An officer?

Q. An officer.

A. Not based on just his -- him doing it. He has to be instructed by a supervisor. That's the only way a body camera can be shut off or not turned on.

Q. Okay. So when an officer is actually on the field and the supervisor is not sitting next to them, you would agree with me that he is required to follow

policy. Correct?

A. Depending on the situation, yes.

Q. Right. Okay. But it's not up to the officer. At the end of the day, they're supposed to follow policy. Correct?

A. Well, depending on the situation.

Q. All right. And if the situation involves the use of force, you would agree with me that's a big deal. Correct?

A. I agree.

Q. And then you also testified that -- that you were not part of the IAD review board disciplinary action involving Mr. Whittington. And as you sit here today, you haven't reviewed the disciplinary letter pertaining to Mr. Whittington. Correct?

A. No, ma'am, I haven't.

Q. Okay. So you have no idea why he was actually terminated. Correct?

A. No, ma'am, I don't.

Q. Okay.

MS. SOSA: I have no further questions, subject to any additional questions of opposing counsel.

MR. ORTH: I don't have any further questions. You're done.

MS. SOSA: I reserve further questions until the time of trial.

(Proceedings concluded at 3:16 p.m.)

**BRYAN SKERO - October 27, 2022**

C E R T I F I C A T E

STATE OF TEXAS    )
                          )
COUNTY OF HARRIS  )

I, Lucy Johnston, Certified Shorthand Reporter in and for the State of Texas, duly commissioned and qualified, do hereby certify that the foregoing is a true, correct, and complete transcript of the proceedings in the foregoing captioned matter taken by me and transcribed from my stenographic notes.

The original deposition and exhibits were delivered to Mr. Philip J. Orth, III, Custodial Attorney.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office at Houston, Texas, this the 6th day of December, 2022.

Lucy Johnston
Texas CSR No. 3847
Expiration Date:  7/31/23

Lucy Johnston Reporting
Texas Firm Registration No. 450
1225 North Loop West, Suite 327
Houston, Texas  77008
(281) 385-9088

Time used by each party:

Mr. Philip J. Orth, III - 02:57
Ms. Susana G. Sosa - 00:24

129

**LUCY JOHNSTON REPORTING**
**(281) 385-9088**