**KELVIN JASON  -  October 28, 2022**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

BERT W. WHITTINGTON, III §

        Plaintiff, §

vs. §    CIVIL ACTION 4:21-cv-03220

KIRK WAYNE BONSAL, JR., §
ET AL §

        Defendants. §

***********************************************

ORAL DEPOSITION OF

KELVIN JASON

October 28, 2022

***********************************************

        ORAL DEPOSITION OF KELVIN JASON, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on the 28th day of October, 2022, from 10:05 a.m. to 11:38 a.m., before Lucy Johnston, CSR in and for the State of Texas, reported by machine shorthand, at 602 Sawyer Street, 2nd Floor conference room, Houston, Texas, pursuant to the Federal Rules of Civil Procedure and any provisions stated on the record or attached hereto; Rule 30(b)(5) requiring an on-record reporter's statement was waived.

---

A P P E A R A N C E S

FOR THE PLAINTIFF:
    Mr. Philip J. Orth, III
    Law Offices of Philip J. Orth, III, P.C.
    16406 Lamplighter Street
    Crosby, Texas  77532
    Phone:    (713) 520-8333
    Fax:      (772) 217-8162
    E-mail:   philip.orth@yahoo.com
FOR THE DEFENDANTS:
    Ms. Melissa G. Martin
    Ms. Susana G. Sosa
    Harris County Attorney's Office
    1201 Franklin Street, 13th Floor
    Houston, Texas  77002
    Phone:    (713) 274-6700
    Fax:      (713) 368-9278
    E-mail:   melissa.martin@harriscountytx.gov

ALSO PRESENT:

    Mr. Bert W. Whittington, III
    Mr. Eric L. Baumgartner
    Chief Kirk W. Bonsal, Jr.

---

I N D E X

                                                Page
Appearances ....................................    2
Stipulations ...................................    1
Certificate ....................................   55

EXAMINATION                                     Page
By Mr. Orth ....................................    4
By Ms. Martin ..................................   45

EXHIBITS

Number    Description                           Page
1    Notice of Intention to Take the Oral
     Deposition of Kelvin Jason ............    5

2    Harris County Precinct 3 Policies
     and Procedures, Section 4:
     Non-Discrimination and
     Anti-Harassment ......................   10

---

KELVIN JASON,

having been first duly sworn, testified as follows:

EXAMINATION

BY MR. ORTH:

    Q.  State your full name for the record, please.

    A.  Kelvin Dewayne Jason.

    Q.  And, Mr. Jason, have you ever given a deposition before?

    A.  No.

    Q.  Okay.  I'd like to make some agreements with you to make it easier for you, me, and the court reporter.  Okay?  The first agreement I'd like to make with you is that you allow me to give you a full question and stop talking before you answer the question, and I'll give you the same common courtesy of allowing you to complete your answer before I interrupt you with an another question.  Okay?

    A.  Okay.

    Q.  The second agreement I'd like to make with you is that you give verbal responses to the questions that I'm asking, because the court reporter can't take down a shake of the head or nods or anything like that.  So you have to give a verbal answer.  Okay?

    A.  Okay.

    Q.  And the last agreement I'd like to make with

---

**EXHIBIT 6**

**KELVIN JASON - October 28, 2022**

you is that if you don't understand any question that I ask, that you let me know and I'll rephrase the question. Because if you answer the question, I'm going to assume that you understood the question. Okay?

A. Yes, sir.

(Exhibit #1 marked.)

Q. (BY MR. ORTH) Let me hand you what's been marked as Exhibit Number 1 to your deposition and ask you whether you've seen that before.

A. No, I have not.

Q. You haven't seen the notice for your deposition yet?

A. Well, I think maybe it was emailed, yeah.

Q. Okay. Exhibit Number 1 was the notice you should have received indicating what time --

A. I think he emailed me this --

Q. Okay. So you did --

A. -- or at least something like that.

Q. Okay. So you received something indicating you're supposed to be here at 10 o'clock for your deposition. Correct?

A. Yeah.

Q. Okay. And what is the highest level of education that you have taken?

A. High school diploma.

Q. Okay. And who are you are currently working for?

A. Coffee City PD.

Q. And what do you do for Coffee City?

A. I'm a policeman there.

Q. And when did you start with them?

A. July -- somewhere around July -- or I think it was August.

Q. August of what year?

A. This year, 2022.

Q. What are your duties as a policeman for Coffee City?

A. Patrol. Basically the only thing I really do is run traffic. That's not the only thing, but we do a lot of traffic.

THE REPORTER: I'm sorry. Can you repeat that?

THE WITNESS: I said that's not the only thing, but we do a lot of traffic.

Q. (BY MR. ORTH) You might have to speak a little louder so the court reporter can hear you.

A. All right. Sorry.

Q. And now, when you started with Coffee City as a policeman, did you receive a employee manual there?

A. Yeah, a manual.

Q. And did you read that manual?

A. Yes.

Q. And did that manual discuss discrimination at all?

A. Yes. It said they were an equal opportunity employer.

Q. Okay. And have you received any training since you've been in Coffee City as a policeman?

A. No.

Q. Okay. And who was your previous employer prior to Coffee City?

A. Harris County Precinct 3.

Q. And when did you start with Harris County Precinct 3?

A. I started with Precinct 3 October the 7th of 2004.

Q. And what were your duties at that time with Precinct 3?

A. At that time, I was a reserve. And I came out and drove with the full-timers pretty much every day. I got on full time April the 16th of 2005, and my duties were patrolling the Parkway Forest area. And that's on the east side of Houston. It's a neighborhood between Tidwell and John Ralston -- on Tidwell between Beltway 8 and John Ralston.

Q. And when did your duties change after that, if at all?

A. They didn't. I worked patrol for the 16 years that I was there.

Q. And when --

A. I --

Q. Go ahead.

A. I did become an FTO. I don't remember exactly when. It was shortly after Sherman Eagleton's administration took over. I was recruited by Craig Berry. He said he wanted me to be one of his FTOs. So I trained a lot of officers.

And a little while later -- I think it was 2020 or '21, I got certified as a TCOLE instructor. So I started as new instructor class for the new probationary deputies.

