**JIMMY EVANS, III - October 28, 2022**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

BERT W. WHITTINGTON, III §

        Plaintiff, §

vs. §        CIVIL ACTION 4:21-cv-03220

KIRK WAYNE BONSAL, JR., § ET AL §

        Defendants. §

*********************************************

ORAL DEPOSITION OF

JIMMY EVANS, III

October 28, 2022

*********************************************

ORAL DEPOSITION OF JIMMY EVANS, III, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on the 28th day of October, 2022, from 1:14 p.m. to 2:49 p.m., before Lucy Johnston, CSR in and for the State of Texas, reported by machine shorthand, at 602 Sawyer Street, 2nd Floor conference room, Houston, Texas, pursuant to the Federal Rules of Civil Procedure and any provisions stated on the record or attached hereto; Rule 30(b)(5) requiring an on-record reporter's statement was waived.

---

A P P E A R A N C E S

FOR THE PLAINTIFF:
    Mr. Philip J. Orth, III
    Law Offices of Philip J. Orth, III, P.C.
    16406 Lamplighter Street
    Crosby, Texas  77532
    Phone:    (713) 520-8333
    Fax:      (772) 217-8162
    E-mail:   philip.orth@yahoo.com

FOR THE DEFENDANTS:
    Ms. Melissa G. Martin
    Ms. Susana G. Sosa
    Harris County Attorney's Office
    1201 Franklin Street, 13th Floor
    Houston, Texas  77002
    Phone:    (713) 274-6700
    Fax:      (713) 368-9278
    E-mail:   melissa.martin@harriscountytx.gov

ALSO PRESENT:

    Mr. Bert W. Whittington, III
    Mr. Eric L. Baumgartner
    Chief Kirk W. Bonsal, Jr.

---

I N D E X

|  |  | Page |
|---|---|---|
| Appearances | ................................... | 2 |
| Stipulations | ................................... | 1 |
| Certificate | ................................... | 48 |

EXAMINATION | | Page |
| By Mr. Orth | ................................... | 4 |
| By Ms. Martin | ................................... | 44 |

EXHIBITS

| Number | Description | Page |
|---|---|---|
| 1 | Notice of Intention to Take the Oral Deposition of Jimmy Evans ............ | 5 |
| 2 | ABC 13 News report, "Pct. 3 sergeant resigns after questionable text message with 'racial undertone.'" ..... | 13 |
| 3 | Harris County Precinct 3 Policies and Procedures, Section 4: Non-Discrimination and Anti-Harassment ....................... | 16 |
| 4 | 7/22/20 memo from Lieutenant Jimmy Evans to Captain Henry Elkin, Subject: Response to Resistance - Deputy Bert Whittington (HC-0021) ..... | 29 |
| 5 | Memo from Deputy B. Whittington, III, to Chief Kirk W. Bonsal, Subject: Use of Force Case #2005-00432 (HC-0051 through HC-0052) ..................... | 34 |

---

JIMMY EVANS, III, having been first duly sworn, testified as follows:

EXAMINATION

BY MR. ORTH:

Q.  Please state your full name for the record.

A.  Jimmy Evans, III.

Q.  And is it Chief Evans?

A.  Yes, Chief Deputy Jimmy Evans.  That's my position now.

Q.  Okay.  Chief Evans, have you ever given a deposition before?

A.  No, sir.

Q.  In order to make it easier on you, myself, and the court reporter, I'd like to make some agreements with you.  The first agreement I would like to make with you is that there be one person talking at a time, which would indicate that you would allow me to finish my question before you start answering.  And I'll allow you the same courtesy to finish your answer before I ask you another question.  Okay?

A.  The yes, sir.

Q.  Second agreement I'd like to make with you is that you give verbal responses, because the court reporter can't take down shakes of the head and nods and things like that.  Okay?

**EXHIBIT 8**

**JIMMY EVANS, III - October 28, 2022**

A. Yes, sir.

Q. And the last agreement I'd like to make with you is that if you don't understand a question that I ask, that you tell me that you didn't understand for whatever reason. I'll be more than happy to rephrase the question. If you answer the question, I will assume that you understood the question. Okay?

A. Yes.

(Exhibit #1 marked.)

Q. (BY MR. ORTH) Let me hand you what's been marked as Exhibit Number 1 to your deposition and ask you whether you received a copy of that. And that's the notice of your deposition to be here today.

A. Yes, I did.

Q. Okay. And what is the highest level of education that you've obtained?

A. A master's degree.

Q. In what field is that?

A. Criminal justice. Administration of criminal justice.

Q. And when was that?

A. I graduated in 2008.

Q. And who is your current employer?

A. Fort Bend County Constable Precinct 3.

Q. And when did you start working there?

A. January of 2021.

Q. And what are your duties as deputy?

A. It's Chief Deputy.

Q. Okay.

A. As Chief Deputy, I'm responsible for the overall operation of the department, and I oversee the civil division, the patrol division, the criminal investigation division.

