**KIRK W. BONSAL, JR. - September 23, 2022**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

BERT W. WHITTINGTON, III §
        Plaintiff §
§
vs. § CIVIL ACTION 4:21-cv-03220
§
KIRK WAYNE BONSAL, JR., §
ET AL §
§
        Defendants §

***********************************************

ORAL DEPOSITION OF

KIRK W. BONSAL, JR.

September 23, 2022

***********************************************

ORAL DEPOSITION OF KIRK W. BONSAL, JR., produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on the 23rd day of September, 2022, from 10:05 a.m. to 3:45 p.m., before Lucy Johnston, CSR in and for the State of Texas, reported by machine shorthand, at Harris County Attorney's Office, 1019 Congress, 15th Floor, Houston, Texas, pursuant to the Federal Rules of Civil Procedure and any provisions stated on the record or attached hereto; Rule 30(b)(5) requiring an on-record reporter's statement was waived.

---

I N D E X

|  | Page |
|---|---|
| Appearances | 2 |
| Stipulations | 6 |
| Certificate | 140 |

EXAMINATION | Page |
| By Mr. Orth | 6 |
| By Ms. Martin | 136 |
| By Mr. Orth | 139 |

EXHIBITS

| Number | Description | Page |
|---|---|---|
| 1 | Internal Affairs Division Complaint, IAD Case #2020-A-002 (HC-0136) | 14 |
| 2 | Harris County Precinct 3 Complaint Form | 20 |
| 3 | Confidential Investigative Report of 6/15/2020 (HC-0140 through HC-0156) | 22 |
| 4 | Confidential Investigative Report dated 7/28/20, 2020-IAD-004 (HC-0001 through HC-0007) | 27 |
| 5 | Relief from duty letter from Chief Deputy Kirk W. Bonsal to Deputy Bert Whittington dated 7/28/20 | 30 |
| 6 | Disciplinary Letter of Suspension dated 7/16/20 from Chief Deputy Kirk W. Bonsal to Deputy Bert Whittington | 31 |

---

A P P E A R A N C E S

FOR THE PLAINTIFF:
    Mr. Philip J. Orth, III
    Law Offices of Philip J. Orth, III, P.C.
    16406 Lamplighter Street
    Crosby, Texas 77532
    Phone:   (713) 520-8333
    Fax:     (772) 217-8162
    E-mail:  philip.orth@yahoo.com

FOR THE DEFENDANTS:
    Ms. Melissa G. Martin
    Ms. Susana G. Sosa
    Harris County Attorney's Office
    1201 Franklin Street, 13th Floor
    Houston, Texas 77002
    Phone:   (713) 274-6700
    Fax:     (713) 368-9278
    E-mail:  melissa.martin@harriscountytx.gov

ALSO PRESENT:

    Mr. Bert W. Whittington, III
    Mr. Eric L. Baumgartner

---

EXHIBITS (continued)

| Number | Description | Page |
|---|---|---|
| 7 | Use of Force Review Board Memo from Chief Deputy Kirk W. Bonsal (HC-0410) | 34 |
| 8 | Memo from B. Whittington, III, to Chief Kirk W. Bonsal regarding Use Of Force Case #2005-00432 | 42 |
| 9 | Email from Corporal Craig Berry to Kirk Bonsal dated 7/24/20 regarding canine paperwork (HC-0095 through HC-0098) | 43 |
| 10 | Harris County Sheriff's Office K9 Handler Course Level I, Certificate of Completion for Bert W. Whittington, III | 46 |
| 11 | Administrative Disciplinary Committee Memo to File (HC-0409) | 48 |
| 12 | Termination letter | 97 |
| 13 | Letter from Claudia Arellano to Bert Whittington dated 4/9/21 | 104 |
| 14 | Memo from Lieutenant Bobby Thurman to Captain Henry Elkin dated 1/4/21 | 107 |
| 15 | Investigative Report 2019-IAD-005 dated 1/27/2020 | 109 |
| 16 | Memo from Chief Deputy Kirk W. Bonsal to Sergeant Troy Barringer dated 11/21/18, Written Reprimand; Preventable Fleet | 115 |
| 17 | Verbal Reprimand to Deputy D. Johnson dated 1/18/22 | 116 |
| 18 | Suspension letter to Deputy Maria Mora (HC-0581 through HC-0582) | 118 |

EXHIBIT 11

Case 4:21-cv-03220  Document 30-11  Filed 01/05/23 in TXSD  Page 2 of 35  2 (Pages 5-8)

KIRK W. BONSAL, JR. - September 23, 2022

EXHIBITS (continued)

Number   Description                                          Page

19   Memo regarding supervisory counseling
     from Sergeant Andrew Ries to Deputy
     Rebecca Mason dated 7/6/20 (HC-0587
     through HC-0588) ......................   119

20   Internal Affairs Division Complaint
     Form, IAD Case #2020-IAD-005 ..........   121

nods of the head or shakes or pointing or anything like that, I'd appreciate it if you'd give verbal responses to the questions.  Okay?

A.  Yes, sir.

Q.  And if you don't understand a question that I ask, feel free to tell me that you don't understand, and I'll be more than happy to rephrase the question.  If you give an answer to the question, I'll assume that you understood the whole question.  Correct?

A.  Yes, sir.

Q.  And you understand you're under the same penalties of perjury as if we were in the courtroom in front of the judge and jury?

A.  Yes, sir.

Q.  Who is your current employer?

A.  Harris County Precinct 3 Constable's Office.

Q.  And when did you start working for Harris County Precinct 3?

A.  January 2017.

Q.  When you started with Harris County Precinct 3 in January of 2017, what were your duties?

A.  I was captain over the internal affairs division and training.

Q.  Now, in your application that put in for Harris County's Precinct 3, did you lie at all on your

THE REPORTER:  Stipulations?

MR. ORTH:  Pursuant to the Federal Rules?

MS. MARTIN:  Yes, agreed.

KIRK W. BONSAL, JR.,
having been first duly sworn, testified as follows:

EXAMINATION

BY MR. ORTH:

Q.  Please state your full name for the record.

A.  My name is Kirk W. Bonsal.

Q.  And have you ever given a deposition before?

A.  Yes.

Q.  Okay.  Approximately how many?

A.  One.

Q.  But you've been sitting in on all the other depositions in this case so far.  Correct?

A.  Yes, sir, that's correct.

Q.  And I'd like to make an agreement with you to make the deposition go a little easier for the court reporter and everybody else.  One agreement I'd like to make is that you allow me to finish my question before you begin your answer, and I'll give you the same common courtesy of allowing you to finish your answer before I ask you another question.  Okay?

A.  Yes, sir.

Q.  And since the court reporter can't take down

application?

A.  No.

Q.  Now, you were at the deposition this week of Lieutenant Simpson.  Correct?

A.  Yes, sir.

Q.  And you heard Lieutenant Simpson testify under oath that he gave you a copy of his investigation regarding Deputy Whittington and a recorded statement of the suspect.  Correct?

A.  Yes.  He gave me a case file.

Q.  And you did receive a copy of that recorded statement of the suspect.  Correct?

A.  I believe it was in the case file, yes, sir.

Q.  And what did you do with the recorded statement?

A.  It remained in the case file.

Q.  And did you listen to the recorded statement?

A.  I do not remember if I did or not.

Q.  Now, would you agree with me that if a constable struck a juvenile in handcuffs, that would be a violation of the policies and procedures of Precinct 3.  Correct?

A.  Yes, sir, if that occurred.

Q.  And you chaired the administrative board regarding Constable Whittington.  Correct?

**(281) 385-9088**

**KIRK W. BONSAL, JR. - September 23, 2022**

A.  Yes, sir, that's correct.

Q.  And the recorded statement of the suspect that Lieutenant Simpson gave you, was that presented before the board?

A.  It was presented to the board, yes, sir.

Q.  And did the board have an opportunity to listen to that recorded statement?

A.  It was available to them.  I don't remember if it was shown during the hearing.

Q.  And after the hearing, did you retain a copy of the investigation and recorded statement?

A.  The file was retained intact, yes, sir.

Q.  And where did you put the file?

A.  In the file room.

Q.  And to your knowledge, that's where it should go.  Correct?

A.  Yes, sir, that's correct.

Q.  Okay.  Now, do you recall, in the incident on a 5/28/20, whether Sergeant Barringer was in plain clothes that day, or was he assigned to patrol that day?

A.  My understanding is he was in plain clothes that day.  And let me clarify.  We're talking about the incident with the dog bite?

Q.  Yes, sir.

A.  Yes, sir, plain clothes.

Q.  Now, do you recall Deputy Whittington requesting -- or indicating that Sergeant Barringer struck a juvenile --

A.  Yes, sir.

Q.  -- regarding that incident?

A.  Yes, sir.

Q.  And that was investigated.  Correct?

A.  Yes, sir, it was.

Q.  And was the investigator given a copy of that recorded statement of the suspect that Lieutenant Simpson gave?

A.  I would assume so.  I couldn't answer for what the investigator received, but she should have been given access to everything.

Q.  And whose responsibility would that have been to make sure that the investigator had received a copy of the recorded statement of the suspect?

A.  I believe it would be the investigator's.

Q.  And if the investigator that investigated that incident that Constable Whittington complained about received a copy of the recorded statement of the suspect that Lieutenant Simpson did, would she have -- or should she have noted that in her investigative report, to your knowledge?

A.  I guess.  And if I may, I haven't reviewed that report in a while, so I don't know what's in it, if that clarifies that answer.

Q.  Do you know who assigned the officer who investigated Constable Whittington's request or complaint, who assigned that investigator?

A.  I assigned that case to that investigator.

Q.  Okay.  Do you recall the investigator's name?

A.  Yes.  Morrison.

Q.  And why did you pick Morrison to investigate that complaint?

A.  She is one of the personnel that is part of the professional standards unit, which is attached to internal affairs.  She was before her retirement.

Q.  On 5/28/20, who would have been your supervisor?  Would that have been the actual sheriff, Eagleton?

A.  Constable Eagleton.

Q.  Or Constable Eagleton?

A.  Yes, sir, that's correct.  Constable Eagleton.

Q.  And at that point in time -- when I say "that point in time," I'm talking about 5/28/20 -- how long had Constable -- or Deputy Eagleton been your supervisor approximately?

A.  Since December of 2017.  He was always my supervisor, but he was my immediate supervisor since December of 2017.

Q.  Okay.  And how much daily contact would you normally have with Deputy Eagleton, your supervisor?

A.  Constable?

Q.  Constable.

A.  I don't know daily, but we're in constant contact.

Q.  Okay.  Have you ever given a copy of the recorded statement that Lieutenant Simpson took of the suspect to Constable Eagleton at any time?

A.  I don't believe I did, no.

Q.  And do you know where the recorded statement that Lieutenant Simpson took of the suspect is currently?

A.  I would imagine it's in the case file where it belongs.

Q.  When you say "case file," you're talking about the one that you talked about earlier that has the whole investigation and the statements and everything else in it.  Correct?

A.  Yes, sir, that is correct.

Q.  Okay.  Do you know how long those case files are kept?

A.  There is a retention for records required by the County, but internal affairs files for our industry

are pretty much kept forever.

Q. Did you give a copy of that to your attorney? And all I'm asking is whether you gave to them a copy, not when or what was said.

A. Are you talking about the case file?

Q. Yeah. I'm sorry. The whole case file, yeah.

A. I didn't personally give a copy to the attorneys. I would -- I'll stop there.

Q. Do you know whether the case file regarding -- and we're only talking about Lieutenant Simpson's investigation. That's the only one. Do you know who gave that or who was responsible to give that to your attorney?

A. The records manager for the department.

Q. And who's that?

A. Ms. Paula Green.

Q. And who would let Paula Green know what to give and when to give it to whom, as far as the attorneys are concerned, your attorney?

A. If you'll allow me, I can explain the process.

Q. Sure.

A. Because I'm not intimately familiar with what she was specifically told. When a request is received from the county attorney's office, the district attorney's office, or even a Freedom of Information

request, they go through Ms. Paula Green.

Ms. Paula Green, my understanding, confers with the county attorney on certain files, what gets released, and public information. And Ms. Green just sends over whatever is requested to the county attorney and the district attorney.

(Exhibit #1 marked.)

Q. (BY MR. ORTH) Let me hand you what's been marked as Exhibit Number 1 to your deposition and ask you whether you've seen that before (indicating).

A. Yes.

Q. And what is it?

A. This is the Internal Affairs Division Complaint Form.

Q. And that is your signature, correct, on Exhibit Number 1?

A. Yes, sir.

Q. Okay. And this is your complaint regarding Deputy Whittington. Correct?

A. This is a departmental complaint, yes.

Q. Well, you brought the complaint. Correct?

A. The department is the complainant in this. And as a designated representative of the department, I signed it.

Q. So who decided to bring the complaint against

Deputy Whittington that's exhibited in Exhibit Number 1?

A. If I can explain the procedure to you, if that's okay.

Q. Sure. That's fine. If that answers the question, go ahead.

A. The statute, the government code, requires a complaint be given to an officer when there's an investigation or a complaint or a policy violation before an investigation can be conducted. And this is a form that we use for those.

If there is a civilian that comes in and files a complaint, the civilian complainant would sign the actual complaint form and then provide an additional statement as to what their complaint is.

In this case, it was brought to my attention there was an issue with evidence handling. And in order to comply with the Government Code 614, a complaint form was drafted and signed so that we could proceed with the investigation.

Q. All right. And were you the one that determined who was going to investigate this complaint in the internal affairs division?

A. Yes, I did make that decision.

Q. And in this case, you chose Lieutenant Duffy. Correct?

A. That is correct.

Q. And why did you choose Lieutenant Duffy?

A. Multiple reasons that that occurred. One is the internal affairs investigator was out battling cancer. And I also use opportunities to assign investigations to other commanders for crew development purposes. And Lieutenant Duffy has done other ones, and I assigned him to do it for availability mainly.

Q. And what instructions, if any, did you give Lieutenant Duffy regarding the investigation?

A. I don't remember giving him any instructions other than to conduct the investigation.

Q. Did you hand him a copy of Exhibit 1?

A. I don't know if I handed it to him or not. I don't know if he was given a file. I don't know.

Q. Did have you any communications with Lieutenant Duffy while he was actually doing the investigation?

A. I'm sure, but I don't know. About the case specifically, probably not.

Q. Yeah. And that's what I was talking about, about the actual investigation. I'm not talking about "How are you doing" or anything like that. I'm talking about questions or any information concerning the investigation itself.

A. I couldn't tell you. It was a couple of years

**KIRK W. BONSAL, JR. - September 23, 2022**

ago. Had I had any communication with him, it would have been a status update and how long before it's finished maybe.

Q. Did you have any contact with Major Villarreal regarding the investigation while it was going on?

A. I probably did.

Q. And do you recall whether anything was said to Major Villarreal regarding the actual investigation that Duffy was doing at the time?

A. The initial conversation was when it was reported to me by Major Villarreal that there was some cocaine missing and his division was going to do the follow-up investigation. And I told him no, I was taking it outside and assigning it to someone else.

But other than talking about that, I can't think of anything else we discussed regarding this in particular until towards the end of the investigation.

Q. And when you say "towards the end of the investigation," would that have been prior to its completion, or after it was completed?

A. Before it was completed.

Q. And what conversations did you have with Major Villarreal before the investigation was completed towards the end regarding the investigation?

A. I knew Major Villarreal was having

conversations with the district attorney because it was a pending criminal case against the defendant, and I instructed him to see if they couldn't locate the individual who was arrested and find out if he would consent to an interview.