Q. Okay. Can you explain to the ladies and gentlemen of the jury what an FTO is?

A. A field training officer.

Q. And what would a field training officer do for Harris County Precinct 3?

A. When new hires come in, they're assigned to an initial field training officer. And they train with that officer for a four-week period, I think it was. And then they go to a different FTO.

**KELVIN JASON - October 28, 2022**

So you're training them on pretty much everything they do. Patrol, policies, procedures. The objective is to make them a good cop.

Q. And, now, you also mentioned a TCOLE instructor. Can you explain to the ladies and gentlemen of the jury what "TCOLE" means and what your duties would be for that?

A. TCOLE is the Texas Commission on Law Enforcement. And TCOLE instructor means that you're certified to give classes on TCOLE-required classes. Those classes could be anywhere from building searches to active shooters to highway traffic stops, arrest, search, and seizure. You know, you actually give classroom instruction on these courses, and then you do practical application.

Q. Now, when you were at Precinct 3, did you receive an employee manual while you were there?

A. Yes.

Q. And did you read through that manual?

A. Yes.

Q. And did that manual have any instructions regarding discrimination?

A. Yes. It also says it is an equal opportunity employer.

Q. Okay.

(Exhibit #2 marked.)

Q. (BY MR. ORTH) Let me hand you what's been marked as Exhibit Number 2 to your deposition and ask you whether you've ever seen a copy of that (handing).

A. I don't remember seeing this.

Q. Okay. I'm submit to you that I received that as part of the Harris County -- I should say, Precinct 3 employee manual regarding their discrimination policy. Okay? And I don't know what year it was from, so it may have been after the point in time which you left or not. I don't know.

A. Okay.

Q. But anyhow, what I want you to focus on in Exhibit Number 2 is the section under 4.013. Do you see that there?

A. Yes.

Q. And I'm going to focus on what the definition of harassment or harassing conduct is there. Okay?

A. Okay.

Q. All right. Those are the next questions I'm going to be asking you. And based on what's in Exhibit Number 2 in Section 4.013, do you believe you've ever been discriminated against while you were at Harris County Precinct 3?

A. Yeah, I'd say that I was.

Q. And how were you discriminated against?

A. Well, I feel like I was treated differently than White deputies who would conduct either worse or the same amount of -- let's just say, for instance, if I had a car crash and I got disciplined for it, I got put into older cars, cars that weren't up to par. And in a different instance where a White Deputy would get into a car crash, it wouldn't be long before he's driving a brand-new car.

I feel like I wasn't treated fairly when it came to promotions. There was an incidence where we had a sergeant's -- what they call a sergeant's assessment, and I took the assessment. And there was a panel sitting in front of me consisting of lieutenants, sergeants, and a major and a captain -- actually, I think -- I don't know. I'm not sure if it there was a sergeant there, but I know there were lieutenants, captains, and majors -- after which I was told that I did an excellent job. I felt like I did an excellent job, but I was told that I didn't pass.

During that time in which, from what I understand, as far as I know, there were no Black deputies promoted out of that class after that assessment.

When I first -- I think it was the first sergeant's test that we took, I was hurt. I had hurt my ankle. I had torn my Achilles tendon, and I told the Chief Deputy at the time, Milton Rivera, that I was hurt and I was -- I was I wasn't back yet. I was still walking on what they call a peg leg. And I told him, "I'm on medication. I can't take this test on this medication. I don't feel like I'm going to be very effective."

And he said, "Well, you have to take it. There's no excuse." So I hobbled up there and I took the test, and of course I failed it.

However, I was employed with the -- I was assigned to the Harris County Water District Number 36 at 903 Hollywood Boulevard. We shared an office with -- we didn't share the actual office space, but we shared the building. They wanted to promote me. I was already a sergeant, so they wanted to promote me to lieutenant, but I was told that Precinct 3 said no because they didn't want supervisors -- and this is why they made me take the test, because even though I was already a sergeant and 100 percent contract, they didn't want supervisors in contracts unless they were supervising over multiple people.

I said, "Okay." Later on I find out there was a lieutenant who was working in environmental or IAD

**KELVIN JASON - October 28, 2022**

or whatever it was they had assigned him to. His name was Bill Warden. He was a lieutenant working in IAD, from what I understand, by himself, and he's White.

Q. Okay. Now, going back to the first incident that you talked about, you had indicated there was a -- you were in a car crash, and there were other -- there was other deputies that were in car crashes that didn't -- were treated differently than you. What other deputies do you believe were treated differently than you were?

A. Well, for one, Sergeant Barringer. He rear-ended another deputy's car speeding to some call. He ran a car in the back of him, and he wasn't driving an old piece of crap.

Q. All right. Do you know if Sergeant Barringer was disciplined in any way, shape, or form for that incident?

A. I don't know what goes on behind closed doors, but I don't believe so, no.

Q. And what race is Sergeant Barringer?

A. White.

Q. Are there any other non-African-American officers that were treated differently as far as a car crash was concerned compared to you?

A. Douglas Johnson. He committed --

Q. And what was the situation with Deputy Douglas Johnson?

A. He committed FSGI in a county vehicle, hit the major's vehicle.

Q. Okay. When you say FSGI --

A. I'm sorry.

Q. -- you have to understand we're going to be showing this to a jury and they don't know these terms that you're throwing out here. So can you explain what an FSGI is?

A. Failed to stop and give information. He crashed into a major's vehicle, drove away, didn't report it. He got asked about it and lied about it, but he still works there.

Q. Do you know if he was disciplined for that?

A. No, I don't know.

Q. Okay.

A. But I know it wasn't filed on him.

Q. When you say "it wasn't filed on him," what do you mean by that?

A. He didn't have charges brought against him.

Q. So when you say "charges," what type of charges are you talking about?

A. Failure to stop and give information charges, a Class B misdemeanor.

Q. And when you were in a car accident, how were you treated?

A. Let's see here. Where do I begin? Let's try to begin. I got into a car accident on ice, hit some ice, struck two vehicles. One was a mirror. My mirror hit the mirror of his. I was going back to see what I hit. He caught up with me, and I gave him my information.

Leaving out of the neighborhood, I hit another vehicle, slid on the ice. I went home to get the insurance information and ultimately take it back over there.