Q. All right. And did you receive an employee manual when you started working at Fort Bend County?

A. Yes.

Q. And did the manual discuss at all discrimination?

A. Yes.

Q. And where did you work prior to working at Fort Bend County?

A. Harris County Constable Precinct 3.

Q. And when you start working for Precinct 3.

A. December of 2017.

Q. And what were your duties when you started in December of 2017?

A. I was a patrol lieutenant, evening shift.

Q. And approximately from today, how long have you been in the deputy police arena?

A. I think it's 29 years.

Q. And did your duties ever change while you were at Precinct 3?

A. My initial duties, I was responsible for the patrol division, and also later I was appointed as one of the use of force compliance persons and also the vehicle pursuit compliance person.

Q. Now, as far as the use of force compliance person, what would you do regarding that at Precinct 3?

A. I would get a file and I would review body cam footage, dash cam footage, statements and reports, and any other evidence that involved the use of force.

Q. Okay. And would you make a decision regarding that or pass it on to somebody else? What would you do with it?

A. I would review it and have -- I would do a summary of my recommendations and my findings on whether it was in compliance or out of compliance with the departmental policy and state law.

Q. And then when you made that determination, what happened after that?

A. I would turn it in to the patrol captain.

Q. And who was the patrol captain at that time when you first started there?

A. Henry Elkin.

Q. And was Captain Elkin the same person you would have done that with the whole time you were at Precinct 3?

A. Yes.

Q. And then do you know what Captain Elkin would do with it?

A. He would forward it -- I think he would forward it up to Chief Bonsal. It would go to the headquarters, which I believe he would forward that -- his findings and my findings to Chief Bonsal. Kirk Bonsal.

Q. And do you know what happens -- what would happen to it when it got to Chief Bonsal's office?

A. Chief Bonsal, I don't know. I think he would review it.

Q. Now, specifically what then would you do as far as being the person in charge over vehicle pursuits?

A. I would do the same thing. I would review the offense report, witness statements, the officers' statements, body cam, dash cam, and any other evidence.

Q. And then would you make the same determination as to whether it's in compliance or out of compliance?

A. Yes.

Q. And would you forward that also to Captain Elkin, or somebody else?

A. No. Captain Elkin.

Q. Okay. Did you do any training while you were

**JIMMY EVANS, III - October 28, 2022**

at Precinct 3?

A. Yes.

Q. And did you have any training involving the area of discrimination or hostile work environment?

A. I read the Harris County policy on racial discrimination and hostile work environment.

Q. Okay. And who was the constable while you were at Precinct 3?

A. Sherman Eagleton.

Q. And did you have a lot of interaction with Constable Eagleton while you were at Precinct 3?

A. No.

Q. How much interaction did you have with Constable Eagleton during the time you were there for Precinct 3?

A. If I had an issue sometimes, I would call him or I'd just call and give him a heads up on what's going on, give him an update what was going on in my shift. If there was a vehicle pursuit or use of force or something, I would notify him and kind of give him a heads up on what's going on or if we had a meeting or something like that. But that was about it.

Q. And who would have been the individual that held your position as far as the chief while you were at Precinct 3?

A. Can you repeat that question?

Q. Sure. While you were at Precinct 3, who would have held your current position there at Precinct 3 while you were there?

A. Kirk Bonsal.

Q. And did you have a lot of interaction with Chief Bonsal at that time?

A. Yes.

Q. Were you aware of any unwritten -- I know there were written policies and procedures involving -- at Precinct 3, but were there any unwritten policies that you're aware of?

A. No.

Q. Now, while you were at Precinct 3, did you know a Jason Hutchins?

A. Yes.

Q. And who was he?

A. Jason Hutchins was assigned to me as the sergeant over evening shift patrol.

Q. And were you aware of a text message allegedly sent out by Sergeant Hutchins --

A. Yes.

Q. -- regarding "a bunch of monkeys"?

A. Yes.

Q. Okay. And did that comment by Sergeant Hutchins offend you at all?

A. No.

Q. And did any employees at Precinct 3 notify you that they were offended by that comment?

A. Yes.

Q. And who were the individuals that notified you that they were offended by the comment of Sergeant Hutchins?

A. It was a female sergeant, an African-American sergeant. I don't remember her name.

Q. If you remember the name at any time during the deposition, you can let me know. That's fine.

A. Okay.

Q. Did Deputy Whittington let you know that he was offended by that comment?

A. I don't remember.

Q. Okay. Do you know if Sergeant Hutchins, since you were basically a supervisor of him, was disciplined regarding that incident?

A. Yes.

Q. And how was he disciplined?

A. I believe that there was an investigation that was conducted, and I was notified -- and can I back up? Sergeant Julia Davis.

Q. Okay.

A. That's the sergeant's name.

Q. Okay. Anybody other than Julia Davis that contacted you concerning being offended by the comment made by Sergeant Hutchins?

A. Not exactly, but I remember her specifically because she came to me twice, at least two times.

Q. But was there anybody else?

A. I can't remember.

Q. Okay. Now, you indicated that there was an investigation done regarding Sergeant Hutchins' comment about "a barrel of monkeys." Do you know if he was disciplined regarding that comment?

A. What I remember is he was summoned to the headquarters in regards to that incident, and he returned back to our station. And I remember having a short conversation with him. He said that he had been relieved of duty.