Q. And why did you want the suspect to be given an interview?

A. I wanted to know if he took the cocaine.

Q. And did you choose the individual that was supposed to conduct the interview of the suspect?

A. No. I just instructed the major to make sure whoever interviewed him did it with a video camera on him.

Q. Do you know if Major Villarreal chose the individual that conducted the interview with the suspect or not?

A. I don't know if he chose them, but I know who did it, obviously.

Q. And who did it?

A. Sergeant Barringer.

Q. Do you know why Lieutenant Duffy himself did not do the interview with the suspect, since he was the investigator?

A. I assigned it to Major Villarreal for a specific reason to carry out that task and not to Duffy.

Q. Now, during the investigation, were you aware that Deputy Johnson may have done more than one statement --

A. No, sir, I was not.

Q. -- for Lieutenant Duffy.

I'm sorry?

A. No, sir, I was not.

Q. And since you had experience and were trained in internal affairs when you started working for Precinct 3, would it be your understanding that if there are multiple copies of statements, that all the statements should be included in the investigative report?

A. If there's multiple statements, I would think so.

Q. And do you know whether Sergeant Barringer did more than one statement for Lieutenant Duffy in the investigation?

A. No, sir, I do not.

Q. Do you know of any other witness in the investigation done by Lieutenant Duffy that did more than one statement?

A. No, sir, I do not.

Q. When you received a copy of the investigation work done by Lieutenant Duffy, did you notice whether

there were multiple statements of any of the witnesses in it?

A. No, sir, I didn't notice it.

Q. You didn't see that there were any?

A. I don't recall everything that was in the file, but I don't recall seeing multiple statements.

Q. Okay.

(Exhibit #2 marked.)

Q. (BY MR. ORTH) Let me hand you what's been marked as Exhibit 2 to your deposition and ask you whether you can identify that.

A. Yes, sir. A complaint form.

Q. And is that your signature on Page 2?

A. Yes, sir.

Q. And this would be another complaint form regarding Deputy Whittington. Correct?

A. Yes, that's correct.

Q. And in the second paragraph on Page 1, it describes what your complaint is -- or what it -- it says "My complaint," but it's dealing with you. Correct?

A. Yes, sir.

Q. And what brought the issues described in Paragraph 2 to your attention?

A. A report submitted by or a memo submitted by

**KIRK W. BONSAL, JR. - September 23, 2022**

the compliance enforcement officer, Lieutenant Jimmy Evans.

Q. And do you know who this investigation was assigned to?

A. This was the dog bite?

Q. Yeah.

A. The canine?

Q. Yes.

A. Lieutenant Simpson.

Q. And who chose Lieutenant Simpson to do the investigation --

A. I did.

Q. -- concerning Exhibit number 2?

A. I did.

Q. And why did you choose Lieutenant Simpson?

A. He was also assigned at that time to admin, and he was an available investigator for the task.

Q. And were you aware at that time that Lieutenant Simpson had prior experience doing the investigation?

A. Yes, sir.

Q. And would that have been one of the reasons why you chose him?

A. Yes, sir.

Q. Going back to Paragraph 2, it's my understanding that there were two incidents on 5/28/2020

that involved Deputy Whittington.  Correct?

A. Please be more specific.  Two incidents?

Q. There were two incidents on 5/28/20 that Deputy Whittington was involved in.  One was dealing with a juvenile, and one was dealing with another suspect who was not a juvenile.  Correct?

A. I don't know that.

Q. Okay.  And, well, the suspect that you're describing regarding your complaint on May 28th, 2020, in Paragraph 2, was that a juvenile or was that an adult suspect?

A. My understanding is it was a juvenile suspect.

Q. Okay.  And earlier on you indicated that it was brought your attention by the force compliance officer, Jimmy Evans, that there might have been a violation regarding Deputy Whittington.  Did he indicate that there was just one incident on 5/28/2020 or whether there were two regarding the force compliance?

A. If I remember correctly, the file that Jimmy Evans sent to my office as part of his duties was specifically in reference to the juvenile and the recall of the dog and that the use of force was not in compliance, in his opinion.

Q. Okay.

(Exhibit #3 marked.)

Q. (BY MR. ORTH) Let me hand you Exhibit Number 3 to your deposition and ask you whether you can identify that (handing).

A. This is the investigative report submitted by Lieutenant Duffy.

Q. Okay.  And directing your attention to Page 16 where it says "Conclusion."

A. I'm there.

Q. Got it?

A. Yes, sir.

Q. And it goes on to Page 17.  If you could take a minute and read over those conclusions, I'd like to ask you some questions concerning that.

A. Do you want me to read "The corrective measures" part, too?

Q. No, sir.  Just the conclusions.

A. I'm finished.

Q. My question concerning those conclusions of Lieutenant Duffy, did you read over those when you received the actual investigative report from Lieutenant Duffy?

A. Yes, sir.

Q. Did you agree with each of those conclusions from Lieutenant Duffy?

A. Taking the information from Lieutenant Duffy, I

took in account what his opinions were on what was going on.

Q. Did you have any discussion with Lieutenant Duffy, that you recall, regarding those conclusions that he put in his investigative report in Exhibit 3?

A. No, sir, I don't believe that I did.

Q. Now, since we're on that page, looking at "The corrective measures" that Lieutenant Duffy put in there on Page 17, at the time that you were presented the report from Lieutenant Duffy, did you agree with all the corrective measures that he suggested?

A. Yes.

Q. All right.  And were any of those corrective measures put into place, if you can recall?

A. Yes.

Q. Which ones?

A. Video cameras were installed in the evidence processing area.  There were directives for processing evidence to remain in the processing area, which is a real building.

I do not believe we've been able to secure the video of interview currently yet.  Policy training has been pushed out multiple times.  The same information about where prisoners are allowed to be has been discussed and pushed out.  And property bar coding

should not be printed on thermal paper. My understanding is the only person that did that after being told multiple times not to do that was Deputy Whittington. And the reason they don't want it printed on thermal paper is you can't read it. It's not the sticky things that come out of the machine in order to do the bar codes.

Q. Now, turning your attention to starting on Page 8.

A. I'm sorry. The page number, sir?

Q. Page 8 on the bottom.

A. Okay.

Q. Where it says "Deputy David Johnson's statement and responses," do you see that?

A. Yes, sir, I do.

Q. Now, if you look at that on Page 8, it does not indicate in the actual investigative record that Deputy Johnson did more than one statement. Correct?

A. Correct. And if I may, you know, I don't know. You referred to two statements. I'm not sure what you're talking about. I was told that he amended a statement at the request of the investigator, but I don't know of two statements. For my clarity, I don't know of two statements.

Q. Okay. Well, would you agree with me that

there's nothing indicating -- when it talks about Deputy Johnson's statement on Page 8 and 9, does it indicate that any statement from Deputy Johnson was amended?

A. I don't see that in here, no, sir.

Q. And if you want to look through the whole thing, there's no statement in here indicating that any witness amended their statement.

A. No. As far as I know, there's not.

Q. Now, when you assigned Lieutenant Simpson to do the investigation based on Exhibit Number 2, did you give him any instructions as to conducting the investigation?

A. I don't believe so. I just assigned the investigation to him.

Q. Did you indicate to Lieutenant Simpson any of the possible witnesses that he might want to interview?

A. No. I didn't give him any instructions.

Q. Okay. Did you have any communication with Lieutenant Simpson regarding the investigation while the investigation was ongoing?

A. I would imagine I got updates possibly, but we were housed in the same building at that time. I'm sure we had conversations.

Q. Would any of those conversations, if you can recall them, have been guiding Lieutenant Simpson

regarding his investigation?

A. Only if he asked for it, and I don't recall him ever asking for guidance or direction.

Q. Did you have any conversation that you recall with anyone else concerning the investigation while it was ongoing?

A. I don't know. The only thing I could think of was the constable was briefed on the investigation and the status. But I don't know exact conversations.

Q. And did you receive a copy of the investigation done by Lieutenant Simpson?

A. Yes, I did.

(Exhibit #4 marked.)

Q. (BY MR. ORTH) Let me hand you what's been marked as Exhibit Number 4 to your deposition and ask you whether you can identify that.

A. This is then Deputy but now Lieutenant Simpson's IAD report or report of investigation.

Q. And turn to Page 6 in the exhibit where it says "Conclusion."

A. Uh-huh.

Q. And you can go ahead and read that if you want.

Done reading? It's only on that page.

A. Yes, sir.

Q. Okay. Did you agree with the conclusions when

you received the report from Deputy Simpson at that time?

A. I would say so.

Q. And did you have any conversations with Lieutenant -- or Deputy Simpson at that time concerning his investigation or conclusions?

A. No, I don't believe so.

Q. And was this investigation something that was discussed in the administrative board that you had on Deputy Whittington?

A. Yes.

Q. And in the Conclusion section on Page 6, correct me if I'm wrong, but it does not indicate that the evidence was conclusive, as far as the investigation was concerned, that Deputy Whittington violated the force or response to resistance policy. Correct?

A. I'm sorry. Explain that to me again.

Q. Sure. Directing your attention to the Conclusion. Okay?

A. Yes, sir.

Q. Would you agree with me that it states that Deputy Whittington may have violated but was not conclusive as far as the investigation done by Simpson at that time -- Deputy Simpson or Lieutenant Simpson, that he concluded that Deputy Whittington did actually

KIRK W. BONSAL, JR. - September 23, 2022

violate the use of force or response to resistance policy?

A. Let me explain that the investigators are not allowed to make conclusions on policy violations. That's what the administrative disciplinary committee is for or the review -- the post-investigation review, if you will.

So they're not supposed to be typing "I found he violated this policy." They are just supposed put what their findings are and what they believe supports what their findings are, not a definitive decision by the investigator.

MR. ORTH: Okay. Objection as nonresponsive.

A. I'm sorry. Try again.

Q. (BY MR. ORTH) I'm just indicating whether Lieutenant Simpson, or Deputy Simpson at that time, should have put it in or should not have put anything in as far as concluding as to whether, you know, in his opinion Deputy Whittington violated the use of force or response to resistance. He did put that in his report, correct, in the conclusion section in the first paragraph there?

A. You said that he did violate policy, so you want to correct your question?

Q. No, no. I said he did put something in regarding his opinions as far as whether Deputy Whittington violated the use of force or response to resistance policy. Correct?

A. He put "may have," that is correct.

Q. Okay. So that's not conclusive saying that he actually did. Would you agree with me?

A. That's correct.

Q. Okay.

(Exhibit #5 marked.)

Q. (BY MR. ORTH) Let me hand you what's been marked as Exhibit Number 5 and ask you whether you can identify that.

A. Yes.

Q. And what is it?

A. This is a relief from duty letter.

Q. Okay. And this is something that you gave to Deputy Whittington on or about July 28, 2020. Correct?

A. I wrote it, but I believe Captain Elkin issued this.

Q. Okay. And who determined that Constable -- or Deputy Whittington should be relieved of his duty at that time?

A. That was me.

Q. And why did you determine that?

A. Based on the two allegations or two cases, if you will, the lost cocaine and excess use of force, I felt that it was appropriate to take him off of the street to avoid any additional new cases occurring while the investigation was being completed.

Q. Okay. And in the investigation that was done by Lieutenant Duffy, did he come up with a conclusion that Deputy Whittington took the cocaine or the 14.8 ounces of the white substance?

A. Yeah, the 14.8 grams or whatever it was, I believe that there was no determination of where it actually went.

Q. Okay.

(Exhibit #6 marked.)

Q. (BY MR. ORTH) Let me hand you what's been marked as Exhibit Number 6 to your deposition and ask you whether you can identify that.

A. Yes, sir. This is a disciplinary letter of suspension.

Q. Okay. And what disciplinary instance were you talking about in this letter in Exhibit Number 6?

A. I'm not sure. Can you be more specific what you're asking me?

Q. Sure. If you look at the first paragraph -- okay? -- the second sentence, it says, "The investigation has determined that you violated policy 313.3 regarding the activation of your body worn camera during a law enforcement action, specifically this incident involved a use of force that resulted in your K-9 biting a juvenile suspect."

Now, first of all, that's a correct reading of what's in Exhibit Number 6. Correct?

A. Yes, sir.

Q. Now, it's referencing, you know, two different things, a body activation -- body-worn camera activation violation, as well as an incident of use of force involving the canine biting the juvenile. And my question to you is, did this letter of disciplinary suspension to Officer -- or Deputy Whittington involve both of those incidents or one or neither?

A. Reading it, it sounds like it was in direct response to a biting of a juvenile where he didn't turn the camera on, which has been apparently multiple times the camera wasn't turned on, as noted in here.

Q. So it was only involving the body-worn camera issue and not the biting of the juvenile. Correct?

A. That's correct.

Q. Okay. And would this have been the same instance that you had Lieutenant Duffy investigate?

A. I'm not sure, but it sounds like it is. The

**KIRK W. BONSAL, JR. - September 23, 2022**

date appears to be the same event.

Q. And regarding this disciplinary letter of suspension, did Deputy Whittington receive just a letter of suspension, or did he receive anything else, to your knowledge?

A. In reference to this?

Q. Yeah.

A. So if I'm understanding your question correctly --

Q. Let me rephrase it.

A. Please.

Q. Sure. How long was the suspension for Deputy Whittington concerning this incident in Exhibit Number 6?

A. One day.

Q. Okay. And who determined whether it was one day or more than one day?

A. In this particular case, it's just based on recommendation from his supervisors.

Q. And at that time, who were Deputy Whittington's supervisors?

A. It would have been Sergeant Barringer and Major Villarreal.

Q. But his direct supervisor was Sergeant Barringer. Correct?

A. Direct supervisor was Sergeant Barringer, that's correct.

Q. Okay.

(Exhibit #7 marked.)

Q. (BY MR. ORTH) Let me hand you what's been marked as Exhibit Number 7 and ask you whether you can identify that.

A. Okay.

Q. Okay. Now, my question was, can you identify it?

A. Oh, yes, sir. I'm sorry.

Q. That's okay.

A. I read it and forgot your question. I apologize.

Q. That's okay. And what is it?

A. This is a memo summarizing use of force review board findings.

Q. Okay. And the use of force review board was chaired by you. Correct?

A. That is correct.

Q. And who picked the individuals that the board consisted of?

A. In this case, I probably did.

Q. And do you recall why you picked these specific individual deputies?

A. In the case, for example, of Deputy Lerma, a request was sent to his supervisor to send a deputy to sit on the board, meaning that that person was picked by that supervisor and sent. The same thing with Deputy Jaramillo. I asked Deputy Hodges to sit on it because he was in my command. Deputy Brown, also in my command and in my building, and I had him sit on it. And Deputy Morrison was also in there on that command that worked in my building. It was availability mainly for those three.

Q. Now, since it doesn't indicate the date of the incident that we're talking about, do you recall -- all it indicates is the Case Number 28-2020. Do you recall whether this is the same incident that Lieutenant Simpson was assigned to investigate or whether it was a different incident?

A. No. This would have been the one assigned to Lieutenant Simpson.

Q. And do you recall, would this have been done after the investigation by Lieutenant Simpson was over, or was it during that or before that?

A. This would have been done afterwards, after the investigation was complete.

Q. Going back to Number 4, the actual investigation by Simpson, if you can get that again.

A. Uh-huh.

Q. If you look on the first page there, do you have it? Where it says "Alleged Violations," you note that right next to that it says "503.4, Use of Force and K9 Bite Procedures." Correct?