Precinct 3 had gone out and done an FSGI, failure to stop and give information report. And I was contacted by Lieutenant Simpson the next day. And he asked me, "Did you get into an accident?"

I said, "Yeah." I told him about the one where I hit the mirror.

He asked me, "Did you get into another accident?"

I thought about Kirk Bonsal who I was afraid of because he had already tried to get me up on a different incident that he found out it wasn't my fault. I had nothing to do it.

Q. Now, why were you afraid of Chief Bonsal?

A. Because he had already had me investigated in an IAD investigation about supposedly not going to a call. And then he finds out that it wasn't me, although he -- from what I found out through the sergeant who was investigating the case, he wanted to push that "Yes, I did something wrong" -- "Yes, he did something wrong. You need to find out what he did wrong."

Well, she completed her investigation and it wasn't me. It was a mistake between the dispatch and the female White deputy who went to the call. She --

Q. And who was -- I'm sorry. Go ahead.

A. Her name was Rebecca Mason. She went to the wrong Dollar General.

Q. Any other reasons why you were afraid of Chief Bonsal at that point in time?

A. Well, the fact that I stood up to Major Villarreal and I knew that they were friends. And I felt like they didn't like me from when I stood up to him over these cars. And I felt like at any given moment that he had, that he could find to get rid of me or ruin my career, he would go after it.

Q. And when you say --

A. And he did.

Q. And when you say "he," who are you are talking about?

**KELVIN JASON - October 28, 2022**

A. Bonsal.

Q. Okay. Now, getting back your accident, you had talked to Lieutenant Simpson. And what discussion did you have with them?

A. I told Lieutenant Simpson that a friend of mine was driving the car. I lied to him. I told him that a friend of mine was driving my truck.

And he told me, "Okay." He said, "Hey, captain wants to see you in his office tomorrow morning at 10 o'clock."

I said, "Okay." So I had an order to go to the office. All right?

So I go to the office and I said, "Captain, look." Me and Captain Elkin had a -- I would say a pretty good relationship. And I am not a liar, so I couldn't sit there and say my friend was driving. Number one, I didn't want my friend to get in trouble over something that he didn't do.

So I went in there and I said, "Look, I'm here to tell you the truth. I was driving my vehicle. I hit the vehicle. I went home and got my insurance and took back over there later on and gave it to the vehicle.

Okay. So he says, "Hey, we haven't done an IAD investigation -- have not done an IAD investigation.

---

We have not done an administrative investigation. So if you resign, it's like you're saying thank you for the 16 years. I'm moving elsewhere. Okay?"

I said, "Hey, Bonsal doesn't like me. Neither does Villarreal. Is Bonsal going to try to interfere with this?"

He says --

Q. And how did you know that Major Villarreal didn't like you?

A. I wouldn't like you either if you got on me about something and called me a sorry son of a bitch.

Q. That's what Major Villarreal called you?

A. I didn't call him that, but I said it.

Q. Okay.

A. There was an incident where I crashed a car, and they put me in an old car, an old Crown Vic. And that car almost killed me. I was running hot to a call, made a turn, and the car went straight. I had already been upside down in a ditch over a car with the previous administration, because I had put the car in the shop five times in one week for the brakes. They didn't fix it. The car ultimately turned over when I was running hot. The car turns over, lands in an 8-foot ditch, and I get Life-Flighted. Six operations later, I pulled through.

---

So I took this car that they gave me, that Villarreal put me in, this Crown Victoria. I said, "I can't drive this car. It almost killed me, so take it to the dealership."

The mechanic said, "We've got to down this car."

So they put me in a -- sharing a Charger with a guy.

While I was sharing the Charger, Lieutenant Evans tells me one night, "Hey, I've got you back in a Tahoe."

I said, "Okay."

He goes, "You're going to be sharing with Terrence Brimley" (phonetic).

I said, "Okay." So I started sharing with Terrence Brimley.

I came into work one day, and some of the administration I noticed that were there were having a meeting, I suppose. And I got my stuff, got in the Tahoe, went out on patrol.

The next morning -- forgive me, I don't know the exact dates on this, but the next morning Lieutenant Evans calls me and he says, "Hey, you've got to turn that Tahoe in."

I said "What?"

---

He said, "Well, somebody saw you getting out of the Tahoe here in the office and they blew a gasket. They said, 'Why is Kelvin Jason driving a Tahoe? Kelvin Jason wrecks cars.'" Mind you, under Sherman Eagleton, I had only crashed one car.

Q. Now, I hate to interrupt, but when you're talking about the different kinds of cars, was one car better or assumed to be better than another car there at Precinct 3?

A. Oh, yeah. The Tahoes were the go-to. Everybody wants a Tahoe, you know. Well, everybody wants a new car. I'll put it that way.

Q. Okay.

A. If this was a Crown Vic that had 20 miles on it, everybody would be chomping at the bit to get it, you know, but it wasn't. It was a car that had over 100,000 miles on it that was falling apart, and that's what they wanted me to drive.

Q. Who wanted you to drive that?

A. Bonsal. Whoever was over the cars. I don't know who was over the cars. At that particular point in time, Villarreal assigned that car to me. I'll put it this way. That car before they gave it to me was a carpool car, which means everybody, when their car goes to VMC, vehicle maintenance for -- to get something

fixed or something happens and the car gets towed to vehicle maintenance. Then they go to the carpool and they have to pull whatever car is there for them to drive that day. So everybody drove this car before I got it.

Q. And did you perceive that as discrimination against you or something wrong against you?

A. Yeah, because I watched incidents where White deputies would get into an accident or something with a car, and when the new cars come in, they're driving a brand-new car. Their car -- my -- I only got -- well, this was with the previous administration, but during my 16-year career with Precinct 3, I never got a brand-new car handed to me. You know how I got a brand-new car handed to me?

Q. How did you get a brand-new car handed to you?

A. Barringer had a Tahoe -- I think it was Barringer who had a -- a Charger. That vehicle had -- didn't have very many miles on it at all. And they were getting rid of the cars -- there was one car left at VMC, but this car rolled off a wrecker when they were delivering it to the vehicle maintenance and the car got crashed. The whole front side of it apparently had to be replaced. The bay arms or whatever they had to replace. It had a significant amount of damage. That's

how they agreed to give me a new car, because it had already been crashed, was their idea.