Q. Okay. And when you say "relieved of duty," does that mean terminated or fired, or does that mean something else?

A. That means something else.

Q. What does that mean to you?

A. It means that his peace officer power was taken away. His badge and ID would be also taken away.

Q. And do you know whether that actually happened

**JIMMY EVANS, III - October 28, 2022**

to Sergeant Hutchins?

A. Yes.

Q. And did it?

A. Yes.

Q. Okay. Do you know if Sergeant Hutchins was eventually employed by somebody else, some other police --

A. No.

Q. Okay.

(Exhibit #2 marked.)

Q. (BY MR. ORTH) Let me hand you what's been marked as Exhibit Number 2 and ask you whether you can identify that.

A. That appears to be an ABC 13 news story, a photo. The person in this photo is Jason Hutchins.

Q. And have you ever seen this document before?

A. I saw the story, yes.

Q. And do you know how ABC 13 got their information concerning Exhibit Number 2 with the information involving Sergeant Hutchins?

A. No.

Q. And when this was going around in Precinct 3, as far as Sergeant Hutchins' comment of "circus with monkeys," did you actually get to see what was in Exhibit Number 2?

13

A. The text message?

Q. Yeah, the text message or anything in Exhibit Number 2.

A. I got the text message because I was in the group text.

Q. Okay. And when you got that group text, what, if anything, did you do regarding that?

A. I looked at the group text. And when I looked at it and I saw it saw what I saw, I remember Sergeant Davis was standing right besides me. And she asked me, "Did you see what Sergeant Hutchins just texted?"

And I looked at it and I said, "Yeah. What is he doing?"

And she said, "I'm offended by in S-H-I-T."

Q. Okay. And when she said that to you, did you respond to her at all?

A. I told her -- I said. "Yeah. Okay. When this is over with, I'll get with him and see what's going on."

Q. And did you, in fact, get with Sergeant Hutchins and see what was going on?

A. Yes.

Q. All right, sir. And what was -- what happened because of that?

A. He said he was referring to some movie he had

14

seen.

Q. And did he indicate to you what movie he was referring to?

A. I don't remember 100 percent.

Q. Okay. Did you have any -- while you were at Precinct 3, did you have any work-related problems at all?

A. No, sir.

Q. Okay. Did you have any disagreements with any of the individual employees there at Precinct 3?

A. Disagreements?

Q. Yeah, just general disagreements about work, everything.

A. That question is kind of broad. I don't understand the question.

Q. Okay. Let me rephrase it, then. In any employment situation, you can either get along with, you know, the individuals that you're working with, or you have problems dealing with certain individuals because they just don't like anybody or they have problems dealing with a certain type of people. Do you have any what you would characterize as problems or dealings with some employees that you had problems working with?

A. I've had some disagreements.

Q. Okay. And what would those -- who would those

15

have been with?

A. You know, being the lieutenant, when I would have a disagreement. Now, I never had a disagreement to a point where it's another supervisor, but I have had disagreements with other employees on the way they may have conducted themselves, may have done something, and I didn't agree with it or I might not agree with their opinion or some statement they made.

Q. Okay.

(Exhibit #3 marked.)

Q. (BY MR. ORTH) Let me hand you what's been marked as Exhibit Number 3 to your deposition and ask you whether you've ever seen that before (handing). And while you're looking at it and reading it, I'll indicate to you that it's a page out of the employee manual while at Precinct 3.

A. I've never seen the document exactly like this, but the wording I've -- you know, because I look at the policies and procedures all the time, so from Harris County, I have seen documents similar to this, but not this particular document, no.

Q. Okay. Now, in the next questions when I talk about harassment or discrimination, I want you to focus on the definition under Section 4.013. Do you see that down there (indicating)?

16

**JIMMY EVANS, III - October 28, 2022**

A. Yes, sir.

Q. Okay. And using that definition as far as discrimination -- I'll let you read it so you have an understanding of what it says, and then I'll ask you some questions. Just let me know when you're done reading it.

A. Okay.

Q. Okay. Now, while you were at Precinct 3, did you -- do you have any knowledge of any discrimination or harassment based upon that definition while you were at Precinct 3?

A. Myself. Right?

Q. Yeah, do you have any knowledge of it?

A. Any knowledge?

Q. Any knowledge.

A. Of anyone else?

Q. Of you or anyone else.

A. Oh, 4.013, harassing conduct, yes, I have.

Q. Okay. When is the first incident that you remember regarding the definition of 4.013 as far as discrimination occurring at Precinct 3?

A. I can't remember the exact date.

Q. Okay. Do you know approximately when it was?

A. I would think maybe 2018 or 2019.

Q. Okay. And what were the circumstances surrounding that?

A. I received an email from Captain Elkin.

Q. And what did the email indicate?

A. The way I took it, that the email was aggressive and condescending.

Q. And was that directed to you?

A. Yes.

Q. Okay. And did you contact Captain Elkin concerning that email?

A. No. I sent an email to Chief Bonsal.

Q. And what was in the email that you sent to Chief Bonsal concerning the email you received from Captain Elkin?

A. I detailed that I felt like it was condescending.

Q. And anything else that you can recall?

A. I can't recall.

Q. Okay. And did you have any understanding as far as whether it was regarding your race, your age, your sex, or anything? How did you take that email from Captain Elkin?