A. Yes, sir.

Q. Okay. And that's the only alleged violation, well, regarding the canine bite procedures listed. Correct? There's not another one under 503.2, 503.1 listed there?

A. Yes, sir.

Q. Now, directing your attention then to Exhibit Number 7, which was the last one that we had.

A. Okay.

Q. All right. If you look in the body of -- down towards the last of that big paragraph there, do you see that where it lists violated policy 503.1 and 503.2?

A. Uh-huh.

Q. Do you see that?

A. Yes, sir.

Q. And that's different from what's in Exhibit Number 4. Correct?

A. That's true.

Q. Okay. Do you know why there's a discrepancy, as far as the alleged violation, between the two

KIRK W. BONSAL, JR. - September 23, 2022

documents?

A. I wouldn't call it a discrepancy. This is what Lieutenant Simpson noticed, and this is what the board found in their findings on the use of force review. They were only looking at the use of force review with the dog.

Q. Okay. And do you know if the board was given a copy of the investigative report by Lieutenant Simpson, Exhibit Number 4, to review?

A. Yes, sir.

Q. Do you know what other documents the board was given, the review board in Exhibit Number 7, other than the investigative report?

A. What this document says and what is typical of what we do, they're given access of everything pertaining to what they're reviewing, videos, memos, the training coordinator from the use of force compliance officer, anything available, including they have the ability to request to speak to witnesses if they choose.

Q. And did they request to speak to any individual witness?

A. No, sir.

Q. And since you were chairing that board, do you recall at this point in time whether the actual investigation by Lieutenant Simpson was discussed?

A. Yes, sir, it was.

Q. And were any conclusions regarding the investigation by Lieutenant Simpson discussed in that board meeting, as far as Exhibit Number 7?

A. I'm not sure I understand what you're meaning.

Q. Okay. That's fine. I'll rephrase.

A. Yeah. I don't want to answer wrong.

Q. That's okay. Were the conclusions of Lieutenant Simpson that he did in his report that you recall we went through, were those discussed at the use of force review board in Exhibit Number 7?

A. I believe the report was discussed. Everything that was in it.

Q. Okay. And do you recall whether the board came out with a different conclusion, as far as what should happen in the case, than what Lieutenant Simpson recommended --

A. This board --

Q. -- or came up with?

A. This board does not make recommendations. They find whether there was a policy violated or not for use of force.

Q. And wasn't that something that Lieutenant Simpson was supposed to do, as far as his investigation, to see if there were any policy violations that Deputy

Whittington may have done in the incident that he was investigating?

A. Lieutenant Simpson's job is to determine the facts of the case and conclude a conclusion of his findings.

The administrative disciplinary committee decides if there's policy violations.

And the use of force review board, a separate entity for another policy, reviews all use of force, whether it goes to IAD or not. And they have to make their own determination.

Q. Going back to Lieutenant Simpson's report, why would he have put, if you know, "alleged violations" if he was not supposed give his opinion on those or indicate whether any policies or procedures, specifically the ones he alleged or that he indicated alleged violations on Page 1, were violated or not?

MS. MARTIN: Objection; speculation.

A. His job is to identify policy violations that may not have been known to anyone and list them and then any supporting information that would indicate that the policy was violated, but he is not the final decision-maker on whether a policy was violated or not.

Q. (BY MR. ORTH) Well, I understand that he's not the final decision-maker, but he does make or give his opinions on whether there were any alleged violations. Correct?

A. I guess if you say it's an opinion, then yes. His conclusions or his findings should be based on what he believes the evidence shows him.

Q. Right.

A. But again, he doesn't get to say "He violated Policy Number 1." That's not his job to do that.

MS. MARTIN: We've been going about an hour. Can we go ahead and take a break?

MR. ORTH: We can go ahead and take a break at any time.

Q. (BY MR. ORTH) And I forgot to tell you that. We can take a break at any time other than between question and answer.

A. Whatever you want, sir. That's fine.

MR. ORTH: Okay.

(Recess from 11:06 a.m. to 11:25 a.m.)

Q. (BY MR. ORTH) Now, we talked about you assigning the investigation to Lieutenant Duffy. Did you assign that investigation to any other constable or individual, before you assigned it to Lieutenant Duffy, who denied doing it or not?

A. I'm sorry. Say that again.

Q. Sure. We talked about the investigation that

you assigned to Lieutenant Duffy. Correct?

A. Yes.

Q. Now, prior to assigning Lieutenant Duffy to do the investigation, had you previously assigned it to anyone else?

A. No, sir.

Q. Now, we originally talked about Paula Green being the individual who receives the request for information. And you indicated that she's the one that sends out the documents. Correct?

A. Yes, sir.

Q. Okay. Now, before she sent out the documents, whether it be a formal request or whether it be to another agency requesting those documents, do you have any input as far as what documents go out or not?

A. No, sir, I do not.

Q. Okay.

A. I can --

Q. Are you aware --

A. May I answer additionally to that?

Q. Well, if you need to, your attorney can do that.

A. Okay.

Q. Do you know when the requests for information come in?

41

A. Not all the time, no, sir.

(Exhibit #8 marked.)

Q. (BY MR. ORTH) Now, directing your attention to Exhibit Number 8, can you identify Exhibit Number 8?

A. Yes. It's a memo from Deputy Whittington.

Q. To you. Correct?

A. Yes, to me.

Q. Okay. And do you recall approximately when you received that?

A. No, sir, I do not.

Q. Okay. And was this in response to, to your knowledge, the use of force case that we previously talked about in the prior exhibit -- let me get that -- Exhibit Number 7?

A. Yes. Exhibit 7 was the use of force review board memo.

Q. Yes. And my question to you -- I'll repeat it. That's okay. Was Exhibit Number 8 in response to Exhibit Number 7?

A. That, I do not know.

Q. Okay. Well, would you agree with me in Exhibit Number 8, and if you look at the first paragraph, it talks about "My In Car Camera System," second line from the top?

A. Uh-huh.

42

Q. "My In Car Camera System was activated from the time I left 904 Dell Dale until reaching the area in which the suspect evading on foot."

A. Yes, sir.

Q. First of all, that's a correct reading of that?

A. That is correct.

Q. Okay. Does that refresh your memory at all as to whether the two events are -- the response in 8 was in response to 7?

A. Actually, 8 is in response to 6.

Q. Okay.

A. The suspension letter.

Q. Okay.

A. Once you refreshed my memory, that's what that's in response to.

Q. Okay. And what, if anything, when you received Exhibit Number 8, did you do?

A. Inserted the file into the -- the memo into the case file after reading it.

Q. Okay. But you didn't take any action on it other than putting it in the case file. Correct?

A. That is correct.

(Exhibit #9 marked.)

Q. (BY MR. ORTH) Let me hand you Exhibit 9 to your deposition and ask you whether you can identify that.

43

A. Yes.

Q. Okay. And what is it?

A. It is an email response from Sergeant -- or at this time, Corporal Berry. I asked for some information, if he could give me information regarding canines from Harris County Sheriff's office.

Q. Okay. And first of all, when you received this information, what, if anything, did you do with it?

A. I imagine I gave it to Lieutenant Simpson or had it put in the case file, but I'm not sure.

Q. Okay. And when you talk about Lieutenant Simpson and the case file, you're talking about the investigation that he did. Correct?

A. Yes, sir, that's correct.

Q. And why did you initially request this information from Sergeant Berry, or Deputy Berry at that time?

A. Deputy Berry is a former Harris County Sheriff's employee, and he is friends and he knows and does training with the staff at the sheriff's office. And I needed some information that I did not have regarding canine procedures or canine training, and I wanted it. And I asked him to get it for me.

Q. Okay. If you notice on Page 2 and 3 of Exhibit Number 9, there's certain portions that are highlighted.

44

KIRK W. BONSAL, JR. - September 23, 2022

Notice that?

A. Yes, sir, there are portions that are highlighted.

Q. Were they highlighted when you received it?

A. I don't remember.

Q. Okay. Do you recall whether you highlighted them or not?

A. I don't think I did, but I don't know.

Q. Well, if you look at the second sentence on the first page, do you see there where it says "I have attached a copy of the Standards and highlighted"?

A. Okay.

Q. You see that?

A. So he did.

Q. Would that indicate to you that Deputy Berry is the one that highlighted this?

A. Yes. I just read that a few seconds ago and missed it. Thank you for pointing it out, sir.

Q. Do you know if Deputy Whittington and K-9 Zane had met the NNDDA standards for testing and training prior to the 5/28/20 incident?

A. I would imagine he did.

Q. And is any canine unit assigned to Precinct 3 required at any point in time to get certified by the NNDDA standards?

A. I don't directly supervise canines, but I understand that is the standard that is used before the dogs are allowed to be deployed or certified for deployment.

Q. Have you ever worked in a canine unit in any of your prior experience or employment?

A. Thirty years ago I did work and train with a canine. I did not have my own dog. I was trying to get into the canine unit at the time. So that's about the limit of experience I have was observing the training and participating in it. I've never had a patrol dog assigned to me.

Q. Okay. And I can't remember if you said whether you -- did you give a copy of Exhibit Number 9 to Officer Simpson while he was doing his investigation?

A. I would believe I did, but I can't remember. It should be in the case file if it was.

Q. Okay. Would it have been something that Lieutenant Simpson would have noted, or I should say should have noted in his investigative report as far as documents that he reviewed or used?

A. I don't know.

(Exhibit #10 marked.)

Q. (BY MR. ORTH) Let me hand you what's been marked as Exhibit Number 10 to your deposition and ask

you whether you can identify it.

A. It appears to be a certificate of completion for training from the sheriff's department for Deputy Whittington on the canine course.

Q. And that's given by the Harris County Sheriff's Academy. Correct?

A. That is correct.

Q. Okay.

A. Or the sheriff's office, yes, sir.

Q. And it indicates that he completed 360 hours of course instruction regarding canine instruction. Correct?

A. Yes, sir.

Q. And that was done in June 2019?

A. Yes, sir.

Q. Are all canine units that work in Precinct 3 of the constable's office required to go through this training course?

A. It's my understanding they have to get certified, yes, sir.

Q. Okay. Do you know whether you gave a copy of Exhibit Number 10 to Lieutenant Simpson before or during his investigation?

A. No, I did not.

Q. Okay. Were you aware of Exhibit Number 10 prior to the investigation that was done by Lieutenant Simpson?

A. I was not aware of this exact piece of paper, but I was aware training had been completed.

Q. Okay. And in the use of force board that we talked about earlier, Exhibit Number 7, do you recall whether Exhibit Number 10 was brought up at all?

A. No, I don't.

Q. Okay. But it would have been one of the documents that would have been available to the board if they so chose to retrieve it. Correct?

A. If they had asked for it or it was available to them. I don't know where this document came from. It could have been in Mr. Whittington's personal file. Not personnel file, but personal files. Because I've never seen it.

Q. Okay.

(Exhibit #11 marked.)

Q. (BY MR. ORTH) Let me hand you what's been marked as Exhibit Number 11 to your deposition and ask you whether you can identify this.

A. Yes. Exhibit 11 is a memo regarding the administrative disciplinary committee.

Q. And that committee was regarding Deputy Whittington. Correct?

A. That is correct.

Q. Now, who would have picked the members of this disciplinary committee?

A. I believe I did, but I can't 100 percent say for sure. I know that in most cases I will email the supervisors of different commands and ask them to send me someone to sit on these committees.

Q. But you were the chair of this committee. Correct?

A. That is correct.

Q. And is that normally something that you would be a chair of?

A. I do typically chair this committee, but there are also other members of the department that could chair these committees at different times.

Q. And would Major Jones be one of those individuals that would chair a committee such as an administrative disciplinary committee?

A. I don't know if he's ever chaired one or not, but he's certainly eligible to. I don't know whether he's done one or not.

Q. Did Major Jones have anything to do with this disciplinary committee in Exhibit Number 11, to your knowledge?

A. No. Are you referring to where it says "Deputy

49

Jones appeared before the committee"?

Q. Yeah. Is it Deputy Jones?

A. No. That's actually a typo. I don't know why I typed Jones. Deputy Whittington appeared before the committee. That is a typo. Jones was not present, not a deputy or a major.

Q. Okay. Now, in looking at the individuals assigned, Lieutenant Sanders, Sergeant Howard, Sergeant Gonzales, Sergeant Magana, and Sergeant Sullivan, are any of those individuals Afro-American?

A. Two of them are.

Q. Which ones?

A. Lieutenant Sanders and Sergeant Howard.

Q. Okay. Had you worked previously with any of these individuals in prior administrative disciplinary committees?

A. Oh, I don't know. I'm sure. I don't know. I'd have to go back and look at every individual in the committee.

Q. Okay. Now, directing your attention to the finding of misconduct regarding several policies that included -- specifically we're going to go through them in order -- "313.5 Body Worn Cameras," to your knowledge, was the fact that Deputy Johnson in this same investigation, in his statement in this investigation

50

that was done by Lieutenant Duffy, admitted that he did not wear his body-worn camera or did not have it activated or on during the whole investigation, did that come up at all in the administrative board hearing?

A. I do not know. I don't believe so.

Q. And did the issue of Deputy Watson, whether she had her body-worn camera on during any of the incident, come up with the administrative board hearing?

A. I don't know. This hearing was specifically to address allegations brought against Deputy Whittington.

Q. I understand that.

A. Okay.

Q. And do you know if Sergeant Barringer had been issued a body-worn camera on 5/28/20?

A. I do not believe he had one, no.

Q. Okay. If he was assigned one, should his body-worn camera have been activated if he was a participant in the interview of a suspect?

A. If he was, if he had one, I would say yes. But I know he was in plain clothes and he wasn't wearing a body-worn camera.

Q. Okay. Normally does Sergeant Barringer have a uniform, or does he always have plain clothes? Is there a reason why he would wear plain clothes compared to a uniform?

51

A. Every officer that works for the department has a uniform. His assignment, if I'm not mistaken, is plain clothes.

Q. And would Deputy Jaramillo -- I don't know if I'm pronouncing that right or not, but did he have a body-worn camera on 5/28/20?

MS. MARTIN: Objection; speculation.

A. Deputy Jaramillo?

Q. (BY MR. ORTH) Yeah.

A. Was he at this scene?

Q. No. I'm sorry. Not on 5/28. When the investigation was going on that Lieutenant Duffy investigated, he was part of the procedure between the handling of the evidence and the suspect all the way through the process. And that's what I'm getting at there.

And my question to you is, do you recall or know whether Deputy Jaramillo even had a body-worn camera at that time?

A. Did not have one.

MS. MARTIN: Objection; speculation.

Q. (BY MR. ORTH) Okay. And if a body-worn camera violation occurs, would you, as the chief, become aware of those violations?

A. Not necessarily.

52

Q. Okay. What do you mean by "not necessarily"?

A. If the supervisor corrects it or gives a verbal counseling or even sometimes documented counseling, they might not send it to my office. It may be something they use for an evaluation mid year or at the end of the year. I may not be made aware of it at all.

Q. And prior to the disciplinary council meeting, had you been aware of other deputies such as Deputy Whittington violating the body-worn camera policy?

A. At the time of the agency?

Q. Yeah -- no, no. Well, prior to that, had you been aware of other deputies other than Deputy Whittington that had violated the body-worn camera policy and procedure?

A. I may have. I don't know.

Q. Okay. During the administrative disciplinary committee meeting, other than questioning Deputy Whittington, were there discussions made regarding any other evidence or either of the two investigative reports by Lieutenant Simpson or Lieutenant Duffy?