Q. Now, going back to what you were discussing earlier as far as Lieutenant Simpson indicating that you had not done a -- they had not done an investigation with you?

A. This was Captain Elkin.

Q. And you were seeing Captain Elkin. What happened after you saw Captain Elkin?

A. Well, before I left there, Lieutenant Simpson gave me this guy's phone number that owned the truck that my mirror hit. I forget his name. I think it was Gaytan or something like that was the last name. He gave me his number and said, "Call the guy and see if he'll make an agreement with you so you don't have to file it on your insurance."

I said, "yeah, you're right."

So I called the guy or I texted him. I said, "Hey, mean, how much is your mirror going to cost on your truck?"

He said $200.

I said, "Do you mind if I pay you $200 so you don't have to file it on my insurance?"

He said, "Yeah. You buy me a mirror, we're good. We're square."

I said, "Okay." So I cash-apped him $200, and he cancelled the claim.

So the other people, the lady, she had gotten my insurance information. And she called me on the phone and she says, "Hey, I just wanted to call and let you know that I got your information. I appreciate you dropping off the information, and I don't want anybody to get in trouble for this. You know, I'm satisfied, because I had just bought that car for my son and he was pretty upset about it."

And I said, "Well, I have full coverage insurance and, you know, everything should be taken care of. My insurance company is pretty good." I had GEICO.

Q. So she didn't indicate that she was going to do any prosecution or any claims or anything like that. Correct?

A. No. She said she didn't want anybody to go to jail. She didn't want anybody to get in trouble over it.

Q. And the first individual that you hit in that collision also indicated that -- or they indicated that they weren't going to prosecute or they weren't going to try to get you criminally investigate or start a criminal investigation on you. Correct?

A. Correct.

Q. So what happened after you had the conversation with the lady concerning this auto accident?

A. That was the -- I think it was the next day or later on that night I got a call from Lieutenant Simpson about it all. And that's when he came to my house and explained to me that Captain Elkin wanted me to go to the office and talk to him.

So I went in. And when he asked me about -- when he told me about they didn't do any kind of investigations and it was just like me saying "Thank you for the 16 years, I'm going elsewhere. We're going to give you an honorable discharge."

I said, "Okay."

He said, "We have not done an IAD investigation. We have not done an administrative investigation. It's just like me saying 'Thank you for the 16 years. I'm moving elsewhere.'"

I said, "Okay." I said, "Wait a minute." I said, "Is Bonsal going to try to interfere with this?"

He said, "No."

I said. "Bonsal doesn't like me. Neither does Villarreal."

Q. So why did you think that Chief Bonsal or Major Villarreal were going to interfere with you leaving Precinct 3?

**KELVIN JASON  -  October 28, 2022**

A.  Number one, I felt like the reason -- part of the reason that they didn't like me was because I was Black and I wasn't one of their so-called pets.  I don't know how else to explain that.  The guys that they like that they get to do things with them, that they pamper and give new police stuff to and promotions to and new cars.  And "You want to go to CUI?  Fine.  You can go to any division that you want to go to," you know.

I wasn't that guy.  I was the guy.  I was the guy that wanted to come to work, training my PPDs, teach classes.  That's where my home was.

Q.  Did you find it unusual that basically they were asking you to resign after 16 years?

A.  I felt -- I couldn't believe it, but I felt like "Okay.  It's not a surprise to me."  Because I felt like Bonsal had been after me, and I gave him a reason by lying to him.

Q.  What do you mean "by lying to him"?

A.  I told him that a friend of mine was driving my truck initially on the second accident.

Q.  And why did you lie to him?

A.  Because I was afraid of what he might do to me.  I was afraid.  I pretty much knew that there was no point in trying to reason with them, because they weren't going to -- it was -- it was a done deal.  Had I been Troy Barringer or Douglas Johnson or somebody like that, maybe I would have been taken care.  Bobby Thurman, you know, he's another one of the "in" boys.

Q.  So after the conversation you had with Major Villarreal regarding resigning, did you, in fact, resign?

A.  Captain Elkin.

Q.  Oh, I'm sorry.  Go ahead.

A.  Yes.  Before I resigned, I asked Captain Elkin, "Is my job pretty much done here?"

And he says, "Kelvin, yeah.  You know, your job is pretty much done here."

I said "Okay."

So he called -- after he told me that they hadn't done any investigation, he called Bonsal on the phone and he explained to Bonsal, "Hey, I got Kelvin in the office.  He's wanting to resign.  We haven't done any administrative investigation.  We haven't done an IAD investigation.  This is just like Kelvin saying 'Thank you for the 16 years,' and he's moving elsewhere."

He hangs the phone up with Bonsal and he says, "There you go.  Honorable discharge."  He gives me the honorable discharge.

I go home.  I resign.  Elkin filled out my resignation form for me and I signed it.  They gave me the honorable discharge.  I go home.  I'm at -- I'm thinking, "Okay, everything is over."  I know it's over.  Once I leave that office with an honorable discharge, this thing is over.  My career at Precinct 3 is over.  Any -- any and everything that I leave there, it stays there.  It's a done deal.  Right?

Q.  All right.  So what happened after you received the honorable discharge that would indicate that you that something else was going on?

A.  Well, I went home and I get -- I'm trying to decipher all of this stuff, like what just happened, you know.  I'm just trying to coming to grips with never working the Precinct 3 again.  Because like I said, that was my home.  And I loved working that area.  I loved the people that I worked around.  I made a name for myself in the community, and I was known as "Cowboy."

So I get a call from Captain Elkin and he says, "Hey, Kelvin."  And I'm looking up at the ceiling kind of rolling my eyes because I know there's some BS about to come down the pipe.  He says.  "We just got a call from TCOLE."

I said, "Okay."

He says, "TCOLE says we have to give you a general discharge rather than an honorable."

And I said, "Captain, why in the hell would" -- can I speak freely?

Q.  Well, why -- I mean --

A.  I said, "Why in the hell would TCOLE say some shit like that?"

Q.  Okay.

A.  Sorry.  Those were my exact words.

Q.  And what response did you receive from Captain Elkin?

A.  He says, "Well" -- his exact words were, "Well, when we send these things in, TCOLE requires a response.  The response that I gave them, they said we have to give you a general discharge."