A. Intimidation.

Q. And what race is Captain Elkin?

A. He's a White male.

Q. And did Chief Bonsal respond to you at all?

A. Yes.

Q. And what was Chief Bonsal's response to your email to him?

A. He told me that -- I think he called me on the phone and we talked about it, and he also scheduled a meeting and we all met.

Q. And do you recall any part of that conversation here today?

A. Not all of it.

Q. Well, what do you recall?

A. I remember there were several individuals. I think that Major Isaac Villarreal was in the office, Chief Bonsal, and Henry Elkin, and I believe there may have been one or two others.

Q. And do you recall, other than the individuals that may have been in that phone call or in the meeting afterwards, what the subject matter was or what happened?

A. Chief Bonsal told me that he had an opportunity to review the statement and that based on his assessment, that did not fall in the category of harassment or intimidating.

Q. And did you respond to Chief Bonsal's comment?

A. Yes.

Q. And what was your response, if you remember?

A. I believe I stated that -- I made the statement that he didn't know what my emotional quotient was, so he couldn't tell me what offended me or what did not offend me.

Q. And did he make -- did Chief Bonsal make any response to that?

A. He did say something back to the effect of, well, that was his opinion and that was my opinion.

Q. So essentially there was nothing more that you could do regarding that issue?

A. No.

Q. And the only one above Chief Bonsal at that point in time would have been Eagleton. Correct?

A. Yes.

Q. Any other instances other than this one that you would characterize as violating Section 4.013 in Exhibit Number 3 regarding yourself or somebody else while at Precinct 3?

A. No.

Q. While at Precinct 3, were you aware of individuals that were given preferential treatment compared to anybody else?

A. There may have been instances where I felt that an employee that I had that may have committed a policy violation may have received a harsher punishment than

**JIMMY EVANS, III - October 28, 2022**

someone else that may have committed a violation similar and received a different punishment.

Q. And which individuals are you talking about concerning those policy violations or those that were treated better than others?

A. I'm trying to remember. There was an incident where a deputy violated a policy, backed into another County vehicle. And that employee didn't receive -- and it was a White male, and to my knowledge, he never received any discipline for that.

Q. Do you know of any deputies while you were at Precinct 3 who were being paid by Precinct 3 while working an extra job at the same time?

A. No.

Q. Okay. Were you aware of any individuals having a sexual relationship or having sex at Precinct 3 while on duty?

A. Not proven.

Q. Well, what knowledge do you have of that?

A. Yes. There were -- not -- well, repeat the word at the end. I'm confused with the word "knowledge."

Q. What knowledge do you have of any incident that involved any constables at Precinct 3 having sexual relationships while at Precinct 3 on duty?

A. Sexual?

Q. Yes.

A. Okay. Not relationships?

Q. No, not relationships. Just sexual relationships.

A. No.

Q. Were you aware of any just plain relationships between a supervisor and somebody they supervised as far as at -- I mean at Precinct 3 while you were there?

A. Yes.

Q. And who would have been those individuals?

A. There was a Sergeant Sullivan.

Q. And who else?

A. And Sergeant Sullivan was having a relationship with another female. I can't remember her name. It was a White female.

Q. And what race is Sergeant Sullivan?

A. He's a White male.

Q. And do you know if they were disciplined -- well, first of all, is that a violation of the policies and procedures of Precinct 3?

A. I don't remember. I can't remember.

Q. Okay. You can't remember if that was a violation?

A. I know there was -- I believe that there was a

policy that prohibits fraternization between supervisors. Yes, there was a policy.

Q. And do you know if either one -- either Sergeant Sullivan or the female that he was involved with that you can't remember were disciplined at all concerning that?

A. No.

Q. So they were not disciplined?

A. No.

Q. Are you aware an incident while at Precinct 3 of Constable Johnson assaulting either his girlfriend or his wife?

A. I remember being contacted by Sergeant Magana -- Magana, a female. Hispanic female.

Q. Okay.

A. She called me on the phone and stated that she was en route to Deputy Johnson -- Johnson? I can't remember his first name. Douglas Johnson.

Q. Yeah.

A. That she was en route to Douglas Johnson's residence because he had had a disturbance with his girlfriend and another female was involved.

Q. And did that deputy give you any other information after that?

A. No.

Q. Do you know if that would have been violation of the policies and procedures then at Precinct 3?

A. If it had been substantiated, yes, that would have been a violation of a Precinct 3 policy and possibly the law, also.

Q. And do you know if there was any investigation concerning that issue, that matter?

A. No.

Q. You don't know, or was there any done?

A. I don't know if there was or not.

Q. Okay. Are you aware of any circumstances in which a deputy bought prescription pills from somebody that's not licensed to sell them while on the property of Precinct 3?

A. No.

Q. Would that have been a violation of the rules and policies of Precinct 3 if they did that?

A. Yes.

Q. And were you aware of Deputy David (sic) Johnson being involved in a collision while at Precinct 3 with another constable's vehicle and not immediately reporting that?

A. Douglas? You said Deputy David --

Q. Deputy Johnson.

A. Deputy Douglas Johnson, yes.

**JIMMY EVANS, III - October 28, 2022**

Q. Okay. Do you know if that deputy was disciplined at all for that?

A. No, he wasn't.

Q. And would that have been a violation of the rules and policies of Precinct 3 for not immediately reporting an incident like that?