A. I'm not understanding the question.

Q. Sure. And I'm just talking about the administrative disciplinary committee in Exhibit Number 11 that you were the chair of -- well, first of all, I'll ask you whether you were in that whole procedure.

A. Yes, sir, I was.

Q. Okay. So you were in attendance. So during that period of time, you heard everything that was going on or saw everything that was going on. Correct?

A. Yes.

Q. Okay. And sitting here today -- because I can only go by what you remember -- you recall, first of all, that Deputy Whittington was questioned. Correct?

A. Yes, sir.

Q. Okay. And now going back to my previous question, other than Deputy Whittington being questioned, were there any other individuals questioned during that administrative disciplinary committee meeting or hearing or whatever you want to call it?

A. I don't know. I don't remember.

Q. Okay.

A. I don't think so, but I don't recall anybody else coming in.

Q. Okay. Do you recall, other than the questioning of Deputy Whittington, whether any evidence or -- let's just go with any evidence was discussed or reviewed at that administrative disciplinary committee meeting?

A. Yes. Videos, and reports were read by the participants, videos were watched, and discussions were held.

Q. And sitting here today, what videos do you recall being watched?

A. I know I remember for sure that the body-worn camera video from Deputy Whittington was watched, the one that was turned on after the dog bite, but I don't know if they watched any of the other ones. I don't remember. I know that one was watched, but I don't remember if they watched the interviews or anything else you're asking me about.

Q. And that would have been after the dog bite concerning the juvenile. Correct?

A. Yeah. Both cases were heard at this committee.

Q. Okay. And when you say "both cases," for the ladies and gentlemen of the jury, we're talking about the two investigations that were done, the one by Lieutenant Simpson and the one done by Lieutenant Duffy. Correct?

A. Yes, that is correct.

Q. Those were the two issues that were brought before the administrative disciplinary committee hearing. Correct?

A. Yes, those two issues were brought before the committee.

Q. There's not any other issues or any other investigations other than those two that were brought before the disciplinary committee. Correct?

A. No. They would have been made aware of the repeated violations of policy regarding the body-worn camera that were documented.

Q. And we'll get into that. Other than the video that we talked about, the one that was done or involving Deputy Whittington after the dog bite, were there any other videos that were viewed by the committee members that you can recall at this time?

A. I don't recall, sir.

Q. Okay. Other than the two investigative reports, do you recall whether there was any other investigative reports done that the committee members reviewed or discussed?

A. I don't know.

Q. Okay. And if I asked this before, I apologize, but the investigation by Lieutenant Simpson, was that made available or discussed -- I should say, was it discussed with any of the board members? And when I talk about the video, I'm talking about the audio or video of the suspect where he interviewed the juvenile suspect.

A. You kind of jumped around a little bit. Would

**KIRK W. BONSAL, JR. - September 23, 2022**

you do that again, please.

Q. Sure. Do you know if the board viewed the video that Lieutenant Simpson did in his investigation in the hearing?

A. I don't know if they did or not. I know that they were given everything, including the reports. We were in that deal discussing this for four hours, as you can see from this memo. They would have had the authority, the privilege, the opportunity to review everything available to them. But as far as what was plugged into the computer and played for them, I can't remember. This was over two years ago -- or roughly two years ago.

Q. All right. And do you recall how much time in the four-hour hearing was spent on questioning Deputy Whittington?

A. I don't know the exact amount of time. There's a recording of it that should be timed, but I don't remember.

Q. Now, moving on down to Section 319.6.3, "Prisoner Processing, Handling Prisoners," are you aware of whether the committee took into account whether the body-worn -- that the body-worn camera footage does not conclusively indicate that the suspect in the case -- that Deputy -- or Lieutenant Duffy investigated was left

---

alone without supervision?

A. I'm sorry.

Q. Sure. I can rephrase.

A. Please. It was kind of confusing.

Q. Okay. Do you know -- and we're dealing -- I'll be dealing with the administrative disciplinary committee meeting for a while now, so that's what we're talking about.

A. Okay.

Q. And during that committee meeting, do you know or can you recall whether they took into account the body-worn camera footage that was done by either Deputy Johnson or Deputy Whittington and that there was nothing actually in either of those videos that indicated conclusively that the suspect was left alone without supervision by the officers involved, Barringer, Johnson, and Whittington?

MS. MARTIN: Objection; confusing.

A. I can't tell what they concluded from it. I can only tell you what I concluded from watching it.

Q. (BY MR. ORTH) And what did you conclude, as far as watching those two videos, as to whether the suspect was left alone without supervision?

A. In my opinion, he was left alone multiple times without supervision, including one time -- well, he was

---

left alone with the dope unsupervised.

Q. Okay. Let's go through those.

A. Okay.

Q. In your opinion --

A. Uh-huh.

Q. -- when was the first time that he was left alone with the evidence?

A. I haven't seen the video in over two years, but I watched the video and the suspect was left alone with narcotics in that training room.

Q. And where were the individuals -- where was Deputy Johnson and Deputy Whittington when that occurred?

A. I don't know.

Q. And do you recall whose body-worn camera would have indicated that the suspect was left alone without supervision?

A. If I'm not mistaken, the one I believe that you're referring to would be the one from Deputy Whittington's camera.

Q. And do you recall Deputy Johnson in his statement -- and we can go back to the exhibit -- and the investigation by Lieutenant Duffy indicated that he didn't believe there was any time that the suspect was left unattended?

---

A. Is that what Johnson said? Is that what you're asking me?

Q. Yeah. I said do you recall that?

A. No, I don't recall that, but that's possible.

Q. Okay. Well, let's go back to Exhibit Number 3.

A. I'm sorry. Which one?

Q. Exhibit Number 3.

A. Number 3? Okay.

Q. And I believe it is page number -- it's going to be on Page Number 9. And let's see. Okay. And see under that section that says "Suspect was handcuffed the entire time," the next paragraph.

A. Okay.

Q. And it's going to be the third line down where the sentence starts, "I did not recall and was uncertain if the suspect was ever left alone, but after reviewing my body cam footage, I can confirm at one time I did step into the hallway while Deputy Whittington was standing in the door frame." Do you see that?

A. Yes, sir.

Q. According to Deputy Johnson, there was one time in the body cam footage that it showed, according to him, that Deputy Whittington was standing in the door frame and he was in the hallway. Correct?

A. Okay.

**KIRK W. BONSAL, JR. - September 23, 2022**

Q. Okay.

A. Yes, sir.

Q. Okay. And the body cam footage did not confirm -- or do you recall it confirming that Deputy Whittington could not have -- from standing in the doorway, could not have seen the suspect?

MS. MARTIN: Objection; speculation.

A. And you're asking about something I looked at two years ago, and I'm going to tell you from what I remember, the suspect was left alone. I don't know what Deputy -- I can't speak to Deputy Johnson's perceptions of anything. I know that he was left alone, and I know there was dope missing.

Q. (BY MR. ORTH) And is that a conclusion that you shared with the board at the administrative disciplinary committee meeting?

A. The board reviewed the videos, and the board reviewed this. I make no recommendations or statements regarding these in any of the committees that I chair. They're given the policies, they're given the reports, and they're given the available videos to review.

Q. So you didn't discuss with any members in Exhibit Number 11, the board members, any of the evidence?

A. I do not give them what I think the evidence

shows or what the evidence is. I do not interject my opinions in order not to influence decisions of the members.

Q. When you read over Exhibit Number 3 when you received it from Lieutenant Duffy, did you question Lieutenant Duffy as far as why he didn't ask whether Bert Whittington could have seen the suspect while he was standing in the door frame?

A. No, I didn't. I didn't ask him that.

Q. Did you question Lieutenant Duffy as to who originally handcuffed the suspect?

A. No, I didn't ask him that.

Q. Did you ask Lieutenant Duffy anything concerning the investigation that he did as to why he included some things and not other things?

A. No, I did not.

Q. As far as the written statements in Sergeant Duffy's investigation, Exhibit Number 3, would you agree with me the only witness that indicates the suspect was left alone by the Deputy Whittington and Deputy Johnson was Sergeant Barringer in his statement?

A. Without reading this whole thing again, I don't know if I can answer that or not.

Q. Okay.

A. You want to ask me differently maybe or

rephrase that? You're asking me to make a determination about what all the witnesses said, and I haven't read this thing in a while. I don't know what all the witnesses said.

Q. Well, I mean, the ladies and gentlemen of the jury will be able to look at it and read it all, and you don't need to take the time to do that now.

A. Okay.

Q. And Sergeant Barringer was not asked by Lieutenant Duffy in his questions how far he was away when he allegedly saw Deputy Whittington standing in the doorway and Lieutenant -- I'm sorry, Deputy Johnson in the hallway. Correct?

MS. MARTIN: Objection; speculation.

Q. (BY MR. ORTH) Let's go back, then.

A. As far as I know, he did not.

Q. Okay. We can go back to Exhibit Number 3 and take the time to go through that. If we look at -- okay. Starting on Page 8 -- I'm sorry. Yeah. Starting on Page 8, go ahead and read Sergeant Barringer's responses to questions.

A. Okay.

Q. Now, my question to you is, in Sergeant Barringer's response to Lieutenant Duffy's questions, does he indicate how far he was away when he observed

Deputy Johnson in the hallway and Deputy Whittington by the door?

A. No.

Q. Now, going back, but still on Page 7, looking at Questions 1, 2, and the next one, 3 on Page 8. Do you see that. The questions that Lieutenant Duffy asked Sergeant Barringer to answer. Correct?

A. Yes, sir.

Q. Okay. In any of those three questions, you can take your time to look at them if you need to. Did Lieutenant Duffy ask Sergeant Barringer to elaborate on how far he was away when he allegedly saw Deputy Johnson and Deputy Whittington at or near the doorway of the interview room?

A. The training room? No.

Q. Was Sergeant Barringer, according to either the report from Lieutenant Duffy or any discussions you may have had with him, left alone with the narcotics?

A. I don't know that answer.

Q. Now, go back to Exhibit Number 3, and go to Page 5. And you can look at the questions on Page 5 that Lieutenant Duffy gave to Deputy Whittington. And based on those questions, did he ask Deputy Whittington -- and I may have asked you this before, but I apologize if I did. Did he ask Deputy Whittington

specifically whether he handcuffed or changed the handcuffs of the suspect at any point in time?

A. No.

Q. Do you think that would have been an important question to ask him by Lieutenant Duffy, in your opinion?

A. No, not necessarily.

Q. Okay. Because there is a policy violation or alleged violation as far as the prisoner being handcuffed in front. Correct?

A. Uh-huh.

Q. Do you know whether there was an internal memorandum or policy regarding having prisoners handcuffed in the front or having it be okay at around that time of 5/28/20?

A. I'd have to look at the policy again, but I believe the policy prohibited it except under certain circumstances, medical issues or those type of things.

Q. Okay. And I'm not asking you about that specific policy. What I'm asking you is whether that policy or provision was overwritten by an internal memo or anything like that during that period of time because of things that were going on in the department at the time at Precinct 3?

A. Not to my knowledge.

65

Q. In your experience while at Precinct 3, has that ever happened where there was a -- because of whatever is going on in the world or in Constable 3's area of concern, that an internal memo would go out or any type of memo would go out indicating that a certain policy would not be upheld at any point in time?

MS. MARTIN: Objection; speculation.

A. I don't know of anything like that, no.

Q. (BY MR. ORTH) Okay. Going through the investigation of Lieutenant Duffy, Exhibit Number 3, and the statements, as well as anything that was attached to it, are you aware of any point in time -- and that would include the body cam footage -- that Deputy Whittington had anything to do with the handcuffing of the suspect, whether it was changing the handcuffs or even touching the handcuffs or putting them on or off?

MS. MARTIN: Objection; speculation.

A. I don't recall.

Q. (BY MR. ORTH) Okay. Would that have been on the body-worn camera footage of either Johnson or Lieutenant -- not Lieutenant, Deputy Whittington?

MS. MARTIN: Objection; speculation.

A. It might be there, especially at the scene video, but I don't remember.

Q. (BY MR. ORTH) Okay. Do you recall, based upon

66

the investigation done by Lieutenant Duffy or any conversations that you had with Lieutenant Whittington, as to whether he told Sergeant Barringer that he was not aware of the suspect being left unattended?

MS. MARTIN: Objection; speculation.

A. I did see that in the report, yes, sir.

Q. (BY MR. ORTH) Okay. Was that taken into account or discussed at all during the administrative disciplinary committee meeting on Exhibit Number 11?

A. My best answer is the committee members read the report, so they would have had that information. Whether it was considered, I couldn't tell you what they considered.

Q. And my question is whether it was discussed.

A. I don't know. It was in the report. That's the best answer I can give you, sir.

Q. Okay.

A. I don't know whether they actually specifically discussed that or not.

Q. The tape of the committee meeting would indicate one way or another what was discussed, as far as that. Correct?

A. The only recording was actually with Mr. Whittington. The actual meetings and discussions were not recorded.

67

Q. Okay. And do you recall, sitting here today, approximately what time was spent by the committee that was not recorded?

A. However long the recording of Mr. Whittington's visit or interview, whatever you want to call it, minus that. I don't know how long his interview was. I just know this meeting, from my notes, was four hours.

Q. So it would be four hours minus however long it took for Deputy Whittington to be questioned by committee members. Correct?

A. That's correct, yes, sir.

Q. Okay. Now, going on to "Restraint Guidelines," 321.3.2.1 in Exhibit Number 11, do you recall whether the committee discussed that Deputy Johnson was the one that was transporting or did transport the suspect to 904 -- to the station?

A. I don't know if that was discussed or not.

Q. Okay. And since I don't have -- since there was no recording of it, you understand that's the only evidence I have is to go through you or one of the other members there to see whether it was discussed or not?

A. Okay. Yes, sir.

Q. Now, if a deputy or a supervisor sees a violation of any policy, whatever it is, do they have any duty to correct that violation when they can, in

68

**KIRK W. BONSAL, JR. - September 23, 2022**

your opinion?

A. Yes, sir.

Q. Okay. And in viewing the pictures, first of all, did you view the pictures in Lieutenant Duffy's report, his investigation?

A. Yes, sir, about two years ago. Yes.

Q. Okay. And do you recall, first of all, whether those pictures -- even though they were available to the committee, outside the questioning of Deputy Whittington, whether those pictures were discussed by committee?

A. I would have to say I believe they were. I know they were in the room and they were available for them. And the case was discussed quite lengthy and in detail.

Q. Okay. Now, in those pictures, they depict Sergeant Barringer in full view of the suspect when he's handling narcotics. Correct?

A. Yes, sir, that's correct.

Q. Okay. And that would be a violation of policies and procedures. Correct?

A. I believe so, yes, sir.

Q. And is there any indication in the investigative report done by Lieutenant Duffy that indicated Sergeant Barringer requested the handcuffs or

that the suspect -- I should say, anything to be changed regarding that or whether it should have been stopped or changed or anything regarding that violation?

A. No, nothing noted in the report.

Q. Okay. But that would have been a violation of policies and procedures done by Sergeant Barringer if he allowed that to happen. Correct?

A. Yes, sir.

Q. Now, also if you noted in the pictures, Sergeant Barringer -- I mean, when Sergeant Barringer was asking or having the suspect handle the narcotics, his handcuffs were in the front. Correct?

A. That's correct.

Q. Okay. Is there anything, first of all, in Lieutenant Duffy's report indicating that Sergeant Barringer had the suspect have his handcuffs removed from the front to the back at any point in time?