Okay.  Me, knowing that that was a lie, I said "Okay."  I hung up the phone with him.  And I called TCOLE and I asked TCOLE, "In a situation where a deputy resigns, the agency gives them an honorable discharge, and they send the honorable discharge to you guys, do you contact that agency and change that discharge?"

And she tells me, "No.  We don't change discharges.  That is up to the agency who's issuing the discharge."

And I said, "Okay."  Now, mind you, during the course -- during that time -- well, I'll get to

**KELVIN JASON - October 28, 2022**

that, but I -- initially generally speaking, I talked to two directors at TCOLE, and they represented -- the first one, I don't know. I think she was maybe a secretary or something. I don't know what she was. But I've spoken to the two directors at TCOLE who have both told me TCOLE does not change your discharge.

They said, "Now, if you get something of a higher class, you know, like a felony or something like that or something they t1hink they need to look into, they will refer you to their1" legal department at TCOLE.

Q. So at that point in time, you had an honorable discharge and a general discharge?

A. I hadn't had the general yet.

Q. Okay.

A. I didn't know how serious they were until Magana showed up at my house. I think it's Margaret Magana.

Q. Okay. And when she showed up at your house, what happened?

A. She came to get my uniforms. And she handed me an envelope and she tells me -- I was on the phone at the time with my attorney asking him about the fact that they just gave me an honorable discharge and then turned it around to a general. Because it's like they're --

you know, you're having to leave there. I'm already hurting and emotional because I just lost my job. And I'm like, "Okay. Well, at least they gave me an honorable discharge, so they kind of understand."

And then you kick me in the nuts by turning around and having the sergeant show up at my house and hand me a general discharge and then telling me, "The captain said you can just tear that other one up."

So, of course, my attorney said, "No, you're not tearing up shit."

Q. And what, in your mind, would be the difference between an honorable discharge compared to a general discharge?

A. I served 16 years honorably. I went out there, I did my job. I turned people's lives around. I impacted people's lives. Like I said, I was well-known in the community as a good guy. And for you to tell me that after 16 years I made a mistake by crashing into a vehicle and then I made good on my mistake by making sure that these people were taken care of, you're going to tell me that I served okay by giving me a general discharge?"

Q. So after you received this -- you had the honorable discharge, but after you received the general discharge, what's the next thing that happened, if

anything, regarding either one of the discharges?

A. After the general discharge, I got a call from Lieutenant Simpson. And he told me, "Hey, people wrote statements saying that they didn't want to pursue any charges. They were satisfied that you took care of their vehicles. Case closed. We are not doing anything criminal."

I said, "So I can go work somewhere else?"

He said "Yes."

I said, "Will you give me a letter of recommendation?"

He said, "Yes," which he did.

Q. And did you apply to go someplace else?

A. Yes. I went to Precinct 2 Constable's Office.

Q. And did you apply to Precinct 2?

A. Yes.

Q. And did you get a job at Precinct 2?

A. No.

Q. Why not, if you know?

A. I'd like to elaborate on that part, if I may.

Q. Well, just indicate why you didn't get it, if you know?

A. I got -- I initially received the information that I was getting the job at Precinct 2. After a two-week period of time, I hasn't heard anything, so I

inquired as to why. And then I checked my mailbox and I got a rejection letter stating that I was basically rejected. And it didn't say those exact words, but what it did say was "the reason is confidential and will not be disclosed to you."

Q. Did you ever find out what the reason was why you were rejected for --

A. I have a good --

Q. -- employment at Precinct 2?

A. I have had a pretty good idea.

Q. And what's that idea?

A. Bonsal blackballed me.

Q. What do you mean by "Bonsal blackballed" you?

A. He contacted Precinct 2, and whatever he told them changed their minds about extending employment to me, so...

Q. Now, as far as the accident that you were in, were you ever criminally prosecuted for that?

A. I was criminally charged.

Q. I'm sorry. Charged. Were you ever criminally charged for that?

A. Yes.

Q. And what's the circumstances concerning that?

A. It got dismissed. But the reason that it happened, after I thought everything was said and done,

**KELVIN JASON - October 28, 2022**

the case was closed. I didn't get a job at Precinct 2. I know he had something to do with that -- that Bonsal had something to do with that. I just kind of chilled out for a minute.

I get a text message on my phone from A-1 Bonding telling me that I may or may not have a warrant for my arrest.

So I moved the phone away from my face to make sure I'm reading this right. And I called A-1 Bonding. I said, "Hey, you guys said I have a warrant out for my arrest. I want to make sure you've got the right person. I think you may have made a mistake."

And mind you, this was two months later, two months after Lieutenant Simpson contacted me and told me that the charges -- that they were not doing anything criminal.

So the bondsman tells me, "Yeah, it looks like Precinct 3 filed charges on you for FSGI," again which was failure to stop and give information.

I said, "What are you talking about? They told me they weren't doing anything criminal because I gave the people my insurance and I paid out of my pocket for one of the vehicles to get fixed. Me and that guy entered into a civil agreement. How can you make that criminal after the fact?"

Q. And did you ever find out whether Precinct 3 actually filed charges against you?

A. Yeah. I contacted Lieutenant Simpson. I said, "Hey, what the hell? You guys said that y'all weren't doing anything criminal. The case was closed. Why am I hearing that I have a warrant? Why is A-1 Bonding telling me that I have a warrant for my arrest?"

And he said, "That was all Bonsal." He said, "Bonsal called us and told us that the DA's office called him and told him to go ahead and file the charge."

And my knowledge and experience in law enforcement, I said, "The DA's office is not going to call you and tell you to file charges on me without knowing about the charge. They don't know about anything unless you call them, unless an officer who has been involved in a situation where they need to call the DA to obtain charges. If that officer doesn't call the DA's office, nobody down there knows what's going on."

Okay? So I asked Lieutenant Simpson, and he tells me that Bonsal said that the DA's office called and said, "Hey, go ahead and file that charge."

So I contacted the investigating officer, who was Anissa McCoy (phonetic).