A. Yes.

Q. Now, during your employment at Precinct 3, did you know Deputy Whittington?

A. Yes.

Q. Did you have interactions with Deputy Whittington on at least a weekly basis?

A. Yes.

Q. Did you have enough interaction with Deputy Whittington to form an opinion as to his character as far as his work was concerned?

A. Yes.

Q. And what is that opinion?

A. I was impressed. He was professional. He was hard-working. As far as I know, every time I asked him to do something, he did it. He did everything that -- from what I can see as a supervisor and my observation, he was a hard worker.

Q. And during the time that you worked at Precinct 3 and had interactions with Deputy Whittington,

did you form an opinion as to his truth and veracity or his honesty?

A. Yes.

Q. And what is that opinion?

A. You know, I would always compliment him on his military service. And I've always -- I told him all the time to make sure that he didn't allow anybody to tarnish his name and his accomplishments in the military, from what I saw in law enforcement.

Q. Now, do you have any knowledge of an incident on 5/28/20 that involved Deputy Whittington?

A. There were several.

Q. There were two incidents, from what I understand, on 5/28/20 involving Deputy Whittington and his canine. Correct?

A. Yes. I did the use of force. I've done several use of force that involved Deputy Whittington.

Q. Okay. And that was part of your duties. Correct?

A. Yes.

Q. Were you asked by Chief Bonsal to do any type of investigation regarding any incident that happened on 5/28/20 regarding Officer Whittington -- or Deputy Whittington?

A. I don't remember the actual date. If you

would, be a little bit specific what happened that date.

Q. The incident involving a juvenile and use of force.

A. Yes.

Q. Were you instructed by Chief Bonsal to do anything regarding that incident?

A. I'm not sure, because there was -- there were several use of force that involved Deputy Whittington and his canine. If you could give me something a little bit more specific on the case.

Q. Well, I'm talking specifically about the date -- there were two incidents involving Deputy Whittington on 5/28/20; one involving his dog, which allegedly bit a suspect, and then he also in the afternoon bit a juvenile when he was in pursuit of the suspect.

In either one of those scenarios, did have you any involvement in either one as far as use of force?

A. I recall having an involvement in a canine fight involving a Hispanic juvenile, I believe, on or near a railroad track.

Q. Yes. That would have been the incident we're talking about. And what involvement did you have on that?

A. I reviewed the use of force.

Q. And who instructed you to do that, if anybody?

A. That was my duty. I reviewed all use of force involving the use of force.

Q. Okay. And when you reviewed that, did you -- what did you do regarding that review?

A. After I reviewed the use of force, I heard the juvenile state on the body cam footage, "I gave up and the let the dog go."

Q. Did you hear on any of the -- either the body cam footage or the video footage from the vehicle that Deputy Whittington was driving as far as whether Deputy Whittington was trying to recall the dog at all during the process or during the pursuit?

A. No. I actually called Deputy Whittington in and I interviewed him in regards to how all of that operated. And he explained to me that -- he went through the whole detail and explained to me how he -- what do you call it? I guess he ordered the dog, the dog jumps out, and how he releases the dog. He explained to me the whole procedure to me. And after he explained the procedure to me, I had a better understanding on what had occurred.

Q. And after that conversation with Deputy Whittington, what, if anything, did you do?

**JIMMY EVANS, III  -  October 28, 2022**

A.   I went and spoke with Captain Elkin about it.

Q.   And what did you tell Captain Elkin?

A.   I told Captain Elkin that I reviewed the video and heard the juvenile state that "You let the dog go on me."  And then I told him I had Deputy Whittington come in and explain to me his actions, why did he let the dog go, and we went through the whole steps.

He explained it to me, and I told him that I still didn't quite understand, but I believe that we may be okay, but I think I may have wrote that that may not have been in compliance and needed further investigation.

Q.   And other than this use of force incident, did you have any other involvement in that issue or in that case?

A.   No.

Q.   And did Chief Bonsal ever ask you to do an investigation of any of the use of force incident regarding Deputy Whittington.

A.   No.

(Exhibit #4 marked.)

Q.   (BY MR. ORTH) Let me hand you what's been marked at Exhibit Number 4 to your deposition and ask you whether you recognize that.

A.   Yes.

Q.   And what is it?

A.   This is a summary.  After I review all the evidence involving the use force, I would do a summary and then I would forward it up to Captain Elkin.  And this is the document that I presented to Captain Elkin.

Q.   And is this what we've just been talking about, the incident involving the minor?

A.   Yes.

Q.   Okay.  And directing your attention to the first sentence there, it says, "I reviewed the response to resistance report."  What response?  Whose response?

A.   That's the title.  Instead of using "use of force" under best practices, we don't use the use of force.  We use response to resistance.

Q.   Okay.  And who prepared the -- who prepared that report?

A.   The supervisor on the scene.

Q.   And who would that have been?

A.   I can't remember.  It would have been the supervisor on the scene involving this case.

Q.   Do you recall whether that was Sergeant Barringer or not?

A.   I would say 98 percent or 99 percent of the use of force ones that I get came from Sergeant Barringer.

Q.   Okay.  And who did the offense report?

A.   I don't remember.

Q.   Okay.  And do you recall who did the canine deployment report of the incident as referenced in Exhibit Number 4?

A.   Per policy, it was Deputy Whittington's case, so he would have had to do the offense report.  And he would have done the canine deployment report.