A. No.

Q. And having the handcuffs in the front would have been a violation. Correct?

A. That's correct.

Q. And if you look at -- and we can go to the statement if you don't remember. In Sergeant Barringer's statement, he indicated that when he first saw the suspect come into the station house, he had his

hands cuffed in the front, in the front of the main building. And noting that, should Sergeant Barringer have had the handcuffs changed from the front to the back?

A. What page is that on, sir?

Q. Sure. We can go to that. We'll go to Barringer's statement, which is --

A. I'm asking for clarification, because I don't know if he saw him when the suspect came into the room or if when Barringer came into the room. So that's why.

The answer to the question is, he should have corrected the handcuffs and made mention of that, if that helps.

Q. Well, we'll go through in sequence and make it easier.

A. Sure.

Q. And that is, if you turn to his statement on Page 8.

A. Okay.

Q. Okay. And that's Exhibit Number 3. You might as well keep that out.

A. Well, I've got them right here. It's just that you jump around a little bit, so --

Q. I understand. Thank you.

A. Thank you.

Q. Now, if you look at the first -- and I'll direct your attention to it. The first paragraph, the last sentence where it says, "The male was handcuffed with his hands in the front of his body." And the one before that says "I found the suspect in the front main building, inside of the training room." Correct?

A. Okay.

Q. Now, when Sergeant Barringer first saw the suspect with his handcuffs in front, first of all, was that a violation of policies and procedures to have the suspect handcuffed in the front in that circumstance?

A. Yes.

Q. Okay. And in your opinion, should Sergeant Barringer have done something to change that to have the handcuffs put in back of the suspect compared to the front at that point in time?

A. He should have addressed it, yes, sir.

Q. Okay. Now, while the suspect was handling the narcotics, he also would have had to have his handcuffs in the front. Correct?

A. That's correct.

Q. And Sergeant Barringer didn't change those handcuffs at that point in time. Correct?

A. That's correct.

Q. Okay. And would it had have -- in your

opinion, would it have been possible for Sergeant Barringer to have the suspect identify the narcotics without touching them?

MS. MARTIN: Objection; speculation.

Q. (BY MR. ORTH) Such as having them on a table and having the suspect pointing to the narcotics -- the individual narcotics and naming what he knew about each one of them?

A. That's possible, yes, sir.

Q. Prior to the suspect being taken away out of the training room, is there anything in Exhibit Number 3 that indicates that he had his handcuffs put where his hands were behind his back, to your knowledge?

A. To my knowledge, no. It's not indicated.

Q. Okay. And to your knowledge, between Sergeant Barringer, Deputy Whittington, and Deputy Johnson, while they were in the training room with the suspect, who would have been in charge of the interview process during that period of time?

A. Deputy Whittington. It's his prisoner, his case, his investigation.

Q. So Deputy Whittington was the one that should have been telling Sergeant Barringer what to do as far as the interview process is concerned. Correct?

A. It was Deputy Whittington's case. He could request actions of anyone, assistance of anyone. By policy, he is responsible.

Q. Do you recall whether there was any body-worn camera footage either by Deputy Johnson or Deputy Whittington that would have indicated how the suspect was handcuffed when he first came into the station or arrived at the station?

A. I don't recall.

Q. And Deputy Johnson was also aware of the suspect being handcuffed in front during the interview process. Correct?

A. That's correct.

Q. And there's nothing on the body-worn camera footage that indicated that Deputy Johnson had the suspect change from having his handcuffs in front to in back?

A. That's correct.

Q. Was the issue as to whether Sergeant Barringer and/or Deputy Johnson not having the handcuffs of the suspect changed from the front to the back discussed at all in the administrative disciplinary committee by the board members?

A. In the committee, I don't know. I don't recall.

Q. Okay. Do you recall -- and we can go through

Exhibit Number 4 -- or I should say, Exhibit 3 again.

A. Exhibit 3?

Q. Yeah.

A. Okay.

Q. Do you recall whether Lieutenant Duffy asked Deputy Johnson the positioning of the handcuffs on suspect occurring the whole process or interview?

A. No, he did not.

Q. And do you recall whether Deputy Johnson was disciplined at all for not having his body-worn camera on during portions of the interview process?

A. For my purposes, would you define "discipline," please.

Q. Discipline, whether it was verbal counseling, whether it was a written reprimand, whether it was a suspension, whatever disciplinary process, you know, from the lowest to the highest.

A. Yes, sir. That's why I wanted you to clarify it for me. My understanding is that they were counseled about that, that they should have taken action or had the camera on. That was brought up.

Q. And who would have brought that up, to your knowledge?

A. My conversation was with Major Villarreal to address that.

Q. Okay. And when was that brought up with Major Villarreal? Before the administrative disciplinary council convened or after?

A. I believe it was before.

Q. And was that discussed at all or brought up, to your knowledge or to your memory, as far as in the administrative disciplinary council?

A. I don't know if it was. It's very possible, but I do not know.

Q. Okay. Based on the investigation and your knowledge of all the documents in the investigation with Lieutenant Duffy, other than Deputy Whittington, was anybody else left alone with the narcotics at any point in time?

A. My recollection, yes. There was -- the narcotics were left alone in the room. And on the video when, I believe, Deputy Whittington returned to the room, housekeeping was in there.

Q. Okay. And we'll go through that later. But other than -- my question to you is whether the evidence was left with any other constable or deputy while they were alone without supervision?

A. I believe the backpack was left with Sergeant Vega. And if there's any others, I'm not sure.

Q. And when Deputy Johnson was bagging or sealing

Q. the evidence, was he alone, to your knowledge?

A. I don't know. To my knowledge, no, sir. I don't know.

Q. Okay.

A. I would assume so, but that's an assumption.

Q. All right. But we you do know that Deputy Johnson did not have his body-worn camera on during the time that he was packaging the narcotics. Correct?

A. I believe that's correct.

Q. Moving on to the next section, 321.3.1, "General Guidelines," as far as evidence handling --

A. Uh-huh.

Q. -- in Exhibit Number 11.

A. Okay.

Q. Do you recall whether the body cam footage of either Deputy Whittington or Deputy Johnson showed where they were when Sergeant Barringer was having the suspect identify the narcotics?

A. Not without looking at it again, no, sir.

Q. Do you know whether Deputy Johnson was asked by Lieutenant Duffy whether the narcotics were in close proximity of the suspect?

A. I don't know.

Q. Well, we can go to Exhibit Number 3 again.

MS. MARTIN: We're going to want to go ahead and take a lunch break at 12:30, in 30 minutes. I don't know how long you're planning on going, but we want to take a short break to get this done.

MR. ORTH: I don't have a lot more on this, so I'd like to finish this section. It's probably ten minutes, and then we can take a lunch break after that.

MS. SOSA: Okay. Are you okay with that?

THE WITNESS: Yeah, that's fine.

MS. SOSA: Okay.

Q. (BY MR. ORTH) Okay. Where were we? Okay. Deputy Johnson. His statement begins on Page 8 and goes through Page 9, but we want to focus on the questions on Page 8.

Looking over those three questions that Deputy Johnson was supposed answer from Lieutenant Duffy, you don't see anything indicated in those questions Lieutenant Duffy asking Deputy Johnson how close he was to the proximity of the defendant when the defendant was identifying the narcotics. Correct?

A. That is correct.

Q. Okay. And if you look at the statement of Deputy Johnson or at least the one that we have in the report on Page 8 and 9, he doesn't indicate how close he was. Correct?

A. That's correct.

Q. And Deputy Johnson was also aware of the suspect touching the narcotics. Correct?

A. Yes, sir.

Q. Based upon the body-worn camera footage?

A. Yes, sir.

Q. And he did not say anything or stop that from happening, based on the body cam footage of Deputy Whittington. Correct?

A. That's correct.

Q. And that's something that he should have done, according to policies and procedures?

A. Yes, sir.

Q. And on the body cam footage of Deputy Whittington, do you recall whether it indicated that he instructed the suspect to touch any of the narcotics at all?

A. I don't recall. I don't know.

MR. ORTH: We can go ahead and take a lunch break at this time.

MS. MARTIN: Okay.

(Lunch recess from 12:34 p.m. to 1:34 p.m.)

Q. (BY MR. ORTH) Okay. I'm going to digress just a minute to the investigative report from Lieutenant Simpson. When he handed that to you -- and we talked about this earlier in the deposition -- did he indicate to you whether the juvenile indicated that he had been assaulted?

A. I believe he did, yes.

Q. Okay. And what did you do with that information, if anything?

A. He gave me the statement, and I assigned an investigator to investigate that allegation.

Q. Okay. And who was the investigator?

A. Corporal Morrison.

Q. And that's the one we talked about earlier, and as far as the complaint from Deputy Whittington when he brought that the to attention or made a complaint about that, that you indicated earlier that Morrison was the one that did the investigation on that?

A. Yes, sir, that's correct.

Q. And that would have been in conjunction with the complaint from Deputy Whittington also, or did one happen before the other? Or were there two investigations?

A. You need to rephrase. I'm sorry.

Q. Okay. Sure. You just told me that when Lieutenant Simpson gave you a copy of the investigative report, that he told you that the juvenile indicated that he was assaulted. And you indicated in your testimony that you referred that for an investigation to

KIRK W. BONSAL, JR. - September 23, 2022

Corporal Morrison?

A. Yeah.

Q. Okay. When did that happen?

A. Towards the end of or at the end of Simpson's investigation. I couldn't give you an exact date.

Q. Okay. And were you the one that assigned Corporal Morrison to do the investigation?

A. Yes.

Q. Okay. And when you assigned Corporal Morrison to do that investigation, did you indicate that it was based on -- from a statement that Lieutenant Simpson gave you, or whether it was from a report from Deputy Whittington, or both or neither?

A. It would have been both. She was briefed on the information that we had, that Deputy Whittington made an allegation against Sergeant Barringer some months after it happened instead of when it initially happened like he was required to by policy. And I assigned it out for investigation.

Q. And when did you first -- strike that.

But you knew about it, or at least an allegation that the juvenile had made, when Simpson gave his investigation to you. Correct?

A. It was, yes, sir, at the end of the investigation Simpson conducted after he had interviewed the kid and after Deputy Whittington submitted a written statement. And he briefed me on that information, and I decided to assign it to another investigator.

Q. Do you know what the time delay was between you getting the information from Lieutenant Simpson compared to when Deputy Whittington presented his complaint? Do you know what time frame we're dealing with between those two events?

A. They were very close, but I'm not sure of the days, hours, or whatever.

Q. Okay. We can talk about that later. Now, going back to Exhibit -- we're still going to be dealing with Exhibits 11 and 7, if you want to pull those two out. And now we're going to go down to Number 11 where it's dealing with the 600.8, "Property Room Collection, Inventory and Storage." Okay?

A. I'm still looking for it.

Q. Sure.

A. So 11 and 7?

Q. Yeah.

A. Okay. 11 and 7. Got it.

Q. Oh, I'm sorry. Not 7. I was looking at my number. It's 3, the investigative report. I'm sorry.

A. No problem.

Q. I'll get it right.

A. No worries. It's all good. I've got them right here.

Q. Okay. Now, going to Exhibit Number 3, Page 14, when we go down to -- see the bottom paragraph? We're talking about Section 600.8 and the bottom of Page 14.

A. Yes, sir.

Q. Okay. I'm going to go ahead and let you read that over, and then I've got a question or two to ask about that one. Okay?

A. Okay.

Q. Now, in reading that statement over, it doesn't indicate how Deputy Whittington violated Policy 600.8, does it?

A. Specifically how he violated it?

Q. Yeah.

A. No, I guess not.

Q. Okay. Was that Policy 600.8 discussed in the administrative board hearing on Exhibit Number 11; do you recall?

A. I believe it was.

Q. Do you remember any specifics as far as the discussion that was going around concerning that?

A. No, sir.

Q. And the administrative disciplinary committee found that Deputy Whittington had violated that provision, 600.8 -- correct? -- if you look at Exhibit Number 11?

A. Yes.

Q. All right. And how did -- and it doesn't mention it in Exhibit Number 11, how he violated that section. Do you recall in the discussions of the board members as to how Deputy Whittington allegedly violated Section 600.8?

A. I don't remember the discussion.

Q. Is there any document that you're aware of in existence that would indicate how it was found that Deputy Whittington violated or how he violated 600.8 of the policies?

A. It says here he's responsible to weigh it, bag it, tag it. It's his responsibility. It says right there in the policy it's the deputy's responsibility.

Q. And what didn't Deputy Whittington do as far as bagging, tagging, and weighing?

A. I don't know. Let's see here. I'd have to look at the videos or something. I'm not sure exactly what you're referring to. But obviously there's cocaine missing that wasn't bagged and tagged properly, so the policy was violated.

Q. Okay. Now, then in that case let's go back to Exhibit Number 3 and go to Deputy Johnson's statement,

which is found on Page, actually, 8 and 9. Directing your attention to Page 9, we'll go to that part. Now, directing your attention in the paragraph that says "Sometime between 1:30 PM and 2:00 PM," do you see that?

A. Yes, sir.

Q. Okay. And directing your attention to the last sentence in that paragraph where it reads, "I can confirm after reviewing Deputy Whittington's body cam that the powdered cocaine which was in a small clear plastic sandwich baggie was placed in the backpack to be packaged." First of all, that's a correct reading of that?

A. That's what it says, yes.

Q. And what would that indicate to you, as far as what Deputy Johnson was saying at that time?

A. That in his opinion, based on the camera, that the cocaine was placed in the backpack.

Q. Okay. And then going into the next paragraph, as far as the sequence of events, it indicates that he walked to the next building and where he took the evidence out of the backpack and began packaging and sealing all the evidence that was in his possession.

So does that indicate to you that the next thing Deputy Johnson's claiming he did was he took the backpack that contained the cocaine and walked to the

next building and began packaging it and sealing it?

A. Yes.

Q. Okay. Then he says in the next sentence, "When I completed the packaging, I loaded all the evidence back into the backpack."

So would you agree with me that you can conclude from that sentence that the cocaine would have been or should have been packed into the backpack?

A. According to this sentence, yes, sir.

Q. And then you look at the next sentence where it says, "I can't say for certain that the missing evidence was packaged or left on the table." What does that say to you, as a previous investigating officer as far as what Deputy Johnson said in that sentence?

A. He's saying what we all know. We don't know what happened to the dope. He doesn't know what happened to it. He can't say for certain it was packaged or left on the table. He doesn't know where it went.

Q. But we know, based on his statement and what we read, that he had the cocaine, he took it to be packaged, that he packaged the evidence, and it wasn't in the evidence after he packaged it. Correct?

A. According to this information here.

Q. And that's all we have is this information.

Correct?

A. Yes, sir.

Q. Because there was no body cam footage of this. Correct?

A. Yes.

Q. And would Deputy Whittington be responsible for what Deputy Johnson did as far as packaging the evidence outside his custody and control?

A. In my opinion, yes. It's his arrest, his dope. He was responsible for everything that transpired.

Q. And that's the way it's been in Precinct 3 ever since you've been there, correct, as far as any investigation -- or I should say any narcotics bagging, sealing, tagging evidence. Correct?

A. Since I've been there and since I've been a policeman, I've never had a case where an officer lost dope, so I can't answer that question the way you want me to, I guess. There's never been a case with this unique situation.

MR. ORTH: Objection; nonresponsive.

Q. (BY MR. ORTH) My question to you, sir, is has it been that way -- and when I say "that way," that the officer that originally arrests or I should say obtains a suspect with narcotics is responsible for everything that happens after that point in time until it's given

to the property room person?