Q. And when you say investigating officer?

A. At the crash.

Q. Okay. For the crash. Okay. And you contacted her?

A. Uh-huh.

Q. And what did you -- what happened then?

A. I said, "Hey, what's going on with these charges that they supposedly put on me?"

She said, "Well, Kelvin, that was all Bonsal." She said, "We didn't know anything about it. Bonsal contacted the DA's office himself and obtained charges against you and told us that the DA's office called and said to go ahead and file the charge." She said, "I told them that" -- I don't know who "them" was. I guess the entire administration or whoever had anything to do with that case. She told them that "Y'all already got the guy out of here. Why don't y'all just leave him alone?"

She said that she went to my previous sergeant, who was Craig Berry, nine times or more and told Craig Berry, "I don't want to file these charges because they are bullshit."

Q. Okay. And --

A. I confirmed that.

Q. And did you at any later point in time find out whether or not Chief Bonsal instigated the charges against you?

A. Other then them two telling me that he did it, no.

Q. Okay. And what was the conclusion as far as these charges? Were they tried or not tried, or what happened to them?

A. Well, initially the DA's office offered me 30 days in jail with no restitution.

And I told them, "Hell no." I said, "I know what this is -- I know what this is about. I know Bonsal, because all of this" -- let me back up. All of this happened right after Precinct 3 received the petition of me challenging my TCOLE -- my discharge, because I challenged it with SOAH, the State Office of Administration Hearings. I challenged my discharge between them. And just after they, Precinct 3, received notice is when these charges came about.

So after the charges came about, it was about maybe between two and four days later, I would say safely, I had -- maybe it was longer than that. I'm not sure. Anyway, I had two sheriffs knocking on my door. And I'm thinking, "Why are two sheriffs knocking on my door? Their cars are hidden, and the only thing that I have against me is a Class B misdemeanor. Why are there two sheriffs hunting me down for a Class B misdemeanor?"

**KELVIN JASON - October 28, 2022**

I didn't have any civil issues going on. I didn't have any other issues going on. The only thing that pointed a towards why the sheriff would be knocking on my door for a Class B misdemeanor is that Bonsal sent them over there.

Q. And when you say a Class B misdemeanor, are you referring to the charges that were put against you for the accident?

A. Yes.

Q. Okay. And --

A. So --

Q. -- what happened with the deputies that were at your door -- the sheriffs that were at your door?

A. They left because they got ignored.

Q. Did subsequently any other police officer or sheriff, constable come to your door regarding those same charges?

A. No, because I went -- another one did come to my house, to be truthful, it wasn't for that. It was for a subpoena that I got for a case that I worked while I was a cop.

But, no. According to in reference to this case that I was charged with, no, because I went and contacted a bondsman and got a non-arrest bond.

Q. Okay. And what was the final result of those

charges?

A. Everything got dismissed.

Q. Okay. Now, are there any other instances in which you feel you were treated differently as far as -- going back to Exhibit Number 2 in Section 4.013, as far as the definition of harassment? Other than what you've discussed already, compared to other individuals at Precinct 3 in which you feel you were discriminated against that you haven't discussed yet?

A. Not right off the top of my head. But I did -- well, there was one other instance.

Q. And what was that?

A. We used to have roll call meetings, which means when the deputies arrive for a new shift, the sergeant, the lieutenant if they have one on duty, and everybody goes into an office. Whether it be our patrol office or the training room or something, they would go in there and we have a little powwow of what happened on the evening -- I worked the evening shift. So what happened on day shift? Did night shift have anything significant that we might need to be looking for?

Sometimes Bonsal would show up to these roll calls. I was very vocal and active with the deputies when we were in roll call if there was something that came about, because I was -- I felt like

I was very knowledgeable of different kinds of calls and what we could be doing to find potential suspects or stolen vehicles or stuff like that.

So Bonsal would come in and he would say his spiel about what was going on with the community or how they have an open door policy or whatever. And there were times when I would chime in. I worked with them for what? Five or six years, Bonsal and this new administration.

Never once did I feel included in these meetings by Bonsal. If I would say something, he would look at me. I would be looking at him, but he would be looking through me like I wasn't there.

So when he would come to these meetings, I felt like I was sitting in a hole in the back of the room while he was there, excluded. Once he left, I was part of the group again.

Q. I don't know if I asked you this, but what race are you?

A. Sorry. What?

Q. What race are you?

A. Black. All Black.

Q. Any other instances other than what -- of discrimination that you perceived based upon Section 4.013 while you were working at Precinct 3

regarding yourself?

A. I don't know if you can use it or not, but I'm going to say it because it's in my head. We were at a training incident in Crosby. There was a training facility out there on Foley Road, F-O-L-E-Y. I was dating a girl at the time who also worked for Precinct 3, and we were going through some problems. And I was sitting in class. Bonsal comes to the class like he would do occasionally, and he pulls me out of the class. "Hey, let me talk to you in the hallway for a minute."

I said "Okay."

He goes out in the hallway and he says, "Hey, you know your girlfriend is going through some things." She was working at Channelview ISD at the time.

I said, "Yeah." She was having issues with Jeff Gonzales and Gregg Board.

And he says, "Well, just don't give her any bad advice." So we talked about not giving her any bad advice. "Just don't give her any bad advice," and then he walks off.

Why he would pull me out of class to tell me not to give my girlfriend bad advice. Me giving my girlfriend advice is no concern of yours.

Q.  And how do you perceive that as being discrimination against you based on your race?

A.  If you're going to go out of your way -- that office -- that building is roughly, what, 20 miles from Baytown maybe?  15 from Baytown?  And you're going to drive all the way up there to pull me out of class to tell me not to give my girlfriend any advice?

If I was a White Deputy, would you have come all the way that way going out of your way all the way over that way to get into my face to tell me not to give my girlfriend any bad advice?  And my girlfriend was Hispanic at the time.

Q.  Okay.  Now, earlier on you indicated that there were individuals that you believed were not of your race that were treated better than you.  You indicated one was Sergeant Barringer.  Were there any other instances in which you believe that anyone other than from the Black community -- or I should say not Black constables or employees that were treated better than you?