Q.   Okay.  And then you indicated Deputy Whittington -- in the second sentence there "Deputy B. Whittington failed to activate his body worn camera."  Did you get that from him, or did you get that from someplace else as far as --

A.   When I reviewed the use of force, when I look at the body, the system will tell me if there's body cam or dash cam.  And the information that I received came from the dash cam, not the body cam.

Q.   Now, were there policies and procedures at Precinct 3 at this time when you did this report regarding activating body-worn cameras?

A.   Yes.

Q.   And what, to your knowledge, did they say?

A.   I can't remember verbatim.

Q.   Okay.  Well, I mean, were individual deputies that had body-worn cameras supposed to use them at all times or certain times, or do you recall?

A.   The policy states that any investigation or any interaction with a citizen, you are to activate the body-worn camera.  Pursuits, use of force -- vehicle pursuits.  I'm sorry.

Q.   Okay.  And based upon your experience at Precinct 3, did you have a problem with deputies not having their body-worn cameras activated during the times that you just indicated?

A.   I can't remember if I did.  But, yeah, I remember I had several instances where they may not have activated their body-worn camera or their body mic.  And I would get that information because when they turn the emergency lights on, it automatically activates the camera.  The problem I was having that was a big problem, was activating their body mics.  So could see, but I couldn't hear anything.

Q.   Okay.  And do you know whether deputies were being disciplined for not having their body cameras on when they should have while you were there at Precinct 3?

A.   There was a -- I would say that with the issuance of the body cams, there was a time that we -- if I observed them not activating their body cam and there was some type of incident, we would characterize that as a training issue unless it was being -- if it

**JIMMY EVANS, III - October 28, 2022**

was repetitive. After you've been retrained and you've been counseled on it, then there may be some more severe consequences.

Q. Now, going down there, you originally categorized that "as being in compliance and the failure to activate the body worn camera in a timely manner could be discussed with his immediate supervisor." Is that a correct reading of what you put in your statement, first of all? It's right in the middle there.

A. Yes.

Q. And is that what you believed when you wrote that?

A. Yes.

Q. Okay. And after making that conclusion, what, if anything, did you do?

A. That was all I did.

Q. Okay. Have you done any investigations while at Precinct 3?

A. I've done -- yes.

Q. In any of those investigations, did you only send out written questions to the witnesses?

A. No.

Q. Do you think that's a prudent policy to have if somebody does that in an investigation, only send out,

33

you know, written questions to witnesses without interviewing them, in your opinion?

A. In my opinion, no.

(Exhibit #5 marked.)

Q. (BY MR. ORTH) Let me hand you what's been marked as Exhibit Number 5 to your deposition and ask you whether you've ever seen that document (handing).

A. No, I've never seen this document before.

Q. Okay. Were you ever aware of whether Deputy Whittington requested a -- third paragraph up from the bottom that starts "I have attempted." Do you see that one?

A. Yes.

Q. Okay. Can you read that and indicate whether you have any knowledge of that happening or not?

A. When I spoke to Deputy Whittington in regards to this incident (indicating) --

Q. Yes.

A. -- he did tell me that he had reported it to his supervisor that he needed some -- what they call a popper or he needed some additional work done that would allow him to deploy his dog and activate the camera, but he was told that it was too expensive or they weren't going to spend the money. I remember that conversation.

Q. And in your last response where you indicated

34

"this incident," you were talking about the one in Exhibit Number 4. Correct?

A. Yes.

Q. And the reason I had to put that in there is because we don't know when you say this, that, or the other thing, as far as a deposition is concerned. That's all.

A. Yes. Yes, I am referring to the incident in Exhibit 4 (indicating).

Q. Now, while at Precinct 3, were you aware of any policies regarding handcuffs, whether an individual should be handcuffed in the front or the back, or did it matter?

A. I don't remember the exact policy. Being the supervisor, I would always require, unless medically told that they had to be handcuffed to the front, that they would have to be handcuffed to the back.

Q. And while at Precinct 3, was there a policy or procedure regarding individual suspects handling narcotics?

A. Could you repeat that?

Q. Sure. Was there a policy or procedure while at Precinct 3 as to whether a suspect should handle narcotics that they've -- that they were caught with?

A. No, no policy allowed suspects to handle

35

narcotics.

Q. Okay. So that suspect should not be handling narcotics?

A. Absolutely not.

Q. Okay. Even while they were handcuffed. Correct?

A. No. That is correct.

Q. And would you agree with me that if a deputy or supervisor at Precinct 3 saw another deputy committing a policy violation, that they should report that to somebody?

A. Yes, they should report that.

Q. And being in supervision as far as in Precinct 3, would it be normal procedure for an arresting officer to tell a supervisor who volunteers in the investigation what to do and how to do it in the investigation?

A. Repeat that question.

Q. Sure. Okay. In the incident involving Deputy Whittington, Sergeant Barringer volunteered to help with the interview of the suspect. Would it be normal as far as the policies and procedures and normal activity of Precinct 3 for Deputy Whittington, even though he's the arresting officer, to tell Sergeant Barringer, his supervisor, what to do and how to conduct that

36

**LUCY JOHNSTON REPORTING**
**(281) 385-9088**

**JIMMY EVANS, III - October 28, 2022**

interview?