A. The policy states that, I believe, yes.

Q. Which policy is that?

A. The evidence handling. It says the deputy is responsible for doing all those things. You just read it to me.

Q. You mean 600.8?

A. Uh-huh.

Q. Is that the one you're referring to?

A. My interpretation of it, it says the deputy is responsible for those tasks.

Q. So essentially Deputy Johnson, based upon the reading that we did on Page 9, didn't verify that the cocaine was packaged or that he packaged the cocaine. Correct?

A. Would you ask that again?

Q. Sure. And we can go through it again, but the question is, based upon what we just read in Deputy Johnson's -- and we can only go by what Deputy Johnson wrote in his statement, which is that he could not verify that once he took the cocaine from the backpack and took it to package it, that it was packaged accurately and sent back to Deputy Whittington. Correct?

A. I believe he says that, yes.

**KIRK W. BONSAL, JR. - September 23, 2022**

Q. Okay. Now, Deputy Watson in her statement indicates that Deputy Johnson packaged empty baggies with a tray in a sealed bag. And we can go back to Deputy Watson saying that if you want no. But my question to you is, would that be standard operating procedure in packaging evidence to package empty plastic bags and a tray in a sealed compartment for narcotics?

A. I don't know. I don't work narcotics, and I'm not sure what context you're talking about plastic baggies.

Q. Okay.

A. Because they would be considered evidence in a case, so I would say yes, I guess.

Q. Okay. Deputy Johnson took the narcotics and indicated that he was going to package those narcotics in a sealed train. You understand what a sealed train is?

A. A sealed train?

Q. Yeah. That's what he used in his deposition answers, a sealed train in which the individual packages of the individual narcotics were connected to each other.

A. Oh, the baggies are connected?

Q. Yeah.

A. The plastic bags?

89

Q. Yeah.

A. That's called a train? I didn't know. I've never heard that before.

Q. Okay. I'm just using his terminology, because I don't know.

A. I've never heard that before.

Q. Okay. To be labeled after that point in time in which Deputy Johnson indicates that he left and let Deputy Whittington handle that in his statement. My question to you is, is that, if you know, the standard procedure to seal up the narcotics in a plastic type bag and have them connected to each other? Is that a procedure that you're aware of that happened at Precinct 3 at that time?

A. I don't know. I've never packaged evidence since I've been here, so I have no idea. I know what the policy says, but I don't know how they have baggies connected or if they tape them shut or paper bags. I have no idea.

Q. And if you look back at what we read on Page 9 of Deputy Johnson's statement, he indicates that the powdered cocaine was in a small clear plastic sandwich baggie. Correct?

A. Yes, sir.

Q. Okay. And, then, let's see. We'll get to

90

Deputy Watson's statement. It's actually, I believe, Page 10 where it says -- and I'll direct your attention so you don't have to read it all. You see in the seventh line down, it starts? At one point." Do you see that?

A. Yes, sir.

Q. Okay. The sentence says, "At one point I asked Deputy Whittington which bag contained the cocaine because it was not visible to me. Deputy Whittington pointed and showed me the package that contained the cocaine so I attached the label to that package." Do you see that?

A. Yes.

Q. So it appears that the cocaine is being packaged or Deputy Whittington showed her the package that should have had the cocaine. Correct?

A. Should have had the cocaine, yes, sir.

Q. And then she goes on, "I was not able to actually see any cocaine. It looked like a bunch of wadded up clear baggies in the evidence bag."

A. Okay.

Q. So we don't know whether the cocaine was packaged in the sealed containers by Deputy Johnson at that point or not. Correct?

A. I do not know that, correct.

91

Q. What I'm saying, there's nothing in either one of the statements that indicates that the cocaine was there. Correct?

A. Correct.

Q. Okay. And do you recall whether any of that information that we just went over, as far as Deputy Johnson's statement as far as the cocaine and the backpack and Deputy Watson's statements that she couldn't see the cocaine in the bag that was sealed by Deputy Johnson, was discussed in the administrative board hearing at all?

A. I do not know. I know they were provided all this information. That's a long time ago.

Q. Did the fact that Deputy Johnson did not have his body cam on during the packaging of the evidence come up at all in the administrative board --

A. I don't remember.

Q. -- hearing?

Okay. And did the information in Deputy Johnson's statement that we read over where he took responsibility for not verifying all the evidence when he returned the evidence in sealed packages to Deputy Whittington was that brought up in the administrative disciplinary committee meeting at all, to your knowledge?

92

KIRK W. BONSAL, JR. - September 23, 2022

A. They had this information.

Q. Did they discuss it?

A. I don't remember if they discussed it. There was a lot discussed. We're talking about over two years ago.

Q. Okay. And to your knowledge, was Deputy Johnson disciplined at all concerning the loss of the cocaine in this investigation?

A. No. No, he was not.

Q. And Deputy Watson was not disciplined at all for the loss of cocaine. Correct?

A. That's correct.

Q. And if you look at the investigative report, Deputy Jaramillo was not even questioned at all concerning the missing cocaine. Correct?

A. I don't know.

Q. What?

A. I don't know if he was questioned or not. It's not in the report.

Q. It's not in the report?

A. I don't know if he was questioned or not. It's not in the report. I agree with that part.

Q. If Deputy Jaramillo was asked questions and the response is in Lieutenant Duffy's report, if he was, in fact -- I mean, if Deputy Jaramillo was asked questions

93

and had given responses to those questions, would you expect it to be in Lieutenant Duffy's report?

A. Yes.

Q. And since it's not in there, would you come to the conclusion that he was not questioned concerning this?

MS. MARTIN: Objection; speculation.

A. I don't know if I could come to that conclusion. I'd want to know, but I don't know if he was or not.

Q. (BY MR. ORTH) Okay. And do you recall whether in the investigative report by Lieutenant Duffy in Exhibit Number 3, whether he investigated the -- or questioned the ME's office regarding the missing cocaine or not at all?

A. I don't know if he did that or not. It's not in the report.

Q. It's not in the report. And if he did, it should have been in the report. Correct?

A. I agree with you there, yes, sir.

Q. Okay. Because didn't the ME's office indicate they signed for the receipt of the evidence, the narcotics?

A. That's my understanding. I haven't seen any of that paperwork.

94

Q. And isn't it true that Lieutenant Duffy concluded in his investigation that he was unable to determine what happened to the missing cocaine?

A. Yes, that is true.

Q. And was that discussed at all, to your knowledge, in the administrative board committee meeting?

A. I believe it was, yes.

Q. And what discussions do you recall happening concerning that issue?

A. I just know that they were made aware that we have no idea what happened to it.

Q. Okay.

A. Or where it went.

Q. Now let's go to the next section, 503.1 and 503.2, "Utilization of properly trained police service dog," and basically dealing with K-9 Zane.

A. Yes, sir.

Q. Okay. And this would have been -- correct me if I'm wrong -- regarding the investigation that was done by Lieutenant Simpson. Correct?

A. Yes, sir.

Q. Okay. And was the conclusion that Deputy Simpson came up with in his investigation in Exhibit Number 4 discussed by the board members that there was

95

no conclusionary finding as far as Deputy Whittington violating any policies or procedures?

A. They had the report.

Q. Okay. I'm asking you, did they discuss it? I'm going by your memory.

A. It was discussed, but I don't know exactly in what context.

Q. Okay. Do you recall whether the training record of K-9 Zane was discussed at all at the administrative board disciplinary meeting?

A. I believe it was.

Q. And did you have or did the board have the records as far as the training of K-9 Zane --

A. Yes, sir.

Q. -- available to them?

A. Yes, sir.

Q. And do you recall any conclusions that the board made concerning those training records of K-9 Zane?

A. I know that the issues identified and some of the training problems were discussed, but I don't know in what detail or how detailed.

Q. And isn't it true that Deputy Whittington -- and I think we went through this before -- that he had received a day of suspension with pay for that incident

96

previous to that?

A. His suspension was for the body-worn camera.

Q. Okay. I think we discussed there were two issues in that, but they also mentioned the K-9 Zane incident. Is it your understanding now or back then, too, that the suspension was only for the body-worn camera.

A. That is correct.

Q. And that's the same incident that was discussed in the administrative disciplinary committee in which he was terminated, the same body-worn camera. Correct?

A. Yeah, it was discussed because it was part of what happened, yeah.

(Exhibit #12 marked.)

Q. (BY MR. ORTH) Let me hand you what's been marked as Exhibit 12 and ask you whether you can identify that.

A. Yep, termination letter.

Q. What is that?

A. The termination letter.

Q. Okay. And that's from you to Deputy Whittington. Correct?

A. That is correct.

Q. Okay. And you drafted this. Correct?

A. Yes, I did.

Q. Okay. And what did you base the information that's in Exhibit Number 12 on?

A. The findings of the administrative disciplinary committee.

Q. Well, I mean, if you look at -- and I understand you based it on Exhibit Number 11. Correct? Or were there more findings from the administrative disciplinary committee that are not in Exhibit Number 11?

A. I don't know.

Q. And to make it easier for you --

A. I'm trying to understand your question, I guess.

Q. Okay. Let me rephrase the question. Okay. Looking at Exhibit Number 11, there's nothing in Exhibit Number 11, would you agree with me, that indicates how Deputy Whittington violated the numbers or the policies and procedures in the first paragraph. Correct?

A. Okay. Yes, sir.

Q. Okay. Yet if you look in Exhibit Number 12, the one that you drafted as far as the termination letter, there's a lot more detail involved in how Deputy Whittington allegedly violated these policies and procedures. Correct?

A. Okay. Yes, sir.

Q. And my question to you is, where did you come up with the individual -- all the other information that's not in Exhibit Number 11?

A. Based on the totality of the information and the reports that I was given from the investigators, the facts of the case as I knew them.

Q. So you used the information that was presented to the administrative disciplinary committee to draft Exhibit Number 12. Correct?

A. Partially. Absolutely.

Q. What else did you use other than that?

A. I just told you, the reports and the information and my understanding the case facts, the facts as I understood them.

Q. Okay. Now, directing your attention to the second page there, when we get down to the bottom paragraph -- are you there?

A. Give me a second.

Q. I'm just getting you there first.

A. Second page. Okay.

Q. Second page, bottom paragraph, second sentence, "It was determined that the juvenile suspect stopped, raised his hands and gave up. Your attempts to recall the dog after being deployed failed and the juvenile suspect was bit."

Okay. Looking at Exhibit Number 4, and I'm just directing your attention to the difference in the statements from the suspect compared to what Deputy Whittington said in there and that there's a difference between one says it was fairly close, within 5 feet when that happened. And Deputy Whittington said -- indicated it was many yards away basically when the defendant put his hands up -- or I should say reverse. The defendant says multiple yards when he put his hands up and the dog still coming at him compared with Deputy Whittington saying the dog was basically in the air almost. And we can look at that.

But based on that, did you make a determination or did the committee make a determination as to the weight given to one versus the other statement, the statement given by the suspect or the statement given by Deputy Whittington?

A. I don't believe so.

Q. Okay. But you didn't bring that up? You would agree with me that you didn't indicate that information in the termination letter on Page 2. Correct?

A. That's correct. The distance?

Q. What?

A. The distance?

Q. The distance.

**KIRK W. BONSAL, JR. - September 23, 2022**

A. No, that's correct. It's not in the letter.

Q. Okay. Does the board, when they're going through -- and when I say "board," I'm talking about the administrative disciplinary committee or meeting. Do they give weight to different aspects of the evidence, to your knowledge?

MS. MARTIN: Objection; speculation.

A. I would assume so.

Q. (BY MR. ORTH) Okay. Well, you were there?

A. Yeah.

Q. Okay.

A. But I can't get in people's heads.

Q. Do you remember, when you were in the administrative disciplinary committee meeting regarding Deputy Whittington, whether any of the members of the board gave more weight to one piece of evidence compared to another?

MS. MARTIN: Objection; speculation.

A. No, I don't recall that happening.

Q. (BY MR. ORTH) Okay. In your opinion, would you personally give, in any situation where a suspect's testimony doesn't coincide with a deputy's testimony -- and we're not talking about this investigation. We're talking about any one that you have done previously. And you've indicated that you've done a lot. When

101

there's a discrepancy between the two, would you tend to favor what the deputy says as being the truth compared to what a suspect says?

A. No.

Q. Okay. Let's go back to Exhibit Number 3 in this case. Okay. And I believe you said you told Major Villarreal in your prior testimony to have the suspect interrogated again at his home, or I should say have a written recorded statement done at his home concerning Lieutenant Duffy's investigation. Correct?

A. Yes.

Q. And Sergeant Barringer, I think you told me, is the one that did that. Correct?

A. I know he was the one, yes, sir.

Q. Okay. Now, directing your attention to Page 13.

A. Exhibit Number 3, sir?

Q. Exhibit Number 3, yes, sir.

A. Okay.

Q. Now, the defendant in this case indicated that he did not take the cocaine and flush it down the toilet. Correct?

A. That's correct.

Q. But he did indicate, if you look at five lines down, that he grabbed possibly eight bars of Xanax pills

102

on the table and tried to swallow them or did swallow them or whatever. Correct?

A. Yes, sir.

Q. And I'm not an expert on narcotics, but if you look at Exhibit Number 3, as far as a list of narcotics that were found on Page 2 listed by Deputy Whittington, would you agree with me that Xanax is not one of the narcotics that was found or in the backpack?

A. It does not specifically say the word Xanax in this paragraph anywhere, but I have no idea what the defendant was calling Xanax or what other names of certain drugs are. I'm not an expert on drug names.

Q. But Xanax is not listed there?

A. It's not listed there.

Q. And you also agree with me that -- well, there's nothing listed as eight bars or anything in the quantity of bars listed in Page 2 either?

A. I don't see that either, no, sir.

Q. Okay. And going back to Page 10 -- not 10. I'm sorry. Back where we were about the statement on Page 13.

A. Page 13?

Q. Page 13.

A. Yes, sir.

Q. The defendant, when asked, indicated if you

103

look in the last part of the first paragraph there, that his money, "$10,000 that he states was located in the center console."

A. Yes, sir.

Q. First of all, that's what he said, according to what's on Page 13. Correct?

A. Yes, sir.

Q. And we know, in fact, if you look down on the bottom part of that last paragraph in there, that actually, instead of $10,000, it was $54, based upon body cam footage. Correct?

A. That's correct.

Q. We know the defendant was lying at least on one, if not two occasions in his statement. Correct?

A. Yes. And he's also a drug dealer.

Q. And would that be typical what suspects do, lie about certain things, as far as suspects?

A. It wouldn't surprise me at all.

Q. Okay.

(Exhibit #13 marked.)

Q. (BY MR. ORTH) Let me hand you what's been marked as Exhibit Number 13 to your deposition and ask you whether you've ever seen this before.

A. No, I've never seen this before.

Q. Okay. Did you have any communication with

104

**KIRK W. BONSAL, JR. - September 23, 2022**

Claudia Arellano or whatever it is -- it's hard to read there -- regarding Bert Whittington after he had been terminated?

A. No, sir, I did not.

Q. Okay. Are you familiar with what's called a Brady list?

A. Yes, sir.

Q. And for the ladies and gentlemen of the jury, what is that?

A. The district attorney maintains what's called a Brady closure database, and they require agencies to submit information about employee misconduct. And they review it and they determine which employees -- which police officers go in that database.

Q. Okay. And to your knowledge, can somebody who was either honorably or generally discharged being a constable be put on the Brady list?