A.  Sergeant Jason Hutchins.

Q.  And how was Sergeant -- is it Hutchinson?

A.  Hutchins.

Q.  Okay.  And how was Sergeant Hutchins treated better than you?

A.  Sergeant Hutchins -- and the reason I say this is because he's no longer with the agency.  He resigned. He was at a COVID-19 site.  There were Black deputies setting up cones.  Sergeant Hutchins sent out a mass text message by mistake saying that these deputies look like a bunch of monkeys.  He didn't know that he sent it out to a mass until later on.

From what I understand, he was allowed to resign after making a racial slur.  And he got a job with Roman Forest Police Department, which is apparently, from my knowledge, the chief over there is a friend of Bonsal's.  And Jason Hutchins was referred by Bonsal.

Q.  Were you offended at all when you heard of or saw the text sent out by Sergeant Hutchins that indicated something looked like a barrel of monkeys?

A.  I'm probably the last guy that -- the last Black guy that you're going to see complain about something being triggered by racial discrimination. However, when it's blatant and it's right there in my face and then being like this, you know, if you're going to do that, you do it behind closed doors, and I don't want to hear it.

But when I hear it like that, and I feel like Jason Hutchins was a good friend of mine, yeah, that pissed me off.  It hurt my feelings at the same

time.

Q.  Any other instances in which you observed anyone other than from the Black race being treated better or preferentially compared to you?

A.  Compared to me?

Q.  Yes.

A.  I think I'll leave it at that for now.

Q.  Are you aware of any cameras in the building that Precinct 3 was located in?

A.  I've heard there were cameras everywhere over there.

Q.  And that would have included --

A.  There's the --

Q.  I'm sorry?

A.  There's the training room, the FTO office, the patrol office.  From my understanding, there were cameras all over there.  I've never confirmed that, because obviously they're hidden.  Because I've looked, but I didn't see them.

Q.  What about in the interrogation room or the room where suspects were interrogated?  Was there a camera in there, to your knowledge?

A.  I think that's the training room.

Q.  Okay.

A.  But, yeah, I think there's cameras in there.

Q.  Okay.  And do you know whether there was cameras in there back in May of 2020, May 28th, 2020?

A.  I don't remember, but I think the cameras were put in by -- like when the building was put in.

Q.  So if they were put in when the building was put in, it would have been there on 5/28/20, to your knowledge.  Correct?

A.  As a matter of fact, I remember seeing a camera crew there.  Yeah, I remember seeing a camera crew in there installing cameras, but they were just installing the cable at the time.

Q.  Okay.  And when was that?

A.  I don't remember.

Q.  Do you know Deputy Whittington?

A.  Yes.

Q.  Okay.  And when you were working at Precinct 3, did you have a lot of involvement with Deputy Whittington, or not much at all?

A.  We had some involvement.  We solved some crimes together.

Q.  And did you have any dealings with Deputy Whittington outside of the precinct?

A.  Not like political meetings and stuff like that.

Q.  Okay.  Do you believe that you had enough

experience with Deputy Whittington while you were at Precinct 3 to give an opinion as to his character as far as his work habits?

A. He's one of the hardest working, nicest guys that I know.

Q. And do you feel you were working -- or you had enough experience with Deputy Whittington while he was working at Precinct 3 to give an opinion about his honesty?

A. Yeah. He's always been honest with me. I mean, he strikes me as the kind of person who has no reason to lie.

MR. ORTH: Can we take a break now? We've been going now -- I'm pretty sure I'm almost done.

MS. MARTIN: Okay. Thank you.

(Recess from 11:13 a.m. to 11:27 a.m.)

MR. ORTH: At this time, I pass the witness.

EXAMINATION

BY MS. MARTIN:

Q. At this time, I have a few follow-ups.

A. Do I raise my hand?

Q. No. You're still sworn in.

A. Okay.

Q. Okay. When you talked about the situation

---

where you were forced to take a test with your hurt leg, when was that?

A. Let's see. I hurt my leg in 2016. And they took over -- I don't remember exactly when they took over. 2016, '17. I was out for maybe a year, almost a year and a half before I came back. So 2018 sometime, I guess, I think.

Q. And that's when you took that test, in 2018?

A. I don't remember exactly. It was -- we had a series of different sergeants tests. That was -- let's see. I'm trying to remember here. So I got hurt in 2016. Thinking back, yeah, I think it had to be 2018, yeah.

Q. So you hurt your leg in 2016, and you didn't take the test until two years later?

A. A year and a half. My leg was -- I had six surgeries on my leg. During that time, it would not heal because it kept getting a staph infection. I had more surgeries, so it took a year and a half.

Q. So let's start with the timeline. So 2016 you hurt your leg?

A. Yes.

Q. And you had the first surgery when?

A. It was probably within two weeks of hurting it I think I had the surgery.

---

Q. Okay. And then the second surgery?

A. See, I don't have the paperwork with me, so I can't answer that accurately. I don't know. But between -- all I can say is the timeline between 2016 and 2018. During that time span, I had six surgeries on my leg.

Q. Were you cleared for duty by a doctor to go back to work?

A. No, not while -- when they took the test? No.

Q. Okay.

A. I wasn't. I was still on the peg leg thing.

Q. Okay. So you weren't cleared to go back to work?

A. No.

Q. And you decided to take the test?

A. They said I had to.

Q. Okay. Who said that?

A. Milton Rivera.

Q. Okay. So that's who the chief was at that time?

A. Yeah, assistant chief.

Q. Who was the chief over Milton Rivera?

A. Greenwood.

Q. So Chief Bonsal was not there during this time that you were made to take the test. Is that correct?

---

A. He was there at the agency.

Q. But he was not the chief. Correct?

A. No. No, ma'am.

Q. Okay. Now, you mentioned Sergeant Barringer having a car accident. Did he hit citizens' vehicles, or did he hit County vehicles?