MS. MARTIN: Objection; confusing and compound.

Q. (BY MR. ORTH) You can answer the question.

A. Ask the question one more time.

Q. Sure. Okay. I'll rephrase it. Okay. If a supervisor is involved in or volunteers in an investigation with another deputy and volunteers to do whatever activity or to help with that investigation with an investigating officer, how would the -- would the arresting officer be able to tell the supervisor how to do his job?

MS. MARTIN: Same objection. And objection; calls for speculation.

A. The sergeant -- the sergeant can guide the employee on what he needs to do. And the employee -- the deputy also can recommend that it be done another way.

Q. (BY MR. ORTH) Okay. And in a situation where there's a supervisor involved or whether he is involved by volunteering or any other means in an interrogation with the arresting officer there present, who would be responsible for the interrogation, the arresting officer or the supervisor, in your opinion?

A. In my opinion, because I always tell

supervisors to supervise from 40,000 feet. If the supervisor comes down on that level, then it's all going to fall on him, the supervisor.

Q. And if a supervisor allows a suspect who is handcuffed in the front to touch narcotics during an investigation, would that be a violation of policies and procedures of Precinct 3?

A. Yes.

Q. And if a supervisor in an investigation sees a suspect handcuffed in the front, should they -- and that's assuming the suspect is medically fine and there would be no reason to have the suspect handcuffed in the front, should the supervisor make sure that the individual's handcuffs are changed from front to back, according to the policies and procedures of Precinct 3?

A. Yes.

Q. Now, in your opinion and based upon your experience as a supervisor at Precinct 3, is the arresting officer responsible for anything and everything that happens from the time that the suspect is arrested involving narcotics to the point in time where the narcotics are driven to the County?

A. Yes.

Q. Okay. And would the arresting officer be involved -- I mean be responsible even if the arresting

officer is going to the bathroom and handed off the suspect to the supervisor or another deputy to supervise?

MS. MARTIN: Objection; compound.

A. No. The deputy who he handed off the responsibility at that time is responsible for the care and custody and control of the arrested person.

Q. (BY MR. ORTH) And is it common practice at Precinct 3 for deputies to assist other arresting officers, other deputies, when narcotics come in such as bagging the narcotics or tagging them or any other procedure that would be involved in that process?

MS. MARTIN: Objection; compound and confusing.

A. Yes.

MS. MARTIN: There's three questions in there.

Q. (BY MR. ORTH) So it would not be uncommon for deputies to help other deputies involved in dealing with narcotics and substances -- correct? -- at Precinct 3.

A. No.

Q. And if one of those deputies that are helping another deputy with narcotics does something out of the purview of the arresting officer, would the arresting officer then be responsible for whatever happened with

the other deputy outside his purview?

A. In my opinion?

Q. In your opinion.

A. Yes.

Q. And why do you say that?

A. Because they're both -- because there could be another policy violation on why the other officer did not observe what was going on.

Q. Okay. I think were you familiar with the training room at Precinct 3?

A. Yes.

Q. Okay. If a Deputy was standing in the doorway, would they be able to observe what's going on in the training room --

MS. MARTIN: Objection; speculation.

Q. (BY MR. ORTH) -- if they wanted to.

MR. ORTH: Can I finish my question before you object, Counsel?

MS. MARTIN: I don't know. Can you?

Q. (BY MR. ORTH) Let me rephrase the question. In your opinion, could a deputy standing in the doorway be able to observe what's going on in the training room if they look in there from standing in the doorway?

A. There's a -- can I explain?

Q. Sure.

JIMMY EVANS, III - October 28, 2022

A. There's a doorway to the training room on the east end, and there's a doorway, I believe, on the west end. And if the deputy is standing in the east doorway looking west, he could see. And if he's on the east end -- on the west end looking east, he can see. And if he's on the east end, he could see the whole room, similar to this room.

Q. Okay. And do you know if there were cameras in the training room?

A. No.

Q. There weren't cameras in the training room?

A. No.

Q. Do you know what the Brady list is for Harris County? Have you ever had heard of that term?

A. Yes, I've heard of that term.

Q. And do you know what it is?

A. I've heard a Brady list is -- refers to a case, Brady versus Illinois, I believe, requiring that all evidence pertaining to a case has to be presented. And the way we've been told and trained, that if you have any sustained untruthfulness -- untruthfulness, insubordination, that it could affect your reliability and credibility to testify in a case and you could be placed on the Brady list and won't be able to testify in any cases, is the way it was explained to me.

Q. Did you have any involvement at all with the investigation that was done involving Officer Whittington -- or Deputy Whittington involving the missing cocaine on 5/28/20?

A. I was asked to be the primary investigating supervisor in regards to that case.

Q. And who asked you to do that?

A. I was called into the office by Captain Henry Elkin and Chief Kirk Bonsal.

Q. And what did either one of them say to you regarding heading up that investigation?

A. Chief Bonsal provided me a summary on the case and what it involved and stated that he -- like, I would be the person to investigate this case because of the good job that I had done on a prior case investigating another deputy for a different incident.