A. I would assume so. I don't know.

Q. You don't know?

A. The decisions of who goes on the Brady list is in the district attorney's office.

Q. Okay. And did you make any recommendations as far as Deputy Whittington being on a Brady list?

A. No. We don't make recommendations.

Q. Did you submit anything to the authorities as

---

far as he should be going on the Brady list?

A. No. I don't do "shoulds" and I don't make recommendations. We're required by statute to notify the district attorney's office of employee misconduct if it's sustained.

Q. Did you make any recommendation concerning Deputy Skero to the DA's office as far as whether they should be on the Brady list or not?

A. We don't make recommendations.

Q. Did you give his name regarding any disciplinary action to --

A. A disciplinary letter --

MS. MARTIN: Objection; asked and answered.

A. A disciplinary letter was sent to the district attorney's office in reference to Bryan Skero.

Q. (BY MR. ORTH) And what was the disciplinary letter regarding, if you recall?

A. He was documented in a write-up from Major Villarreal that he had been untruthful with him in a meeting.

Q. And at whose discretion is it, if it is discretion, as to which violations of policies or procedures or which disciplinary actions are sent to the district attorney's office to determine whether they should be on a Brady list or not?

---

A. It's not discretionary. The statute says "shall." And the DA is provided a list of what things such as excessive force, evidence handling, demotions, untruthfulness, insubordination, a list of -- I don't know if that's all of it or not, but they've given us a list of what we are required to turn over to them in reference to employee misconduct if it's sustained.

And in most cases they just get the disciplinary letter that's given to the employee. If they want more to review the file, they have to ask for it.

Q. Let me hand you what's been marked as Exhibit Number 13 and ask you whether you've seen this before?

MS. MARTIN: 13 was already marked.

MR. ORTH: Or 14. I'm sorry. I've got to remark it.

(Exhibit #14 marked.)

Q. (BY MR. ORTH) There you go (handing).

A. Uh-huh.

Q. Have you ever seen this before?

A. Yes.

Q. Okay. And what is it?

A. It's a memo submitted by Lieutenant Thurman regarding Sergeant Magana's job performance.

Q. Okay. And does it indicate what disciplinary

---

action Sergeant Magana received concerning the allegations that are in Exhibit 14?

A. The last letter has a suspension.

Q. And how long a suspension was it?

A. Originally three, and it looks like it was crossed out to two days.

Q. And did you have anything to do with the suspension going down from the recommended three days to the two days?

A. I did.

Q. And what was your input into that?

A. I assigned a three-day suspension based on this and my meeting with other supervisors. And her captain, after meeting with her, requested we reduce it to two, and I approved that.

Q. Okay. And what race is Sergeant Magana?

A. She's Hispanic.

Q. Now, directing your attention to the second-to-last page, do you see that? Now, in the first sentence there, it indicates "Her constant disregard for policies and failure to obey lawful orders given to her by her Supervisors constitutes 'insubordination.'" My question to you is, would that be considered insubordination, first of all, as indicated in the sentence, if that happened?

KIRK W. BONSAL, JR. - September 23, 2022

A. Give me just a second to read this if you don't mind.

Q. Sure. Go ahead.

A. Okay.

Q. Okay. Would that have been -- if a deputy fails to obey a lawful order given to them by their supervisor, would that be insubordination?

A. Yes, sir, absolutely.

Q. Would that be something pretty serious, in your opinion?

A. Yes. Depending on the circumstances, it absolutely can be.

Q. And yet she only received a two-day suspension. Correct?

A. Yes.

Q. Looking down a little further, it says, "During this meeting, she offered no valid excuses." Did you have any discussions with Deputy -- or I should say Sergeant Magana concerning this incident?

A. Did I? No, sir.

Q. Okay. We're done with that one.

(Exhibit #15 marked.)

Q. (BY MR. ORTH) Let me hand you what's been marked as Exhibit Number 15 to your deposition and ask you whether you can recognize that or identify it.

109

A. Yes, I recognize this. It's an investigative report in reference to a complaint against Amanda Watson.

Q. And what involvement, if any, did you have concerning Exhibit Number 15?

A. I investigated it, and I wrote the report.

Q. Okay. Now, you said you did investigate it and wrote the report?

A. Yes, sir.

Q. I didn't hear you. I'm sorry.

A. Yes, sir. Okay.

Q. Directing your attention to the actual investigation on Page 2 --

A. Okay.

Q. -- where it says -- the last two paragraphs indicate "I spoke with Corporal Lewis." Is that you that spoke with Corporal Lewis?

A. Yes, sir, that's correct.

Q. Okay. Now, what is a civil standby?

A. A civil standby is when the police or constables are called to a residence to stand by while people gather clothing to ensure that no disturbance happens. They were pretty common years ago, but due to manpower or other reasons, we try not to do those. They stand down on occasion.

110

Q. And if you look at your report in this bottom sentence, second-to-last paragraph, you indicated that the person you talked to, Corporal Lewis, indicated that a patrol deputy should not be doing a civil standby. Correct?

A. That's what he said, that's correct.

Q. Okay.

A. He said that, yet they're dispatched to do it all the time.

Q. And even though -- and Deputy Watson at that time was in Precinct 3, and she was indicating that she was going to be going to Liberty County. Correct?

A. Yes, sir.

Q. Which is not in Constable 3's jurisdiction. Correct?

A. Well, we do handle Liberty County.

Q. But where she was going to was not under Precinct 3. Correct?

A. No, it's not in Precinct 3. Right.

Q. Okay. And in your investigation, you found that there was no report done -- turn to the next page, and I'm just going by the first paragraph there.

A. Okay.

Q. There was no report done or submitted by Deputy Watson, and there was no body cam footage found by

111

Deputy Watson. Correct?

A. Correct.

Q. Would those two things have been a violation of policies and procedures of Precinct 3?

A. Yes.

Q. Okay. And there was no call for service, according to your investigative report or activity, for Deputy Watson to do this. Correct?

A. Correct.

Q. So basically Deputy Watson was doing something, if you read your investigation, for a friend in Liberty County. Correct?

A. That's correct.

Q. And since there was no assignment given to her to do that, she was doing it on her own, just trying to help a friend personally. Correct?

A. Yes.

Q. Okay. And she was being paid for the time that she was gone -- correct? -- by Precinct 3.

A. Yes.

Q. Would that in itself be a violation?

A. Not in this case.

Q. Not what?

A. Not in this case.

Q. And why is that?

112

A.  Because she got permission to go do it.

Q.  Okay.  And she got permission from who?

A.  Sergeant Barringer.

Q.  And did she tell Sergeant Barringer specifically why she was going there?

A.  I don't believe so.

Q.  What?

A.  I do not believe so.  I don't know exactly what she told him.

Q.  Well, directing your attention to the next page, the one that says "Conclusion" on the bottom of it.

A.  Conclusion.

Q.  Where it says in the first full paragraph there about Sergeant Barringer's reply during your investigation.  And it indicates in the second sentence that he did give Deputy Watson permission to leave the county to conduct the civil standby, but he instructed her to contact Liberty County Sheriff's Office.  Correct?

A.  Uh-huh.  Yes.

Q.  Did she, in fact, contact the Liberty County Sheriff's Office, to your knowledge, based on your investigation?

A.  I believe she did, and they wouldn't go.

Q.  Okay.

A.  If I'm not mistaken, they wouldn't go.

Q.  If they weren't going to do it in Liberty County, Deputy Watson shouldn't have done it.  If they weren't going to do it, should she have done it, being outside the county?

A.  I don't know.  I think I noted in the report that that should have been a clue for her not to do it.  I think I remember I wrote that in there.  It's a clue, don't do it.  They said they're not coming, so don't do it.

And like I said, civil standbys are very common.  They're asked for quite frequently.  People want to go get stuff and not be assaulted after domestic violence incidents.  Sometimes police will respond, and other times they don't have the manpower and won't go.  We have pretty much a standing policy that we will evaluate and go to those on a case-by-case basis, but that usually pertains to patrol.  This came out of the criminal interdiction unit.

Q.  Okay.  Directing your attention to the second-to-last page under "Findings," do you see that?

A.  Okay.

Q.  Okay.  You indicated that you thought, as the investigating officer, that Sergeant Barringer should

not have authorized Deputy Watson to leave the jurisdiction to conduct this standby.  Correct?

A.  Correct.

Q.  Was Sergeant Barringer disciplined in any way, shape, or form concerning that incident?

A.  He was counseled, yes.

Q.  What type of counseling?

A.  A verbal counseling.

Q.  By whom?

A.  I believe I instructed his major to do that, along with sending him to some supervisory training.

Q.  Okay.  And what disciplinary action, if any, did Deputy Watson receive concerning your investigation?

A.  She received a letter of reprimand, which is a permanent entry in your personnel file.

Q.  And that's all she received.  Correct?

A.  That's what she received, yes, sir.

(Exhibit #16 marked.)

Q.  (BY MR. ORTH) Let me hand you what's been marked as Exhibit Number 16 to your deposition.  And have you ever seen Exhibit Number 16 before?

A.  Yes, sir, I have.

Q.  And what is it?

A.  This is a written reprimand for a preventable fleet accident issued to Sergeant Barringer.

Q.  And do you recall how many police vehicles were involved in this incident?

A.  I think he hit one and drove it into another one, so a total of three, I think.

Q.  Okay.  Had Sergeant Barringer done anything like this prior to November 21st of 2018, to your knowledge?

A.  I don't remember.  I don't think there's been other fleets, but I don't remember.  I'd have to look.

Q.  And how damaged, if you can recall, were the vehicles involved?

A.  I remember one was totaled, I believe.  I don't know if all of them were or not.  I don't think so.  I think one was totaled.

Q.  And he received only a written reprimand concerning that.  Correct?

A.  That is correct.

Q.  And does a written reprimand stay in your personnel file?

A.  Permanently, yes, sir.

Q.  What?

A.  Permanently, yes, sir.

(Exhibit #17 marked.)

Q.  (BY MR. ORTH) Let me hand you what's been marked as Exhibit Number 17 to your deposition and ask

you whether you've ever seen this before.

A. Yes. I initialed it and put my stamp on it, indicating it came through my office.

Q. Okay. And this is involving Deputy Johnson. Correct?

A. Yes.

Q. And he was given a verbal counseling for his violating the body-worn camera policy. Correct?

A. Well, it says "Documented Counseling."

Q. And what is "Documented Counseling" compared to?

A. With verbal counseling, nothing is written down on paper and put in your file. It's just something between you and your supervisor. Documented counseling is a memo like this that goes in your file.

Q. Okay. And is that a permanent part of the file?

A. It can be. Documented counselings are requested to be removed if you have no other disciplinary action within a year, per policy.

Q. Okay. Do you know if Deputy Johnson, prior to this, had any violations of the body-worn camera policy?

A. I wouldn't know without looking it up.

Q. Okay. Is that something that is usually done prior to -- either by the supervisor or whoever has

authority over that individual or who's recommending or deciding on what type of disciplinary action to give the individual to research whether they did it prior to this or prior to the one they're looking at?

A. Yes, sir. It's the responsibility of the supervisor issuing these.

(Exhibit #18 marked.)

Q. (BY MR. ORTH) Let me hand you what's been marked as Exhibit Number 18 to your deposition and ask you whether you can identify Exhibit Number 18.

A. Yes. It's a disciplinary letter for a one-day suspension to Deputy Mora.

Q. And is this coming from you. Correct?

A. That is.

Q. Okay. And did you do an investigation into this action?

A. There was an investigation, not conducted by me.

Q. And Sergeant Mora received a one-day suspension for her body-worn camera violation. Correct?

A. Deputy Mora, for losing a $1,500 camera, yes. That's correct.

Q. Okay. And since this letter was coming from you, did you review whether Deputy Mora had any prior violations of either losing her body-worn camera or

violating the body-worn camera policies and procedures?

A. I don't believe she did.

Q. My question is, did you investigate it, first?

A. Yes, but I don't want to say there's no one because I'm not 100 percent sure right now. But I would have reviewed if there were other policy violation, and I do not believe that there were. I believe that there were not.

(Exhibit #19 marked.)

Q. (BY MR. ORTH) Okay. Let me hand you what's been marked as Exhibit 19 to your deposition and ask you whether you can identify that.

A. Yes. This is a supervisory counseling written up by Sergeant Andrew Ries in reference to a Deputy Mason.

Q. And did you actually get to see or review the information in Exhibit Number 19?

A. Yes, I've seen it before, along with my initials indicating that it was turned in to my office.

Q. And this again was a body-worn camera violation. Correct?

A. If I'm not mistaken, she reported it as being lost, but then it was found between the seat of the cars.

Q. But there was a day -- based upon the loss of

it, there was a day that she couldn't use it. Correct?

A. That's correct.

Q. According to the second page?

A. That's correct.

Q. And what was the disciplinary action taken against her?

A. She received supervisory counseling.

Q. Okay. And that would be something that would not be put in her file. Correct?

A. No, this goes in the file. And I believe that's how you have it.

Q. And did you determine or have any input as to the disciplinary action that was going to be taken concerning this violation in Exhibit Number 19?

A. No, sir. It was sent to me like this, and I didn't reject it. In other words, saying I don't think it's enough or need more or too severe. I accepted it as it was written, providing the supervisor's discretion on how they enforce policy.

Q. Okay. But you have the authority to change or to revise the disciplinary action that is sent to you by a supervisor. Correct?

A. That depends. Yes, sir, depending on if it's been executed or not. For example, if the employee has already been told they're getting a letter of reprimand

**KIRK W. BONSAL, JR. - September 23, 2022**

and they signed it, it's a little hard for me to change that at that point. And that is a possibility that could happen, despite training and conversations with supervisors.

Q. Okay.

(Exhibit #20 marked.)

Q. (BY MR. ORTH) Let me hand you what's been marked as Exhibit Number 20 to your deposition --

A. Yes, sir.

Q. -- and ask you whether you've seen that before.

A. Yes.

Q. And what is it?

A. This is a complaint form signed by Deputy Bert Whittington in August of 2020 regarding an incident that he failed to report that occurred back on May 28th of 2020.

Q. Is this the same complaint that we talked about earlier that you started an investigation with Deputy -- was it Morrison?

A. Morrison, that is correct.

Q. Okay. And the second page of Exhibit Number 20, what is that?

A. The second page attached to this complaint?

Q. Yes.

A. It is Deputy Morrison's conclusion of the

121

investigation.

Q. And if you look on the bottom there, it says Page 13.

A. That is correct.

Q. Do you know where the rest of -- or what the rest of Sergeant Morrison's investigative report contained?

A. That's in the case file.

MS. MARTIN: It's never been requested, so it wouldn't have been produced by now.

MR. ORTH: Okay. We need to get a copy of that.

MS. MARTIN: Well, just a request. I mean, I can't -- I can't know what you want without a request. But there would be no reason for me to produce a report of Sergeant Barringer's files.

MR. ORTH: Well, it's not Barringer's file.

MS. MARTIN: It's pertaining to Sergeant Barringer, not anyone else. So we're happy to produce and comply with the rules upon a proper request.

MR. ORTH: We'll give you a proper request.

MS. MARTIN: Sounds great.

Q. (BY MR. ORTH) Now, do you know, since you started the process going by assigning Sergeant Morrison to this investigation and you received a copy of the

122

investigation -- a complete copy of the investigation done by Sergeant Morrison -- or Deputy Morrison. Correct?

A. Yes, I received a complete report.

Q. Okay. Do you recall anything in that, other than the conclusionary statement in Page 13 presently, in her investigative report?