A. He hit County vehicles.

Q. Okay. And did he fail to give information or report that?

A. No.

Q. Okay. And do you know who determined Sergeant Barringer's discipline?

A. No.

Q. Would you be surprised if it was Constable Eagleton himself who made that decision?

A. No.

Q. You would not be surprised?

A. No.

Q. And why is that?

A. He's the constable.

Q. And the constable makes the decisions. Correct?

A. No, not all of them.

Q. Then why are you not surprised about Sergeant Barringer?

**KELVIN JASON  -  October 28, 2022**

A.  Sorry?

Q.  Why are you not surprised, then, that he made the decision for Sergeant Barringer?

A.  I wouldn't be surprised made it.  Whether it be Bonsal or Eagleton, I wouldn't be surprised.

Q.  And Douglas Johnson, you said he committed an FSGI.  Who did he hit?  Did he hit a citizen's vehicle?

A.  He hit Major Villarreal's vehicle.

Q.  Okay.  And in your case, you hit two citizens' vehicles.  Correct?  Not County vehicles?

A.  Yes.

Q.  Okay.

A.  In my personal car.

Q.  And the owner of the vehicle, the first owner's name was Eddie Gaytan.  And you say that you gave him your information.  Isn't it true that that was after he chased you down in his vehicle?

A.  No, he didn't chase me down.  He met me like this (indicating).  He wasn't chasing.  I was circling back around.  He met me like this (indicating).

Q.  He met you on foot, or in a car?

A.  In a car.

Q.  Okay.  So then you agree, then, that he got in his car and came out and followed you.  Correct?

A.  He didn't follow me.  I met him like this

49

(indicating).  That's not following.  Following is when you're behind somebody.  I was coming back around to his house when I guess he was leaving his house, because I was going to go back around to see what I hit.  And he met me like this and said, "Hey, you hit my vehicle."

I said "Yes."  I was going back to see what I hit, and I gave him my insurance information.

Q.  Okay.  And the second person that you hit, Laura Foreman, how did she find you?  Are you aware that she had to put it on social media to find out who hit her?

A.  No.  She -- I took my information back to her.  I don't know what they did while between the time that I went home to get my insurance and the time that I went back and took it over there.

Q.  So are you aware that it was Mr. Gaytan that had to tell her your identity?

A.  Then why did she call me?

Q.  Because she got it --

A.  She got my phone number from me.

Q.  -- from Mr. Gaytan?

A.  No, she didn't.

Q.  Okay.

A.  He got my phone number.

Q.  Okay.  So --

50

A.  She got my phone number from my note that I gave her.

Q.  Okay.  So you're saying the investigative notes will corroborate what you're testifying to?

A.  I don't know what the investigative notes mean.  She got my phone number from me.

Q.  Okay.

MS. MARTIN:  Objection to the nonresponsive portion.

Q.  (BY MS. MARTIN) So I'm asking if the investigative notes and the statements that were taken of the complainants are different from what you're testifying to.

A.  I don't know what the investigative notes said.  They didn't tell me anything about the investigative notes.  The only thing that I know is she didn't get my information from Eddie Gaytan.  She may have gotten my insurance because I gave it to him, but she got my insurance, my phone number from me.

Q.  And why would she have gotten the insurance information from Mr. Gaytan if you gave it to her?

A.  I said I left to go get my insurance.  During the time that I was gone, by the time I took my insurance back over there later that evening, they all had met up.  The police had gone out there.  They had

51

taken a report, an FSGI report.  A failure to stop and give information report.

When she got my information, she contacted me later on that evening and told me she didn't want to pursue any charges.  She didn't want nobody to get in trouble, is what she said.  She said she was satisfied that she got my information.  And they wrote statements, from what I gathered from Anissa McCoy, that they did not want to press any charges.  They were satisfied that they got the information.

Q.  Do you have any knowledge as to whether Mr. Whittington was ever involved in a car accident?

A.  No.

Q.  Now, talking about Jason Hutchins, did you receive that text message from Jason Hutchins?

A.  No.

Q.  And when you say he was allowed to resign, what do you mean by "allowed"?

A.  Just Bonsal or whoever, I guess it would be Captain Elkin.  Whatever they decide from the uppers to whoever the enforcer is, I guess they either are going to fire you or they will allow you to resign in lieu of termination.  So if you don't resign, you'll be fired.

Q.  Did you resign?

A.  Yeah.

52

**KELVIN JASON - October 28, 2022**

Q. Okay. Do you have personal knowledge on what type of discharge Jason Hutchins received?

A. From my understanding, he got a general discharge.

Q. And who told you that he got a general discharge?

A. I was speaking to some of the deputies at Precinct 3.

Q. So you have no personal knowledge?

A. No personal knowledge, no.

Q. And your testimony is that Chief Bonsal recommended Jason Hutchins for a job?

A. Uh-huh.

Q. How do you know that?

A. I don't know that definitively, but that's what's up in the air. That's a rumor.

Q. So it's just rumor; you have no personal knowledge?

A. No.

Q. And who is the individual that you believe Chief Bonsal spoke to, to recommend Jason Hutchins?

A. The chief of Roman Forest.

Q. Chief Carlisle?

A. I don't know his name.

Q. And so although you have no personal knowledge

53

of any conversation between Chief Bonsal and the chief of that department, you still believe that he recommended him?

A. I believe that, yes.

Q. Now, you're not in the crime interdiction unit, are you?

A. CUI?

Q. Correct.

A. No.

Q. And your supervisor was not Sergeant Barringer?

A. No.

Q. And your supervisor was not Major Villarreal?

A. No.

MS. MARTIN: No further questions.

MR. ORTH: Reserve all questions for the time of trial.

MS. MARTIN: We'll reserve, too.

(Proceedings concluded at 11:38 a.m.)

54

C E R T I F I C A T E

STATE OF TEXAS    )
                  )
COUNTY OF HARRIS  )

I, Lucy Johnston, Certified Shorthand Reporter in and for the State of Texas, duly commissioned and qualified, do hereby certify that the foregoing is a true, correct, and complete transcript of the proceedings in the foregoing captioned matter taken by me and transcribed from my stenographic notes.

The original deposition and exhibits were delivered to Mr. Philip J. Orth, III, Custodial Attorney.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office at Houston, Texas, this the 6th day of December, 2022.

Lucy Johnston
Texas CSR No. 3847
Expiration Date: 7/31/23
Lucy Johnston Reporting
Texas Firm Registration No. 450
1225 North Loop West, Suite 327
Houston, Texas 77008
(281) 385-9088

Time used by each party:

Mr. Philip J. Orth, III - 01:10
Ms. Melissa G. Martin - 00:11

55

**LUCY JOHNSTON REPORTING**
**(281) 385-9088**