Q. And what response, if any, did you have to that?

A. And after hearing some of the specifics of that case, I told him that I didn't feel comfortable investigating that type of case.

Q. And why didn't you feel comfortable investigating that type of case?

A. Due to the fact that I -- I was thinking that it may -- it involved drugs, and I needed to be an

expert on drugs. Also it was -- Bert Whittington was not assigned to me, so I didn't think it was fair as a supervisor because I felt that his own supervisor should be investigating the case and not me, because he didn't work for me.

Q. And did you tell Chief Bonsal that or Captain Elkin?

A. Yes.

Q. And how did they respond, if at all?

A. Chief Bonsal told me that normally that since he's the chief, he could order me to investigate the case and that he would give me until the next day to make a decision if I wanted to volunteer to investigate the case.

Q. Okay. And did you volunteer to investigate the case?

A. No.

MR. ORTH: I think we've been going for a little while here. Can we take a break?

MS. MARTIN: Yes.

(Recess from 2:26 p.m. to 2:43 p.m.)

MR. ORTH: I'll pass the witness at this time.

MS. MARTIN: Give me a couple of minutes here. I just have a few questions.

EXAMINATION

BY MS. MARTIN:

Q. I want to go back to -- you talked about the email with Captain Elkin that was harassing and intimidating?

A. Yes.

Q. Can you tell me, what did that email say?

A. You know, no, I can't remember verbatim, but my complaint was that I felt like the email was condescending. I do remember that at first -- I mean, it was kind of weird to put in words, but I think it started out, "I told you." That's what really was part of it when he said "I told you." And I thought he was being condescending and I thought it is rude.

Q. Okay.

A. And I was concerned because there was some background to that also that made it feel -- because there was a prior statement that had been made by Captain Elkin that led up to, I think, the way I was feeling about that because of the prior incident or the other incident that we had had a discussion about.

Q. What was the other incident?

A. The incident, there was an incident -- a prior incident where Captain Elkin and I had worked at Precinct 1 Constable's office back in 2005. And prior

**JIMMY EVANS, III - October 28, 2022**

to me coming over to Precinct 3, there was a background investigation that was conducted. And there was a statement that -- a statement that Captain Elkin had wrote, and it was placed in my file as a letter from him stating something that I had said or did that wasn't true.

Q. Okay. And that happened at Precinct 1?

A. That happened at Precinct 1. But prior -- while they were conducting my investigation prior to Chief Bonsal becoming the Chief, according to Chief Elkin, the Chief made him write that statement in regards to me and place it in my background.

Q. What chief made him write that statement?

A. It was before I got there. The chief, he was terminated. There was another chief deputy prior to Chief Bonsal being promoted to chief who was overseeing the background. I can't remember his name.

Q. Okay. And when you say chief made him put it in the file, are you talking about the chief at Precinct 1 or Precinct 3 at that time?

A. The chief that was at Precinct 3 at that time.

Q. Okay. And do you know what the statement was?

A. Yes, I remember the statement. There was a statement. And, I guess, like, we were sitting around and we were talking about child support, and I told the

sergeant -- he was a sergeant at the time in Precinct 1. I told him that I could not work any jobs that took out taxes because it would affect my child support and would cause my child support to go up if I went back to court, that I could only work extra jobs that paid cash.

The statement that he wrote, he said that he felt like I wasn't a credible individual because I didn't pay my child support.

So when I found that in my file, I had no idea that he wrote the letter. It's just coincidence I found it. And when I went to him, I told him that, you know, if I want to say something, that's fine. But it bothered me more because it wasn't true, what you said.

And Captain Elkin told me that the prior chief made him write that and put it in my time. And Chief Bonsal removed it from my file.

Q. Okay. So Chief Bonsal removed that from your file, so it doesn't exist in your file anymore?

A. Yes.

Q. Okay. And with regard to, I guess, the investigation of the cocaine -- well, scratch that.

You've never seen Deputy Whittington's termination letter, have you?

A. No.

Q. Okay. And you don't know, as you sit here

today, all the reasons for the -- the details as to the termination. Correct?

A. That is correct.

MS. MARTIN: And I have no further questions. I'll reserve till trial.

MR. ORTH: I have no further questions. I'll reserve till trial.

(Proceedings concluded at 2:49 p.m.)

C E R T I F I C A T E

STATE OF TEXAS      )
                    )
COUNTY OF HARRIS  )

I, Lucy Johnston, Certified Shorthand Reporter in and for the State of Texas, duly commissioned and qualified, do hereby certify that the foregoing is a true, correct, and complete transcript of the proceedings in the foregoing captioned matter taken by me and transcribed from my stenographic notes.

The original deposition and exhibits were delivered to Mr. Philip J. Orth, III, Custodial Attorney.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office at Houston, Texas, this the 6th day of December, 2022.

Lucy Johnston
Texas CSR No. 3847
Expiration Date: 7/31/23

Lucy Johnston Reporting
Texas Firm Registration No. 450
1225 North Loop West, Suite 327
Houston, Texas  77008
(281) 385-9088

Time used by each party:

Mr. Philip J. Orth, III - 01:13
Ms. Melissa G. Martin - 00:08