A. No. I'd have to see the report so I don't make a mistake.

Q. And do you recall -- and I understand that you don't remember, but do you recall, as we sit here today, whether she indicated in her report that she reviewed the recorded statement from the suspect that Lieutenant Simpson conducted?

A. It says in here, "Marcos Garcia admitted in the recorded interview to P. Simpson that he had trouble recalling events of that day." So reading what she wrote, I would say she must have watched the video.

Q. Okay. If there is an assault by a deputy in Precinct 3 and you became aware of that, what, if anything, would be your responsibility concerning that?

A. To assign it for an investigation to gather the facts, and that's what was done.

Q. And after you received a full investigative report by Deputy Morrison, what action, if any, did you

123

take?

A. What actions I took in response to this?

Q. Yes, once you received the report.

A. Sergeant Barringer received, I believe, a reprimand for not submitting a response to resistance report in a timely manner.

Q. Okay.

MR. ORTH: We've been going for an hour. If we can take a ten-minute break, I don't have a lot left.

MS. MARTIN: Okay. So I guess come back at 3:00?

MR. ORTH: That's fine.

(Recess from 2:47 p.m. to 3:07 p.m.)

Q. (BY MR. ORTH) Okay. Do you have any knowledge concerning an incident with Deputy Johnson where he crashed his assigned county vehicle into another county vehicle and failed to report the crash?

A. No, sir.

Q. Did Deputy Johnson, to your knowledge, ever report a crash of his county vehicle into another county vehicle?

A. Which Deputy Johnson? There's like five of them.

Q. Oh, sorry. David.

124

**KIRK W. BONSAL, JR.  -  September 23, 2022**

A.  David Johnson?  Not that I'm aware of.

MS. SOSA:  Doug Johnson?

THE WITNESS:  Oh, Doug Johnson?

A.  Not that I'm aware of.

Q.  (BY MR. ORTH) Okay.  Do you have any knowledge of an incident with Doug Johnson physically assaulting a co-worker whom he was dating?

A.  There was an investigation concerning that, yes, sir.

Q.  And who did the investigation?

A.  I don't remember who did it.  It's one of the investigators.  I'd have to look at who did it, but it was done.

Q.  Do you recall approximately what time frame we're talking about, what year?

A.  It was February of this year, I believe.

Q.  Oh, okay.

A.  But I don't remember which investigator did it.

Q.  Did you assign that?

A.  I would have, yes, sir.

Q.  Okay.  Do you recall seeing the results or conclusions concerning that?

A.  Yes, I know what the results were.

Q.  And what were those results or conclusions concerning that investigation?

---

A.  The case was reviewed by the district attorney's office and no action taken because the female employee was the aggressor, and there was some discipline issued and counseling.

Q.  And when you say disciplinary action taken, would that have been coming from your office?

A.  Yes.

Q.  But you don't recall what?

A.  Yes.  It was a one-day suspension for Douglas Johnson, and I think it was a reprimand for the other employee.

Q.  Okay.  And do you know anything about a statement by Jason Hutchins involving an issue of making a statement to the effect that there was a bunch of monkeys?

A.  Yes, sir.

Q.  And was an investigation done concerning that issue?

A.  Yes, sir.

Q.  And who did that investigation?

A.  I don't remember who did that one.  I'd have to look at the report or the file.

Q.  Do you know if the investigation was completed?

A.  Yes, sir, it was completed.

Q.  Do you know the result of the investigation or

---

what the conclusions were?

A.  The conclusions were that he was sustained for the policy violations, I think it was.  And he had already quit, so there was no disciplinary action available to us to take.  He quit about two hours after being relieved of duty when the comment was discovered.

Q.  Now, are you aware of any emails between the constables in Precinct 3 in which the word "nigger" was brought up?

A.  No, sir, not that I'm aware of.

Q.  Okay.  Now, do you have any knowledge of an incident involving Constable Magana in which she was caught using a county vehicle for the purpose f engaging in sexual relations while on duty?

A.  No.

Q.  Okay.  And that would be something that would be investigated.  Correct?

A.  Yes.

Q.  If it happened.  Something of that nature.  I'm not saying this specific incident.  An incident such as this would be investigated by your office.  Correct?

A.  It depends if it's a rumor or if it's some substantiated complaint.  We don't investigated rumors.  If I investigated rumors, we would have had investigations on your client.

---

Q.  I understand.  What, if anything, do you know of a Constable Patrick Sullivan engaging in sexual relations while on duty with a subordinate deputy under his supervision?

A.  Nothing.

Q.  Would that be something -- and when I say "that," I'm talking about a deputy in sexual relations with a subordinate under his supervision, is that a policy and procedures violation?

A.  Yes, sir, it is.

Q.  And would that be something that would be investigated if it, in fact, happened?

A.  If it was brought to my office and there was allegations of that, yes.

Q.  And what knowledge, if any, do you have of a Deputy George Suarez providing security for a private -- or with a swapping sex group?  Do you know of anything involving that, any knowledge?

A.  I have no knowledge of what you're talking about.

Q.  Okay.

A.  I was recently informed that he had previously worked at an extra job.  That might have been what you're talking about.

Q.  And when did you become aware of that?

---

A.   Yesterday, actually.

Q.   Okay.  And how did you become aware of that?

A.   Major Villarreal told me.

Q.   Okay.  And did Major Villarreal indicate to you how he became knowledgeable about that?

A.   No, he didn't.

Q.   And you didn't ask him, did you?

A.   No.  The conversation was short.  He informed me that he had that information.  And with what's going on right now, I told him we'd discuss it next week.

Q.   Okay.  And what knowledge, if any, do you have of Deputy George Suarez buying unprescribed steroid and erectile dysfunction pills from an unlicensed street drug dealer?

A.   I have no knowledge of that.

Q.   Okay.  Would that be something that would be against the policies and procedures of Precinct 3?

A.   I'm sure it would be.

Q.   And do you have any knowledge of Major Villarreal and/or Sergeant Barringer buying pills from a drug dealer involving steroid or erectile dysfunction?

A.   No, I don't know anything about that.

Q.   And what information, if any, do you have concerning Constable Ross Woods that he interfered with a police canine handling issue or circumstance?

A.   I'm not sure what -- I know there was an issue where one of the dogs bit -- actually his dog bit Ross Woods, if that's what you're talking about.  And there was a difference of opinion about whose fault that was.

Q.   And was there any investigation done concerning that issue?

A.   I don't recall.  I don't know.

Q.   Do you recall when that -- when approximately that issue happened?

A.   No, sir.  I know there's a file on it.

Q.   Okay.  What knowledge, if any, do you have of an Eliel Pereda --

A.   Pereda.  Deputy Pereda.

Q.   Deputy Pereda in which he was working overtime for private employment with Deputy Villarreal or Isaac -- Deputy Isaac Villarreal at a scrap yard business.  Do you know anything about that?

A.   I know they worked at a scrap yard business.

Q.   Okay.  And do you know whether they were doing that while working on the clock, as far as Precinct 3 was concerned?

A.   I don't have any knowledge of that.  And that would not be allowed.  That's a policy violation.

Q.   And would it be a violation of county policies and procedures if two deputies engaged in sexual relations while on duty inside a county building?

A.   Yes.

Q.   Okay.  And do you have any knowledge of Deputy Pereda doing that?

A.   No.

Q.   Do you know anything about emails that were going around in which Sergeant Barringer was involved and other individuals in the patrol unit where it was discussed concerning the murdering of George Floyd?

A.   Emails?  No, sir.

Q.   Emails.

A.   No.  I've heard of text messages.

Q.   Or text messages.  I'm sorry.

A.   I've heard there were some text messages.  I learned that here.

Q.   Okay.  And you haven't seen those yet, have you?

A.   I was shown recently, yes.

Q.   And since you've been shown those, what action, if any, are you going to take concerning those?

A.   None.

Q.   Did you at any point in time after Deputy Whittington's termination try to file charges with the district attorney's office on his excessive use of force incident involving the minor on 5/28/20?

A.   No, I don't recall anything like that.

Q.   Okay.

A.   I will say we probably had to send it to the civil rights for review, but we don't get to make those charges.  But I don't know if it was even sent to them.

Q.   And that's something you'd probably remember, wouldn't you?

A.   I would think so, but I don't recall that being discussed about sending the case file to the DA's office.

Q.   Have you ever sent a case file over to the DA's office concerning offenses that individual constables were terminated for?

A.   Yes, I'm sure we have.

Q.   Do you recall any of those instances?

A.   Deputy Wilcox double-dipping, working basically three jobs at the same time, on duty with the county, on duty with the school, and then working a construction site, that was sent over to them.

Q.   Anything else?

A.   The Calvin Jason case was sent over.

Q.   And what did Calvin Jason allegedly do?

A.   Calvin Jason was involved in two FSGI accidents.  He was charged.  The cases were later dismissed when he made restitution to the plaintiff.

Q. And when you say FSGI, can you explain --

A. Failure to stop and give information. He did a hit-and-run driving his vehicle, knocked a vehicle completely out of the street and up into a courtyard. It's on videotape. It's a pretty cool video actually.

Q. Anything else that you remember at this point?

A. For charges? Yes. Deputy Cassandra Garcia. Internal affairs sent some stuff over there on her. That's still being reviewed. Actually, I believe it's scheduled for grand jury pretty soon.

Q. Okay. Now, who replaced Constable Whittington?

A. What do you mean "replaced"?

Q. After he was terminated, obviously there was a vacancy.

A. Okay.

Q. My question is who, if anybody?

A. In his position with CUI or the canine, or what are you talking about?

Q. Any one.

A. I don't think we've got a canine, but I'm not sure. And I have 15 openings still to this day that I'm trying to fill, so I don't know that his actual PCN has been filled. And I know another person was transferred into the CUI, but I don't know who they were.

Q. When you say "transferred into the CUI," where were they transferred from?

A. They would come from patrol or from one of the schools or the civil division, whatever department where someone requests to be transferred in there. And the supervisors make the selection who they want after interviews or whatever process they choose.

Q. But you didn't have anything to do with that?

A. No. I don't have anything to do with transfers.

Q. Now, earlier on you indicated that Deputy Skero was referred to the DA regarding a potential Brady list, and you indicated that he was untruthful about something.

A. His disciplinary letter was sent to the -- I guess they're called the disclosure group. I don't know. It was sent over there to the people we're supposed to send to.

Q. Okay.

A. But it wasn't referred for a criminal charge or anything like that, if that's what you're referring to.

Q. Okay. And the disciplinary letter, what was that concerning? What issue?

A. That was the issue where he had a meeting with Major Villarreal and had a discussion about some activities that he was doing, specifically looking for

another job. And I think he lied to the major about that.

And he said, "If I can't trust you to tell the truth about something like that, I can't trust you in a sensitive position," and he removed him. He sent me a request to transfer, and I approved it.

Q. Okay.

MR. ORTH: If we could have a ten-minute break, I might be done.

MS. MARTIN: Okay.

(Recess from 3:25 p.m. to 3:40 p.m.)

Q. (BY MR. ORTH) What knowledge, if any, do you have regarding a Rebecca Mason forging time sheets in Precinct 3?

A. It was actually a COVID vaccination card, and she made a false entry on her time sheet. That's what I know about that.

Q. And was that incident investigated?

A. Yes, sir, it was.

Q. And what disciplinary action, if any, was done?

A. She was terminated.

Q. Do you know somebody named Vanitra Johnson?

A. Yes.

Q. And who is that?

A. Vanitra Johnson is a deputy in the civil division. I think her name is Williams now.

Q. Oh, and one last question. Does your wife work at Precinct 2?

A. Yes, sir, she does.

Q. And how long has she worked there?

A. Twelve years or more.

Q. Okay.

MR. ORTH: Pass the witness.

EXAMINATION

BY MS. MARTIN:

Q. I just have a few follow-ups. Let's look again at Exhibit 5.

A. I should have put those in order. I'm sorry. I can't find 5. Can I use yours?

Q. Here.

A. I got it.

Q. Okay. You have the discretion to relieve -- do you have it now?

A. Yes, ma'am, I do. I'm sorry.

Q. To relieve from duty during pendency of an investigation. Is that correct?

A. Yes, ma'am.

Q. And do you talk with Constable Eagleton before you impose relief of duty?

A. Absolutely, yes.

**KIRK W. BONSAL, JR.  -  September 23, 2022**

Q.  And in this particular case, did you speak with Constable Eagleton before you did that?

A.  Yes.

Q.  And why did you make the decision in this case at that point to relieve from duty with pay during this investigation?

A.  At this point, based on the information I had at the time, which was the dog biting several civilian personnel and then possibly biting a juvenile that had given up, I felt that the liability was too great to leave the dog and the handler on the street.  And until we got a resolution and determination of the facts, I relieved him of duty.

Q.  And if a dog was not fully trained and he was deployed, is that alone enough for termination in and of itself?

MR. ORTH:  Object as speculation.

A.  The determination for -- determination is enough to terminate an employee based on deployment of the dog if the bite was unauthorized and outside of the policy or considered excessive force, that alone, the excessive force, would be enough to terminate an employee.

Q.  (BY MS. MARTIN) And if a handler has any information that the dog is still learning and still

---

training, should the dog be deployed in those instances?

A.  No.

Q.  Okay.

A.  The policy's very concise about that.  The handler has a responsibility not to deploy a dog that is fully capable of functioning.

Q.  Okay.  Let's look at Exhibit 16.

A.  I found it easy this time.

Q.  Okay.  And this is the incident with Sergeant Troy Barringer.  Do you see that?

A.  Yes, ma'am.  The written reprimand for the preventable fleet, yes, ma'am.

Q.  And in this situation with regard to Troy Barringer and this -- what do you call it?  The preventable fleet, who made the disciplinary action determination?

A.  Constable Eagleton did on this one.

Q.  Okay.  And so he is the one that made the ultimate determination as to what, if any, specific discipline was going to be deposed on Barringer?

A.  That is correct.

Q.  Okay.  I don't have any further questions.

MS. MARTIN:  I'll reserve till the time of trial.

MR. ORTH:  I have a few follow-up

---

questions.

MS. MARTIN:  Okay.

EXAMINATION

BY MR. ORTH:

Q.  Prior to Constable Whittington, to your knowledge, during the time that you've worked in Precinct 3, have you ever terminated or have knowledge of any canine officer or deputy who was terminated for an unlawful use of excessive force?

A.  No.

Q.  That's all I have.

MR. ORTH:  Pass the witness.

MS. MARTIN:  No further questions.  Reserve the rest until the time of trial.

(Proceedings concluded at 3:45 p.m.)

---

C E R T I F I C A T E

STATE OF TEXAS      )
                    )
COUNTY OF HARRIS    )

I, Lucy Johnston, Certified Shorthand Reporter in and for the State of Texas, duly commissioned and qualified, do hereby certify that the foregoing is a true, correct, and complete transcript of the proceedings in the foregoing captioned matter taken by me and transcribed from my stenographic notes.

The original deposition and exhibits were delivered to Mr. Philip J. Orth, III, Custodial Attorney.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office at Houston, Texas, this the 12th day of October, 2022.

Lucy Johnston
Texas CSR No. 3847
Expiration Date:  7/31/23

Lucy Johnston Reporting
Texas Firm Registration No. 450
1225 North Loop West, Suite 327
Houston, Texas  77008
(281) 385-9088

Time used by each party:

Mr. Philip J. Orth, III - 03:41
Ms. Melissa G. Martin - 00:09
Ms. Susana G. Sosa - 00:00
Ms. Natalie DeLuca - 00:00

---